07-30-4820 ARDC No. 01144642

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RICK ALEMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2007 C 5049 |
| ) | |
| VILLAGE OF HANOVER PARK; et al. ) | Judge Bucklo |
| ) | |
| Defendants. ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**

NOW COME the Defendants, VILLAGE OF HANOVER PARK, an Illinois Municipal Corporation, OFFICER TODD CARLSON, OFFICER ERIC VILLANUEVA and SERGEANT CAROL LUSSKY, and each of them, and pursuant to Local Rule 56.1(a)(3)(A)(B), submit the following material facts which the moving parties contend that there is no genuine issue and that entitled them to judgment as a matter of law:

**Parties – Local Rule 56.1(a)(3)(A)**

1. Defendant, VILLAGE OF HANOVER PARK, is an Illinois Municipal Corporation.

2. Defendants, OFFICER TODD CARLSON, OFFICER ERIC VILLANUEVA and SERGEANT CAROL LUSSKY, were at all relevant times, employed as police officers with the VILLAGE OF HANOVER PARK.

3. Plaintiff, RICK ALEMAN, was, at all relevant times, a citizen of the Village of Hanover Park, Illinois.

## Jurisdiction and Venue – Local Rule 56.1(a)(3)(B)

4. This court has subject matter jurisdiction over this action pursuant to 42 U.S.C. Section 1983, and pursuant to 28 U.S.C. Section 1343, 1331, and 1367. This court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. Section 1367. Venue is proper as all alleged violations occurred within this District.

## Undisputed Material Facts – Local Rule 56.1(a)(3)(B)

5. Rick Aleman began his career in home day-care in May-June 2005. (See Plaintiff's deposition, attached hereto as Exhibit 1, page 39, lines 12-20).

6. Aleman had no prior home day-care experience. (Ex. 1, pg. 45, lines 8-11).

7. The daycare application for Joshua Schrik was received by Rick Aleman on Wednesday, September 7, 2005. (Ex. 1, pg. 50, lines 11-16).

8. The incident (involving Joshua Schrik) occurred on Friday, September 9, 2005. (Ex. 1, pg. 50, lines 17-19).

9. Rick Aleman had cared for Joshua Schrik for a total of three days – September 7-9, 2005. (Ex. 1, pg. 50, lines 20-22).

10. On September 9, 2005, Danielle Schrik, the mother of Joshua Schrik, dropped Joshua off at Aleman's home at approximately 8:00AM. (Ex. 1, pg. 67, lines 15-22).

11. Carl Gutman, a parent of one of Aleman's client's, entered Aleman's home and they spent approximately twenty (20) minutes together. (Ex. 1, pg. 94, lines 17-23).

12. Aleman took Joshua into the kitchen and tried to revive him by shaking him "like you would shake anybody else that's sleeping." (Ex. 1, pg. 102, lines 13-17).

13. The baby's head was moving back and forward when Aleman was moving him. (Ex. 1, pg. 102, lines 22-24).

14. Aleman tried to revive the infant prior to calling 911. (Ex. 1, pg. 111, lines 7-9)(See also Exhibit 6 to Aleman deposition - audio recording of 911 call).

15. Hanover Park Police officers immediately arrived at his home with the paramedics. (Ex. 1, pg. 122, lines 23-24 and pg. 123, lines 1-4).

16. Hanover Park Police provided him a doll for Aleman to demonstrate how he tried to revive the baby with his hands out forward and moving. (Ex. 1, pg. 124, lines 15-20).

17. He could recall speaking with Hanover Park Officer Carol Lussky at his home. (Ex. 1, pg. 125, lines 15-24).

18. Officer Lussky requested that Aleman cooperate by going to the police station and Aleman consented to do so with his wife, Barbara. (Ex. 1, pg. 128, lines 18-24).

19. Aleman was never told that he was under arrest at the time in which he was asked to go to the Hanover Park police station for questioning. (Ex. 1, pg. 129, lines 1-3).

20. Aleman was not handcuffed in Officer Lussky's squad car which was used to transport Rick and Barbara Aleman to the police station. (Ex. 1, pg. 129, lines 22-24).

21. While in the interview room with his wife, no member of the Hanover Park Police Department ever told Rick Aleman that he was under arrest. (Ex. 1, pg. 135, line 24 and pg. 136, lines 1-3 and deposition Exhibit 7, DVD #1 – 12:58:40 -12:58:45).

22. On more than one occasion, Aleman was allowed to contact his attorney on a cellphone prior to the initiation of an interview either by an Illinois State Police or Hanover Park Police officer. (Ex. 1, pg. 138, lines 4-17, pg. 139, lines 14-18)

23. Aleman signed a <u>Miranda</u> waiver prior to giving an interview or being questioned by Hanover Park or Illinois State Police. (Ex. 1, pg. 140, lines 10-13; see also Aleman deposition Exhibit 4 (pg. 97 of 133); see also Aleman deposition Exhibit 7, DVD #1 – 17:14:01-17:17:40).

24. Before signing the <u>Miranda</u> waiver, Aleman spoke with his attorney on his cellphone. (Ex. 1, pg. 141, lines 9-13; see also Aleman deposition Exhibit 7, DVD #2 – 17:49:08-17:50:01).

25. Aleman recalled being given three (3) phone calls to his attorney, Paul Ankin, prior to the interview by law enforcement personnel. (Ex. 1, pg. 144, lines 22-24 – pg. 145, lines 1-6).

26. Aleman was never denied a request by the members of the Hanover Park Police Department to make a phone call. (Ex. 1, pg. 145, lines 15-18).

4

27. Aleman believed that Officer Eric Villanueva may have asked one question during the interview, however, Investigator Micci of the Illinois State Police asked all of the questions. (Ex. 1, pg. 148, lines 1-24).

28. Aleman was advised by Master-Sergeant Joseph Micci that the interview was being videotaped. (Ex. 1, pg. 149, lines 11-14; see also Aleman deposition Exhibit 7, DVD #2 – 21:05:50-21:06:17).

29. Aleman was provided a plastic baby and demonstrated to Master-Sergeant Micci and Officer Villanueva how he handled Joshua Schrik after he became unresponsive. (Ex. 1, pg. 149, lines 15-18; see also Aleman Exhibit 7, DVD #2- 21:41:33-21:43:20).

30. During the interview, Aleman told Micci and Villanueva that the back of the baby's head hit its back. (Ex. 1, pg. 156, lines 16-18).

31. On September 9, 2005, at 21:58:19, Aleman was advised by Master-Sergeant Micci that he was now under arrest. (Ex. 1, pg. 159, lines 6-9; see also Aleman Exhibit 7 - DVD #2 – 21:58:10 - 21:58:22).

32. On September 10, 2005, Aleman admitted to Micci and Villanueva that he did the wrong thing and that he felt terrible about what happened to Joshua Schrik. (Ex. 1, pg. 163, lines 15-21; Aleman deposition Exhibit 7, DVD #3 - 10:53:53 - 10:54:40).

33. On September 10, 2005, after Aleman stated that he now wanted his attorney present, the interview ended. (Ex. 1, pg. 172, lines 1-2; see also Aleman Exhibit 7, DVD #3 – 11:25-31 – 11:25:54).

5

34. On September 12, 2005, Judge Tobin found probable cause to detain Aleman on charges of Aggravated Battery to a Child. (Ex. 1, pg. 172, lines 21-23)(See also transcript of proceedings before Judge Karen Tobin, attached hereto and marked as Exhibit 2, pg. 4, lines 11-12).

**Sergeant Carol Lussky, Hanover Park Police Department**

35. Sergeant Lussky arrived at Aleman's home at approximately 9:45AM on September 9, 2005. (See transcript of Carol Lussky deposition, attached hereto and marked as Exhibit 4, pg. 13).

36. Sergeant Lussky instructed Detective Carlson to go to the hospital to interview the mother of the injured baby, Danielle Schrik, and to interview treating physicians. (Ex. 4, pg. 80, lines 6-14).

37. Just before leaving Aleman's home, Lussky received information from Detective Todd Carlson that Joshua Schrik had suffered from shaken baby syndrome and had retinal hemorrhaging in the eyes. (Ex. 4, pg. 17, lines 4-14).

38. Prior to receiving this information from Detective Carlson, Lussky asked Aleman to come with her to the police station as she was trying to determine the course of events and she wanted to be in a controlled environment with less interruptions. (Ex. 4, pg. 20, lines 2-9).

39. Upon arrival at the station, Lussky placed the Alemans into an interview room and activated the DVD recording system. (Ex. 4, pg. 27, lines 1-4).

6

40. Lussky activated the recording system because Detective Carlson had conveyed to her that the baby was probably not going to make it. (Ex. 4, pg. 27, lines 5-10).

41. Based upon Detective Carlson's reporting of the baby's condition, Sergeant Lussky believed that this was a potential homicide investigation. (Ex. 4, pg. 27, lines 11-13).

42. Danielle Schrik, the mother of Joshua Schrik, was considered a possible suspect the moment that Officer Lussky learned of possible shaken baby. (Ex. 4, pg. 64, lines 11-17).

43. Officer Lussky did not request that any of her investigators bring Danielle Schrik to the police station for questioning due to the severe injuries sustained by her son, Joshua Schrik, and because questioning could occur at the hospital. (Ex. 4, pg. 65, lines 11-16).

**Detective Eric Villanueva, Hanover Park Police Department**

44. Upon his arrival at the station, Villanueva was instructed to stand outside the interview room to make sure that anybody coming in or out of the interview room would have some sort of direction. (See transcript of Eric Villanueva deposition, attached hereto as Exhibit 5, pg. 23, lines 19-23).

45. Detective Villanueva was present in the interview room when Master Sergeant Micci questioned Rick Aleman. (Exhibit 5, page 12, lines 6-10).

46. While Aleman was on the hallway telephone, he never instructed Detective Villanueva to leave. (Ex. 5, pg. 102, lines 5-11).

47. Aleman never informed Detective Villanueva that his attorney wanted him to leave while Aleman was speaking on the telephone. (Ex. 5, pg. 102, lines 12-15).

48. Aleman's attorney knew that Detective Villanueva was standing in the hallway because he asked to speak with Detective Villanueva on the phone. (Ex. 5, pg. 102, lines 16-19).

49. Detective Villanueva signed the <u>Miranda</u> waiver form as a witness after Rick Aleman had done so. (Ex. 5, pg. 103, lines 5-7).

50. After the Miranda form was signed and once the interrogation began, Aleman did not request to speak to his attorney. (Ex. 5, pg. 104, lines 16-20).

51. During the interview, Aleman demonstrated how he tried to revive Joshua Schrik by shaking a plastic baby. (Ex. 5, pg. 103, lines 21-24 and pg. 104, lines 1-8)

52. In his opinion, Aleman shook the plastic baby violently. (Ex. 5, pg. 104, lines 9-11).

53. Aleman admitted to Villanueva and Micci that he shook Joshua too hard on September 9, 2005. (Ex. 5, pg. 105, lines 6-9).

54. Villanueva did not ask any questions of Rick Aleman during the entire interview. (Ex. 5, pg. 105, lines 17-21).

55. Detective Villanueva signed the initial criminal complaint against Rick Aleman for aggravated battery to a child. (Ex. 5, pg. 79, lines 11-24, see also Exhibit 1 to Villanueva deposition).

8

56. Villanueva signed the initial criminal complaint for aggravated battery to a child on September 11, 2005. (Ex. 5, pg. 104, lines 12-17, see also Exhibit 1 to Villanueva deposition).

57. Villanueva attended the autopsy of Joshua Schrik that occurred on September 14, 2005. (Ex. 5, pg. 85, lines 15-19).

58. Villanueva recalled that the medical examiner's findings from the autopsy were that the child's injuries were consistent with shaken baby syndrome. (Ex. 5, pg. 86, lines 13-18).

### Detective Todd Carlson of the Hanover Park Police Department

59. On September 9, 2005, upon his arrival to the Hanover Park Police Station, he went to Rick Aleman's home. (See transcript of deposition of Detective Todd Carlson, attached hereto as Exhibit 6, pg. 21, lines 3-5).

60. Upon his arriving at Aleman's home, he was instructed by Sergeant Lussky to go to the hospital. (Ex. 6, pg. 22, lines 1-4).

61. Carlson's understanding was that there was an unresponsive infant who had been transported to the hospital and it was unknown at the time why that was the case. (Ex. 6, pg. 23, lines 7-11).

62. Upon arrival, he was told by Dr. Reyes that the infant, Joshua Schrik, had shaken baby syndrome. (Ex. 6, pg. 24, lines 13-19).

63. Upon being provided information that the baby had shaken baby syndrome, Carlson contacted his supervisor, Sergeant Lussky, via his Nextel radio. (Ex. 6, pg. 26, lines 12-23).

64. Carlson then began to interview family and friends at the hospital, including Danielle Schrik, Nancy Schrik, Barbara Sabel and Seth Sabel. (Ex. 6, pg. 28, lines 2-15).

65. Carlson interviewed Danielle Schrik, Nancy Schrik, Barbara Sabel and Seth Sabel because they were all in the area and had contact with Joshua Schrik at some point. (Ex. 6, pg. 28, lines 23-4).

66. Carlson asked Danielle Schrik, the mother of Joshua Schrik, if she had ever hit or struck the child and she denied ever doing that. (Ex. 6, pg. 33, lines 12-17).

67. While at the hospital, Dr. Reyes told Detective Carlson that the onset for the injuries sustained by Joshua Schrik were immediate. (Ex. 6, pg. 50, lines 2-4).

68. On Tuesday, September 13, 2005, Joshua Schrik was pronounced dead. (Ex. 6, pg. 90, lines 23-4 and pg. 91, line 1).

69. On September 14, 2005, Carlson, Villanueva and an evidence technician went to the Cook County Medical Examiner's office to attend the autopsy performed by Dr. Nancy Jones, an Assistant Medical Examiner. (Ex. 6, pg. 99, lines 2-9).

70. During an afternoon meeting with Dr. Jones on the same day, she told Detective Carlson that the injuries sustained by Joshua Schrik occurred on September 9, 2005. (Ex. 6, pg. 108, lines 12-17).

10

71. On the date of the autopsy, Dr. Jones spoke with Assistant State's Attorney Lance Northcutt regarding the timing of the injury to Joshua Schrik. (Ex. 6, pg. 112, lines 8-13).

72. After the Cook County State's Attorney's Office Felony Review Division approved the charges, Detective Carlson signed the criminal complaint against Rick Aleman for the First Degree Murder of Joshua Schrik. (Ex. 6, pg. 58, lines 21-23; Ex. 6, pg. 131, lines 7-24).

73. On September 15, 2005, Detective Carlson arrested the Plaintiff, who was accompanied by his attorney, for First Degree Murder and he was processed and taken to the Rolling Meadows Courthouse for a bond hearing. (Ex. 6, pg. 129, lines 13-22).

74. On September 15, 2005, Judge Fecarotta, Jr., found probable cause to detain Aleman on the charge of First-Degree Murder. (See transcript of proceedings, attached hereto and marked as Exhibit 3, pg. 7, lines 20-21).

**Dr. Albert Hasson - Joshua Schrik's pediatrician**

75. Dr. Hasson is a board certified pediatrician certified in pediatrics since 1987. (See Hasson deposition, attached hereto as Exhibit 7, pg. 7, lines 9-12).

76. Dr. Hasson began treating Joshua Schrik on November 23, 2004 when Joshua was two (2) months old. (Ex. 7, pg. 9, lines 5-9).


77. On September 8, 2005, during an office visit, Joshua's temperature was taken and noted by Dr. Hasson's nurse to be at 97.1 degrees. (Ex. 7, page 19, lines 3-5).

78. On September 8, 2005, Dr. Hasson checked Joshua's eyes, which is part of a normal examination. (Ex. 7, pgs 21-22, lines 24, 1-3).

79. Dr. Hasson is familiar with petechial hemorrhaging. (Ex. 7, pg. 22, line 10-12).

80. The presence of petechial hemorrhaging was not noted in Dr. Hasson's September 8, 2005 entry. (Ex. 7, pg. 23, lines 2-4).

81. On September 9, 2005, Dr. Hasson spoke with Sergeant Carol Lussky and told her that Joshua looked great and that he could provide no reason why Joshua would have collapsed. (Ex. 7, pg. 30, lines 16-20).

82. It was Dr. Hasson's opinion to a reasonable degree of medical certainty that Joshua Schrik's fever had resolved as of September 8, 2005. (Ex. 7, pg. 48, lines 12-15).

**Dr. Gerardo Reyes – Pediatric Intensive Care Unit – St. Alexius Hospital**

83. In September 2005, Dr. Reyes was on staff at the St. Alexius Medical Center Pediatric Intensive Care Unit. (See deposition transcript with exhibits, attached hereto and marked as Exhibit 8, pg. 10).

84. The diagnoses that Dr. Reyes reached with respect to Joshua Schrik's condition were: (1) head trauma; (2) cardiac arrest and (3) shaken baby syndrome. (Ex. 8, pg. 16, lines 12-24; pg. 17, lines 1-5).

85. Dr. Reyes arrived at shaken baby syndrome because the findings on the CT scan were suggestive of shaken baby syndrome. (Ex. 8, pg. 17, lines 12-13).

86. When a diagnosis of shaken baby is made, hospital staff notifies the local police department and DCFS as a matter of law. (Ex. 8, pg. 22, lines 6-21).

87. Dr. Reyes ordered an ophthalmology consult to see if there was retinal damage or bleeding within the eyes. (Ex. 8, pg. 23, lines 17-20).

88. A fever or an ear infection would not produce symptoms consistent with shaken baby syndrome, including petechial hemorrhaging in the eyes. (Ex. 8, pg. 44, lines 4-7).

89. It is very unlikely that a child could walk, react to anything or eat if he had hemorrhaging and swelling of the brain that was detected on the CT scan. (Ex. 8, pg. 51, lines 9-19).

90. Dr. Reyes had no reason to doubt that he spoke with police officers if the police officers reported that they spoke with him. (Ex. 8, pg. 55, lines 14-17).

**Dr. Michael Seigle – Consulting Ophthalmologist**

91. Dr. Seigle is a board-certified ophthalmologist. (See deposition transcript of Dr. Seigle, attached hereto as Exhibit 9, pg. 7, lines 17-18).

92. In September 2005, he held privileges at St. Alexius Hospital in Hoffman Estates. (Ex. 9, pg. 7, lines 10-14).

93. He recalled his examination of Joshua Schrik that occurred on September 9, 2005. (Ex. 9, pg. 8, lines 10-13).

94. The attending physician, Dr. Reyes, ordered the ophthalmology consult that he fulfilled. (Ex. 9, pg. 9, lines 21-24).

95. Dr. Seigle's examination revealed bilateral retinal hemorrhages consistent with traumatic head injury consistent with shaken baby syndrome. (Ex. 9, pg. 15, lines 6-9).

96. There were police detectives at the hospital who had asked him about his findings. (Ex. 9, pg. 9-18).

97. It was his opinion to a reasonable degree of medical certainty that the injuries detected in the child's eyes were consistent with shaken baby syndrome. (Ex. 9, pg. 24, lines 1-4).

98. It was also his opinion again to a reasonable degree of medical certainty that the hemorrhages detected in both eyes were fresh. (Ex. 9, pg. 24, lines 8-11).

99. He told the police detectives/officers that the retinal hemorrhaging detected in Joshua Schrik's eyes appeared to be fresh. (Ex. 9, pg. 32, lines 16-22).

**Dr. Nancy Jones – Cook County Medical Examiner**

100. Dr. Jones performed the autopsy of Joshua Schrik on September 14, 2005. (See Jones deposition transcript, attached hereto and marked as Exhibit 10, pg. 6).

101. Her opinion as to the manner of death of Joshua Schrik was homicide. (Ex. 10, pg. 11).

102. Her opinion as to cause of death of Joshua Schrik was determined to be subdural hematoma due to blunt head trauma. (Ex. 10, pg. 11).

103. Her opinions as to manner and cause of death have not been changed or otherwise amended as of her deposition date (11/26/08). (Ex. 10, pg. 63).

104. She had no reason to disagree with Dr. Reyes' opinion that Joshua was the victim of shaken baby syndrome as he exhibited all of the classic symptoms including (1) subdural hematoma, (2) retinal hemorrhages and (3) no external injury or evidence of impact. (Ex. 10, pg. 61).

105. It was her opinion to a reasonable degree of medical certainty that shaking a baby violently is a competent cause for bilateral subdural hematoma. (Ex. 10, pg. 66).

106. It was also her opinion to a reasonable degree of medical certainty that she could not rule out September 9, 2005 as the date that the child was injured to the extent that he died. (Ex. 10, pg. 68).

107. On the day of the autopsy, she told law enforcement personnel that the injuries sustained by Joshua Schrik occurred on the morning of September 9, 2005. (Ex. 10, pg. 78, lines 16-24, pg. 79, lines 1-3).

108. She never suspected that the officers whom she spoke with were not being truthful in conveying information to her. (Ex. 10, pg. 103).

109. If a baby is suffering from subdural hematoma and the onset is slow, it was her opinion to a reasonable degree of medical certainty that shaking the baby could aggravate the condition such that it can cause death. (Ex. 10, pg. 103).

110. Following the autospy's completion, Dr. Jones wrote down her opinions for law enforcement who requested that she do so. (Ex. 10, pg. 73, see also Jones deposition Exhibit #4).

111. On September 22, 2005, Carl Gutman testified before the grand jury. (See transcript, attached hereto and marked as Ex. 11)

112. On October 6, 2005, Adam Michalik testified before the grand jury. (See transcript, attached hereto and marked as Ex. 12).

113. On October 6, 2005, the Plaintiff, Rick Aleman, was indicted on two (2) counts of First Degree Murder. (See Indictment, attached hereto and marked as Exhibit 13).

**Danielle Schrik – Joshua Schrik's mother**

114. On Friday (September 9, 2005), she took her son, Joshua, to Aleman's home and arrived at approximately 8:15AM. (See deposition transcript, attached hereto as Exhibit 14, pg. 69, lines 4-9).

115. On that morning, Rick Aleman took Joshua from her arms and he gave the indication wanted to be back in her arms. (Ex. 14, pg. 71, lines 1-13).

116. At approximately 9:00-9:15AM, Aleman called her at work stating that Josh had stopped breathing and that he had called paramedics. (Ex. 14, pg. 76, lines 15-23).

117. After her arrival at the hospital, she met with Detective Carlson where he asked her some basic questions. (Ex. 13, pg. 82, lines 12-20).

118. Detective Carlson asked her if she ever struck, hit or violently spanked Joshua and she denied that she had. (Ex. 13, pg. 84, lines 18-23)

119. She told Officer Carlson that Joshua had been sick all week and that on Tuesday of that week, Joshua had had a 103 degree fever. (Ex. 13, pg. 86, lines 11-16).

120. She also told Carlson that on the morning of September 9, 2005, Joshua was being fussy and was laying and watching television prior to going to Aleman's home. (Ex. 13, pg. 86, lines 20-24, pg. 87, lines 1-2).

121. Dr. Reyes told her that the babysitter was responsible for the injuries sustained to her son because the damage had occurred within the last 24 hours. (Ex. 13, pg. 93, lines 9-18).


/s/ Michael R. Hartigan
One of the Attorneys for the Defendants, Village of Hanover Park, Officer Carol Lussky, Eric Villanueva and Todd Carlson

HARTIGAN & O'CONNOR, P.C.
Russell W. Hartigan
Patrick H. O'Connor
Michael R. Hartigan
20 N. Clark Street #1250
Chicago, IL 60602
(312)201-8880
(312)201-8905 (F)

17