**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
     EASTERN DIVISION
3
4    RICK ALEMAN,                          )
5              Plaintiff,                   )
6         -vs-                              )  No. 07 C 5049
7    VILLAGE OF HANOVER PARK; HANOVER       )
     PARK POLICE OFFICERS CAROL LUSSKY      )
     Star 12; ERIC VILLANUEVA, Star 9;      )
8    TODD CARLSON, Start 126; JOHN          )
     DOSSY, Star 48; ILLINOIS STATE         )
9    POLICE OFFICERS JOSEPH MICCI,          )
     Start 3566, STEVE CARDONA, Star        )
10   3213; and GERY FALLON, Star 4060,)
11             Defendants.                  )
12
13
14            The deposition of RICK ALEMAN, called
15   for examination pursuant to notice and the Federal
16   Rules of Civil Procedure for the United States District
17   Courts pertaining to the taking of depositions, before
18   SUSAN G. BRADTKE, a notary public within and for the
19   County of Will and State of Illinois, and a Certified
20   Shorthand Reporter of the State of Illinois,
21   No. 084-001564, at Suite 1250, 20 North Clark Street,
22   Chicago, Illinois, on the 24th day of July, 2008, at
23   the hour of 10:30 a.m.
24

**Page 2**

1    APPEARANCES:
2      MR. DANIEL KISS
       LAW OFFICE OF LAWRENCE JACKOWIAK
3      20 North Clark Street
       Suite 1700
4      Chicago, IL 60602
5           on behalf of the Plaintiff;
6      MR. RUSSELL HARTIGAN and
       MR. MICHAEL HARTIGAN
7      HARTIGAN AND O'CONOR
       20 North Clark Street
8      Suite 1240
       Chicago, IL 60602
9           on behalf of the Defendants.
10          Village of Hanover Park and Hanover
            Park Police Officers;
11
       HONORABLE LISA MURRAY MADIGAN
12     ATTORNEY GENERAL STATE OF ILLINOIS by
       MR. PETER KOCH
13     MS. ALICE KEANE
       ASSISTANT ATTORNEYS GENERAL
14     100 West Randolph Street
       Chicago, IL 60601
15          on behalf of the Defendants;
16          Illinois State Police Officers.
17
18
19
20
21
22
23
24

**Page 3**

1                    I N D E X
2    WITNESS                                       PAGE
3    RICK ALEMAN
4      Examination By Mr. Russell Hartigan ..........    4
5      Examination By Mr. Koch ...................   115
6      Examination By Mr. Russell Hartigan .........   118
7      Examination By Mr. Koch ...................   154
8      Examination By Mr. Koch ...................   205
9      Examination By Mr. Russell Hartigan .........   273
10     Examination By Mr. Koch ...................   276
11     Examination By Mr. Michael Hartigan .........   291
12     Examination By Mr. Kiss ...................   295
13     Examination By Mr. Kiss ...................   312
14
15                 E X H I B I T S
16   Aleman Deposition Exhibit
17     Nos. 1 through 4 ...........................    4
18     No. 5 .....................................   50
19     No. 6 .....................................   112
20     No. Group 7 ...............................   294
21
22
23
24

**Page 4**

1              (Whereupon, Aleman Exhibits Nos. 1
2    through 4 were marked for
3    identification.)
4              (Witness sworn.)
5                    RICK ALEMAN,
6    called as a witness herein, after having been first
7    duly sworn, was examined and testified as follows:
8                    EXAMINATION
9    BY MR. RUSSELL HARTIGAN:
10       Q     Let the record reflect that this is the
11   deposition of Rick Aleman taken pursuant to notice and
12   in accordance with the Northern District of Illinois,
13   Eastern Division and Rules of the Federal Court of
14   Civil Procedure.
15             Mr. Aleman, my name the Russ Hartigan and I
16   represent the Hanover Park officers.  I'm going to ask
17   you a series of questions about an incident of
18   September 9th, '05, and facts leading up to it and
19   facts after the incident.
20             Please keep your voice up for the record.  If
21   you don't understand my question, I'll repeat or
22   rephrase it for you.  However, once you do answer, we
23   assume that you understood the question, okay?
24       A     Yes.

**Page 5**

1     Q    You can't nod your head, hmm-hmm, uh-uh,
2 huh-huh because the court reporter can't take that
3 down, all right?
4     A    Yes.
5     Q    Would you state your full name for the
6 record?
7     A    Rick Aleman.
8     Q    You go by Rick, essentially?
9     A    Yes, sir.
10     Q    And having told you about the rules of a
11 deposition, have you ever been deposed before?
12     A    No.
13     Q    In a formal setting with lawyers present like
14 this?
15     A    No.  No.
16     Q    What is your current address?
17     A    220 East Lincoln, Glendale Heights, 60139.
18     Q    And how long have you resided there?
19     A    Uh, roughly a year and a half.
20     Q    Okay.  And who do you live there with?
21     A    My wife and three of my five kids.
22     Q    Three of your five kids you said?
23     A    That's right.
24     Q    We'll explain that one later, but your wife's

**Page 7**

1 way?
2     A    10/2/68, 1968.
3     Q    Your date of marriage?
4     A    I can't remember this one.
5     Q    Tough one.
6     A    No, it's easy because it's after my birthday.
7 October 3rd, the date.  Well, let's see, it's pretty
8 bad when you have to think how old your kid is to
9 remember.  '99.
10     Q    What was the marriage date?
11     A    '99.
12     Q    You mentioned that three of your five
13 children are living in the Glendale Heights address?
14     A    That's correct.
15     Q    What are the three?
16     A    Ricky, Junior.
17     Q    How old is Ricky?
18     A    Nine.  Samantha.
19     Q    Okay.
20     A    She's eight.
21     Q    Okay.
22     A    And Amanda, she's six.
23     Q    And where are the other two children located?
24     A    They live with their mother and stepfather in

**Page 6**

1 name is what?
2     A    Barbara.
3     Q    Is she employed outside the home?
4     A    Yes.
5     Q    Where is he employed at?
6     A    She works at -- it's called Carton Craft.
7     Q    Can you spell that?
8     A    Carton, C-A-R-T-O-N.  Craft, C-R-A-F-T.
9     Q    Where is that located?
10     A    St. Charles.
11     Q    What does she do there?
12     A    CSR.
13     Q    How long has she had that job?
14     A    23 years.
15     Q    Twenty three years?
16     A    Yes.  I mean, roughly, 22, 24.
17     Q    What is her position or title?
18     A    CSR, customer service representative.
19     Q    Okay.  Is that a full-time position?
20     A    That's right.
21     Q    And is that your first marriage and only
22 marriage?
23     A    Yes.
24     Q    And what is your date of the birth by the

**Page 8**

1 Elmwood Park.
2     Q    So did you have children of another woman
3 then?
4     A    That's correct.
5     Q    But it is wasn't a formal marriage?
6     A    No.
7     Q    What is the mother's name?
8     A    Cindy.
9     Q    And the last name?
10     A    Her maiden or present?
11     Q    Both.
12     A    Maiden name was K-E-P-L-E-Y.  Her current
13 name is C-O-R-E-S.
14     Q    Does she work outside the home do you know?
15     A    I have no idea.
16     Q    Where does she live, I'm sorry?
17     A    Elmwood Park.
18     Q    What are the names of those two children?
19     A    Christina.
20     Q    How old is she?
21     A    Uhm, she'll be -- she's 18 now.  She's 18 and
22 the other daughter is 17.  Her name is Gina.  Gina
23 Marie.
24     Q    How old?

**9**

```
 1       A    Gina is 17 years old.
 2       Q    Do you have to provide any type of child
 3  support for them?
 4       A    Yes.
 5       Q    Is that through Cook County?
 6       A    No.
 7       Q    What county is that?
 8       A    No county.
 9       Q    Just voluntarily did it?
10       A    Do the right thing.
11       Q    What has been the amount of that support over
12  the years?
13       A    We agreed upon $500 a month.
14       Q    At the time of the incident that we're here
15  for on September 9th, '05, where was Christina and Gina
16  living?
17       A    Same, in Elmwood Park with their mother.
18       Q    Okay.  That's always been the case?
19       A    Always since she moved out when they were
20  young, like two and three, three and four.
21       Q    And you said that there was no formal
22  marriage, so there were no divorce proceedings?
23       A    No, we were young.
24       Q    Would you give me your Social Security number
```

**10**

```
 1  and if you want to go off the record, we can on that?
 2       A    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.
 3       Q    As far as your educational background, where
 4  did you attend high school?
 5       A    Taft.  William Howard Taft.
 6       Q    Did you graduate with a degree there?
 7       A    No.
 8       Q    No?
 9       A    No.
10       Q    How many years at Taft?
11       A    Three.
12       Q    Did you ever get a GED degree?
13       A    No, sir.
14       Q    Were you ever asked to leave Taft for any
15  reasons?
16       A    Yeah.  I was expelled from Taft.
17       Q    Sorry?
18       A    I was expelled from school.
19       Q    What was the reason?
20       A    Chronic tardiness.  Just not going to
21  classes.
22       Q    No attendance?
23       A    Yes, not caring.
24       Q    What year would that have been, roughly?
```

**11**

```
 1       A    That was -- I always have trouble with this.
 2  When you don't graduate, you don't remember the year.
 3  I'm 38, so probably about -- well, roughly --
 4       Q    About '84, something like that?
 5       A    I guess, something like that.  Sorry about
 6  that.  I have trouble with that one all the time.
 7       Q    Did you have any military background?
 8       A    No, sir.
 9       Q    By the way, prior to coming here today, what
10  materials did you review for your deposition?
11       A    Prior, before coming into this room?
12       Q    Yes.
13       A    I -- I briefly looked at the interrogatory
14  questions and I looked at the complaint.
15       Q    Okay.  As far as -- we'll get to that later.
16            Your Answers to Interrogatories, did they
17  appear to be in proper form and proper response from
18  you as far as the interrogatories?
19       A    Yeah, from what I looked at, yeah.  I didn't
20  look front to back, but I just tried to answer the
21  questions.
22       MR. KISS:  I'm sorry, could I interject?  I know
23  you're about to ask him.  He realized right away we had
24  his incorrect birthdate listed in one of these answers.
```

**12**

```
 1       MR. RUSSELL HARTIGAN:   Well, as long as we're
 2  doing it.
 3       MR. KISS:  Where was that?
 4       MR. RUSSELL HARTIGAN:   I'll just show you what's
 5  been marked as Exhibit No. 1, which is your Answers to
 6  Interrogatories -- we have a copy.  You said that you
 7  reviewed those prior to your deposition.
 8       THE WITNESS:  You could call it review.  I just
 9  kind of glanced at these first two pages and I was more
10  or less we were talking.
11       MR. RUSSELL HARTIGAN:   If you want to take the
12  time and look at them now.
13                 (Whereupon, a discussion was had
14                  off the record.)
15       THE WITNESS:  There was another.  Page 4.
16  BY MR. RUSSELL HARTIGAN:
17       Q    Page 4 of your answers?
18       A    The last bold faced under 18.  There was
19  another attorney, his name is Scott Sherwin for a very
20  brief time.
21       Q    Scott Sherwin?
22       A    That's correct.
23       Q    You want your answers to be amended to
24  reflect Scott Sherwin was an attorney for you?
```

13

```
1     A    Yes, yes.
2     Q    Okay.  Anything else?  Page five or six?
3     A    (No response.)
4     Q    These appear to be in proper order?
5     A    Yes.
6     Q    They are proper responses?
7     A    Yes.
8     Q    As of today's date is this the first time
9  with your Counsel, you have seen these Answers to
10 Interrogatories?
11    A    Yeah.
12    Q    You never signed the Answers to
13 Interrogatories, correct?  Look at the document.
14    A    I'm just -- my first time here.
15    Q    I understand.
16    A    Yeah, I signed it.
17    Q    You did sign them?
18    A    Yeah.
19    Q    Okay.  On the last page.  We're going to go
20 back to this so just keep it in front of you.
21         As far as your previous health is concerned,
22 were you always in good health?
23    A    For the most part.  I have had some back
24 issues since I was younger.
```

14

```
1     Q    Okay.
2     A    But yeah, nothing out of the ordinary.
3     Q    At the time of our occurrence here,
4  September 9th, '05, were you on any form of medication
5  at all?
6     A    No.
7     Q    Were you under the care of any doctor at the
8  time of the incident?
9     A    No.
10    Q    Is that true today, you're not under the care
11 of any doctor currently, and not on any medication?
12    A    No, I'm currently -- I'm currently, I was
13 just prescribed Prozac about a few weeks ago.  Well,
14 actually --
15    Q    Who prescribed that?
16    A    Dr. McNett.
17    Q    How do you spell that for the record?
18    A    M-C-N-E-T-T.
19    Q    Where is Dr. McNett located?
20    A    I seen him in Hoffman Estates out of St.
21 Alexius Hospital.
22    Q    What was the -- do you know what milligrams?
23    A    I -- no, not off the top of my head I don't.
24    Q    The dosage?
```

15

```
1     A    One a day is all I take.
2     Q    Okay.  What is Dr. McNett's specialty?
3     A    I -- I couldn't answer that right now.  He's
4  an MD.  I don't know what his exact, if he's an
5  orthopedic surgeon, I don't know what he is.
6     Q    Do you know what the cause was, as far as,
7  you know, being put on Prozac?  Were you anxious or --
8     A    Well, I told him that, yeah, I get -- I have
9  been anxious and I get anxieties advertise and stuff,
10 as of late.
11    Q    I was just going to say, has that been more
12 recent or have you had a history of that over the
13 years?
14    A    No, sir.
15    Q    Just recently?
16    A    Yes, sir.
17    Q    What is causing the anxiety?
18    A    Well, I -- I think, you know, I mean it's
19 been ever since this has been happening, you know.  I'm
20 not a doctor, but ever since this happened, it's been
21 very hard for me to deal with.  There is a lot of
22 problems inside and --
23    Q    Is this the first doctor that you have seen
24 since September 9th, '05 with respect to having any
```

16

```
1  form of anxiety?
2     A    Yes, sir.
3     Q    Have you ever been treated for depression?
4     A    No, sir.
5     Q    And when you went to Dr. McNett, did you tell
6  him about this incident when you first encountered him?
7     A    No, no, sir.
8     Q    Is high school, the three years at Taft, is
9  that the highest education?  Did you ever go back to
10 any --
11    A    There was a --
12    Q    Wait until I get through with the question.
13 Any seminars or anything for your job, or for your
14 child care center, anything of that nature?
15    A    My job at the child care center or any job I
16 have ever held in my life?
17    Q    You're splitting it, you're dividing it.
18    A    I thought you were asking me --
19    Q    I'll repeat it for you, sure.
20         Did you ever have to go to any seminar or any
21 specialized training for your child care center?
22    A    Only CPR training at Hanover Park Fire
23 Department.
24    Q    Aside from that, did you ever attend any
```

17

```
1   seminar, any further educational pursuits other than
2   Taft High School?
3       A    No.
4       Q    When did you attend the CPR training at
5   Hanover Park Fire Department?
6       A    I can only -- I can only estimate.  Would you
7   like me to estimate?
8       Q    Sure.
9       A    Probably in May of '05.
10      Q    How long a course is that?
11      A    It was just a matter of hours.
12      Q    One day?
13      A    Yeah.
14      Q    Did they provide any material to you?
15      A    Yes.
16      Q    Do you still have that material?
17      A    No, it was taken.
18      Q    Do you know who -- by chance, do you know the
19  name of the person who conducted the training?
20      A    No, I -- I have been trying to find out but
21  they haven't been too helpful.
22      Q    You have been trying on your own to find out?
23      A    (Nodding head.)
24      Q    You have to say yes?
```

18

```
1       A    Yes.
2       Q    For what reason?
3       A    Because -- because the paperwork was taken
4   out of my house that certified, showed I was certified
5   and I completed the course and it was taken from me and
6   never given back, so I wanted another copy of it for my
7   records.
8       Q    Who took the paperwork from your house?
9       A    I don't know.  The police.  When I got back
10  to my house a lot of stuff wasn't there.
11      Q    It certifies you as having training in CPR?
12      A    Yes, that's correct.
13      Q    It was, to your knowledge, a one-day clinic
14  or seminar that you attended?
15      A    Yes.
16      Q    Was there anything that was studies there
17  that had any form of effect as far as your dealing with
18  Joshua Schrik in September '05?
19      A    Yes.
20      Q    What was that, if you recall?
21      A    Well, I -- I -- I exercised what I was taught
22  when the circumstance, you know, matched the symptoms
23  that I was taught in class.  You know, the term rescue
24  breath.  I wouldn't know what that was unless I went to
```

19

```
1   the class and then I knew what to do and how to.  How
2   to initiate CPR, that was helpful that day.
3       Q    We'll get into that a little bit as we go on
4   here.
5            As far as your work background is concerned
6   with respect to employment, you said that you
7   graduated -- or I'm sorry, you attended Taft High
8   School.  What did you do, if you can summarize by way
9   of job background, up to the time that you opened the
10  child care clinic?
11      A    I was a -- I was a printer my whole life.
12      Q    Okay.
13      A    That's the only job I ever held.
14      Q    In your Answers to Interrogatories, it
15  mentions that you worked on Page 1, which you have in
16  front of you, Blooming Color, 230 Eisenhower Lane,
17  North Lombard, Illinois?
18      A    Yes, sir.
19      Q    What did you do before that?  That was 2003.
20  Where did you work in the late '80s or in the '90s?
21      A    The name of the companies?
22      Q    Yes.
23      A    There is a list.  I have been -- I probably
24  worked in ten different print shops in my life.  I
```

20

```
1   could start, my best recollection the first place I
2   worked was LeFebvre L-E, capital F-E-B as in boy,
3   V-R-E.  LeFebvre Intergraphics, that's what it was
4   called.  They are no longer there, but they were in Des
5   Plaines.
6       Q    You said that you worked at about ten
7   different --
8       A    Roughly.
9       Q    -- companies?  Why this shift in the various
10  companies?  Why did you move from company to company?
11      A    Different reasons.  Different times, change.
12      Q    Give me some reasons?
13      A    Shift change, money.  More money,
14  advancement.
15      Q    Do you have a particular technique, or skill,
16  as a printer with respect to a particular type of
17  press?
18      A    I'm an offset pressman.  Sheet fed offset
19  pressman.
20      Q    Are you a member of any union?
21      A    No, sir.
22      Q    Have you ever been asked to leave any company
23  because of any difficulties with management?
24      A    No.
```

21

```
1      Q    So every job you had you left on your own?
2      A    I was fired one time from Glenbard Graphics.
3      Q    What was the reason for that?
4      A    They were concerned I was running the press
5  too fast and it was an old machine.
6      Q    Where are they located?
7      A    They are not anymore, but they were located
8  in Carol Stream.
9      Q    What are you currently doing --
10     A    I'm unemployed.
11     Q    -- by way of employment?
12     A    Unemployed.
13     Q    When is the last time you had gainful
14 employment?
15     A    When I was doing day care.  Oh, well, I
16 worked for a week at a print -- I tried -- I tried, at
17 a print shop when I got out, and it didn't work out
18 real well.  Then I worked at another print shop,
19 shortly after that, for maybe a month or so and that
20 didn't work out.
21     Q    When you say, "when you got out," are you
22 talking when you got out of jail?
23     A    Yeah.
24     Q    What's the name of the print shop that you
```

22

```
1  worked at when you got out of jail?
2      A    Paulson, P-A-U-L-S-O-N, I believe.  It's in
3  Elk Grove Village.
4      Q    Why didn't that work out?
5      A    It was third shift and I was really desperate
6  for a job and I know that working at night wasn't going
7  to be a good idea, but I had no choice but to give it a
8  shot and it just was awful so...
9      Q    You said you were there about a month?
10     A    No, that was like just a week.  I tried it
11 and I didn't like it.
12     Q    Are they still in operation?
13     A    Yes, sir.
14     Q    And you said you tried another job?
15     A    Irving Press.
16     Q    Spell that?
17     A    Irving Press.
18     Q    Where are they located?
19     A    Elk Grove Village.
20     Q    How long did you work there?
21     A    Maybe a couple months.
22     Q    What was the reason for leaving?
23     A    I got fired because he says -- because, you
24 know, my -- the quality of my work was poor, basically.
```

23

```
1      Q    Who was your supervisor there?
2      A    Jerry Gaul, G-A-U-L.
3      Q    You said they are still in business?
4      A    That's correct.
5      Q    And the unemployment that you're receiving,
6  or strike that.  Are you receiving unemployment?
7      A    No, sir.
8      Q    How do you get by then?
9      A    My wife works.
10     Q    Do you have any applications in at any place
11 for a job?
12     A    Not a this moment.
13     Q    Have you applied for unemployment
14 compensation?
15     A    I collected unemployment last year.
16     Q    What period of time?
17     A    Six months.  The full duration of the term,
18 it was like six months, I think.
19     Q    Keep your voice up, please.
20          And where did that -- for what company did
21 you work?
22     A    Irving Press.
23     Q    Irving Press.
24          Getting back to your background, we will
```

24

```
1  cover some more of this later on, the employment issue,
2  but have you ever filed a Worker's Compensation claim
3  for injuries associated with any jobs that you have
4  been at?
5      A    Yes.
6      Q    Okay.  You're looking down at your answers to
7  interrogatories, is that reflected in your answers to
8  interrogatories, on Page 2, is that the one?
9      MR. KISS:  Number 6.
10     THE WITNESS:  I'm looking, I'm reading, yes.
11 BY MR. RUSSELL HARTIGAN:
12     Q    That was against Blooming Color,
13 Incorporated?
14     A    Yes.
15     Q    What was the nature of your injury there?
16     A    My back.  I have a herniated disc.
17     Q    Have you had surgery on that?
18     A    No.
19     Q    Have you ever -- is that the only Worker's
20 Compensation claim?
21     A    No, there was another one for the same, for
22 the back, and it was at LeFebvre, the first place, many
23 years ago.
24     Q    Okay.  How many?
```

25

```
1        A    Probably 18 years ago.
2        Q    18 years ago?
3        A    Roughly.
4        Q    For your back?
5        A    Correct.
6        Q    So you would amend your answers on Page 2 to
7   reflect that?
8        A    Yes.
9        Q    Any lawsuits that filed other than the
10  current pending lawsuit?
11       A    No, sir.
12       Q    As far as your criminal background is
13  concerned, you mentioned in your answers to
14  interrogatories, if you want to use them to refresh
15  your recollection, that's fine, you were arrested in
16  2004 for retail theft; is that correct?
17       A    That's correct.
18       Q    What was the disposition of that?
19       A    Guilty.
20       Q    And did you get supervision or --
21       A    No, I -- I did 61 days.
22       Q    61 days in Cook County?
23       A    No, in -- in state prison.  Vienna.
24       Q    Where was that theft?  Was that a commercial
```

26

```
1   enterprise or business?
2        A    (Nodding head.)
3        Q    You have to answer out loud?
4        A    Yes.
5        Q    What was the name of that business?
6        A    Sears.
7        Q    Where were they located?
8        A    Woodfield Mall.
9        Q    What was the amount of the theft?
10       A    I don't recall.  It was like 300, 400 bucks.
11       Q    What items were they?
12       A    It was a camera.
13       Q    Did you have an attorney represent you?
14       A    Yeah.
15       Q    Do you remember his name offhand?
16       A    Ed Edens.  He's in here.  Ed Edens.  He's one
17  of the names on the list.  Number 18, Page 4.
18       Q    Which one?  Which guy?
19       A    Ed Edens.
20       Q    Okay.  Also in the interrogatories, Page 2,
21  you were convicted of burglary on June 6, 1986?
22       A    Yes.
23       Q    Where did that take place?
24       A    Chicago.
```

27

```
1        Q    What was the circumstances surrounding that?
2        A    Uhm, what it says.
3        Q    Who did you burglarize?
4        A    I don't know who.  What do you mean?  If it
5   was it was a woman, I don't know who she was.
6        Q    Burglary is usually entering a premises.
7        A    Yes.
8        Q    So was it a home?
9        A    Apartment.
10       Q    Commercial development?
11       A    Apartment.
12       Q    Apartment.  Okay.
13            Do you know who lived in the apartment?
14       A    No.
15       Q    Do you know the address of the apartment?
16       A    No.
17       Q    Do you know what you supposedly took as a
18  result of the burglary?  What items?
19       A    I -- that was along time ago.  The only thing
20  that's popping in my head was a video recorder.  I'm
21  sure there was more than that.
22       Q    You were arrested by the Chicago police?
23       A    Yes.
24       Q    Did you have an attorney on that?
```

28

```
1        A    Yes.
2        Q    Who was that?
3        A    I can't think.  Phil Rotche was his name.
4        Q    And did you serve any time in jail for that?
5        A    For that?
6        Q    Yes.
7        A    No.
8        Q    But were you on probation until June 5th
9   1989; is that correct?
10       A    Yes.
11       Q    It also says you were arrested in Wheaton for
12  an ordinance violation, December 11, 2003?
13       A    Yes.
14       Q    What did that consist of?
15       A    I was selling newspapers door to door, and it
16  turned out that you're not allowed to sell door to door
17  if you have a felony conviction on your records in the
18  town of Wheaton.  So I got a village ordinance
19  violation.
20       Q    Do you know who filed a complaint against
21  you?  Was there any individual that brought the
22  complaint?
23       A    Her name was Lisa Sherber, S-H-E-R-B-E-R.
24       Q    She was annoyed that you rang her doorbell
```

29

```
1    because you were soliciting for newspapers?
2        A    No, no, she wasn't happy with the deal after
3    I left.  She -- she -- she misunderstood, and she --
4    she called the police and said that, you know, this guy
5    came to my door, you know, he said that I was
6    getting -- she didn't understand that she was signing
7    up for the term of the paper.  She thought it was only
8    like for one month.
9        Q    What paper was it?
10       A    The Daily Herald.
11       Q    Were you like a salesman for them?
12       A    That's right.
13       Q    How long did that job last?
14       A    Under a year.
15       Q    So, she was confused about the deal or the
16   terms of the agreement, is that right?
17       A    That's right.
18       Q    And that was it?
19       A    Right.  She called the police and when they
20   ran my name, they seen the felony and I got the ticket
21   for the other thing.
22       Q    Any other criminal violations or convictions?
23       A    Excuse me.  Yes.  I was convicted for illegal
24   acquisition of a controlled substance.
```

30

```
1        Q    That's not reflected in your answers to
2    interrogatories; is that correct?  You would want to
3    add that.  Page 2, No. 8.
4        MR. KISS:  It's not in there.
5    BY MR. RUSSELL HARTIGAN:
6        Q    Where did that occur?
7        A    Schaumburg.  No, sorry.  Carol Stream.
8        Q    Carol Stream.  What was the substance that
9    you were in possession of?
10       A    Vicodin.
11       Q    And do you remember the dosage?
12       A    No.  No, I don't.
13       Q    Do you remember how much you had on you?
14       A    No, I picked up the bottle.  I don't remember
15   how many.  I don't recall how much it was for.
16       Q    Did you get it from a druggist?
17       A    Pharmacy, yeah.  The Jewel or Osco.
18       Q    Which one was that at?
19       A    Uhm --
20       Q    Sorry?
21       A    I'm thinking.
22       Q    Okay.
23       A    Hmm, I'm not sure.  It was it was like near
24   Jerrey and Schick (phonetic), somewhere around there.
```

31

```
1        Q    Was that out in Bloomington or something?
2        A    Carol Stream.
3        Q    Did you have a prescription for it?
4        A    No.
5        Q    You just went to the pharmacy and asked them
6    for Vicodin and they gave it to you?
7        A    No.  I called the prescription in myself,
8    ahead of time.
9        Q    Did you represent yourself to be a doctor?
10       A    Yes.
11       Q    And how much time did you receive on that?
12       A    None.
13       Q    Did you get probation on that?
14       A    Yes.
15       Q    For what length of time?
16       A    I don't recall.  I think it was three years.
17       Q    Are you currently on probation?
18       A    No.
19       Q    When was the last time, then, that you have
20   been -- when was the last time that you were on
21   probation where it terminated?
22       A    That time.
23       Q    This time would be, if you run it
24   three years, when would it have ended I guess is what
```

32

```
1    I'm asking you?
2        A    I'm not sure of the date -- the year.
3        Q    That's in DuPage?
4        A    That's correct.
5        Q    To your understanding, you're not on
6    supervision, probation, there are no criminal cases
7    pending against you right now?
8        A    No.
9        Q    Were you also charged with a criminal
10   trespass to building?
11       A    Yeah.
12       Q    And when was that?
13       A    Long time ago.  Like late '80s, mid '80s.
14       Q    What were the facts surrounding that?
15       A    Oh, wait, wait, wait.  Can you repeat the
16   charge?
17       Q    Criminal trespass to building.
18       A    Hmm, I -- I got -- I went over the railroad
19   tracks.  That was it.  I wasn't supposed to be on the
20   railroad tracks, me and my friends, we were kids.
21       Q    Do you remember what year that might have
22   been?
23       A    I think somewhere in the mid '80s, mid to
24   late '80s.  I don't remember exactly.
```

33

```
1        Q     Okay.  Was that in DuPage?
2        A     Cook County.
3        Q     Cook.  What did you receive for that?
4        A     I don't -- I don't recall.  It was a long
5   time ago.
6        Q     Supervision, fine?
7        A     I can't guess.
8        Q     Okay.  I don't want you to guess.
9        A     Then I don't know.
10       Q     Does that consist of everything that you're
11  aware of as far as all your criminal charges and
12  criminal history?
13       A     Uhm, I'm not sure.  There was a charge right
14  around the same time as this case.
15       Q     '05?
16       A     Yeah.  For -- I think it was trespassing
17  again into Wal-Mart because they told me not to go --
18  I'm not supposed to be in there and I went there to buy
19  milk.
20       Q     Why weren't you supposed to be in Wal-Mart?
21       A     Because they suspected me of like, you know
22  trying to steal something.  I was walking around the
23  store, looking suspicious so they pulled me aside and
24  questioned me.  I didn't do anything.  They asked me
```

34

```
1   not to come to the store anymore, and maybe a month
2   later, it was right across the street from my house and
3   I needed milk, and I went to the store and so they
4   called the police and I got arrested.
5        Q     Which police was that?
6        A     Carol Stream.
7        Q     You said it's right across from where you
8   live?
9        A     That's correct.  Well, Hanover Park, one side
10  of Barrington Road is Hanover Park and the other side
11  is Carol Stream?
12       Q     Can you tell me the road then that that would
13  be located on, the Wal-Mart?
14       A     Barrington Road, and it's called Butitla
15  B-U-T-I-T-L-A, I think it's L-A, something like that.
16  It's actually the same street my house was on, Laurie
17  Lane, but when you cross the street, it turned into
18  Butitla.
19       Q     What did you receive for that by way of any
20  punishment?
21       A     Nothing.  They dropped the charges.
22       Q     Were you ordered never to go back to
23  Wal-Mart?
24       A     No.
```

35

```
1        Q     You can go in there now if you wanted?
2        A     To the best of my knowledge, yes.
3        Q     They never charged you with any theft at
4   Wal-Mart?
5        A     No.
6        Q     Just trespass?
7        A     Yes.  Yes, no theft.
8        Q     By the way, you said that you lived at
9   Glendale Heights for the last year and a half.  Where
10  did you live prior to that?
11       A     Roselle.
12       Q     How long did you live there?
13       A     Maybe a year or so.  Little over a year.  A
14  year and a few months.
15       Q     Glendale Heights, was that a single-family
16  residence?
17       A     Yes.
18       Q     How about Roselle?
19       A     Yes.
20       Q     What's the address in Roselle, do you
21  remember?
22       A     420 East Bryn Mawr.
23       Q     Take me one step back.  Before Roselle, where
24  did you live?  Before Roselle?
```

36

```
1        A     We didn't live anywhere.  I didn't have a
2   house.  I stayed by friends for a day, went by another
3   friend for a day, went to my family until I could get
4   some money to find somewhere to live.
5        Q     Where would you hang your hat?
6        A     At my friends' house, different friends.  I
7   just -- like a nomad.  I just called and said is it
8   okay if I stay at your house tonight, I have nowhere to
9   go because my house has been taken from me.  Yeah, you
10  can stay by my house.  I just kind of bounced around.
11       Q     You said your house was taken from you.  Was
12  it foreclosed upon?
13       A     No.  I had to sell it to get out of some
14  problem I had.
15       Q     What problem was that?
16       A     The problem of the false arrest.
17       Q     Was that to get attorney's fees you mean to
18  pay for --
19       A     That's right.
20       Q     And false arrest, was what charge?  That was
21  what?
22       A     Murder.
23       Q     Okay.
24       A     And there was the first charge.
```

37

```
1       Q    And you said the house that you sold was --
2   I'm sorry, one more time, 420?
3       A    No.
4       Q    Which one was it then?
5       A    We haven't talked about it yet.  The house I
6   lived in when this happened was 1434 Laurie Lane in
7   Hanover Park.
8       Q    I was trying to go back in time as far as the
9   homes that you had resided in.
10      A    Right.
11      Q    So 1434 Laurie Lane.  Who was your mortgage
12  with then?
13      A    They sold it a few times.  I think it was
14  Chase at the end.  I could be wrong.
15      Q    Prior to this incident happening, were you in
16  arrears on your mortgage prior to September 9th, '05?
17      A    No.
18      Q    No?
19      A    No.  No.
20      Q    Who was on the mortgage?
21      A    My wife and myself.
22      Q    How long had you owned that house?
23      A    Six years.  Six, seven years.  Maybe
24  six years, I guess.
```

38

```
1       Q    And when you sold the house, how much did you
2   profit on the sale of the house?
3       A    So, is that the difference between what I
4   bought it for and what I sold it for.
5       Q    What did you walk away with in terms of --
6   after paying everything off?
7       A    I want to make sure I answer the question
8   right.  When you say "profit," that's assuming I made
9   money by selling the house and the money in between I
10  didn't use.  I put a lot of money into my house, so I
11  mean it wasn't like a profit when I sold it, but I did
12  sell it for more than I bought it for.
13      Q    When you go to a closing, you want to
14  eliminate all your mortgages, all your debts, obviously
15  the buyer doesn't want to take subject to those.  So
16  you walked away from the closing, what was your net
17  check, if you recall?  Your net --
18      A    I was in jail.  I have no idea.
19      Q    How did you sign the deed?
20      A    My lawyer brought it to the jail and I signed
21  it.
22      Q    Were you in the Cook County Jail?
23      A    That's right.
24      Q    And it's my understanding that the money that
```

39

```
1   you received, call it a profit, or whatever, gain from
2   the sale of your house, went towards the payment of
3   lawyer's fees?
4       A    That's right.
5       Q    Which lawyer was that?
6       A    Barry Spector.
7       Q    How did you pay him?
8       A    What do you call it, surety, the bond.  I
9   signed the bond over to him.  Once the bond was put in
10  place, then I signed it over to him.
11      Q    We'll get into that later.
12           With respect to your child care background,
13  credentials, or facility that you had, when did you
14  first begin engaging in child care?
15      A    Maybe like, May or June.
16      Q    What year?
17      A    '08.  I'm sorry, '05.
18      Q    '05.  May or June of '05?
19      A    Yes.
20      Q    Okay.  And how did you first come about with
21  the idea of child care?
22      A    Because I was hurt at work, and I was off
23  work for an extended period of time and my wife was
24  working and I became, you know, the guy who was making
```

40

```
1   the meals for the kids, putting them on the bus for
2   school, making their lunches, giving them baths and
3   stuff like that and I became very accustomed to doing
4   that.  It was what I wanted to do and when it was time
5   to go back to work, I didn't want to have a babysitter
6   or day care, I wanted to deal with these things myself
7   if I could, and I thought it was a good idea that maybe
8   if I just want -- I'm already watching these guys, if I
9   watch a couple more, then I could see my kids off to
10  the bus every day, and it was just great.
11      Q    Did you look into what requirements there may
12  be, either state, local, federal as far as operating a
13  child care center?
14      A    Yes.
15      Q    What was your understanding of any legalities
16  or requirements as far as licensing is concerned?
17      A    I called -- I called DCFS.  I don't remember
18  the agency.  I don't remember.  I guess it's DC --
19  whoever you're supposed to get in contact with,
20  something like that. I'm struggling with trying to
21  remember who the agency was, but I contacted them and
22  let them know my intentions and they sent me out a
23  first mailing.
24           The first mailing was represented like what
```

41

1   you're getting into, kind of spelled it out for you,
2   and then if you read it and still think you want to do
3   it, then you kind of sign it and send it back and then
4   they send you like a formal application type thing.
5        I received the second mailing, the second
6   application, and I was in the process of filling it out
7   when this happened.
8        So, it was sitting on my table there when
9   this all happened.
10     Q    What was the first application for, if you
11   know?
12     A    It was -- I think I said, it was just
13   basically letting you know what you're getting into,
14   making -- the way I interpreted it was they just wanted
15   to make sure you knew what you were getting into and
16   you still agree that, you know, is this really what you
17   want to do. You have to do this with your house, you
18   have to do that, and if this is still what you want,
19   then you sign it, and then they send you the stuff to
20   get started.
21     Q    Is there a second application, then? You
22   said that was sitting?
23     A    Yeah, then they sent me the second -- they
24   sent me that application.

42

1     Q    Let me backtrack to the first application.
2        You said that you signed it. What is it?
3   What does it attest to on the first application? What
4   are you attesting to? What are you signing, do you
5   know, the first application?
6     A    Right.
7     Q    Just where your house is?
8     A    It spells out what is going to be required of
9   me for the -- to do this. What do I need to do to my
10   house. I need to get CPR training. What guidelines I
11   need to follow.
12        And then by signing it, I guess I'm now
13   letting them know that I have read this, this is what I
14   want to do.
15     Q    Did you have to make any sort of special
16   applications to the Village or anything for your home
17   as far as any sanitary or playground or anything like
18   that?
19     A    I -- I didn't. I have no idea if you are
20   supposed to or not. I didn't.
21     Q    The second application, what was that
22   supposed to be and let's assume it's DCFS that is the
23   agency here? What was the second application all
24   about?

43

1     A    I couldn't answer that question completely
2   when you say all about, because I really don't
3   remember. I -- I just remember starting to fill it
4   out, you know, my name and my intentions and I -- I
5   really -- I really don't remember.
6     Q    Okay. As far as you know, how many children
7   were you able to have in your custody and control at a
8   residence of your nature under the guidelines of DCFS?
9     A    If I recall, it's three or more.
10     Q    Three or more?
11     A    To be licensed. You need to be licensed if
12   it's three or more if I remember correctly.
13     Q    You had to be licensed if it was three or
14   more?
15     A    Yes, if you could watch somebody's kid at
16   your house without a license, but if you're going to
17   watch three or more you have to.
18     Q    Sorry. Were you finished with your answer?
19     A    Yes.
20     Q    At any point in time, how many children did
21   you have while you operated a child care? What was the
22   most in terms of numbers?
23     A    Three.
24     Q    Three. As far as you know, were you properly

44

1   licensed at the time of this occurrence on
2   September 9th, '05?
3     A    No.
4     Q    It's your understanding that, perhaps, the
5   second application had to be processed and sent in?
6     A    Yes.
7     Q    Do you remember what day that second
8   application came in in relation to September 9th, '05?
9     A    No.
10     Q    And I think I asked you, and I apologize, but
11   did you do any modifications in your home, at all, to
12   accommodate what the highest number was, three, in
13   terms of your child care center?
14     A    Uhm, I mean I prepared the house. I put, you
15   know, safety measures, gates, locks on the cabinets --
16   I prepared the downstairs with like make shift lockers,
17   drawers for the kids, and I had a swimming pool in the
18   yard, that was safe, and I guess that's -- that's about
19   it.
20     Q    Did you ever have any contact with the
21   Village of Hanover Park with respect to your operating
22   a child care center?
23     A    No.
24     Q    Did you ever, aside from the CPR training --

45

```
1    by the way, do you remember what month that was?
2          A    (Nodding head.)
3          Q    You have to say yes or no?
4          A    No, I don't.  I don't.
5          Q    Aside from the CPR that you took, do you have
6    any medical training or background?
7          A    No.
8          Q    Do you have any family child care background
9    other than your -- other than your opening the child
10   care center?
11         A    No.
12         Q    How did you advertise to get clients?
13         A    Uhm, originally, I put an ad in the Daily
14   Herald, you know, Classified.
15         Q    Okay.
16         A    I also put a couple generic little signs in
17   the supermarket.  And eventually, I put a little sign
18   out in front of my house.  Those were the only
19   measures.
20         Q    Do you remember what month that was?
21         A    I don't.
22         Q    And the little sign that you put out in front
23   of your house, what did it say?
24         A    Child Care, Come In.
```

46

```
1          Q    Did you ever have any child care clients
2    whose families were friends of yours and became clients
3    --
4          A    No.
5          Q    -- those children?
6          A    No.
7          Q    No?
8          A    No.
9          Q    Prior to September 9th, '05, do you know how
10   long you had been operating a child care center,
11   months, weeks?
12         A    Few months.
13         Q    Few months.  What was the financial
14   arrangement as far as your taking custody and control
15   of the child as a child care center with the parents?
16         A    How much did I charge?
17         Q    Hmm-hmm?
18         A    $175 to watch a full-time child.
19         Q    For what length of time?
20         A    For the week.
21         Q    For the week?
22         A    For Monday through Friday.
23         Q    Would any nearby neighbors have children that
24   were clients of yours?
```

47

```
1          A    Yes.
2          Q    Who were they?
3          A    Carl Gutman, Carl and Debbie Gutman.
4          Q    G-U-T-M-A-N?
5          A    That's right.
6          Q    Were they friends of yours?
7          A    Uhm, no, they weren't.
8          Q    By that I mean, were they friends of yours
9    prior to taking on their -- their child in the child
10   care facility?
11         A    No.
12         Q    Okay.  How far away did they live from you?
13         A    Across the street.
14         Q    When was the last time you seen the Gutmans?
15         A    I seen Carl a couple weeks ago.
16         Q    What occasion was that?
17         A    Uhm, I went golfing with him.
18         Q    So you remain in contact with him?
19         A    Yes.  I owe him a lot of money.
20         Q    Why do you owe him money?
21         A    Because he bonded me out of jail.
22         Q    How much do you owe him?
23         A    The high 20 thousands.
24         Q    Anybody else that their children were at the
```

48

```
1    child care center that lived in the neighborhood?
2          A    What do you consider the neighborhood?
3          Q    Well, in your -- in your particular area
4    within, let's say, a mile or two?
5          A    No.
6          Q    Who were some of your first clients, if you
7    remember, by name?
8          A    Boys name is Aidan, A-I-D-E-N or A-N.
9          Q    What is the last name?
10         A    I don't remember.  They were -- I don't
11   remember.
12         Q    Where did they live, the parents?
13         A    I don't know.  I'm sure it's on the
14   application that I gave them, but I don't remember.  I
15   don't think they live in Hanover Park.  They may or may
16   not have.
17         Q    Anybody else that comes to mind?
18         A    It was JT, Aidan and it was.
19         Q    J-C?
20         A    JT is Gutman, and then Adam Junior.
21         Q    Adam?
22         A    His last name is Mahalik, and I could take a
23   stab at spelling it.  M-A-H-A-L-I-K, I think.
24         Q    Okay.
```

49

```
1
2        A     Probably way off.
3        Q     What did you ask of the parents, as far as
4    prescreening goes, when you took in the child at your
5    center?
6        A     Uhm, I had a standard, like application, it
7    was the same what DCFS uses.  I got it over the
8    internet and just printed it out.  I don't remember
9    what questions were on there besides the basic
10   particulars.
11       Q     Sorry?
12       A     Besides the basic particulars, your name,
13   address, phone number, things like that.  I don't
14   remember the others.
15       Q     Okay.  Did it ask any medical background on
16   that application, medical history of the baby?
17       A     I don't remember.
18       Q     Is there a certain age that you would take
19   them for?
20       A     No.
21       Q     Would you keep records on a daily basis as
22   far as the eating and feeding, excuse me, feeding and
23   what the infant was doing while at your center?
24       A     Yes.
```

50

```
1        Q     Would you mark this as No. 5.
2              (Whereupon, Aleman Exhibit No. 5
3              was marked for identification.)
4        MR. RUSSELL HARTIGAN:   Back on the record.
5    BY MR. RUSSELL HARTIGAN:
6        Q     Mr. Aleman, I'll show you what has been
7    marked as Group Exhibit 5.  Is that the application
8    that we discussed that you would ask of a potential
9    client to fill out?
10       A     Yes.
11       Q     Okay.  And before you is Joshua Schrik's
12   application, correct?
13       A     That's right, yes.
14       Q     The date child received is September 7th,
15   '05; is that correct?
16       A     Yes.
17       Q     And to your knowledge, this incident occurred
18   on September 9th, '05?
19       A     Yes.
20       Q     So you had the child here three days,
21   seventh, eight and ninth?
22       A     Yes.
23       Q     And it notifies here that physician to call
24   if child becomes ill or injured is Dr. Hasson at St.
```

51

```
1    Alexius, is that your understanding?
2        A     Yes.
3        Q     How did you get wind -- or strike that.  How
4    did Danielle Schrik come to your day care center?  How
5    did she learn about it?
6        A     Her boyfriend at the time, Seth, lives right
7    there.  He's down as the father.
8        Q     Seth Sabel?
9        A     Yes, it says he's the father, but he's not.
10   He originally stopped by, just knocked on the door
11   because he seen the sign.  He came in, looked around,
12   thought it was great and brought her back like I think
13   the next day, with the boy, and they looked and decided
14   they liked it.
15       Q     Did they do a little to tour?
16       A     Yeah, a little bit.
17       Q     To your knowledge, was Danielle working
18   somewhere?
19       A     Yes.
20       Q     Where was that at, if you know?
21       A     Genesis Management, apparently.
22       Q     Some things I have to ask you just to --
23       A     No, apparently now I know because I'm looking
24   at this.  Then I probably couldn't have told you.
```

52

```
1        Q     All right.  How about Seth Sabel, the father,
2    do you know?
3        A     Work history?
4        Q     Yes.
5        A     I have no idea.  First time I'm looking at it
6    right now.
7        Q     It indicates for the record BJS and
8    Associates?
9        A     Hmm-hmm.
10       Q     Is that your understanding?
11       A     Yes.
12       Q     Any -- any -- when the child was dropped off
13   to you, was there any special requirements or
14   instructions given to you by the mother or father here?
15       A     It's not the father.
16       Q     Well, Seth, it says relationship, child's
17   father?
18       A     I just want to answer the question.  His
19   father didn't tell me anything because I never met him.
20   He was just some boyfriend.
21       Q     I'm going on the form here.
22       A     Okay.  I was -- I was directed to, you know,
23   administer his medicine as she told me.  I don't
24   remember exactly right now what it was, maybe twice a
```

53

1     day or something. I don't remember what she told me at
2     the time.
3         Q    Was this oral medicine?
4         A    Yes.
5         Q    Liquid?
6         A    It was drops. It was like Tylenol. One time
7     it was Tylenol. I think it was Amoxicillin the first
8     time I think she brought Tylenol when she came. She
9     brought Amoxicillin, I believe she had called the
10    doctor and got Amoxicillin and I was supposed to give
11    it to him at lunch time, which I did, that first day.
12         Q    Was that -- you said that was a pill or?
13         A    Liquid.
14         Q    And did she tell you this is something that
15    Dr. Hasson had suggested or prescribed?
16         A    She didn't mention the doctor's name or
17    nothing.
18         Q    Did she indicate to you that there was any --
19    any problem with the baby as far as any illness at the
20    time when she initially dropped off Joshua?
21         A    She said she had a little bit of strep
22    throat.
23         Q    You have to take your hand away from your
24    mouth.

54

1         A    She said he has a little bit of strep throat.
2    Those were her exact words.
3         Q    Was Amoxicillin supposed to, to your
4    knowledge, help that condition?
5         A    To my knowledge, yes.
6         Q    And you said, I'm sorry you lost me on that,
7    the Amoxicillin was supposed to be administered twice a
8    day or once?
9         A    I don't remember.
10         Q    And was that supposed to continue for the
11    following day and then even until the day of the
12    incident, the 9th?
13         A    It was supposed to, yes.
14         Q    On those notes before you, you have the
15    application and then there is three pages here, all
16    part of Group Exhibit No. 5 for purposes of the record.
17    I don't have the dates on some of these, so maybe you
18    could help me if you recall.
19        I'm looking where it says, "over please," on
20    the one note. If that's the same one I have.
21         A    I do.
22         Q    It's --
23         A    I can tell you.
24         Q    You know what date it is?

55

1         A    This is Wednesday, the one you spoke of that
2    says "Josh did seem still not to be feeling so great
3    today. Over please." That was -- that's the first day
4    he was there.
5         Q    That's the first day he was there was a
6    Wednesday?
7         A    That's right.
8         Q    Okay. "Josh seems still to be not feeling so
9    great today. He was okay for awhile but then he got
10    kind of crabby and was not eating much. Around 12 I
11    gave him some of the medicine. He was pretty sleepy
12    after that." Then it goes on to the next page, which
13    is Bates stamp HC0317 at the bottom corner.
14        It says, "He did not really eat much at
15    either meal," correct?
16         A    That's right.
17         Q    Is that your handwriting by the way?
18         A    Yes.
19         Q    "I did manage get him to eat some applesauce
20    around lunch time. He had lots of fluids though. He
21    drank lots of juice. He started perking up about 4:05.
22    He wanted to be held and cuddled all day so I did. You
23    have a smiley face, correct?
24         A    Correct. Yes.

56

1         Q    Do you have any, or recall any notes as far
2    as Thursday goes?
3         A    I believe this would be Thursday.
4         Q    HC0318 at the corner bottom.
5         A    Yes.
6         Q    It says, "Josh had a better day," at the top,
7    and indicates morning 8:45 what you fed him, lunch?
8         A    Uhm. I correct you on that.
9         Q    Yeah, sure.
10         A    That's not what I fed him, that's what I
11    served at 8:45.
12         Q    Okay. Who fed him?
13         A    I fed him. I attempted to.
14         Q    Did he throw up?
15         A    He wouldn't eat. He was spitting it out. If
16    I put it in his mouth, he spit it right back out. He
17    wasn't interested in eating anything.
18         Q    This is Thursday now?
19         A    Yes.
20         Q    The incident that we're here on occurred on a
21    Friday, correct?
22         A    That's right.
23         Q    Seemed to be feeling better today, he was
24    more playful but still did not eat much. Josh took a

57

```
1    fall on the tile floor right at the day's end.  He has
2    a bump on his head.
3           Do you know how that took place, how that
4    occurred?
5       A    I didn't see it happen, but what I thought
6    happened was, I heard the thud, I looked over, I was
7    writing one of these out for somebody else, I looked
8    over and he was laying -- he had a little shopping
9    cart, so I think what he did was when he walked with
10   the cart, it started picking up speed on him and when
11   he hit the throw rug, I think it toppled him over.
12      Q    Were you in the same room at the time?
13      A    Yes.
14      Q    What room was that?
15      A    Uhm, it's kitchen slash dining room,
16   separated by the breakfast counter I was sitting in.
17      Q    What other children did you have at that time
18   under your custody and control?
19      A    Just my daughter, Amanda and Adam.  The other
20   two would have been at school.  My children.
21      Q    And Adam's last name is?
22      A    Mahalik.
23      Q    Were they in the same room at that time?
24      A    Adam and Josh?
```

58

```
1       Q    Yes, in the kitchen/dining area?
2       A    No.
3       Q    Where were they at?
4       A    I don't remember where Adam was at.  He might
5    have been sleeping or playing on the floor.  I don't
6    remember.
7       Q    Where were the other two children?
8       A    Who are they?
9       Q    Where were they?
10      A    They were at school.
11      Q    Did you have any -- do you recall any
12   conversations that you may have had with his mother,
13   Joshua's mother, Danielle, relative to any observations
14   that you had and, of course, the fall that took place
15   that day?
16      A    Can you repeat that, please?
17      Q    Do you recall having any conversations on
18   Thursday when I presume Danielle picked up Joshua
19   regarding the fall and anything related to his health,
20   any observations that you had made yourself?
21      A    Yeah, uhm, she came shortly after it -- it
22   happened.  That's why I was filling out those things.
23   And as soon as she walked in the door, I said Josh took
24   a little fall today.  I told her what happened.  She
```

59

```
1    went over by him, she looked at him and she said, no
2    big deal, he's a -- what was the word she used -- he's
3    a little dare devil, it happens all the time.
4           My words were well, not here it doesn't.  I
5    said I feel really kind of bad.  She said don't worry
6    about it and she left.
7       Q    Did he have any bruise on his head?
8       A    Yeah, he had a little bruise.
9       Q    Where was that located, if you recall?
10      A    It was -- I don't remember which side it was,
11   it was on the side of his forehead.
12      Q    When the fall took place, did you contact his
13   mother when it occurred?
14      A    No.  I knew she was going to be there
15   momentarily.
16      Q    Did you contact anybody?
17      A    No.
18      Q    Had you ever had any previous complaints with
19   reference to your day care center relative to any
20   treatment, or lack of treatment, of the children in
21   your care?
22      A    No.
23      Q    Does this note reflect, then, what took place
24   as far as your observations that occurred on Tuesday,
```

60

```
1    this note Bates stamped HC0318 which would have been
2    the Thursday notation?
3       A    Hmm-hmm.
4       Q    You have to say yes or no?
5       A    Yes, yes, yes.
6       Q    Do you recall making out any notations for
7    what transpired on Friday?
8       A    No.
9       Q    No, you don't recall; or no, you didn't?
10      A    No, I didn't.
11      Q    No, you didn't make any out any notations?
12      A    No, I didn't make out any notations.
13      Q    Why is that?
14      A    Because I was arrested.
15      Q    At any point in time, to jog your memory or
16   help you with your understanding of what took place,
17   did you ever memorialize what took place, in writing,
18   on that day?
19      A    No.
20      Q    Did DCFS ever ask you to put in writing what
21   transpired that day?
22      A    I don't recall, no.  Uhm, after I got out of
23   jail, Michael Booker visited me at my house and yeah,
24   we did go over it.
```

61

1   Q   Did you provide a statement?
2   A   Yes.
3   Q   Who's Michael Booker?
4   A   DCFS investigator.
5   Q   How do you spell his last name?
6   A   B-O-O-K-E-R.
7   Q   And you gave him a written statement?
8   A   I truly believe so.
9   Q   And this is when you were out of jail you
10  said?
11  A   Yes.
12  Q   By the way, do you remember when you first
13  put your house up for sale?
14  A   Uhm -- Uhm, probably late September, early
15  October of '05.
16  Q   Do you know who you listed with?
17  A   Not off the top I don't remember.
18  Q   Was there a realtor involved?
19  A   Uhm, you know what, I couldn't tell you. I
20  didn't handle the transaction, I was in jail.
21  Q   Did you advise your potential clients who
22  dropped off their children or utilized your services of
23  your criminal background?
24  A   No.

62

1   Q   Didn't you think that might be important?
2   A   No.
3   Q   Do you know if that was required on a DCFS
4   application as far as advising them of your criminal
5   background?
6   A   I don't know.
7   Q   Did you ever keep a list of the names of
8   children that you had custody of from July '05 through
9   September of '05?
10  A   No.
11  Q   The $700 (sic) fee that you mentioned for one
12  week of your service, correct? I'm sorry, $175, right?
13  A   Yes.
14  Q   A week. How was that customarily paid by
15  your clients?
16  A   Cash or check. I don't know. Probably 50/
17  50.
18  Q   Okay. Would you declare that as income on
19  your income tax, the cash or check?
20  A   I -- I didn't -- I never got that far, I
21  guess. It never even crossed my mind at the end of
22  that tax year to do it. No, I didn't. I would have,
23  to answer your question precisely, but no.
24  Q   Did you ever come up to any figures as to

63

1   what you lost per week if, in fact, you were to
2   continue operating your child care center?
3   A   Uhm, have I ever come up with a figure?
4   Q   Well, let me rephrase that. What was the
5   maximum amount during that stretch of a few months
6   where you operated your child care center? What was
7   the maximum amount that you ever attained during one
8   week time by way of income from families?
9   A   I couldn't answer that without researching
10  it.
11  Q   Where would you get the research from?
12  A   I -- I guess I would -- I mean I would have
13  to call the bank and look for canceled checks or
14  something. I don't know.
15  Q   What bank were you dealing with then?
16  A   I'm -- probably TCF.
17  Q   Where are they located?
18  A   They are everywhere in Chicago.
19  Q   I'm sorry, I mean which one did you use?
20  A   Schaumburg Road and Barrington Road.
21  Q   In what village?
22  A   Schaumburg.
23  MR. KISS:   Counsel, if I could, I know that we did
24  estimate an answer for Answer 19.

64

1   MR. RUSSELL HARTIGAN:   Right, right. Seven
2   hundred I think.
3   MR. KISS:   Yes.
4   BY MR. RUSSELL HARTIGAN:
5   Q   Did you have to fill out any forms to list
6   your child care operation as a corporation,
7   partnership, sole proprietorship, anything of that
8   nature?
9   A   Did I have to?
10  Q   Yes. Well --
11  A   I assume I was supposed to, but I didn't.
12  Q   Okay. So no, no forms of that nature were
13  filled out with the State of Illinois or the federal
14  government?
15  A   Only what I spoke of when I talked to DCFS
16  that I started filling out.
17  Q   That was the initial application?
18  A   Yes, that's right.
19  Q   As far as corporate forms are concerned,
20  there weren't any that you filled out?
21  A   No.
22  Q   Is that a fair statement?
23  A   Accurate statement, yes.
24  Q   Did you have an accountant back then that you

65

```
1    used for your taxes?
2        A    No.
3        Q    Who would do your filings for you?
4        A    H and R Block, Jackson Hewitt.
5        Q    Was your wife engaged in this, to help you in
6    this business?
7        A    No.
8        Q    What would be her normal working hours?
9        A    Like eight to six, eight to seven.
10       Q    Now, what would be the normal hours that you
11   would have custody of the children as part of your
12   child care center?
13       A    Excuse me, 8:00 to 400.  8:00 a.m. to
14   4:00 p.m.  On the weekdays.
15       Q    And that would include feeding them?
16       A    Yes.
17       Q    And you mentioned a pool, was there
18   recreational usage, too?
19       A    Yes, the kids swam in the pool.
20       Q    Do you have a playground set up in your yard.
21       A    Yes.
22       Q    Would they ever stay overnight, the children?
23       A    No.
24       Q    I'm going to direct your attention to the
```

66

```
1    date of the incident, September 9th, '05, okay,
2    Mr. Aleman?
3        A    Yes.
4        Q    What children were dropped off to your
5    facility on that day that you were getting a fee from?
6        A    Adam and.
7        Q    Give me the full names.
8        A    Adam Mahalik, JT Gutman, Jonathan Taylor.
9        Q    I'm sorry, JC Gutman (sic) and who else?
10       A    Jonathan Taylor.
11       Q    Okay.
12       A    And Joshua Schrik.
13       Q    So there were four there?
14       A    Three.  My daughter was the fourth.
15   Actually, I wasn't getting paid for her, though.
16       Q    I'm sorry, Adam Mahalik?
17       A    JT.
18       Q    JC?
19       A    JT.
20       Q    JT, that's Jonathan Taylor?
21       A    Yes.
22       Q    And Joshua?
23       A    Yes.
24       Q    Okay.  And who was home from your family at
```

67

```
1    the time?
2        A    At what time?
3        Q    During -- September 9th, '05?
4        A    Me.
5        Q    How about family members?
6        A    Amanda.
7        Q    How old was Amanda then?
8        A    How old was she then?
9        Q    Yes.
10       A    Three.
11       Q    And how old was Joshua if you recall?
12       A    He was just under a year.
13       Q    Pardon me?
14       A    Under a year.  Just under a year old.
15       Q    Okay.  What time -- I assume that Danielle
16   dropped off Joshua that day on September 9th?
17       A    Yes.
18       Q    Do you recall what time that might have been?
19       A    I don't remember.  Roughly, roughly, I can
20   tell you.
21       Q    Before 8:00 a.m.?
22       A    It was around 8:00 a.m.
23       Q    Okay.  Do you recall the other people who
24   dropped them off, the parents' names?
```

68

```
1        A    Just the mother dropped him off.  Danielle.
2    The other kids you're talking about?
3        Q    Yes.
4        A    Yeah, Adam Senior, Mahalik, he dropped off.
5        Q    Okay.
6        A    And Carl Gutman dropped off.
7        Q    Okay.
8        A    I apologize for keep yawning.  I apologize
9    for yawning like this.  It was a rough night light
10   night trying to sleep.
11       Q    When was the last time you seen Mr. Mahalik,
12   the father?
13       A    I seen him the other day.  We share the same
14   day care right now, but I just seen him visually.
15       Q    Do you remain in contact with him?
16       A    No.  Well, I owe him that money and they are
17   very angry with me, so there is very little contact,
18   but there is contact, but very little.
19       Q    Is he a friend of yours still?
20       A    No.
21       Q    You say that you owe him money.  How much do
22   you owe him?
23       A    Right now, I owe him $1500.
24       Q    What was that for?
```

69

1    A    To bond me out of my jail term there.
2    Q    When Joshua was dropped off on September 9th,
3  '05, did Danielle give you any specific instructions
4  regarding him?
5    A    No, because she administered medicine herself
6  that morning.
7    Q    She told you that?
8    A    No, I seen her do it in the kitchen.
9    Q    She brought the baby into the kitchen and
10 then administered medicine?
11   A    Yes.
12   Q    What was the medicine?
13   A    You would have to ask her.  I don't know.
14   Q    Was it the Amoxicillin do you know?
15   A    I don't know.
16   Q    By the way, did you administer the
17 Amoxicillin the day before to the baby, Joshua?
18   A    Yes, at lunch time, at noon.
19   Q    Did she tell you anything about how Joshua
20 was feeling at the time?
21   A    At which time?
22   Q    On that September 9th date?  We're at the day
23 of the incident now.
24   A    Okay.

70

1    Q    When she came in, she administered the
2  medicine, did she say anything about the baby?
3    A    She said she went to the doctor the day
4  before.  That's why she picked him up early because he
5  had an appointment with the doctor.  She told me that
6  he's -- I guess he was getting over the strep throat,
7  you know.
8    Q    Did she say that?
9    A    I don't recall.  To tell you the truth, I
10 don't recall.
11   Q    As far as going to the doctor, was that the
12 doctor listed on the application of the child
13 information?
14   A    I have no idea where she took him.
15   Q    Did she indicate to you whether he had a good
16 night, bad night or anything of that nature?
17   A    No.
18   Q    Okay.  What time would you say that you began
19 seeing signs of trouble as it related to Joshua?
20   A    First day she dropped him off.
21   Q    First when she dropped him off, is that what
22 you said?
23   A    The first day she dropped him off.
24   Q    What did you notice the first day?

71

1    A    That he was very lethargic, he wasn't eating
2  and he -- he had no activity in him at all.  He was --
3  he just laid.  He just slept.  That's why I took the
4  pictures to demonstrate what he was doing all day.
5    Q    Did you relate that to his mother?
6    A    Yes.  Verbal and on paper there.
7    Q    Okay.  To your knowledge, was Amoxicillin the
8  only medication he was on during these three days in
9  your custody?
10   A    Uhm, yeah, I -- I -- for some reason the
11 Tylenol keeps popping in my head.  She must have, I
12 don't know, I guess that's the only thing I came in
13 contact with.  That's the only thing I know for sure.
14   Q    Did you notice the same lethargic conditions
15 the second day?
16   A    Yes.
17   Q    Did you relate that to Danielle?
18   A    Yes.
19   Q    Orally?
20   A    Yeah, and Thursday was -- was actually more
21 happened that day with his health.  He -- that's the
22 day he -- he had a lot of diarrhea.
23   Q    What did you say, I'm sorry?
24   A    Thursday, he was real sick.  He was on the

72

1  couch, and he had -- he had an explosion what we called
2  it.  I mean this was a lot.  I got five kids and I
3  never seen anything like it.
4    So he -- he filled up his pants, and I
5  remember I picked him up and I didn't know what to do
6  with him because, excuse me, it was like dripping.  It
7  was almost kind of funny when it was happening, you
8  know.  I was kind of -- I went upstairs to the tub, and
9  I put him in the dry tub and I pulled his pants down
10 and like put the shower on his leg because it was too
11 messy to even deal with at that point.
12   Then when I got all his clothes off, I made a
13 small bath and I got him clean.  I put his clothes in
14 the washer, and I put him in some of my kids' clothes
15 and I called his mother.  I called his mother, told her
16 that Josh just had this incident happen, and she said
17 oh, well, that's okay because I forgot to tell you, I'm
18 glad you called.  I have a doctor's appointment to him
19 today.  Roughly like oneish.  She said I'll be picking
20 him up early.  I said okay, good.  What I want to know
21 is, he always came with this monkey stuffed animal, and
22 I said I threw the clothes in the washer and his monkey
23 also is soiled, I want to throw it in the washer, but I
24 wanted to check with you to make sure it's okay to put

73

```
1    this item in the washer because if something happens to
2    it, I don't want to be responsible for losing his baby
3    toy.  She said no, no, they're a dime a dozen at the
4    store, go ahead and do it.
5         Q    Did you call her at work?
6         A    I called her at the work number, yeah.
7         Q    As far as the third day, which was Friday?
8         A    Yes.
9         Q    September 9th, '05, after she administered
10   the medicine in the room, what room was it?
11        A    Kitchen.
12        Q    Kitchen area.  Did she then hand the baby
13   over to you at that time?
14        A    No.
15        Q    Did she stay around for awhile?
16        A    She didn't hand the baby over to me or
17   anything.  To the best of my recollection, I was -- it
18   was right at the time when the school bus came, and I
19   had to get the kids out in front of house for the bus
20   and Adam still there at that time.
21        Q    Where was he at?
22        A    Somewhere in the house.  I don't remember
23   exactly where, but I stepped out of the house and we
24   missed the bus that day.  We were late.
```

74

```
1         Q    Who is "we"?
2         A    Well, me and my kids, I guess.  They missed
3    the bus, and Adam said oh, that's okay, I'll drive them
4    to school.
5              So while that was going on, I -- that's when
6    she had put him down.  She laid him on the floor in the
7    front room, and apparently, to answer your question now
8    that I'm referring, Adam must have been in that room
9    because she spoke to Adam and I only know this after,
10   is it okay if I talk about this second hand.
11             Afterwards, I found out that she had dropped
12   him off in the room and dropped him on the floor and
13   told Adam like he hasn't slept all night.
14        Q    Are you talking about Adam, the father?
15        A    Yes.
16        Q    He's in the room with her?
17        A    Yes, in the front room, from what I heard.  I
18   don't know because I was outside.
19        Q    Okay.
20        A    She dropped the boy off in there, told him
21   something and then she left.
22        Q    Told him something?
23        A    She told him like he didn't sleep all night
24   or something like that because he told me, he's like I
```

75

```
1    don't know why she's telling me, you know he's like.
2              So it was a little sketchy but that's what I
3    recall him telling me.
4         Q    When did you have a conversation with Adam
5    Mahalik when he told you?
6         A    After the fact.  I don't know what time or
7    day.  After the fact.
8         Q    Before prison, after prison?
9         A    I was in twice so -- I don't recall.
10        Q    Okay.  Do you know who was present?
11        A    When?
12        Q    When you had the conversation with Adam?
13        A    No.
14        Q    Do you know where the conversation occurred
15   at?
16        A    No.
17        Q    Okay.
18        A    I probably heard.  He probably told me that
19   30 times in his life.  I mean we have gone over this
20   like afterwards, we talked about this many times.
21        Q    She laid him down in the front room.  Where
22   did she lay him down?
23        A    I wasn't in the room, I have no idea.
24        Q    You come back eventually, though, from being
```

76

```
1    outside?
2         A    I can't represent where she laid him down.  I
3    don't know where she put him down.  All I know is what
4    I see, and I can't comment on something where I wasn't
5    in the room.
6         Q    I know, but you jumped the gun.  I wasn't
7    through with my question.
8         MR. KISS:  Let him finish his question.
9         MR. RUSSELL HARTIGAN:  Wait until I'm through.  I
10   know you want to -- it will expedite matters.
11   BY MR. RUSSELL HARTIGAN:
12        Q    When you came back in, do you know how long
13   you were outside as far as this bus, missing the bus is
14   concerned, in terms of minutes?
15        A    Just a minute or two.
16        Q    Okay.  And when you come back in, Mr. Mahalik
17   is in the room still, in your home?
18        A    Yeah.
19        Q    Where is he positioned?
20        A    Uhm, I believe he was sitting on the computer
21   chair.
22        Q    In what room?
23        A    In the front room with Josh.
24        Q    Where is Danielle?
```

```
1        A    She's gone.
2        Q    Did you see her leave?
3        A    I don't recall.  I'm sure she said good-bye,
4   but I don't remember.  I wasn't -- I wasn't like making
5   mental notes at the time, you know what I mean.  It's
6   kind of hard sometimes to do this because some
7   questions are important, you know, you're not keeping
8   track of it at the time because you don't know
9   something like this is going to happen.
10       Q    When -- going back a little bit on the same
11  day, when the baby came in, did you see the baby enter,
12  at all, your premises with the mother?
13       A    Yes.
14       Q    Did you notice -- did you look at the baby
15  when it came in?
16       A    Uh, I -- I seen the baby, but I didn't like
17  look -- I seen her walk by with the baby in her arms,
18  yes.
19       Q    She was holding it in your her arms?
20       A    Yes.
21       Q    Was the baby conscious?
22       A    I couldn't tell you.
23       Q    Was the baby's eyes open?
24       A    Uhm, at that time, I don't know what the
```

```
1        Q    Is he -- is the baby -- does it have a
2   blanket on around him?
3        A    I don't recall if he had a blanket or not
4   when he was laying down.
5        Q    Was the baby conscious?  By that I mean was
6   he alert, could you see his eyes?
7        A    No, he was face down.  He was just -- he was
8   doing what he did everyday.  So if you walked past
9   that, you could tell me if his eyes are open or alert
10  or conscious that's about the same shot I had.  He was
11  always -- he laid -- he seemed to like to lay on his
12  stomach.  It was different than any kid I dealt with.
13  He was always on his stomach and very, very, very
14  little movement always.
15       Q    The answer to the question that I had,
16  though, the baby's face was face down you're saying on
17  the floor, on the carpet?
18       A    It wasn't -- you know what, I don't remember
19  what the baby's face looked like.  I don't know which
20  way the baby's head was turned, but I don't recall
21  looking at his face to be able to answer your question.
22       Q    Was the baby making sounds at all?
23       A    No.
24       Q    Was the baby moving?
```

```
1   baby's eyes were.  I know that the baby was conscious
2   that morning at my house because I seen when she gave
3   him the medicine he was wiggling around.  When she was
4   carrying him, I don't know.  I just remember he she was
5   carrying him.
6        Q    When she was giving the medicine that was
7   after the fact, after she had come in the house,
8   correct?
9        A    That's right.
10       Q    Okay.  Was the baby crying at all when you
11  noticed the baby come in the house?
12       A    No.
13       Q    So you're out there for a minute or two with
14  this bus -- missing the bus incident, you come back in
15  the house and you see Mr. Mahalik at a computer; is
16  that correct?
17       A    Yes.
18       Q    And Danielle has left you said?
19       A    Yes.
20       Q    Where is the baby at this time?
21       A    On the floor in the front room.
22       Q    On the floor in the front room?
23       A    Yeah, same room Adam is at.  One would assume
24  that's where she put him.
```

```
1        A    No.
2        Q    What did you do at that time after walking in
3   and seeing the baby on the floor?
4        A    Uhm, I don't know exactly at that second what
5   I did.  I know that I -- I finished with the
6   breakfasts, that morning.
7        Q    Did you try to give the baby breakfast?
8        A    Yeah.
9        Q    Okay.
10       A    That's when -- that's when it --
11       Q    Was the baby alert when you did that?
12       A    No.  When I went to get him -- no, that
13  wasn't for breakfast, I'm sorry.  That's when I wanted
14  him to play, then I tried to get him up.  I tried to
15  pick him up and that's when I noticed something was
16  wrong, but I didn't feed him that morning, no.  I had
17  gotten -- I got -- I fed the other kids and they went
18  to school, and then whatever is left in the pan, you
19  know, that's what I got together, I was going to feed
20  the other kids, but I never got to that point.
21       Q    Let's backtrack.  You saw the baby on the
22  floor, you see Adam at the computer.  Where did you go
23  at this point in time?
24       A    I don't remember.  I mean, you're getting
```

81

1  like really specific about something that I can't be
2  specific about. I'm sorry, but it's three years ago.
3       Q    I understand that, but you've also brought a
4  lawsuit here that we have to know what the details are?
5       A    I know, but I can only tell you what I
6  remember.
7       Q    Is there a certain protocol that you would
8  use as far as how the day is arranged? First you have
9  breakfast with the children, then you bring them into
10  recreate. Do you have any system in place at all?
11       A    Oh. A general one. I mean, breakfast is fed
12  in the morning, and then, you know, lunch is fed at
13  noon. I put -- no, there was no --
14       Q    No organized protocol?
15       A    No list of what we were doing every half
16  hour. Nothing like that.
17       Q    You said that you tried feeding the other
18  children. You went ahead and fed the other children,
19  right?
20       A    My kids, before they went to school, yes.
21       Q    I'm still -- I'm back where -- we see the man
22  at the computer, Adam, baby on the floor, what do you
23  do next? That's what I'm asking you.
24       A    Same question, same answer. I don't know. I

82

1  don't remember.
2       MR. KISS:   Just answer.
3  BY MR. RUSSELL HARTIGAN:
4       Q    What happens after that, though? Did you try
5  feeding other children at the time, shortly after that?
6       A    No.
7       Q    What happened, then, in terms of your day?
8       A    I clean up the kitchen.
9       Q    Where is the baby at when you're cleaning the
10  kitchen, Joshua?
11       A    On the floor in the front room.
12       Q    You left the baby on the floor in the front
13  room and you went in the kitchen to clean up?
14       A    Yes.
15       Q    That's the next thing that you remember,
16  correct?
17       A    Yes.
18       Q    All right. What time of day is this now,
19  would you say?
20       A    Roughly, eight. Closing to 8:30 because if I
21  can remember what time the bus was supposed to come, I
22  could be more accurate but it's been awhile.
23       Q    Do you know how long you left the baby on the
24  floor from the time to you first saw it, when you

83

1  walked in, until the time you went back to the baby?
2       A    Maybe -- maybe five minutes.
3       Q    Was it making any sounds at all, to your
4  knowledge?
5       A    No. No, sir.
6       Q    Crying?
7       A    No.
8       Q    How far was the kitchen where you were at,
9  cleaning up, from where the baby was on the floor?
10       A    Nine feet, eight feet. Eight or nine feet.
11       Q    And where were the other children at this
12  time?
13       A    In the same room. In the front room.
14       Q    What were they doing?
15       A    Playing. The TV was on and the other two
16  kids were playing.
17       Q    How long did it take you to clean up?
18       A    Just a minute or two.
19       Q    And then what did you do next after cleaning
20  up?
21       A    If I remember this right, that's when Adam
22  left. He was -- like I said, he drove the kids, and
23  he's like okay, I got to go to drive the kids.
24  Obviously, it was before. They were going to be late

84

1  for school.
2       Q    Drive your kids, right?
3       A    Yeah, and his daughter. That I didn't watch,
4  but she went to the same school.
5       So he pulled out. He left the front door
6  with the three kids, and then I went into the front
7  room, and that's when I put everything away. The kids
8  were playing on the floor and I started messing with
9  the kids. I had set up a tent for them to play in and
10  I was crawling around on the floor with them, goofing
11  around, chasing them through the tent and stuff.
12       Do I continue or is that?
13       Q    No, keep going.
14       A    And then that's when, uhm, I was like okay,
15  let me get Josh involved over here, you know, and
16  that's --
17       Q    How far was the tent from Josh?
18       A    Right there. Just a couple feet.
19       Q    How long did you play with the kids before
20  you went back to Josh?
21       A    Just a few seconds. I was right around, I
22  said let me include Josh in this. Everybody was
23  laughing and stuff.
24       That's when I went to pick him up, and when I

85

1 picked him up, right away I knew something was wrong
2 right away.
3 Q When you -- when you went back to him, to
4 pick him up, was the face down, sideways, was he
5 looking up at you, do you recall?
6 A No, he was belly down. I don't remember
7 which way his head was right, left or face down, but I
8 know he was on his stomach.
9 Q Do you recall if he was conscious?
10 A Uhm, I don't believe so. No, no, I picked --
11 he wasn't conscious. I picked him up. He was
12 lifeless. He was just laying there.
13 Q Were his eyes open?
14 A No.
15 Q Was he making any form of sounds?
16 A No.
17 Q And was there a towel or blanket around him
18 at the time, or was just his body on the carpet?
19 A Just on the floor, yeah.
20 Q Did you ever see the baby on the couch at
21 all?
22 A Did I see the baby on the couch?
23 Q Yes, Joshua.
24 A I put the baby on the couch.

86

1 Q When was that?
2 A Right then, when I picked him up and then I
3 sat on the couch and I was -- it was -- I was trying to
4 figure out what was going on.
5 Q So you sat down with the baby and -- or did
6 you put the baby on the couch or did you -- did you
7 cradle the baby while you were on the couch?
8 A I held the baby. I held the baby in my arms,
9 and then there was a knock at the door. I held the baby
10 down on the couch and -- wait a minute. I want to get
11 this straight.
12 I think I got these two things backwards. I
13 got -- when I picked Josh up off the floor, I had him
14 in my arms. He was -- I put one thing ahead of the
15 other. The first thing I said about him being on the
16 floor and picking him up unresponsive was after Carl
17 left. It was after Carl left. I got confused.
18 I picked the baby up, the baby was sick, and
19 I held the baby like this, like cuddled it.
20 (Indicating.) Then there was a knock at the door.
21 Then I put him on the couch and I went -- well, then I
22 said come in, because just like the sign in the front
23 said come in. The door was always open. It was open
24 door policy. It was weird that somebody knocked on the

87

1 door. I yelled come in, nobody came in.
2 Q Are you still holding the baby now at this
3 time?
4 A Yes. I got up with Josh. I put him -- hold
5 on. It's hard to remember. I -- I honestly -- I'm
6 having trouble -- I don't know if I carried him to the
7 door or put him down on the couch at that point. No,
8 he was in my arms because as I walked through the
9 threshold I could see the front door has glass, and I
10 could see through the glass who it was at the door, and
11 it was Carl Gutman. I was struck funny like why is he
12 knocking on the door, he knows it's open.
13 I'm like come in, Carl. He opened the door
14 and then explained to me that he was letting JT knock
15 on the door. He's learning how to knock. I was like
16 oh, sorry, if I would have known that, the little guy
17 was knocking, no problem. I said I have this little
18 guy here, he's not feeling well. So, you know, we were
19 on the couch. I was like oh, okay.
20 Then I went --
21 Q Who was at the door?
22 A Carl Gutman.
23 Q Okay. Did he enter the premises?
24 A Yes.

88

1 Q Okay.
2 A To tell you the truth, I either put the baby
3 by on the floor, or the couch at that time, and that's
4 when I went in to clean up. I had it screwed up. I'm
5 sorry. But as we were rehashing this, it's coming
6 back.
7 Then I went in the kitchen and Carl spent
8 some time with the boy for a minute or two, like I had
9 said, while I quickly cleaned up. With Carl in the
10 room, it gave me a chance to leave the room and do
11 something real quick, so I did. I took advantage of
12 that.
13 Then when I came back in the room, Carl and I
14 sat down and talked for a few minutes, and I was
15 holding the baby, and Carl got a phone call and had to
16 leave, and he went out the front door, and I followed,
17 I -- I followed him out the door.
18 That's when I put the baby on the couch. I
19 followed him to the door, then when I came back -- oh,
20 because JT, when Carl left, that's why I left the room.
21 I was sitting on the couch with the baby and when Carl
22 left, JT, who was only crawling at that time, he always
23 had like the separation anxiety, he started crying and
24 he started following his father towards the door.

89

```
1          I got up and put the baby down to tend to JT
2   while he was following his dad, because his dad was
3   taking a work call and I didn't want them to hear all
4   the baby crying stuff.
5          Carl went out in front of my house. I could
6   see him through the glass, and I picked up JT, and I
7   went in the other room. Carl then left. That's when I
8   started playing with the kids. I said, hey, c'mon
9   guys, let's go in the tent and that's when I turned
10  around and grabbed Josh, and that's when he was like
11  that. That's when he was just laying there.
12     Q    Did he have -- you mentioned earlier about
13  his monkey. Do you know if the baby had the monkey
14  that day?
15     A    Did he have the monkey that day?
16     Q    Yes.
17     A    I -- I don't know.
18     Q    Did he have any sort of basket where he was
19  placed in, the baby, in your facility, a basket?
20     A    Did I put the baby in a basket?
21     Q    Or was there one there?
22     A    A basket?
23     Q    Hmm-hmm.
24     A    Uhm, the only thing I could even think of
```

90

```
1   what you're talking about, we have a magazine like,
2   looks like a picnic basket that you put like maybe
3   eight magazines in it. That's the only basket I
4   believe was in the room unless for some reason there
5   was one in the laundry room. I don't recall.
6      Q    Was there any receptacles -- what I'm asking
7   is was there anywhere to put the baby other than the
8   couch and the floor?
9      A    Receptacle?
10     Q    Like a bassinet. Anything where you could
11  put a baby in?
12     A    Like a crib or --
13     Q    Yeah, anything like that?
14     A    Well, just -- in that room?
15     Q    Yeah.
16     A    I don't think so. I don't remember one being
17  in there.
18     Q    The baby, as far as you know, was either on
19  the floor, or on the couch either with you, or
20  separated from you on the couch, is that my
21  understanding?
22     A    Yes, yes.
23     Q    When you first -- let's back track. When you
24  first came in after the bus incident where your kids
```

91

```
1   missed the bus, you said that you cleaned up. Now, you
2   said no, that's not when I cleaned up.
3      Q    What did you do when you first came in then?
4      A    I talked to Adam.
5      Q    You have to take your hands away.
6      A    I talked to Adam about, you know, about the
7   bus situation and he said, you know, I can take all
8   three, you know.
9          We decided, prior to the, you know, we're
10  like we're not going to make it. We're were looking
11  for a maybe like a library book or something and we're
12  like we're not going to make it. The only reason I
13  went out was to flag the bus on. I was like go. We're
14  late. Then when I come back in, Adam was like I'll
15  just take them and everything and we were probably just
16  backpacking, finishing up the getting them out process
17  at that moment.
18     Q    Where was the baby at this time, Joshua?
19     A    The baby was in the front room the whole day.
20  The baby was always in the front.
21     Q    Was he on the floor when all this was taking
22  place with you talking to Adam --
23     A    Yes.
24     Q    -- and worrying about your children?
```

92

```
1      A    Yes, yes.
2      MR. KISS:   Wait until he finishes his question.
3   BY MR. RUSSELL HARTIGAN:
4      Q    When is the first time after your children
5   missed the bus that you came back and you looked at the
6   baby since we're -- you indicated at little difference
7   in terms of your testimony here?
8      A    Uhm, Adam left, I walked back in the room. I
9   picked up the baby immediately and sat on the couch and
10  Carl knocked on the door.
11     Q    When you picked up the baby, how was the baby
12  positioned relative to his feet and his hands?
13     A    I believe his head was towards the TV and his
14  feet were the other way, towards the wall.
15     Q    Where were his hands at, if you recall?
16     A    I don't know.
17     Q    Were they by his head if you know?
18     A    I don't recall.
19     Q    When his head was towards the TV, could you
20  see his eyes?
21     A    No.
22     Q    Were they shut or you just couldn't see his
23  eyes because his face was a different direction?
24     A    I probably couldn't see his eyes because I
```

93

```
1    wasn't looking, you know, I mean I --
2         Q    Okay.  You picked the baby up, went to the
3    couch, right?
4         A    That's right.
5         Q    So we get this straight because you said a
6    couple different things.  We have to straighten these
7    things out here.
8              How long did you remain on the couch?
9         A    Just under a minute.
10        Q    What did you do on the couch with the baby?
11        A    I guess I stared at the TV while I held him.
12        Q    You watched TV?  I'm sorry.
13        A    I just sat on the couch with him.  The TV was
14   on, so I was probably looks at that, and I didn't do
15   anything with him.  I just picked him up because that's
16   the first chance I got to interact with him since
17   everybody left.
18             I picked him up.  He was just like he was
19   every other day.  I put him on my shoulder, did one of
20   these, (indicating), and then I heard a knock at the
21   door.
22        Q    Did he burp at all?
23        A    No.
24        Q    Did he throw up at all?
```

94

```
1         A    No.
2         Q    Did he make any sounds at all, oral?
3         A    No.
4         Q    Did you make eye contact with the baby?
5         A    No.
6         Q    Was the baby's head in a different direction
7    is that why you didn't maybe eye contact?
8         A    The baby head was on my shoulder, face down
9    like this.  (Indicating.)
10        Q    Could you see the baby's eyes?
11        A    No.
12        Q    Did you have any concern in your mind at this
13   time regarding the baby's health?
14        A    Not any more concern than I had the whole
15   week.  He was just lethargic and lifeless like he had
16   been all week.
17        Q    So when you rang the bell here comes in
18   Mr. Gutman, correct?
19        A    Yes.
20        Q    How long do you stay with him, talking to
21   him?
22        A    Roughly 20 minutes.
23        Q    Where is the baby, Joshua, at this time?
24        A    For part of the time is when he was with Carl
```

95

```
1    in the room when I went back in the kitchen to clean up
2    a little bit, but for the balance of the time, he
3    was -- we were all in the front room together on the
4    couch.
5         Q    Was the baby separate on the couch?
6         A    No, he was with me.  I held the baby.
7         Q    During the 20 minutes that you were with
8    Mr. Gutman, how much contact, physical contact, did you
9    have with the baby in terms of you holding him or?
10        A    Or what?
11        Q    Or your holding him?
12        A    Okay.  I didn't know if your question was
13   finished.
14        Q    No, just answer that question.
15        A    How much physical contact did I have with
16   him?
17        Q    Yes.
18        A    I'm going to guess 10 minutes.
19        Q    I don't want you to guess.  We're asking you
20   specifically do you recall.  You brought a lawsuit
21   here.  We're asking you facts.
22        A    I don't know.  I didn't time it.
23        Q    Okay.  Was there a period of time in those 20
24   minutes you weren't with the baby?
```

96

```
1         A    When I cleaned up in the kitchen for a
2    minute.
3         Q    And for a period of time was the baby out of
4    your eyesight?
5         A    Yes.
6         Q    How long, for what length of time?
7         A    About a minute.
8         Q    Even of the 20 minutes that you talked about
9    with Mr. Gutman?
10        A    Yes.
11        Q    The baby was in your eyesight?
12        A    Yes.
13        Q    Where was Gutman, was he in the room inside
14   there with you?
15        A    Yes.
16        Q    For 20 minutes?
17        A    Yes.
18        Q    Did you say anything to him about the baby,
19   something about his condition?
20        A    I think I vaguely remember mentioning that
21   he's still sick.
22        Q    Did you get a response from Mr. Gutman?
23        A    Just like sympathetic sigh or --
24        Q    What happens then, Gutman leaves, what occurs
```

97

1    after that?
2        A    Gutman leaves, he gets a phone call, he
3    starts to leave.  JT starts to follow him, and I put
4    the baby down on the couch to tend to JT.
5            I pick up JT.  I bring him back in the room,
6    put him down and start playing with him, and then I go
7    to grab Josh, and he was lifeless and then, you know,
8    everything transpired after that.
9        Q    You said he was lifeless.  What did you
10   denote while on the couch that was anything different
11   from moments or seconds or minutes before?
12       A    Because when I picked him up originally --
13   when I would pick him up earlier in the day or, you
14   know, he was very, I wouldn't call weak, not like --
15   usually you pick up a kid, they look around.  So when I
16   picked him up, not normally, I just put him on my
17   shoulder, but when I picked him up that time there was
18   nothing.  When I picked him up it was like this.
19   (Indicating.)  This paper.  It was like -- I picked him
20   up and there was nothing there.
21       Q    Prior to that, there had been some life as
22   far as him moving his hands and his legs while on the
23   couch with you?
24       A    Very little bit, if any.  I -- what I recall

98

1    is the baby just sticking to me like glue.  Like --
2    like -- if you have kids and you hold them, they fit
3    like a puzzle piece, they just kind of nestle like that
4    and that's what I remember.  I don't remember him
5    looking around or no whining or moaning or anything
6    like that.
7        Q    But prior to your expression of the baby
8    being lifeless, did you ever make eye contact with the
9    baby from the time that he was brought in until the
10   time of this point of being lifeless?
11       A    I don't recall making eye contact with him.
12   I don't remember looking into his eyes.
13       Q    But he was moving, whether it was slow or
14   not, he was moving prior to -- prior to the
15   lifelessness?
16       A    Uhm --
17       Q    Or do you know?
18       A    I -- no, I mean, he wasn't moving much at
19   all, or at all.  I -- he, but he wasn't limp.  He
20   wasn't crawling.  He wasn't struggling or lifting, he
21   wasn't doing anything.
22       Q    He was moving but it was guarded?
23       MR. KISS:  Objection.  I'm going to say it's been
24   asked and answered.

99

1        MR. RUSSELL HARTIGAN:  I'm trying to get an
2    answer.
3        THE WITNESS:  I know, I'm trying to give you one,
4    too.  I'm really, I respectfully am trying to remember
5    everything as best I can, and that's the truth, and
6    unfortunately, I don't remember -- I don't remember
7    everything.
8    BY MR. RUSSELL HARTIGAN:
9        Q    When you picked up the baby when you noticed
10   him being lifeless, you described that earlier?
11       A    That's correct.
12       Q    You noticed that when you looked back on the
13   couch, when he was on the couch not on the floor,
14   right?
15       A    When I picked him up, I noticed that.
16       Q    Where was he when you picked him up?
17       A    On the couch.
18       Q    You noticed the lifelessness on the couch,
19   correct?
20       A    When I picked him up off the couch, yes, I
21   noticed he was lifeless.
22       Q    What did you do, then, when you picked him up
23   off the couch and you noticed he was lifeless?
24       A    My stomach dropped because it was -- it was

100

1    right away I knew something was wrong, you know.  I --
2    my first thought was to -- I don't know why, but my
3    daughter was sitting over there and I knew something
4    was wrong and I just went right to the kitchen because
5    I just -- I wanted to get him out -- I wanted my kids
6    away from the situation.  I went in the other room
7    because I knew something was wrong and the kids were in
8    there.  So I went right five steps into the kitchen.
9        Q    Do you have the baby with you at this time?
10       A    Absolutely.  I carried the baby in the other
11   room.
12       Q    Before carrying the baby in the other room,
13   did you ever shake the baby?
14       A    No.
15       Q    Did you ever shake the baby when you first
16   picked him up and he was lifeless?
17       A    No.
18       Q    Did you ever demonstrate that to anybody as
19   far as you shaking the baby at any subsequent time?
20       A    Yes.
21       Q    Who was that?
22       A    The police in the interrogation.
23       Q    All right.  Are you talking about the Hanover
24   Park and the Illinois State Police?

101

1    A    That's right.
2    Q    So when you first noticed that he was
3 lifeless, you don't shake the baby at all is what
4 you're saying?
5    A    Yes, that's what I'm saying.
6    Q    What do you do then, do you walk into another
7 room?
8    A    I walk into the kitchen.  I was still in like
9 assessing the situation.  I looked down and he's
10 lifeless, and I'm like oh, my God, what's going on.
11 When I got into the kitchen, that's when I was like
12 Josh, Josh.  (Indicating.)
13    Q    You're indicating for the record you're
14 moving your hands back and forward?
15    A    That's right.
16    Q    Are you holding the baby like that, backward
17 and forward?
18    A    Uhm, I had him in my arms like -- I picked
19 him up, I had him like this (indicating), yeah, I
20 carried him in -- my hands were like this or like this.
21 (Indicating.) I don't know.
22    Q    Your hands are like this, for the record.
23 (Indicating.)
24    A    When I picked him up off the couch, yes, sir.

103

1    Q    Did the baby's head touch the back of his --
2 his back area?
3    A    I don't know.
4    Q    How many times in that manipulation with your
5 hands did you shake the baby in terms of multiple
6 times?
7    A    Three.  Maybe like one, two, three, Josh,
8 Josh.
9    Q    We're now where, in the kitchen?
10    A    Yes.
11    Q    Are you in a somewhat of a panic situation at
12 this time?
13    MR. KISS:  Objection, leading.
14 BY MR. RUSSELL HARTIGAN:
15    Q    Well, what was your state of mind?
16    A    Uhm, I was nervous.  I was concerned. I would
17 say more concerned than nervous.  I would say nervous
18 came later.
19    Q    When you held the baby and were shaking it,
20 were you holding the baby by its arms or side of his
21 body?
22    A    Yes.
23    Q    One hand on one side and one hand on the
24 other side?

102

1    MR. KISS:   Palms facing up for the record.
2    MR. RUSSELL HARTIGAN:   Right.
3 BY MR. RUSSELL HARTIGAN:
4    Q    You're telling me you're in the kitchen with
5 the baby.  I'm asking you what are you doing in the
6 kitchen as far as your hands being out like that, were
7 you holding the baby?
8    A    Yeah, I was holding.
9    Q    Were you shaking the baby with your hands
10 like you just shook your hands to me?
11    A    Yeah, I did try to revive the baby at that
12 point with my hand.
13    Q    How did you try to revive the baby, Mr.
14 Aleman?  Describe for the record how you did that?
15    A    By shaking him, by trying to get his
16 attention by shaking him, like you would shake anybody
17 else that's sleeping, hey, Josh, Josh.
18    Q    You're indicating or the record with your
19 hands somewhat extended, both hands moving back and
20 forth.
21    A    Correct.
22    Q    Was the baby's head moving back and forward
23 when you were moving him?
24    A    Yes.

104

1    A    Uh, yeah.  Yeah.
2    Q    I wasn't there, sir, you have to tell me?
3    A    Yeah, I know.  I -- yeah, I guess so.  Yes.
4    Q    I don't want you to guess, I want you to tell
5 us what you remember.
6    A    I don't remember then.
7    Q    Okay.
8    A    Exactly what position of my hands.  I don't
9 remember if you want a precise, honest answer.
10    Q    But you had both hands on the baby?
11    A    Yes.
12    Q    Could you see if the baby's eyes were open at
13 the time or closed?  Was the baby -- in other words,
14 were you face to face with the baby?
15    A    Yes.
16    Q    And were the eyes open or closed?
17    A    I really don't recall.  I would -- I would
18 imagine.
19    Q    I don't want you to guess.
20    MR. KISS:  Don't imagine.  Don't guess.
21    THE WITNESS:   This is my nature.  This is what got
22 me here in the first place.
23    MR. KISS:  Just listen to the questions, okay, and
24 then answer it.

105

```
 1          THE WITNESS:  Yes, yes, sorry.
 2          MR. RUSSELL HARTIGAN:   Who are the only one who
 3     was there and has recall of this.  We're just asking
 4     you what you recall.
 5          THE WITNESS:  I understand completely.
 6     BY MR. RUSSELL HARTIGAN:
 7          Q     So you don't recall if the baby's eyes were
 8     open; is that correct?
 9          A     I don't.
10          Q     What about the baby moving at all, his arms
11     or legs at all?  Other than you moving, was the baby
12     moving at all on its own?
13          A     No.
14          Q     Was it throwing up at all?
15          A     No.
16          Q     Was it making any vocal sounds?
17          A     No.
18          Q     This is all in the kitchen when this
19     occurred?
20          A     That's correct.
21          Q     When you mentioned the three times that you
22     shook the baby, correct?
23          A     That's correct.
24          Q     What happened next?
```

106

```
 1          A     When -- after I shook him and there was no
 2     response, I -- this is stupid, but I went to the
 3     freezer and pulled out the teething ring and I put it
 4     on his face.
 5          Q     You have to put the baby down to do that?
 6          A     No, I carried him to the fridge, opened up
 7     the freezer and I put this cold thing on his face just
 8     to see, I don't know, to try to get a reaction out of
 9     him.  I was a little --
10          Q     Were you ever taught that anywhere?
11          A     No.
12          Q     Was there any reaction?
13          A     No.
14          Q     What did you do next?
15          A     Put the teething ring down and then I
16     decided, you know, I decided in my head that I needed
17     to do CPR.
18          Q     What's your state of mind at this point in
19     time?
20          A     Concerned, a little nervous, you know, for
21     the baby.  Something's wrong, this is not good.
22          Q     And how did you go about applying CPR and
23     where was the baby when you did this?
24          A     I mentioned earlier there is a breakfast
```

107

```
 1     counter that separates the two rooms, the dining room
 2     and the kitchen and I -- it was right there, so I laid
 3     him on there, and I decided I should try giving him
 4     rescue breaths.  And when I did, I blew inside, that's
 5     when I activated whatever was in his -- liquid was -- I
 6     could hear the gurgle.  When I blew in, stuff came out
 7     of his nose, you know, fluid and...
 8          Q     Was he a certain color at this time?
 9          A     No, I don't recollect.
10          Q     Fluid came out of his nose?
11          A     Yes.
12          Q     Was his eyes open?
13          A     I'm not going to be -- I don't know.  At that
14     time, I don't know.  I was doing that.
15          Q     The gurgling sound, you said you heard that?
16          A     Yes.
17          Q     What did they -- is this -- you mentioned
18     earlier that you -- you had CPR instruction, correct?
19          A     That's right, yes.
20          Q     Did you ever do the complete course on CPR,
21     did you ever fulfill all the requirements of CPR?
22          A     Yes.
23          Q     Did you get a certificate for that?
24          A     Yes.
```

108

```
 1          Q     You have that at home?
 2          A     No, the police took it.
 3          Q     What did the CPR instructor tell you with
 4     respect to what a rescue breath is?
 5          A     Quick short breaths.
 6          Q     How do you have to position the party,
 7     though, and what do you have to hold and how do you
 8     know --
 9          A     The nose, and tilt their head back.  You put
10     them on their back, tilt the head back and cover the
11     nose and just give a quick, I don't know if it was one
12     or a series of three quick breaths (indicating.)  I did
13     that and nothing happened.
14          Q     Did you try it again?
15          A     What I did was when the rescue breath didn't
16     work, then I realized well, I better try to do the full
17     CPR, you know.  I didn't feel comfortable with him
18     laying on the counter, it was a hard surface, so I
19     picked him up and put him on the staircase where the
20     stairs were carpeted and I put him on the fourth stair
21     and I could kneel on the bottom and it was a good
22     level, it was soft.
23          I just immediately took him there.  I took a
24     CPR class, I don't know if I'm any good at it, you
```

109

1  know, but I attempted to do what I was taught, and it
2  was a very short time when I realized it was futile, I
3  wasn't helping.
4      Q    But you did try CPR on the fourth step?
5      A    Yes.
6      Q    What did that consist of?  How did you -- how
7  did you position the baby and how did you position
8  yourself and what hands did you apply to what areas of
9  the body?
10     A    Like I said, it was crude.  I put him up
11 there, and again, I -- I'm just going to tell you what
12 I do remember.  I do remember putting him up there, I
13 do remember tilting his head back, being on his back. I
14 do remember blowing into his mouth, coming back off,
15 and going back down again and -- just giving up
16 right away.  Nothing was happening.
17         I realized in my head that time was not in my
18 favor and I'm not -- I might as well-equipped for this
19 situation and I just went right for the phone.
20     Q    How was it different, the CPR one on the
21 stairs than the rescue breath?
22     A    It's a longer breath.
23     Q    Did you ever apply your hands to his chest at
24 all?

111

1  aware what was going on, and when I realized right away
2  that I wasn't -- I wasn't going about to save this
3  baby, this was not, you know, I'm not the guy, this is
4  isn't working.  This is more than I can handle.  I
5  grabbed the phone right away.  I did the next right
6  thing.
7      Q    Prior to first attempting the rescue breath,
8  did you ever think about calling 911 at that time?
9      A    No.
10     Q    You said that you're not the guy, I think you
11 said earlier you didn't have any medical training other
12 than CPR, correct?
13     A    Correct.
14     Q    And at that point in time did you make the
15 call?
16     A    Yes.
17     Q    I'm sorry, for the record, what was the call,
18 911?
19     A    911.
20     Q    And what was your tone of voice when you made
21 the call?  Were you panic stricken as far as now what
22 was transpiring?
23     A    My tone of voice, I -- I mean I -- I remember
24 calling and telling them what was going on.

110

1      A    No.  No, I didn't. I never realized that
2  until you just asked me the question while I was
3  talking, I realized that I never did that.
4      Q    Did he have mucous come out this second time
5  that you, at least, attempted something her?
6      A    I -- I'm not sure if the mucous was from the
7  first or second time.  I just knew that every time I
8  blew in his mouth, I heard bubbling, so I imagine some
9  degree came out.
10     Q    Do you know if his eyes were open while he
11 was on the fourth step?
12     A    I don't recall.  I really don't recall.
13     Q    Do you know if the baby was moving at all
14 while on the fourth step?
15     A    Absolutely not.
16     Q    Where were the other children at this time?
17     A    Still in the same room that I left them in,
18 the front room.
19     Q    The two others?
20     A    Yeah.
21     Q    What's your state of mind at this time?  You
22 tried two attempts here.
23     A    Like I said, I realized -- I mean I was
24 nervous and I was concerned, but I was still very, very

112

1      Q    Were you excited?
2      A    Yeah, I imagine I was talking fast and trying
3  to get my point across in the lieu of the baby's
4  health.  I was trying to expedite things.
5      Q    What did you tell them as far as the
6  symptoms, or condition, that you observed the baby to
7  the 911 call center?
8      A    I believe I -- I believe I -- what I recall
9  is saying that I got a -- I got a baby here, and he's
10 not breathing, and there is mucous and stuff coming out
11 of him.  I tried to give him CPR and can somebody come
12 and help me.
13     Q    I'll show you the video on it and just ask
14 you to identify it as you being the caller and the
15 content of the video for purposes of the record to
16 simplify matters here.  I don't know if we need to mark
17 it as an exhibit, we'll just identify it.
18              (Whereupon, Aleman Exhibit No. 6
19               was marked for identification.)
20              (Whereupon, a luncheon recess
21               was taken.)
22
23
24

113

```
1              AFTERNOON SESSION
2         (Whereupon, the witness was
3         excused.)
4    BY MR. RUSSELL HARTIGAN:
5         Q    Mr. Aleman, we just broke for half an hour
6    and we're back on the record at 1:20.
7              Showing you, or what's going to be played as
8    Aleman Exhibit No. 6, is a 911 recording, and we ask
9    you to, once it's heard, to identify it as you being
10   the caller and it being a 911 tape, and you being the
11   recipient of the -- I'm sorry, Hanover Park Center
12   being the recipient of the call, okay?
13        A    Yes.
14        MR. RUSSELL HARTIGAN:   You can play it.
15             (Whereupon, the CD was played.)
16   BY MR. RUSSELL HARTIGAN:
17        Q    Okay.  Mr. Aleman, you just his sends to a
18   911 call there is actually like two segments to it.
19             Was that your voice as the person calling in?
20        A    Yes.
21        Q    And that was the response by the 911 Center
22   and then Hanover Park?
23        A    Yes.
24        Q    And did that truly and accurately portray
```

114

```
1    the -- the manner in which your state of mind was as
2    far as the excitement at the time reflected in your
3    voice on this tape?
4         A    Oh, it was apparent I was pretty upset, you
5    know, nervous and concerned for the boy.
6         Q    Just three questions coming from the tape.
7              Number one, did you ever, yourself, at any
8    point in time, try to go into the baby's mouth and wipe
9    out any mucous or was it coming out voluntarily?
10        A    Uhm, I stuck my finger -- when he asked me if
11   there was anything in his mouth, clear the airway, I
12   stuck my fingers like that (indicating), scooped
13   around, I did the scoop and there was nothing but just
14   the fluid on my fingers.
15        Q    That was after the call to the 911 center
16   after he told you you did that?
17        A    I did it prior to and then when he told me
18   to.
19        Q    When did you do it prior?
20        A    Uhm, in the kitchen, when I was doing the
21   CPR, when I administered CPR.  When I put him on the
22   stairs, not on the counter.
23        Q    Where was it, on the stairs?
24        A    After, yeah, on the stairs, when I blew in,
```

115

```
1    and when I pealed back, like there was fluid on my
2    mouth and his, and I looked inside, I went like that,
3    there was nothing in there.
4         Q    Now, according to that recording the baby was
5    breathing when you put him on the stairs?
6         A    Apparently, from the phone call, yeah, I --
7    I -- I -- I don't remember seeing my stomach go up and
8    down.  I don't remember any of those.  I don't remember
9    any of that until we just heard it.
10        Q    That refreshed your recollection, the tape?
11        A    Yes, yes.
12        Q    I think that's all I have.
13             Did you have any questions on that as long as
14   we got the tape on?
15        MR. KOCH:   Yes.  For the record, my name is Peter
16   Koch, K-O-C-H, Assistant Attorney General on behalf of
17   the Illinois State Police Defendants.
18             EXAMINATION
19   BY MR. KOCH:
20        Q    You said that you cleared the airways, you
21   cleared his airways with your finger when the baby was
22   on the stairs?
23        A    Yes.
24        Q    You said that you did that after doing the
```

116

```
1    rescue breaths?
2         A    Yes.
3         Q    So you did the rescue breath and you said you
4    had some mucous on your mouth?
5         A    Yes.
6         Q    After doing the rescue breath, you then put
7    your finger in the mouth to clear the airways?
8         A    Yeah, because there was all that mucous and
9    it was just in his mouth, I just pulled it out so it
10   wouldn't got back down.  So when I went back down, when
11   I pulled away after I blew, it was just a ton of it was
12   on my face, not his, so I just -- I just scooped it out
13   of the way so when I go back down, I could actually get
14   air through.
15        Q    This is with Joshua on the fourth step?
16        A    Correct.
17        Q    And when you went down to do the rescue
18   breath, did you open his mouth with your hands?
19        A    Originally, the rescue breath on the counter.
20        Q    No, I asking you when the baby is on the
21   steps.
22        A    Okay.
23        MR. KISS:   That wasn't the rescue breath.
24        THE WITNESS:   That's why I'm confused.
```

117

1    MR. RUSSELL HARTIGAN:    I think he called it a CPR.
2    That's what he called it.
3    BY MR. KOCH:
4        Q    You were doing -- okay.  Then on the stairs,
5    where was the baby when you cleared his airways with --
6        A    On the stairs.
7        Q    Let me finish my question.  Where were you
8    when you put your finger in his mouth to clear the
9    airway?
10       A    Where was I?
11       Q    Where were you and the baby?
12       A    Up on the stairs.
13       Q    On the stairs.  And when you were on the
14   stairs did you -- did you put your mouth on the baby's
15   mouth?
16       A    Yes.
17       Q    Okay.  And did you separate his -- open his
18   mouth with your fingers?
19       A    Yes.
20       Q    It was after you did that that you then put
21   your finger in to clear the airways?
22       A    Yes.
23       Q    Okay.
24       MR. RUSSELL HARTIGAN:    Okay.  All right.

118

1                    EXAMINATION
2    BY MR. RUSSELL HARTIGAN:
3        Q    Back on the record at 1:30.
4            With respect to, Mr. Aleman, when the baby
5    first came into your home and you first seen the baby
6    after you had been outside, you came back and saw the
7    baby, correct, for the first time?
8        A    (Nodding head.)
9        Q    Yes?
10       A    Yes, I'm sorry.
11       Q    To the point where you first administered the
12   rescue breath, how much time expired, in your opinion?
13       A    Between the time that I first walked back
14   into the house?
15       Q    When you first -- after the episode with your
16   kids missing the bus, you go back in the house, you
17   notice the baby, the mother's gone, and then up to the
18   point of the rescue breath, how much time?
19       A    Roughly 25 minutes.
20       Q    How did you then give the child to the
21   paramedics?  Did you walk outside?  Did they come in
22   the house, describe that, please.
23       A    When I heard the ambulance, I looked out the
24   window and I could see it coming around the corner.  So

119

1    I went in the front of the house, ran out of the house,
2    all the way to the curb, to the street, to meet the
3    ambulance when it stopped in front of my house, and
4    then I handed him over.
5        Q    Did the baby have a certain color at that
6    point in time?
7        A    I don't recall.
8        Q    Did you notice the color when you were on the
9    steps, the fourth step with the baby?
10       A    I don't recall.
11       Q    Okay.  Did the paramedics ask you any -- what
12   happened, what's the medical problem here?  Did they
13   ask you that at that time when you handed the baby
14   over?
15       A    I -- what I remember them asking me was if I
16   was the father.  I -- I don't really remember for sure
17   if they asked me that or not.
18       Q    Did they ask you like did the baby eat today?
19       A    No, I they didn't did ask me anything like
20   that.  They took the baby from me very quickly and the
21   ambulance closed I was on my way back in the house.
22       Q    So specific details of what transpired for
23   that morning?
24       A    Not that I recollect, no.  Once they asked me

120

1    if I was the father, I said no, they were done with me.
2        Q    Did you know whether or not the baby had
3    anything to eat that morning?
4        A    I don't know.
5        Q    You didn't feed the baby?
6        A    No, sir.
7        Q    As far as you know, you've already testified
8    to that you only shook the baby three times, is that my
9    understanding, or was there another episode where you
10   shook the baby?
11       A    No, there was no other episode.
12       Q    Do you remember the color of the -- of the
13   froth that's coming from the baby's nose?
14       A    It was more of a clear, maybe a tint of
15   yellowish.  It was more of a clear substance.
16       Q    Was there anything coming from the baby's
17   mouth at all, that you can describe by way of color?
18       A    Just what I just said, the clear substance,
19   his nose and mouth.
20       Q    Nose and mouth?
21       A    Yes.
22       Q    When the 911 operator told you to make sure
23   the airway was clear, what -- did you turn the baby or
24   position the baby in any manner?

121

1      A      I put the baby on its back, I held the baby
2 and looked, you know, with his face pointed towards me
3 and I looked inside and I didn't see anything.  I just
4 stuck my finger in there and tried to swish, there
5 wasn't really anything to swish out but I just wanted
6 to do what he told me to do.
7      Q      Did the baby vomit at all do you remember?
8      A      No.
9      Q      After you gave the baby over to the
10 paramedics, what did you do then?  You said that you
11 went back inside?
12      A      Hmm-hmm.
13      Q      That's a yes.
14      A      Yes.  And, uhm, the police were there, as I
15 recall, immediately, and right away I was, you know,
16 asked -- they started asking questions.
17      Q      Had you no problem with that, right?  They
18 obviously were investigating what transpired?
19      A      No, no problem.
20      Q      Do you know who called the police?
21      A      I just -- no, I don't.  I assume it was part
22 of the ambulance phone call.
23      Q      Where were the other children now when the
24 police arrived and they started asking you questions?

122

1      A      Still in the house, you know.  In the front
2 room I would imagine.
3      Q      Not what you imagine just what you recall?
4      A      I don't know.
5      Q      Okay.  Do you know how many police officers
6 came to the home?
7      A      I don't know.
8      Q      Do you know if they were male or female?
9      A      Some, both.
10      Q      More than one or two?
11      A      I don't know.
12      Q      Do you remember what color uniform they had?
13      A      No, I don't know.
14      Q      Do you know what department they were from or
15 what municipality they were from?
16      A      Hanover Park.
17      Q      Had you ever had any contact with Hanover
18 Park police officers before this incident?
19      A      No.
20      Q      Had you called your wife at this point in
21 time prior to the police officers asking you questions?
22      A      No.
23      Q      What was your state at this, your state of
24 mind at this time?  You go back in and you said the

123

1 officers were there almost immediately, or did you have
2 to wait before they came?
3      A      Immediately with the ambulance they were
4 there.  I didn't have to wait at all.
5      Q      Were you still excited as you were on the 911
6 tape?
7      A      Uhm, I don't know.  I -- I'm not going to say
8 I imagine.
9      Q      Do you recall?
10      A      I recall being coherent and able to talk to
11 them, you know, accurately.
12      Q      Did you tell them what transpired when they
13 asked you?
14      A      Yes.
15      Q      What -- what did you tell them, Mr. Aleman?
16      A      I told them that I went to pick up the baby
17 and the baby was lifeless and unresponsive, and I tried
18 to do CPR, and it didn't work, so I called 911.
19      Q      Did you ever demonstrate to them at that time
20 how you may have shook the baby?
21      A      Uh, yes.
22      Q      How did you demonstrate it to them?
23      A      Shake the baby?  Wait a minute.  No, I think
24 I only demonstrated -- I'm sorry, I demonstrated to

124

1 them only -- only how the baby was maybe laying on the
2 floor.  That's what I recall.  I don't recall
3 demonstrating anything about shaking a baby.
4      Q      At a later time at the Hanover Park Police
5 Department you demonstrated how you shook the baby, is
6 that correct?
7      A      That's correct.  I think shake's a little
8 rough term.  I'm searching for a better word, you know,
9 but...
10      Q      So what did you demonstrate as far as, at
11 that time, how the baby was positioned?
12      A      Yes.
13      Q      What did you tell them, the officers, at your
14 house?
15      A      I told them that I -- they brought a doll in
16 for me to -- to do an example on, so I just took the
17 doll and held it like I held the baby and showed them.
18 I said well, I went like this. (Indicating.)
19      Q      Indicating both hands out forward and moving?
20      A      Correct, yes.
21      Q      Anything else?
22      A      No.
23      Q      Did your wife eventually come to the home?
24      A      Yes.

125

```
1      Q    What time was that would you say?
2      A    Uhm, I -- I'm not going to speculate.  I
3   don't know.
4      Q    I'm asking -- I don't mean for you to give me
5   an exact time, you can give me an approximation?
6      A    It had to be about 10:00 o'clock or so.
7      Q    And this incident, as far as you being on the
8   fourth step, what time would that have happened when
9   you were on the fourth step with the baby?
10     A    Uhm, right around 9:00 o'clockish.
11     Q    Did you call your wife to come back to the --
12  to the home?
13     A    I was instructed by the police to call my
14  wife and have her come back to the home.
15     Q    Was one of the officers from Hanover Park a
16  female officer?
17     A    Yes.
18     Q    Do you know her name?
19     A    Yes.
20     Q    What's her name?
21     A    Officer Lussky.
22     Q    How do you recall that?
23     A    I recall she didn't have a uniform on when
24  she came.
```

126

```
1      Q    Did she identify herself at the time?
2      A    Not right away because I wasn't sure.  I
3   didn't know who she was, I thought, I didn't know who
4   she was, if she was with the hospital or what was going
5   on, but shortly after, I discovered she was a officer.
6      Q    Did she have a gun or badge or cap on?
7      A    No, not -- not that I noticed.
8      Q    Do you remember any other officer's name that
9   was present?
10     A    Present.
11     Q    Yes?
12     A    No, not present at the scene, no.
13     Q    Okay.  Was she one of the officers asking you
14  questions?
15     A    No.
16     Q    What did she do, if you know?
17     A    Nothing.  She just told me she's the one who
18  drove me down to the police station.  She was -- she
19  kept an eye on me the whole time.
20     Q    She made sure everything was okay?
21     A    She made sure I wouldn't leave.
22     Q    My question, though, is she made sure that
23  everything was okay when she would check on you later
24  at the station?
```

127

```
1      MR. KISS:  Objection, vague.  You can answer if
2   you know.
3      THE WITNESS:  I don't know.  I don't think she was
4   checking on me for my well-being.
5   BY MR. RUSSELL HARTIGAN:
6      Q    She didn't ask you any questions, though, at
7   your home, is that what you said?
8      A    Yeah, she asked like what happened, you know,
9   what's your name, where is your wife, are you okay to
10  keep doing this?
11     Q    Was she taking notes do you remember?
12     A    I don't remember.  I don't think so.
13     Q    Was anybody else besides her questioning you?
14     A    No.
15     Q    Did you talk to any other investigator prior
16  to leaving your home where that investigator had told
17  you the condition of the baby?
18     A    Can you repeat the question, please?
19     Q    Had you talked to any other officer from
20  Hanover Park prior to leaving your home to go to the
21  station where that officer informed you as to the
22  condition of the baby?
23     MR. KISS:  Objection, compound.
24     THE WITNESS:  I don't recall.
```

128

```
1      MR. RUSSELL HARTIGAN:  You don't recall that.
2      THE WITNESS:  I really don't.
3   BY MR. RUSSELL HARTIGAN:
4      Q    So when you got to the station, had anyone
5   ever told you what the condition of the baby was when
6   you arrived at Hanover Park police station?
7      A    I -- I asked once we were there.
8      Q    Once at the station?
9      A    How's the baby, what's going on.  Officer
10  Lussky was the first one to communicate with me about
11  that.
12     Q    That's the first time that you learned
13  anything about the baby was at the station?
14     A    That's right.
15     Q    No other -- no other investigator had told
16  you anything prior to that time?
17     A    No, sir.
18     Q    Did Officer Lussky request your cooperation
19  in going to the police station?
20     A    Yes.
21     Q    And you consented to go to the police station
22  with your wife accompanying you, is that a fair
23  statement?
24     A    Yes.
```

129

1    Q    At this point in time, to your knowledge, you
2  were not under arrest?
3    A    Uhm, no, I was starting to wonder though
4  because...
5    Q    But nobody ever said, sir, you're under
6  arrest for any specific criminal charge at this point
7  in time?
8    A    No.  No.  I wasn't allowed to drive my own
9  vehicle, so I was starting to feel like I was being
10 detained.
11   Q    And just, it was Sergeant Lussky who asked
12 you that, correct, to accompany her and your wife to
13 the station, the Hanover Park police station, correct?
14   A    I wouldn't call it asking me, more or less
15 telling me that's what I needed to do.  That's what
16 happened.  She's like, well, you need to come down to
17 the station, we need to ask you questions to clear
18 things up.  I said well, is it okay if I drive myself.
19 She said no, you better come with me.  I said is it
20 okay if my wife comes.  She thought about it for a
21 second and said yeah.
22   Q    Sure.  You weren't put handcuffs in the squad
23 car, were you?
24   A    No, sir.

130

1    Q    What's your state of mind at this time?
2    A    At that time, in this room, in this meeting
3  or in general in life?
4    Q    You know what I mean?
5    A    I don't know what you mean.
6    Q    State of mind after you're being transported
7  to the Hanover Park police station, Mr. Aleman?
8    A    My state of mind was concern, concern for the
9  baby.
10   Q    Were you concerned about whether you had done
11 anything wrong?
12   A    No.
13   Q    Do you have an approximation what time you
14 arrived at the police station?
15   A    Maybe a little around 11.
16   Q    Did you have any conversations with, I assume
17 that Officer or Sergeant Lussky transported you to the
18 station?
19   A    Yes.
20   Q    Did you have any conversation with her in the
21 vehicle at all that come to mind?
22   A    I don't recall, no.
23   Q    Your wife was in the same vehicle?
24   A    Yes.

131

1    Q    You were both in the back seat?
2    A    Yes.
3    Q    What happened when you arrived at the Hanover
4  Park police station?  Were you placed in the interview
5  room?
6    A    Uhm, uhm, they put me in the interrogation
7  room.
8    Q    Interview room or interrogation room?
9    A    Yeah, I -- I -- that's what I thought it was
10 called.
11   Q    Who called it an interrogation room?
12   A    I did.
13   Q    If I told you it was an interview room, was
14 that ever mentioned to you, that term?
15   A    No.
16   Q    Where was the interview room in -- in -- as
17 far as you're understanding, in relation to the Hanover
18 Park police station?
19   A    When you go into the main entrance and they
20 allow that door to open that you go into the station,
21 you go forward, and it's the last door on the right
22 before you turn the corner, to your right.
23   Q    What time would you say that you went into
24 the interview room at, approximately?

132

1    A    11:01.
2    Q    How do you know it's 01?
3    A    I don't.  I said approximately.  It was right
4  after I got to the station they put me in there.
5    Q    Was your wife in the interview room with you?
6    A    Initially.
7    Q    And at some pint in time she left the Hanover
8  Park police station, correct?
9    A    Correct.
10   Q    And did you -- did your wife, in the
11 interview room, tell you it's best that you cooperate
12 with the police officers in any investigation here?
13   A    I don't recall that.
14   Q    If I showed you in the video, would that help
15 you in your recollection?
16   A    Absolutely.
17   Q    While he's doing that I have another
18 question.
19        When you were the Hanover Park police station
20 did your wife encourage you to stay at the station and
21 tell them exactly all the details of what transpired?
22   A    I -- I don't recall and I don't think so.
23   Q    Were you, or your wife, allowed to go outside
24 and smoke or to walk around?

133

1    A    No.
2    Q    Did you ever ask that?
3    A    Yes.  I did go outside but not to smoke or
4    walk around.
5    Q    Where did you go outside?
6    A    I was allowed to go about three feet from the
7    front door with her supervision, and I was allowed to
8    sit on the like little brick wall there to try to get
9    my breath.
10   Q    Outside of the -- of the interview room?
11   A    Right.
12   MR. MICHAEL HARTIGAN:    Off the record for a
13   second.
14                   (Whereupon, a discussion was had
15                    off the record.)
16   BY MR. RUSSELL HARTIGAN:
17   Q    Did you, at some point in time before being
18   interviewed, attempt to call your attorney?
19   A    Yes.
20   Q    On your cell phone?
21   A    On my cell phone.
22   MR. KISS:  Could you just clarify?
23   MR. RUSSELL HARTIGAN:   I'll break it down.
24   BY MR. RUSSELL HARTIGAN:

134

1    Q    At some point in time, were you allowed to
2    make your initial call to an attorney?
3    A    Yes.
4    Q    What time was that at?
5    A    I -- I have no idea.  I couldn't even guess.
6    Q    Was that before any state police or Hanover
7    Park police officer was in the room with you?
8    A    No.
9    Q    Was it when they were in the room with you?
10   A    Yes.
11   Q    The first time --
12   A    Yes.
13   Q    -- that you were allowed to call?
14   A    Yes.
15   Q    Did you have a cell phone on you at the time
16   of this incident?
17   A    I know there was a cell phone, I don't
18   remember if it was my wife's or mine.  No, I do not
19   have my cell phone because the police took it.
20   Confiscated it.
21   Q    Did your wife have a cell phone on her when
22   she was in the interview room with you?
23   A    Yes, sir.
24   Q    Did she make any call or did you use her cell

135

1    phone to make a call to an attorney while in the
2    interview room?
3    A    I don't remember.
4    Q    While your wife and you were in the interview
5    room, you were not formally under arrest at this time;
6    isn't that correct?
7    A    I -- I couldn't answer that.  I felt like I
8    was under arrest.
9    Q    Not what you felt like, I'm asking were you,
10   did somebody from the state police or, Hanover Park,
11   tell you, sir, that you were under arrest while you
12   were in the interview room with your wife?
13   A    I was under arrest due to the fact I was not
14   allowed to leave.
15   Q    I'm not asking you that. Listen to my
16   question or we're going to be here for hours.
17   A    I'll be right here with you.
18   Q    Fine, we'll stay here all night.
19   A    I'll come back tomorrow.
20   MR. KISS:  Just hold on and answer the questions.
21   He's just asking you if anybody asked you or told you,
22   if I'm right, sir, you're under arrest, at which point.
23   BY MR. RUSSELL HARTIGAN:
24   Q    In the interview room, with your wife, did

136

1    anybody, Hanover Park or state police come in and say,
2    Mr. Aleman, you're under arrest for blah, blah, blah?
3    A    No.
4    Q    That's all I'm asking you.
5    A    That's not the first question.
6    Q    You don't have to volunteer stuff that you
7    think is useful for you.
8    A    No.
9    MR. RUSSELL HARTIGAN:   But that's what you're
10   doing.
11   MR. KISS:  Listen, Rick.
12   THE WITNESS:   But the first question -- the first
13   question.
14   MR. KISS:   Time out.  Let's go outside.
15   THE WITNESS:   That's not the first question he
16   asked me.  The first question he asked was was I under
17   arrest.
18                   (Whereupon, the deponent and his
19                    attorney left the room for a
20                    discussion off the record.)
21   MR. RUSSELL HARTIGAN:   Back on the record.
22   MR. KISS:  Thank you.
23   BY MR. RUSSELL HARTIGAN:
24   Q    Mr. Aleman, I'm going to show you what is

137

```
1    entitled 9/9/05; Time, 12:33, 38 seconds, which
2    purports to be the interview room and identifies
3    yourself and apparently your wife in that room.
4              Is that your understanding of looking at
5    that?
6        A    I can't see.  Yes.
7        Q    There is also going to be some dialogue with
8    respect to you and your usage of a cell phone, so can
9    you put that on, Mike?
10             (Whereupon, a portion of the video
11                 was played.)
12   BY MR. RUSSELL HARTIGAN:
13       Q    Is that the correct time?  Do you have any
14   reason to doubt that that is the incorrect time, 12:33?
15       A    I have no reason to doubt it.
16       Q    Okay.
17             (Whereupon, a portion of the video
18                 was played.)
19   BY MR. RUSSELL HARTIGAN:
20       Q    In the video you're using a cell phone,
21   correct?
22       A    Yes.
23       Q    Do you know who you're calling?
24       A    No.
```

138

```
1              (Whereupon, a portion of the video
2                  was played.)
3    BY MR. RUSSELL HARTIGAN:
4        Q    Does that refresh your recollection, Mr.
5    Aleman, as to who you were contacting at that time?
6        A    Yes.
7        Q    Who was that?
8        A    Paul Ankin.
9        Q    Is he an attorney?
10       A    Yes.
11       Q    This is prior to the -- any interview by any
12   Hanover Park or any Illinois State Police officer?
13       A    Yes.
14       Q    Did Paul Ankin respond back to you at some
15   point in time that evening, call you back?
16       A    I don't remember if I called him back or he
17   returned my call, but we did communicate again.
18       Q    Did that communication -- by the way, I think
19   you already identified, but the video tape does
20   indicate 12:35 and 27 seconds when that call was made.
21   Is that your understanding of the time?
22       A    Sure.  Yes.
23       Q    You have no reason to doubt that?
24       A    No.
```

139

```
1        Q    This is prior to any interview by Hanover
2    Park or Illinois State Police, correct, that you made
3    the call?
4        A    Uhm, any interview or any questioning?  I
5    mean, what's the difference between an interview and
6    questioning.
7        Q    At a later point in time you were interviewed
8    by Investigator Micci and Officer Villanueva was there,
9    correct?
10       A    Yes.
11       Q    This cell phone usage depicted in this video
12   right now is prior to that time, correct?
13       A    Correct.
14       Q    Okay.  And when you called back, or he called
15   back, Attorney Ankin, that was done prior to any
16   interview or interrogation by Investigator Micci or
17   Hanover Park Officer Villanueva, correct?
18       A    Yes.
19       Q    And so you spoke to an attorney, the attorney
20   advised you what to do?
21       A    Eventually, yes.
22       Q    Did he eventually tell you to cooperate with
23   the law enforcement authorities there?
24       A    No.
```

140

```
1        Q    What did he tell you?
2        A    He told me to -- not to talk to them at all.
3    That I had been there too long and that I wanted to
4    tell them I'll come back the next day with an attorney
5    when I'm in better sorts of mind and be more than happy
6    to answer any questions they had.
7        Q    At no point in time you were told by your
8    attorney to cooperate?
9        A    No.  The exact opposite.
10       Q    Did you sign a waiver prior to giving an
11   interview or being interrogated by the Hanover Park or
12   Illinois State Police?
13       A    Yes.
14       Q    Let me show you what's been marked,
15   previously marked -- these are a little bit out of
16   order, as Exhibit 4.
17             Mr. Aleman, is that the waiver that you
18   signed?
19       A    Yes.
20       Q    Can you read in the records just paragraphs
21   one, two, three and four, as far as what they say --
22       A    Out loud?
23       Q    -- on the waiver?
24       A    Out loud?
```

141

```
1        Q       Yeah, read them aloud.
2        A       You have the right to remain silent.
3    Anything you say can be used against you in a court or
4    other proceedings.  You have the right to talk to a
5    lawyer for advice before you answer any questions and
6    have him with you during questioning.  If you cannot
7    afford a lawyer, one will be appointed free of any cost
8    to you before any questioning if you wish.  That's all.
9        Q       Okay.  And did you talk to your -- I
10   apologize if I repeated this, do you recall speaking
11   with your attorney on your cell phone and then signing
12   the waiver?
13       A       Yes.
14       Q       Do you recall Sergeant Lussky telling you
15   that everything was being video taped?
16       A       No, I don't recall that.
17       Q       Do you recall seeing signs in the hallway at
18   the Hanover Park police station, especially by the
19   interview room that the -- that there -- there was the
20   ability to video tape any statements in that room?
21       A       I don't recall that, no.
22       Q       You said that your wife left at some point in
23   time, correct?
24       A       Yes.
```

143

```
1        A       No.
2        Q       Did she ever tell you that she was questioned
3    in the other room?
4        A       Not to this day.  Yes, she has told me she
5    was questioned in a room.
6        Q       Did she say who she was questioned by?
7        A       Uhm, no, I don't, I don't recall.
8        Q       Did she say how long she was in the other
9    room?
10       A       No.
11       Q       Did she ever tell you what time she left the
12   Hanover Park police station?
13       A       No.
14       Q       Do you recall being interviewed by Sergeant
15   Joseph Micci of the Illinois State Police Child
16   Victimization Unit while at the Hanover Park police
17   station?
18       A       Yes.
19       Q       Do you recall what time that interview took
20   place?
21       A       No.
22       Q       There was a gap in time for you to wait for
23   the interview process to begin, correct?
24       A       Yes.
```

142

```
1        Q       Do you remember what time?
2        A       No.
3        Q       Was your wife ever placed in a separate room,
4    do you recall, and interviewed at the Hanover Park
5    police station?
6        A       I was told she was.  I know she left the room
7    I was in.  I didn't -- I didn't see her go in, I don't
8    know.  I know what I was told.  I was told she was
9    being interviewed in another room.
10       Q       The chronological, chronologically what
11   transpired is that when you came to the Hanover Park
12   police station you were put in the interview room with
13   your wife; correct?
14       A       Correct.
15       Q       At some point in time your wife leaves you to
16   go somewhere else?
17       A       Yes.
18       Q       Was she going back home or to work, do you
19   remember?
20       A       She was leaving to go to the other room to be
21   questioned and I -- after that, I have no knowledge of
22   anything, where she went or why.
23       Q       Did you she ever tell you how long she was in
24   the other room?
```

144

```
1        Q       Were you alone for a certain period of time?
2        A       Yes.
3        Q       Would Sergeant Lussky check on you
4    periodically?  I think you said that earlier.
5        A       Yes, yes.
6        Q       Do you know what time increments she would
7    come in and check on you, every 15 minutes, every half
8    hour, do you know?
9        A       No, but it was a lot longer than 15 minutes.
10       Q       Were you ever given the right to make a phone
11   call from a public phone at the Hanover Park police
12   station?
13       A       Hmm, from their phone?
14       Q       From their phone.
15       A       Yes.
16       Q       What time was that at?
17       A       I have no idea.
18       Q       Was that to call your lawyer?
19       A       Yes.
20       Q       Back or --
21       A       Yes, yes.
22       Q       Do you remember in total how many phone calls
23   you had where you spoke with a lawyer?
24       A       I -- I believe three.
```

**145**

```
1      Q    Okay.  And those three phone calls, were they
2  all made prior to the interviewing by Joseph Micci of
3  the State Police and Eric Villanueva from Hanover Park?
4      A    Yes.
5      Q    Were all three made to Attorney Paul Ankin?
6      A    Yes.
7      Q    I may have asked, and I apologize.  I think
8  you said that you do recall speaking to the attorney
9  and then right after that, signing this waiver marked
10  as Exhibit 4; correct?
11      A    Yes.
12      Q    Was that the third phone call or the second
13  when you did that?
14      A    Third, after the third.
15      Q    Okay.  You were never denied a request by the
16  members of the Hanover Park Police Department to make a
17  phone call, correct?
18      A    Correct.
19      Q    And you never -- you were never asked to --
20  strike that.
21           Were you ever -- did you ever ask any Hanover
22  Park police officer to leave and were denied that
23  request?
24      A    For me to leave or them to leave?
```

**146**

```
1      Q    No, for you to leave?
2      A    Yes.
3      Q    When was that?
4      A    There was a couple of times.  Both times
5  involved me being outside when we went out for air and
6  I -- I asked if, you know, can't I just go home and
7  come back, or go to the hospital and check on the baby,
8  and then you guys can call me when everyone gets here.
9  I'm uncomfortable.  This has been a bad day.  I just
10  want to get some rest, go home, relax and get my head
11  together.
12      Q    Did they tell you that you had to wait until
13  the Victimization Unit of the State Police arrived?
14      A    She said that I -- we were waiting for DCFS
15  and that I couldn't leave.
16      Q    Did they mention the Illinois State Police
17  was on their way?
18      A    She didn't mention that.
19      Q    Who is she?
20      A    Lussky.
21      Q    You said that you were outside a couple of
22  times.  Were these like just breaks for fresh air?
23      A    Yeah, I needed some air.
24      Q    Was this outside of the building itself?
```

**147**

```
1      A    It was in the -- in the foyer, yeah.
2      Q    When you were outside, was anybody watching
3  you?
4      A    No.  Lussky.
5      Q    All the time she was watching?
6      A    A hundred percent of the time.
7      Q    And did you have any conversations with her?
8      A    Yes.
9      Q    What did you say?
10      A    I asked her if I could leave.
11      Q    Totally leave?
12      A    Yes.
13      Q    What was her response, just what you said
14  about the --
15      A    No.  Her response was no, and I asked why,
16  and she said because well, you know, it's just their
17  we're waiting for, you know, until we get everyone in
18  the same room.  I said I can come back.  She said oh,
19  no, you better stay here.
20      Q    Do you recall Detective, Hanover Park
21  Detective Eric Villanueva being present when the
22  formal -- when questioning began?
23      A    Yes.
24      Q    Did Eric Villaneuva ever ask you any
```

**148**

```
1  questions?
2      A    Uhm, as I -- I think he interjected once or
3  twice and -- I think one time.
4      Q    We'll show you the time where it indicates
5  that he did not ask you any questions, we can go
6  through that.
7           Would that refresh your recollection or do
8  you know for a fact?
9      A    I know for a fact that he -- I -- the way
10  I -- the way I recall it is I do remember him getting
11  involved with one question, whether he asked it
12  directly to me, or I said something to him and he said
13  it to me.
14      Q    That was the extent of his involvement?
15      A    I could be wrong about that, but I do vaguely
16  remember -- I remember him like one time saying what
17  about, or something to add to it.
18      Q    But you don't know if it was directed to you
19  or to assist Sergeant, or Investigator Mucci?
20      A    I don't remember.  I remember Micci just
21  basically being the guy asking everything.
22      Q    Okay.  Do you recall Sergeant Micci telling
23  you that everything is video taped?
24      A    I don't recall that.
```

149

1    Q    We're going to show you the video of the
2 night when you were at the Hanover Park Police
3 Department with Sergeant Micci and hopefully this will
4 refresh your recollection.
5    THE WITNESS:  I'm sure it will.  We'll see it.  I
6 appreciate the assistance.
7    MR. RUSSELL HARTIGAN:  It's costly.
8                (Whereupon, a portion of the video
9                was played.)
10 BY MR. RUSSELL HARTIGAN:
11    Q    Sergeant Micci told you whether or not the
12 interview process was being video taped.  Now your
13 recollection is refreshed, and he did tell you that.
14    A    Yes.
15    Q    Do you recall being given a plastic baby and
16 demonstrating to Micci and Villaneuva how you handled
17 Joshua Schrik after he became responsive?
18    A    Yes, I do.
19    Q    Do you recall specifically how you
20 demonstrated that?
21    A    Yes, I believe so.
22    Q    In your demonstration, did you slap the
23 baby's cheek in your demonstration?
24    A    I don't remember if I did that in the

150

1 demonstration.
2    Q    Did you shake the baby where the baby's head
3 went back and forth in the demonstration?
4    A    No.  Oh, back and forth.  When you said back,
5 I'm thinking head touching back because that was an
6 issue in this.  Yes, I did shake the baby where the
7 head would be going back and forth.
8    Q    In your demonstration, did the baby's --
9    A    The plastic baby.
10    Q    Right.  Back portion of his head hit the rear
11 shoulder and back area while you were demonstrating
12 that to Villaneuva and Micci?
13    A    I don't believe so.
14    Q    Here we are.
15         For purposes of the record, we're now looking
16 at the video of the interview at 2141 and 11 seconds on
17 9/9/05 of the Hanover Park interview room with the
18 plaintiff being present along with Eric Villanueva
19 Hanover Park and Sergeant Joseph Micci, Illinois State
20 Police.
21                (Whereupon, a portion of the video
22                was played.)
23 BY MR. RUSSELL HARTIGAN:
24    Q    Now, on the video, it shows you shaking the

151

1 baby and also shows your right hand being applied to
2 the left side of the baby's face.
3    Q    Is that -- is that what you recall as far as
4 the manner in which you tried to revive the baby at
5 your home?
6    A    Uhm, in watching it like now, it seems
7 like -- it seems like I'm a little more nervous and I'm
8 a little more shaky, like in general, than I was at the
9 time.
10         When I see that baby shake, it looks like
11 more vibrations than I recall actually at the scene.  I
12 attribute it to maybe my nerves, I don't know, but that
13 looks a little rougher.
14    Q    But that truly, in the video itself, truly
15 and accurately depicts you and your demonstration to
16 the two officers?
17    A    That's correct.
18    Q    Does show the baby's head moving back and
19 forth, correct?
20    A    Back and forth, yes.
21    Q    Shows you making contact with the side of the
22 face; is that correct?
23    A    Correct.
24    Q    Do you recall making contact now with the

152

1 side of the face at your home on the day of this
2 incident, with the baby's face?
3    A    No.
4    Q    That doesn't refresh your recollection?
5    A    That refreshes my recollection that I did it
6 there, but I -- I don't remember that moment at the
7 house where I did that.
8    Q    Continuing on.
9                (Whereupon, a portion of the video
10                was played.)
11 BY MR. RUSSELL HARTIGAN:
12    Q    Hold it right there.  Do you recall shaking
13 the baby as depicted in the photograph as mentioned by
14 you at the stairs?
15    A    No, I -- what I -- what disturbs me about
16 watching this is I keep demonstrating one, one action
17 of shaking him over and over which appears to be four
18 actions of shaking him.  I don't remember, to answer
19 your question, shaking him --
20    Q    Does that refresh your recollection that you
21 may have shook the baby more than once and apparently
22 at the stairs?
23    A    No.
24                (Whereupon, a portion of the video

153

```
1                      was played.)
2        Q      Stop here.  Now, you are demonstrating to
3   Micci and Villaneuva present the head going further
4   back on this doll, is that what you recall when you
5   tried to revive the baby when you shook it?
6        A      No, I don't believe that's what I was saying
7   there.
8        Q      You don't believe that you said on the night
9   of the occurrence before the officers is accurate, is
10  that what you're saying?
11       A      No, that's not what I'm saying, what I'm
12  saying is what I was demonstrating there by saying the
13  head was further down like this was not where the head
14  was going when the baby was being shook, it's where the
15  head was positioned holding the baby stationary, the
16  baby just laying like that.  That's what I was trying
17  to demonstrate there.
18       Q      By the way, for purposes of the record, this
19  is 21 and 43 minutes and 13 seconds, is that your
20  understanding, by virtue of looking at that time?
21       A      Yes.
22       Q      You have no reason to dispute that time?
23       A      No.
24                      (Whereupon, a portion of the video
```

154

```
1                      was played.)
2        Q      Hold it right there.  You indicated to
3   Villaneuva that the baby's head to the chin portion
4   touched the chest.  I'm sorry, Micci.  Excuse me.
5               Was that usual understanding when the baby's
6   head went back and forward?
7        A      No.  I -- I -- I honestly don't recall seeing
8   the baby's chin touch the baby's front, nor do I recall
9   his head going to the back at my house.
10       Q      Does this refresh your recollection?
11       A      No, sir.
12       Q      Continue on.
13                      (Whereupon, a portion of the video
14                      was played.)
15       MR. RUSSELL HARTIGAN:   Just so we don't have to go
16  back, maybe you have some questions on this so we don't
17  have to repeat the video, is that all right?
18       MR. KISS:   Yes.
19                      EXAMINATION
20  BY MR. KOCH:
21       Q      Sure.  Mr. Aleman, Peter Koch again.  In this
22  video clip that we have just seen, I think you
23  testified that -- that you don't recall the baby's head
24  hitting the back of the baby's back, correct?
```

155

```
1        A      At my house, no.
2        Q      But that's what you told Officer Micci in the
3   interview room; correct?
4        A      Eventually, it just sort of progressed to
5   that.  I'm not even sure why I -- I don't know.  I -- I
6   honestly don't remember that happening at my house.  I
7   was just --
8        Q      That's not my question, sir.  We just watched
9   the video clip, and you told Officer Micci that when
10  you were shaking the baby, the baby's head touched the
11  back of the baby; correct?
12       MR. KISS:   Objection.  That mischaracterizes his
13  statement and his testimony.
14       MR. KOCH:   I'm asking you to tell me if that's
15  what you told Officer Micci, more or less.
16       MR. KISS:   I'll object because that question has
17  already been asked and answered by Mr. Hartigan.  His
18  testimony is clear that he said that the head of the
19  child was limp and was falling back.  That that was not
20  a consequence of him shaking the baby.
21       MR. KOCH:   Mr. Aleman, could you answer the
22  question?
23       THE WITNESS:   I don't know if I can or not.
24       MR. KOCH:   Your Counsel has raised an objection,
```

156

```
1   but you can answer.
2        MR. KISS:   You're mischaracterizing his testimony.
3   You're asking him to agree to something that was not
4   said.  That's what the question is based on.
5        MR. KOCH:   Mr. Aleman, can you answer the
6   question?
7        THE WITNESS:   I guess not.
8   BY MR. KOCH:
9        Q      You can't answer the question?
10       A      State the question again.
11       Q      Madam Court Reporter, could you read back the
12  question?
13                      (Whereupon, the record was read.)
14       THE WITNESS:   Yes, told him that.
15  BY MR. KOCH:
16       Q      You told him the back of the baby's head hit
17  the back of the baby's --
18       A      Yes, I did tell him that.
19       Q      Today you say you don't remember if that
20  happened actually in the house?
21       A      Yes, that's true, I don't remember.
22       Q      Is there a reason that your memory wouldn't
23  can be as good on November 9, '05 (sic)?
24       MR. KISS:   Objection, speculation.
```

1    MR. KOCH:   Is your memory of the incident better
2  today or at the police station?
3    MR. KISS:   Objection, speculation.
4    THE WITNESS:   I -- I don't know.  You know, I -- I
5  was having trouble recalling stuff then and I'm having
6  trouble recalling stuff now as well.  More or less, I
7  don't know.  Probably about the same.
8    MR. KOCH:   No further questions right now.  I'm
9  sorry, one second.
10                  (Whereupon, a discussion was had
11                  off the record.)
12    MR. KOCH:   Just for the record, the segment of the
13  video we have been watching ended at 214504.
14    MR. RUSSELL HARTIGAN:   Okay.  Back on the record
15  here.
16  BY MR. RUSSELL HARTIGAN:
17    Q    Sir, do you recall being advised at some
18  point in time by Sergeant Micci that you were under
19  arrest and, at that point, were you not free to leave?
20    A    I -- I remember that -- some of that, I don't
21  remember if he exactly used those words you're under
22  arrest or not.
23    Q    Well --
24    A    What I remember him saying was, at the very

1    Q    So at that point in time, at -- you got more,
2  okay.
3                  (Whereupon, a portion of the video
4                  was played.)
5  BY MR. RUSSELL HARTIGAN:
6    Q    For purposes of the record, 21-hour
7  58 minutes and 19 seconds you were advised at that
8  time, by Sergeant Micci, that you were under arrest?
9    A    Yes, sir.
10    Q    You just heard the video tape?
11    A    Correct.
12    Q    You have never reason to dispute any of the
13  video tape that we have seen so far?
14    A    No.
15    Q    Did you stay overnight, then, at the Hanover
16  Park jail?
17    A    Yes.
18    Q    Were you fed?
19    A    Yes.
20    Q    Were you checked on?
21    A    Yes.
22    Q    The following day was September 10th, '05,
23  correct?
24    A    Yes.

1  end of this interview he's like, well, he's like when I
2  was -- when he decided that we were done talking, he
3  said well now things are going to be different, you're
4  going to the cell.  He may have said, I don't recall
5  that you're arrested also, but that's -- that's how I
6  felt.
7    Q    Is that the first time, then, that you were
8  aware during that whole episode, either at your home or
9  at the station, that you were under arrest?
10          By that I mean nobody else advised you prior
11  to that time that you were under arrest, correct?
12    A    Nobody verbally said I was under arrest
13  before.
14    Q    That was at the end of the interview you
15  said, correct?
16    A    That's correct.
17    Q    Do you have an approximation as to what time
18  it might have been?
19    A    No.
20    MR. RUSSELL HARTIGAN:   For purposes of the record,
21  this is 21 hours 57 minutes and 20th second on 9/9/05.
22                  (Whereupon, a portion of the video
23                  was played.)
24  BY MR. RUSSELL HARTIGAN:

1    Q    What day of the week would that be?
2    A    Saturday.
3    Q    Were you released from the Hanover Park
4  police station jail on that Saturday?
5    A    No.
6    Q    When was it when you were released then?
7    A    Monday.
8    Q    Monday.
9    A    Well, I was taken to Rolling Meadows and
10  released from there.
11    Q    You were taken to Rolling Meadows to be
12  processed?
13    A    Yes, right, I want to be specific.
14    Q    Did you see your wife Sunday, at the jail?
15    A    I don't think so.
16    Q    Did anybody interview you at all --
17    A    Yes.
18    Q    -- between the end of interview that you just
19  seen in the video tape with Micci and Villaneuva up to
20  the point of your being transported to Rolling Meadows
21  courthouse?
22    A    Only interview I had was with an attorney of
23  mine.
24    Q    Who was that?

161

```
1     A    Falenovich (phonetic).
2     Q    Somebody new?
3     A    No.
4     Q    Was he from the same firm as Paul Ankin?
5     A    No.
6     Q    You got a new attorney?
7     A    I didn't get anybody.  They brought -- my
8  wife, they brought an attorney in.
9     Q    Your wife brought an attorney in.
10        Alexander Vesselinovich?
11    A    Yes.
12    Q    Is he from the law firm -- do you know what
13 law firm he's from?
14    A    Katten Muchin?
15    Q    Katten Muchin.
16    A    Yes.
17    Q    Did they represent you, him, and his firm?
18    A    He did, that Monday in court, and he showed
19 up when I turned myself in a few days later and then
20 withdrew from the case.
21    Q    Did he withdraw about September 17th, about
22 maybe a week later?
23    A    Sounds about right, yes.
24    Q    Did he send you a legal bill for his
```

162

```
1  services?
2     A    Yes.
3     Q    Were his services around $9,675?
4     A    Yes.
5     Q    I think we marked that.  Showing you what's
6  been marked, I think your counsel produced this
7  earlier, is Group Exhibit No. 3 for identification.  I
8  think we have copies.
9         Go to the second of the last page, please.
10 Is that the legal bill sent by Katten Muchin?
11    A    Yes.
12    Q    On the last page, is that the balance due?
13    A    Yes.
14    Q    Is that money still due?
15    A    Yes.
16    Q    Have they sent out any bill collectors or any
17 threatening letters to you they are going to sue you
18 for that payment, that particular law firm?
19    A    No.
20    Q    You have not heard from them for quite
21 sometime, isn't that a fair statement?
22    A    Yes.
23    Q    We'll go back to this a little later.
24    A    Okay.
```

163

```
1     Q    The following day, September 10th, you said
2  was a Saturday.  Do you recall telling Sergeant Micci
3  and Detective Villaneuva that you did the wrong thing,
4  you feel terrible about what happened?
5     A    Pertaining to what?
6     Q    This whole incident?
7     A    I -- I'm still foggy, uhm, I did the wrong
8  thing.
9     Q    The wrong thing in terms of your handling the
10 baby and that you feel terrible about what happened?
11    A    I don't recall.
12    MR. KISS:   I object.  Only to the lack of
13 specificity here for foundation purposes.
14 BY MR. RUSSELL HARTIGAN:
15    Q    Do you recall making any admission that the
16 manner in which you handled the baby, as far as the
17 what we'll call the alleged shaking of the baby and
18 your efforts to resuscitate the baby, was the wrong
19 thing and you felt terrible about what happened, do you
20 recall making that statement to those two officers?
21    A    I recall making a similar statement to that.
22    Q    How would it modify from what I just said?
23    A    Just a bit.  What I remember is, this may
24 have been a little different, but I remember at one
```

164

```
1  time making a statement similar to that where I said
2  that -- I said listen, if I hurt that baby when I was
3  trying to help him, I'm sorry, I said, but there was
4  something wrong with that baby before I even picked him
5  up.  I said I was only trying to help.  Maybe not
6  verbatim but that's pretty much close to what I said.
7     Q    Do you recall mentioning the word that you
8  did the wrong thing in terms of your efforts to revive
9  the baby by shaking it and/or your resuscitation of the
10 baby?
11    A    I don't remember saying that.  I wouldn't be
12 surprised if you showed it to me but I'm just being
13 honest.
14    Q    You would or wouldn't?
15    A    I wouldn't be surprised.  I trying to be
16 honest.
17    MR. RUSSELL HARTIGAN:   We're going on the video
18 again of September 10th, '05.
19        While he's doing that, I have a few other
20 questions.
21 BY MR. RUSSELL HARTIGAN:
22    Q    Aside from what you initially spoke with
23 Sergeant Lussky, and possible, possibility of Officer
24 Villaneuva maybe asking you questions, or helping Micci
```

165

1  with a question, did you ever speak to a Detective
2  Carlson at all?
3      A    The only dealing I remember ever having with
4  Carlson, and I hope I'm right, is when I -- when I
5  turned myself in for the second charge, he drove me
6  from Hanover Park to Rolling Meadows. Maybe he did it
7  the first time, too. Maybe it was the first time and
8  not the second. But all I remember of Carlson is him
9  escorting me to Rolling Meadows.
10     Q    He didn't formally interview at that time, it
11 was merely a transport, correct?
12     A    Correct.
13     Q    He didn't ask you questions, his role was to
14 bring you from one place to another place?
15     A    As far as I understood, yes.
16     Q    As far as you being there you understood it?
17     A    Yes.
18              (Whereupon, a portion the video was
19              played.)
20 BY MR. RUSSELL HARTIGAN:
21     Q    For purposes of the record, we're looking at
22 a video tape with the plaintiff, Eric Villaneuva and
23 Sergeant Micci, on 9/10/05, at 10 hours, 54 minutes,
24 correct?

167

1              (Whereupon, the portion of the
2              video was replayed.)
3  BY MR. RUSSELL HARTIGAN:
4      Q    You used the words, I didn't feel good, I
5  feel awful, it's embarrassing at 1054 and 30 second on
6  9/10/05. I'm asking you, did the contents of those
7  words mean that you were apologetic for it?
8      A    No.
9      Q    Did you have any feelings toward it, other
10 than what's expressed in the video?
11     A    Just what's obvious.
12     MR. KISS:  I object. I'm a little late here.
13 Apologizing for what specific action? Apologizing for
14 anything.
15     MR. RUSSELL HARTIGAN:  No, we talked about it
16 earlier, as far as his efforts to resuscitate and
17 shaking the baby.
18     MR. KISS:  Well, I mean it's -- it could be
19 interpreted many different ways.
20     MR. RUSSELL HARTIGAN:  He has already indicated --
21     MR. KISS:  Objection, vagueness.
22     MR. RUSSELL HARTIGAN:  He indicated that the tape
23 speaks for itself.
24     THE WITNESS:  Yes.

166

1      A    Correct.
2      Q    You don't dispute the time?
3      A    No.
4              (Whereupon, a portion of the video
5              was played.)
6  BY MR. RUSSELL HARTIGAN:
7      Q    Does that refresh your recollection as to the
8  content of the conversation that you had?
9      A    Yes.
10     Q    Where it indicates you felt shameful and
11 embarrassed?
12     A    Yes, yes.
13     Q    More or less apologetic, correct?
14     A    I don't remember apologetic.
15     Q    I thought that was the content. Do you want
16 to hear it again?
17     A    Sure.
18              (Whereupon, the portion of the
19              video was replayed.)
20     MR. RUSSELL HARTIGAN:  I don't know if you said
21 the specific word, but I'm saying the content was more
22 apologetic.
23     THE WITNESS:  Can I listen to it, please?
24     MR. RUSSELL HARTIGAN:  Yeah.

168

1      MR. KISS:  Okay.
2  BY MR. RUSSELL HARTIGAN:
3      Q    You recall the comments made in the tape?
4      A    Yes, that's correct.
5      Q    Did you ever speak to Sergeant Dossy of the
6  Hanover Park Police Department?
7      A    I -- unless you show me a picture of him,
8  I -- I don't.
9      Q    Do you know who he is?
10     A    I think I know who he is, but that's not good
11 enough.
12     Q    Who is that?
13     A    He's the guy that came in, he didn't have a
14 uniform on, he was -- he was a little heavy set, not
15 really, but he wasn't a thin guy like me. Shorter than
16 I was, he had dark hair.
17     Q    You said came in, where did he come in?
18     A    I vaguely remember it was in the back door
19 there. I remember him poking in a couple of times. I
20 don't know what he asked, but not much dialogue.
21     Q    Do you have any conversations with him?
22     A    I know he spoke to me. I have no idea -- I
23 don't remember one word of it.
24     Q    Do you know who was present when he spoke to

169

1  you?
2       A    My wife, I think, was with me at the time.
3       Q    Do you know any content of what was said?
4       A    No.
5       Q    As far as Carlson goes, going back to him,
6  you didn't have any conversations with him you said
7  earlier as far as your escort between one courthouse to
8  another courthouse, correct?
9       A    Hmm, that's correct.
10      Q    Do you know what manner Sergeant Dossy or
11 Eric Carlson participated in any wrongful conduct here.
12      A    I'm sorry.  Could you repeat it?
13      Q    Did you know in what manner Sergeant Dossy
14 and Investigator Carlson participated in any alleged
15 wrongful conduct claim that you're making as far as
16 this complaint at law is concerned?
17      A    Only my opinion.
18      Q    I'm asking you specifically, as far as the
19 facts of this case, not what you're surmising or
20 conjecting.  Do you know what their involvement is
21 other than Carlson driving you and Dossy looking in on
22 you and having a brief conversation, is that the
23 involvement that you know?
24      A    That's the involvement I had, yes.

170

1       Q    As far as Eric Villaneuva is concerned is his
2  only involvement with you the time that he spent with
3  Sergeant Micci in the investigation and questioning by
4  Sergeant Micci of you in the interview room?
5       A    Yes.
6       Q    You never had any other contact before or
7  after with Villaneuva?
8       A    No.
9       Q    And I think you said that you were
10 interviewed or you had some interview between Saturday
11 and Monday?
12      A    With the attorney.
13      Q    Just your attorney?
14      A    That's right.
15      Q    But no Hanover Park --
16      A    Yes.
17      Q    -- or Illinois State Police officer?
18      A    Yes, Saturday morning, first thing in the
19 morning, they came at it again.
20      Q    That was just the video that we spoke about?
21      A    I didn't know what the segregation was in it,
22 but Saturday was a real brief.
23      Q    Yeah, that was the 9/10/05 video that you
24 just saw where we were trying to determine if you

171

1  apologized or not?
2       A    Thank you.  That's all I recall.
3       Q    On that same date, 9/10, which is the day
4  after, that Saturday, do you know or remember saying
5  that you want to speak to your attorney and when that
6  was mentioned the interview ended with Villanueva and
7  Micci?
8       A    I do remember I asked to speak to my
9  attorney.  I don't recall if that's what prompted the
10 end of the video.
11      MR. RUSSELL HARTIGAN:   Play it again, Sam.
12           Again, we're on the record looking at a
13 video, Hanover Park police station, we have the
14 plaintiff, Eric Villaneuva and Sergeant Micci in an
15 interview room, correct?  We'll you will see in a
16 minute.  Is that your understanding?
17      THE WITNESS:  That's correct.
18      MR. RUSSELL HARTIGAN:   For the purpose of the
19 record, the hour is 11 minutes 10 seconds 51, 9/10/05,
20 Hanover Park interview room.
21                (Whereupon, a portion of the video
22                 was played.)
23 BY MR. RUSSELL HARTIGAN:
24      Q    Well, after seeing that, there was a mention

172

1  of an attorney.  Do you remember that after you
2  mentioned an attorney, the interview process ended?
3       A    Very shortly after that, yes.
4       Q    Monday, September 12th, you were in the
5  Rolling Meadows courthouse where criminal charges were
6  brought against you and they were formally announced
7  at that time, correct?
8       A    Yes.
9       Q    What was the -- was it aggravated battery, is
10 that your understanding?
11      A    Yes.
12      Q    To a child?
13      A    Yes.
14      Q    Is that the only charge at that time?
15      A    Yes, yes.
16      Q    Did you go before the Honorable Judge
17 Fecarotta?
18      A    No.
19      Q    I'm sorry, Judge Tobin?
20      A    Yes.
21      Q    And did Judge Tobin find probable cause, at
22 least, in the hearing to detain you further?
23      A    Yes.
24      Q    And do you know what that consisted of?  Was

173

```
1    there testimony by anybody on that probable cause?
2        A    I don't know what it consist of, no, I don't.
3    I don't know.
4        Q    Did you have a lawyer present at the time?
5        A    Yes.
6        Q    Was that Mr. Vesselinovich?
7        A    Yes.
8        Q    Did you enter a plea at that time?
9        A    Uhm, I -- I don't remember.
10       Q    Okay.  Bond was set at $250,000, correct?
11       A    Yes.
12       Q    You posted 10 percent?
13       A    Correct.
14       Q    And that being what, $25,000, right?
15       A    Yes.
16       Q    Of the $25,000, how much was yours and how
17   much was other people who may have helped you?
18       A    Uhm, maybe, maybe a thousand or so was mine,
19   maybe none.  I wasn't the one delegating it.
20       Q    Your wife coordinating that?
21       A    Yeah.  But it was -- 90 some odd percent was
22   from other people.
23       Q    Who are the other people?
24       A    Beata and Adam Mahalik.
```

175

```
1        Q    What is her last name?
2        A    Mahalik.
3        Q    How about Gutman?
4        A    I'm not sure how I paid him.
5        Q    How about Mike and Laurie Gregory?
6        A    They are friends from the past of mine who
7    came forward and helped me out and I haven't paid them
8    any of that money.
9        Q    They gave you 5,000?
10       A    That's right.
11       Q    And were do they live, by the way?
12       A    They live in Park -- no, not Park Ridge, I'm
13   going to say it must be Schaumburg right there.
14       Q    Are they friends of yours?
15       A    Mike's an ex-co-worker of mine from years
16   ago.  I was shocked when he came to the jail, I didn't
17   see him for so long.
18       Q    Are they friends of yours to answer my
19   question?
20       A    Yes.
21       Q    With regards to Mahaliks, would you consider
22   them friends?
23       A    No.
24       Q    How about the Gutmans?
```

174

```
1        Q    How much did they contribute?
2        A    Towards that 25, I'm going to take a stab,
3    around 17,000, 16, 18, somewhere in there.
4        Q    Anybody else?  Gutman?
5        A    I bet -- no, I'm not going to bet but -- I --
6    I don't recall, but I would imagine it would have had
7    to have been Gutman because nobody else was really
8    involved at that time.
9        Q    Have Mahalik and Gutman asked you for the
10   money?
11       A    Yes.
12       Q    You have correspondence from them in that
13   regard?
14       A    Yes.
15       Q    And have you paid any payments to them?
16       A    Yes.
17       Q    And did you do it by check?
18       A    No.
19       Q    Cash.
20       A    Uhm, I think it was all cash.  I may have --
21   I would have to get back -- Gutman I don't remember.
22   It was a large amount of money.  I don't remember
23   handing that money, cash, over to him.  Beatta -- No, I
24   wrote her a check.
```

176

```
1        A    Yes.
2        Q    And have you paid back any of the money to
3    either Gutman or, you said that you did, I'm sorry, but
4    I didn't know how much?
5        A    Neither do I.  I paid Gutman, maybe, roughly
6    like $12,000 of his money.
7        Q    And that was cash?
8        A    I don't remember.
9        Q    At this point in time, though, we're asking
10   you to produce, through your Counsel, any checks,
11   receipts, money orders, anything to reflect any payment
12   of any attorney's fees for any attorney that you have
13   hired in this matter, is that okay?
14       MR. KISS:  Sure, certainly.
15   BY MR. RUSSELL HARTIGAN:
16       Q    When did you become aware that Joshua Schrik
17   had died?
18       A    I received a call phone call from Michael
19   Booker, I think you -- I think he said the 17th was the
20   day, the second time I was arrested, if I remember
21   correct, so it would have been on the 16th, but it was
22   on the day before.  The night before I turned myself in
23   at 9:00 a.m. I received a phone call from Michael
24   Booker that said that the baby had passed away and he
```

177

```
1    said things are going to change for you.
2        Q    Who is Michael Booker, for the purposes of
3    the record?
4        A    Michael Booker is an investigator from DCFS.
5        Q    He said everything is going to change?
6        A    Yeah.
7        Q    Do you know if he had any input in terms of
8    upping the charge to murder?
9        A    I have no idea.
10       Q    You said that you were made aware that the
11   charge had gone from what, aggravated battery to a
12   child to murder on or about September 17th?
13       A    I believe the 16th, yeah, on or about.
14       Q    And with respect to that, you -- you
15   voluntarily turned yourself in, correct?
16       A    Correct.
17       Q    Because you had been bonded out that Monday
18   in Rolling Meadows, right?
19       A    That's right.
20       Q    By the way, how did you feel when you heard
21   that Joshua Schrik had died?
22       A    Sad and scared.  I don't know how to answer
23   your question.
24       Q    I didn't hear you.
```

179

```
1        Q    Where is his office located, if you know?
2        A    It's near Wheaton, I'm not sure what town.
3        Q    Detective Carlson took you from the Hanover
4    Park Police Department then, after you voluntarily
5    turned yourself in, to the Rolling Meadows courthouse
6    again?
7        A    I turned myself in to the Hanover Park police
8    station at 9:00 a.m. and then he transported, yes.
9        Q    Sure.  Did you go before the Honorable Judge
10   Fecarotta?
11       A    Yes.
12       Q    And did he make a record as far as his
13   finding of probable cause at that time with your
14   attorney present?  Ask you questions regarding if you
15   understand receipt of the charges?
16       A    I don't have that tape.  I really don't
17   recollect.
18       Q    Do you remember being in court?
19       A    Yeah, I remember standing there.
20       Q    Do you remember the judge asking you
21   questions or your lawyer?
22       A    I -- no, I don't.  You know what I remember,
23   I remember him saying $1.5 million and I remember the
24   State's Attorney mentioning the death penalty.  Beyond
```

178

```
1        A    No, I was going to do one of my run-ons but
2    okay.
3        Q    Sad for the family, obviously?
4        A    Well, sad for the boy is what I remember.
5        Q    Did you have any conversations with his
6    mother at any point in time after September 9th, '05?
7        A    Uhm, the only verbiage that went back and
8    forth was she would continually heckle me at court, but
9    that's the only -- the only words that went back and
10   forth between us two.
11       Q    Did she ever send you any letters or
12   anything?
13       A    No.
14       Q    You had no phone calls with her after this
15   incident of September 9th?
16       A    No.  No, sir.
17       Q    When you found out that the charges were
18   being brought and upgraded to first degree murder, who
19   represented you for that?
20       A    Edward Edens, initially.
21       Q    How do you spell the last names?
22       A    E-D- I don't know if it's A-N or E-N-S.
23       Q    You said Edward Edens?
24       A    Yes.
```

180

```
1    that, I don't remember too much else.
2        Q    You remember the judge saying what?
3        A    $1.5 million bond.  I remember the word death
4    penalty coming up, and that was probably -- that's
5    really all that sticks out.
6        Q    Did your lawyer accept and understand the
7    receipt of the new charges for the record?
8        MR. KISS:  I'm sure they did.
9    BY MR. RUSSELL HARTIGAN:
10       Q    Did you enter a plea at that time?
11       A    Yes, I guess.
12       Q    Do you know who the State's Attorney was at
13   that time, any name?
14       A    (Shaking head.)  No.
15       Q    Why did you change attorneys?
16       A    Which time?
17       Q    Well, you went from the Katten Muchin firm
18   over to Edward Edens?
19       A    Per their request.
20       Q    Per who?
21       A    Per their request.  They didn't want to take
22   the case.
23       Q    Why was that?
24       A    Because it --
```

181

1    MR. KISS:   You know, I'm going to object only
2  because I don't know if this would venture into
3  attorney/client privilege, but it might.
4    MR. RUSSELL HARTIGAN:   I'm not asking specific
5  conversations, I'm not going to go any further, I just
6  want to know why, was it non-payment or --
7    THE WITNESS:   No.
8  BY MR. RUSSELL HARTIGAN:
9    Q    Or a conflict or what?
10   A    They -- they -- the case wasn't -- the case
11 didn't appeal -- they nature of the case wasn't
12 appealing to them, for their firm.
13   Q    Is Edward Edens a criminal lawyer, to your
14 understanding?
15   A    Yes.
16   Q    Were you satisfied with his representation?
17   A    No.
18   Q    Were you unable to post 10 percent of the
19 $1.5 million bond?  Were you unable?
20   A    Unable?
21   Q    To post bond?
22   A    That day or at all?
23   Q    At any time?
24   A    No, I was able to.

182

1    Q    When were you able to?
2    A    I believe it was October 14th of '05.
3    Q    I believe it's October 15th, does that sound
4  better?
5    A    Sounds different.  You're looking at it, so
6  it sounds better to me.
7    Q    What did you do between September 15th, '05
8  and October 15th, '05?  Did you continue working?
9    A    Could you say those dates again, please?
10   Q    September 15th, '05 is when you turned
11 yourself in to the Hanover Park Police Department, am I
12 correct?
13   A    Yes.
14   Q    October 15th, '05, were you in jail during
15 that time period?
16   A    That whole time I was in jail.
17   Q    That's what I'm getting to.
18        At Cook County, correct?
19   A    Yes, sir.
20   Q    Did you ever see any doctor at Cook County,
21 for any reasons?
22   A    Uhm, yeah.  They -- they have you see a
23 doctor.  To answer your question, when I was initially
24 taken in that first night, they put me in, I guess it's

183

1  across the street, you go underground and there is a
2  hospital.  There is, I guess it's when they think you
3  may be unstable, whatever, and they maybe want to
4  observe you from that point on.  Maybe two, three days
5  later, I went to the actual jail.
6    Q    Did they -- did they give you any medication
7  while in jail from the doctor you had seen?
8    A    They sure tried to, but no.
9    Q    Did you relate to them any difficulty you may
10 have had as far as anxiety, depression, anything of
11 that nature?
12   A    No, no.
13   Q    How did you come up with the money for this
14 new bond, sir?
15   A    Substantial amount.  That's when I sold my
16 house.
17   Q    How much of that money went towards the bond
18 from your house?
19   A    Bear with me because I was in jail, and I --
20 these are approximate, but I'm sure they are really
21 close.  I think there was about $60,000 that came out
22 of the house.
23   Q    Does that refresh your recollection as to
24 what your gain was as far as what your check was when

184

1  you sold the house, what the net was?
2        In other words, when you walked away from the
3  title company, I know you're in jail but your wife.
4    A    I understand.  The gain, yeah, it's a gain of
5  sorts, yes.
6    Q    Do you know how much -- how much you walked
7  away with, or your wife did, at the closing?
8    A    I don't know what the exact check was, no.
9    Q    Was it six figures anything?
10   A    About 60 grand.  I could be wrong, but that's
11 what I recall.
12   Q    As far as the dates being spent in custody at
13 the Hanover Park Police Department, what three days,
14 total?
15   A    Friday, Saturday, Sunday, yeah.
16   Q    That's the extent of custody at Hanover Park?
17   A    Besides the second time I turned myself in in
18 the morning, but that was just for a matter of hours.
19   Q    Hours, right?
20   A    Yes.
21   Q    Throughout this whole process, from the time
22 that you got to the Hanover Park Police Department and
23 through the first and second new charges brought
24 against you, you were consulting various attorneys at

185

```
1    various times, correct?
2         A    From incarceration?
3         Q    Yes.
4         A    Various attorneys?  I wouldn't say various.
5         Q    You were consulting attorneys, how's that?
6         A    Yes.  Can I just say something real quick?
7         MR. KISS:  No, wait.
8         THE WITNESS:  No, no, no, this is something nice.
9    I just don't -- I don't try to be difficult.  I'm
10   honestly just trying to be specific and respect the
11   question as it's asked and be respectful in return and
12   give an accurate answer and that's the only thing --
13        MR. KISS:  Listen.  Just listen.  Sometimes you
14   get excited, you get ahead of yourself.  He's asking
15   you a lot of questions.  There is a lot left.  I know I
16   sound like a broken record, but listen to his questions
17   and answer the question.
18        THE WITNESS:  Right.  I don't have any problem
19   with it.
20        MR. KISS:  He's not fighting with you.
21        THE WITNESS:  No, no, no.  I understand.
22        MR. KISS:  All right.
23   BY MR. RUSSELL HARTIGAN:
24        Q    Now, you mentioned that the one attorney
```

186

```
1    bill, I'm going to ask you about your attorneys' fees
2    here.
3         A    Yes.
4         Q    They represented you, Katten Muchin sent a
5    bill of $9,675, that's been paid and they have not
6    sought you out as far as collection is concerned; is
7    that a fair statement?  Is that a fair statement they
8    haven't -- I think you said earlier --
9         A    It hasn't been paid and they have not
10   contacted me in a long time.  That's a fair statement.
11        Q    As far as you know, that has been forgiven?
12        MR. KISS:  Objection, speculation.
13        THE WITNESS:  No, no, certainly not.
14   BY MR. RUSSELL HARTIGAN:
15        Q    Has anybody contacted you in the last
16   two years regarding this bill?
17        A    Yes, I get a bill periodically.  Though I
18   haven't gotten one in a while.  Probably short of a
19   year.
20        Q    You haven't heard from them in a year?
21        A    Well, roughly, yeah.
22        Q    Okay.  Don't you think if they are serious
23   about collecting it, they would be more on it in terms
24   of efforts to pursue it?
```

187

```
1         MR. KISS:  Objection, knowledge, speculation.
2         THE WITNESS:  Yeah.
3    BY MR. RUSSELL HARTIGAN:
4         Q    Mr. Edens also represented you said.
5         A    That's correct.
6         Q    How much was his bill?
7         A    If it's not in there, I think it was about
8    five grand.
9         Q    Have you made any payment on that?
10        A    No.
11        Q    Has he sought any collection against you?
12        A    No.  No.
13        Q    Who is Dr. Stone?
14        A    I believe he's one of the medical experts
15   that we were going to bring to court.
16        Q    Okay.  He's an expert that you have on your
17   case here?
18        A    On?
19        Q    On this pending case?
20        A    I guess so, yes.
21        Q    Have you met with Dr. Stone?
22        A    No.
23        Q    Do you know what he is?  Is he a
24   psychiatrist, psychologist, socialist --social worker,
```

188

```
1    Maybe he's a socialist, too.
2         A    No, I don't know.  I don't know what his
3    title is.
4         Q    Okay.  I'm going to show you, rather than
5    play 20 games here, what's been marked as Exhibit 3 for
6    identification.  Look at the second page of that
7    exhibit, and this is provided by your attorney.
8              It says Aleman Costs, 12/1/05 through
9    12/27/07, are you with me?
10        A    Aleman costs.
11        MR. KISS:  Up there.
12        THE WITNESS:  Yes.
13   BY MR. RUSSELL HARTIGAN:
14        Q    It says 5/10/06, Debra Grant.  Who is Debra
15   Grant?
16        A    I don't know.
17        Q    The next one is Dr. Reyes, $750 it looks
18   like.  Who is Dr. Reyes?
19        A    He's one of the doctors who -- I think he was
20   the -- the emergency room physician when the boy was
21   brought to the hospital.
22        Q    I'm sorry, is the emergency room physician
23   that what, I'm sorry?
24        A    When Joshua was brought in the hospital
```

189

1  initially, I believe he was the physician on duty.
2      Q    Are you charged that cost for that?
3      A    No, I believe that's the -- what he charged,
4  what he charged Barry, my lawyer, for his time to talk
5  to him.
6      Q    Okay.  Were you present during that?
7      A    No.
8      Q    Record Copy, we know what that is.
9          Stuart Bressler, do you know who that is?
10     A    Yes.  He's someone that worked with Barry,
11 another attorney that was helping him.
12     Q    Do you know what the $780 cost is?
13     A    I don't.
14     Q    Federal Express.  Equity Investigation, do
15 you know who that is?
16     A    Yes.
17     Q    What is that?
18     A    Those are two gentleman that we hired,
19 private investigators, to help us with our case.
20     Q    Do you know if they prepared any statements
21 at all?
22     A    I don't.
23     Q    Have you ever looked at anything that they
24 have produced by way of investigation?

190

1      A    No.
2      Q    Any -- any photographs, any, any tapes,
3  anything?
4      A    No.  No, Barry dealt with them.
5      Q    Going back to his Dr. Stone, you said that
6  you didn't meet with Dr. Stone, right?
7      A    No.
8      Q    But he's a potential expert in your case?
9      A    Yes.  I think he's from Cook County Hospital.
10     Q    Dr. James Stone, do you know who that is?
11     A    Isn't that who we just talked about.
12     Q    Sorry.
13     A    Barnes.
14     Q    Michael Booker is with DCFS?
15     A    That's correct.
16     Q    Chase Card Service, what's that?  Do you know
17 what that was for?
18     A    Probably when we ran her records for taking
19 all the money from the trust fund.
20     Q    From the what?
21     A    She ran an illegal fund raiser to raise money
22 for the child's medical expenses and funeral costs and
23 then she spent all the money on herself.  We subpoenaed
24 the records and they were from Chase.

191

1      Q    You were -- you were -- well, strike that.
2  There was a civil case filed against you, correct?
3      A    That's right.
4      Q    For money damages?
5      A    That's right.
6      Q    Brought on her behalf?
7      A    Yes.
8      Q    On behalf of the deceased child?
9      A    Yes.  Yes, sir.
10     Q    Who represented you in that case?  Did you
11 have insurance?
12     A    My insurance company's lawyer, I'm trying to
13 think of his name.
14     Q    Was that homeowner's insurance?
15     A    Yes.
16     Q    Chilton Lambert?
17     A    Yes.
18     Q    Was that case thrown out?
19     A    Yes.
20     Q    Okay.  Did you have -- did you give a
21 deposition in that case?
22     A    No.
23     Q    Did you answer interrogatories like you did
24 here?

192

1      A    No.
2      Q    Sorry.  Did anybody give a deposition to your
3  knowledge?
4      A    No.
5      Q    In the case?
6      A    To my knowledge, no.
7      Q    Do you know if any of these charges that I'm
8  looking at on Page 2 of Exhibit 3 have anything
9  relating to the civil case?
10     A    No.
11     Q    Doctor -- excuse me, Dr. Patrick Barnes, what
12 is his involvement?
13     A    He was, again, he was an expert who was going
14 to come testify for us.
15     Q    Excuse me?
16     A    An expert that was going to come testify.
17     Q    Are you talking about this pending case or
18 the civil case?
19     A    The criminal case.
20     Q    The criminal case?
21     A    Yes, sir.
22     Q    Any other law firm that you have not
23 mentioned that you have -- I mentioned the two lawyers,
24 was there a third lawyer involved?

193

1    A    Let's see. Who did we cover. There was
2  Scott Sherwin.
3    Q    Why did you switch from Edens to Sherwin?
4  You said earlier you weren't happy with Edens'
5  services?
6    A    Yeah. I -- I just used Edens at that moment
7  because I had gotten a call from -- from Vesselinovich,
8  and he informed me they didn't want to proceed with the
9  case, so I needed to grab somebody quick, and he was
10 somebody I had known and I used him briefly. I didn't
11 feel even when I used him then, I knew he wasn't going
12 to be the lawyer I kept, but I needed a lawyer in a
13 pinch, and then I started to look for lawyer after I
14 got locked up. Then that's how I ended up with
15 Sherwin.
16   Q    Had you used any of these lawyers on your
17 past criminal history?
18   A    I used Edward Edens before.
19   Q    How much did Sherwin charge you?
20   A    I don't -- I don't recall. I don't have it.
21   Q    Over 5,000 or?
22   A    Yeah, over 5,000.
23   Q    Has that bill been paid?
24   A    Yes.

194

1    Q    Do you know the amount of it?
2    A    No, I don't.
3    Q    Do you know who paid it?
4    A    Uhm, yeah, I did.
5    Q    Do you have receipts that would reflect
6  payment?
7    A    I'm -- I can obtain them.
8    Q    Do you have them? Was it cash?
9    A    No, I can get a receipt.
10   Q    Can you produce them if you have them?
11   MR. KISS:  If we have them, we will collect them.
12 BY MR. RUSSELL HARTIGAN:
13   Q    After September 9th, '05, did you continue to
14 operate as a child care center?
15   A    No.
16   Q    Did DCFS ever take any action to revoke
17 whatever initial application that was placed before
18 them by you, take any measures in that regard?
19   A    No. If I may?
20   Q    Go ahead.
21   A    What I received from them was very shortly
22 after I was bonded out the first time, like maybe
23 two days later there was a finding of, an indicated
24 finding of guilty, you know, with regards to the

195

1  situation at my house?
2    Q    By DCFS?
3    A    Yeah, which has since been overturned.
4    Q    You said earlier you were operating an
5  illegal day care center admittedly, correct?
6    A    Yes, sir.
7    MR. KISS:  Objection. He never --
8    MR. RUSSELL HARTIGAN:  That he thinks he did.
9    MR. KISS:  Well, did you use the word illegal?
10   MR. RUSSELL HARTIGAN:  Unregulated, how's that?
11 Unlicensed.
12   THE WITNESS:  It's too late now, ain't it?
13   MR. RUSSELL HARTIGAN:  Would you agree with that?
14   THE WITNESS:  Sure.
15 BY MR. RUSSELL HARTIGAN:
16   Q    To simplify matters on your tax returns, and
17 I know that the Attorney General here wants to ask you
18 some questions, and they are entitled to do so, so I'm
19 going to ask you if you disagree, let me know. With
20 reference to your income, are you making a lost time
21 claim here of some sort?
22   MR. KISS:  Lost wages?
23   MR. RUSSELL HARTIGAN:  Of any sort here. Because
24 I mean if you're not, I can -- I can move to -- to

196

1  other things.
2    MR. KISS:  No, Counsel.
3    MR. RUSSELL HARTIGAN:  No lost wages. That
4  obviates a lot of questions of some sort, but I'm
5  sure -- there is no lost time, there is no claim for
6  lost earnings.
7    You did reflect it and it was confusing in
8  the interrogatories.
9    MR. KISS:  We did list that in the answers, yes.
10   MR. RUSSELL HARTIGAN:  Right. Okay.
11 BY MR. RUSSELL HARTIGAN:
12   Q    So at this point in time, based upon the
13 representation, I'm not going to get into any detail
14 accounting of your income tax records based on the fact
15 that you're not making a lost time claim here in this
16 lawsuit, is that your understanding, sir? Mr. Aleman?
17   A    Yes.
18   Q    We finally agree on something.
19   A    Arguably.
20   Q    You said that you're unemployed currently,
21 sir?
22   A    That's right.
23   Q    Do you do any kind of side jobs where you're
24 making cash and, you know, people do it nowadays?

197

```
1        A    No.
2        Q    How do you go about your day?  How do you
3   manage your day?
4        A    I just tend to the kids and that's kind of
5   it.
6        Q    Has your wife been, without embarrassing
7   anyone here, has your wife been the primary wage
8   earner, for the most, part in your life?
9        A    It doesn't embarrass me, yeah.
10       Q    You said earlier you haven't sought out
11  employment by way of taking out any applications for
12  any jobs?
13       A    Not -- I don't believe that's what I said, I
14  said I didn't have any out now, currently.  No, I have.
15  I don't have any out currently.
16       Q    What are you trying to get into, what field?
17       A    I'm a printer, that's all I do.
18       Q    Has that kind of gone south because of
19  computers and everything else, printing?
20       A    The business has taken a huge plunge, yeah,
21  everything is on the internet now.
22       Q    Have you ever sought out any treatment to
23  address any emotion distress that you're claiming as a
24  result of this incident with Joshua Schrik?
```

198

```
1        A    Very little, but yes, very little.  I try to
2   calm my nerves.  I get very excited.
3        Q    You mentioned somebody earlier that has you
4   on Prozac?
5        A    Yes.
6        Q    Dr. McNett?
7        A    Hmm-hmm.
8        Q    Who recommended you to Dr. McNett?
9        A    Nobody.
10       Q    How did you find him?
11       A    I just -- he's close to my house and I just
12  looked in the Yellow Pages for a doctor.
13       Q    Have you gone to your family doctor for any
14  treatment at all?
15       A    No.
16       Q    Have you ever discussed this situation with
17  Dr. Hasson, that would be Joshua's pediatrician at all?
18       A    I have never met the man.
19       Q    Have you ever discussed this case with any
20  doctor at all that was part of the treatment given to
21  Joshua?
22       A    I have not.
23       Q    Have your attorneys, to your knowledge?
24       A    To my knowledge, yes.
```

199

```
1        Q    Okay.  I might have asked you, and I
2   apologize, when is the last job you have had where
3   you're making full-time earnings, so to speak?
4        A    Irving Press.
5        Q    What year was that?
6        A    Last year, '07.
7        Q    Have I covered the primarily the expenses,
8   which are apparently the attorneys' fees and maybe the
9   treatment by Dr. McNett as far as all the -- all
10  expenses that you're attributing to this lawsuit?
11       A    I believe so, yes.
12       Q    Is there anything that I omitted?  I'll take
13  the hit for that if I omitted something.  Did I omit
14  anything?
15       A    I -- I don't think so.
16       Q    Okay.  How much does Dr. McNett charge you
17  nor a visit?
18       A    It's nominal, a $100 a visit.
19       Q    How much?
20       A    $100.
21       Q    How do you pay him?
22       A    I pay him cash.
23       Q    Cash?
24       A    Cash or check.
```

200

```
1        Q    Again, we would ask for copies of those
2   checks if there are checks available?
3        MR. KISS:    All right.
4   BY MR. RUSSELL HARTIGAN:
5        Q    When is your next appointment with Dr. McNett
6   or is it as needed?
7        A    I should see him in about two, three weeks,
8   but I don't have an appointment pending now.  I'm
9   actually right about at the time to call and schedule.
10  I was there about a week ago.
11       Q    How are you doing overall, physically,
12  emotionally okay?
13       A    No.
14       Q    What's wrong?
15       A    Basically everything.  What's wrong?  I guess
16  the first thing that comes to my mind is my stomach,
17  you know, my insides.  When this happened, I -- I got
18  very ill inside, very, very unsettled, very sick.  It
19  hasn't gone away.
20            I wake up every morning, about an hour before
21  I actually wake up, my body seems to wake up and it
22  starts churning.  It's turning, my stomach, it's
23  cramping. I mean if you want to know all the symptoms,
24  I have bleeding, a lot of bleeding, going into the
```

201

```
1   stool.  I -- I get -- I get depressed a lot.  I get
2   sad.  There are certain things that people think there
3   is nothing the matter with me.  Maybe something good
4   happens and I get sad.  My boy might say something
5   really nice like, Daddy, you're the best dad in the
6   world, and it's just like a wrecking ball, it brings
7   everything back.
8       Q    And did you have any of these conditions
9   before this incident?
10      A    No.
11      Q    And I think you said earlier that you didn't
12  tell Dr. McNett that this was your condition, whatever
13  it is currently, was a, in any way, attributable to
14  this incident that we're here on today; is that
15  correct?
16      A    That's correct.
17      Q    Did I interrupt you?  Did you describe your
18  condition now?
19      A    Somewhat, yes.
20      Q    Physically, are you fine?
21      A    Uhm, no.  I -- like I said.
22      Q    Your stomach, what do you take for that?
23      A    Nothing.  I -- I have lost almost 50 pounds
24  since I got out of jail.  I used to weigh --
```

202

```
1       Q    Tell me how you do that.
2       A    Because I don't eat.  Because everything, it
3   all goes back to the stomach.  When I eat, unless it's
4   just oatmeal or chicken breast or green beans, if it's
5   something, it's just stable like that, fine.  If it's
6   anything else, I get sick.  I have very bad stomach
7   problems.
8       Q    As far as the State's Attorney, it's your
9   understanding that the State's Attorney, you have some
10  knowledge of being in court, the State's Attorney
11  approves charges as far as when they are brought
12  against an individual, is that your laymen's
13  understanding?
14      A    Yes.
15      Q    And do you have any understanding as to why
16  the State's Attorney's Office dropped the charges of
17  murder that was leveled against you?
18      A    Based on laymen's?
19      Q    Whatever your understanding is?
20      A    They knew they couldn't win the case.  I
21  don't think they wanted to -- I don't think they wanted
22  -- everything I know, everybody else to know.  That's
23  my opinion.
24      Q    What did you know, I'm sorry?
```

203

```
1       A    Well, just details of the case.  Certain
2   things that I believe were -- were not done by
3   procedure, were done intentional to, you know, to keep
4   this thing pinned on me when it was becoming more and
5   more clear every moment that -- that at least somebody
6   else should have been looked at.  At the very least.  I
7   mean, I just want to come out that it wasn't me.  I'm
8   not going to give them that much because I know they
9   never come out, you know --
10      Q    Do you place any blame on the mother here?
11      A    I --
12      MR. KISS:  Objection, speculation.  All of this,
13  this questioning is speculation.
14      MR. RUSSELL HARTIGAN:  I'm asking -- okay.  I was
15  asking about the criminal charges and he's talking
16  about there is other pieces to the pie, apparently, in
17  his understanding.  I'm just asking what his
18  understanding is as far as those other pieces.
19      MR. KISS:  He's guessing why the State's Attorney
20  dropped the case.  I think we all know that if anyone
21  lies, anything like that.
22  BY MR. RUSSELL HARTIGAN:
23      Q    Do you believe that Josh's mother bears any
24  responsibility here for this incident?
```

204

```
1       MR. KISS:  Objection.  This doesn't lead to any
2   discoverable evidence.  It's totally irrelevant and it
3   serves no purpose.
4       MR. RUSSELL HARTIGAN:  If you know.
5       MR. KISS:  If he knows?
6       MR. RUSSELL HARTIGAN:  If you have an opinion.
7   I'm asking a question.
8       THE WITNESS:  Excuse me guys.  I don't know what
9   the right or wrong thing to do is all the time here,
10  you know.
11  BY MR. RUSSELL HARTIGAN:
12      Q    I know, but you have made an objection, it's
13  noted for the record.  You can answer if you have an
14  opinion.
15      MR. KISS:  If you have an opinion, it's okay.
16      THE WITNESS:  I -- I am of the opinion there is a
17  very strong possibility that she may have something to
18  do with it.  I have the opinion that there is a very
19  strong possibility that she had something to do with
20  the death of the baby.
21  BY MR. RUSSELL HARTIGAN:
22      Q    Are you saying that there was some neglect on
23  her part?
24      A    I'm just saying what I'm saying.
```

205

1    Q    Is that as far as you want to take it?

2    A    It's all out there.

3    MR. KISS:  That's as far as I'll let him take it.

4    THE WITNESS:  It's all out there.

5    MR. KISS:  That's it.  You answered the question.

6    That's good.

7    MR. RUSSELL HARTIGAN:  It's 3:15.  I know we

8    started at what, 10:35, we had a break, so I'm going to

9    pass it.  I may have a few more questions, but I'll

10   pass it over to the State Police because I want to be

11   mindful of their time.

12   MS. KEANE:  Thank you.

13                    EXAMINATION

14   BY MR. KOCH:

15   Q    Mr. Aleman, as I previously introduced

16   myself, my name is Peter Koch and I'm an Assistant

17   Attorney General and I'm being assisted by Alice Keane,

18   also an Assistant Attorney General.  I have some

19   questions for you.

20        Mr. Aleman, you brought a lawsuit against

21   among other defendants, an Illinois State Police

22   Officer named Steve Cardona, are you aware of that?

23   A    Yes.

24   Q    You have to take your hand away from your

206

1    mouth when you answer questions.

2    A    Yes, yes.

3    MR. KISS:  Please don't direct commands like that.

4    MR. KOCH:  You understand what you need to do to

5    be heard by the court reporter.

6    THE WITNESS:  I do.  It's an unconscious thought.

7    BY MR. KOCH:

8    Q    Have you ever met Officer Cardona?

9    A    I -- you have to show me a picture of him.

10   There was a lot of officers in and out of that room

11   that day.

12   Q    You don't have any independent recollection

13   of who he is, correct?

14   A    No.

15   Q    Why did you sue Mr., Officer Cardona?

16   A    Because he's in the reports that I read and

17   just like everyone else is in them, everything that

18   happened in their investigation I believe, especially what didn't

19   happen in their investigation I believe, especially what didn't

20   happen, was intentional.

21        I don't know exactly who said what or did

22   what, or didn't do what or -- so it's a group, it's --

23   it's -- I don't know.  You know, they are all parties

24   who were part of this.  I don't know exactly to what

207

1    degree, but I just -- it's just all grouped together, I

2    guess you could say.

3    Q    Are you saying that Officer Cardona acted

4    wrongfully towards you?

5    A    Not directly to me, I am not sure what

6    happened.  I'm not sure who told the Medical Examiner

7    this, who told the Grand Jury this, when it wasn't

8    true.  I wasn't there.  I don't know exactly which

9    parties took place in those conversations.

10        I don't.  I just know that those -- these

11   were the people who were involved and could have, and

12   as an unit, did.

13   Q    In Paragraph 26 of your first amended

14   complaint, you write that, or you state that Cardona

15   and Carlson interviewed Danielle Schrik.

16        Is that the basis for your claim against

17   Officer Cardona?

18   A    Yes, yes.

19   Q    What about his interviewing Danielle Schrik

20   is the basis for your claims against Officer Cardona?

21   A    Uhm, one thing that comes to mind now is the

22   fact that DCFS report where Michael Booker is on there,

23   I mean he writes that he has -- during this

24   investigation, you know, what about -- what about her

208

1    background, you know, what, you know, she's -- she's

2    had batteries before, you know, how come you're not

3    looking at her.  I believe the response was that didn't

4    come up in our investigation.

5        I'm in jail.  Mr. Booker can get this

6    information in his investigation.  The police, either

7    because they're negligent couldn't find, or didn't

8    look on purpose, or whatever the case may be, why would

9    they not come up in the investigation.  That is an

10   investigation.  That's what you're supposed to be doing

11   is checking out everybody.  Why was it just me and then

12   let's run with it.

13        Why -- why, by his own admittance, he didn't

14   check her background, the mother, and then everything

15   that happened after that, all the information that was

16   coming to light, you know, again kept going back to

17   her, back to her, so maybe if we would have -- maybe if

18   they would have started initially being more, you know,

19   diplomatic about it and looking at everybody, you know,

20   maybe things would have went a lot different for me.

21   Q    You're stating that because Officer Cardona

22   didn't question the mother about her background or a

23   past battery that she committed, that's why you're

24   suing him?

209

1    A    Yes.
2    Q    Any other reason?
3    A    No.
4    Q    You earlier said that -- that for all you
5  know, he -- he didn't ask the mother about a past
6  battery because he was negligent; is that correct?
7    A    No.  What I'm saying is, the way I read it,
8  the way it was explained to me, they didn't even know,
9  they didn't look, they didn't run her background.  They
10  didn't do a background check on her.
11   Q    Why -- why -- why are you -- you're assuming
12  that that was done with the intention of doing -- doing
13  wrong towards you rather than simply being a mistake.
14   MR. KISS:   Objection.
15   MR. RUSSELL HARTIGAN:   Is that correct?
16   MR. KISS:   That was not his testimony.  His
17  testimony is he doesn't know whether it's an act of
18  negligence or whether it was on purpose.  You're
19  mischaracterizing his testimony.
20   MR. KOCH:   I'm sorry, is that what you said.
21   THE WITNESS:   That is what I said.
22  BY MR. KOCH:
23   Q    You're saying you don't know if it was
24  negligent or --

210

1    A    Malice.  Either way, the end result is the
2  same.  If -- if you're ill-equipped or you're just not
3  doing your job and you don't discover something that's
4  important, you know, could shed different light on the
5  situation, then, you know, I shouldn't have to suffer
6  for that.  And if you did it on purpose because, you
7  know, oh, gees I realize now maybe it was someone, but
8  oh, God, I better not say something, that's another.
9  But regardless of --
10   Q    Okay.  So what you're saying then is, at the
11  time that you filed this lawsuit, as far as -- for all
12  you knew, Officer Cardona's actions in not questioning
13  the mother about her past battery was simply a mistake
14  on his part or negligent; is that correct?
15   MR. KISS:   He doesn't know either way.
16   MR. KOCH:   Counsel.
17   MR. KISS:   You're misstating his testimony.
18   MR. KOCH:   I'm trying to understand what his
19  testimony is.
20   MR. KISS:   I'm objecting.
21   MR. KOCH:   Your objection is noted.
22   MR. KISS:   This plaintiff has done his best to
23  state the legal theory as he understands it.  If you
24  ask him the same question, different combination, an

211

1  unlimited and unnecessary amount of times, you're going
2  to get basically the same answer.
3    I think he's answered it adequately.
4  BY MR. KOCH:
5    Q    My last question was, at the time that you
6  filed the lawsuit, as far as you knew, Officer
7  Cardona's, any omission by Officer Cardona in asking
8  the mother about a past battery was an act of
9  negligence on the officer's part; is that correct?
10   MR. KISS:   Same objection.
11   MR. KOCH:   Your objection is noted.
12   THE WITNESS:   I really don't know.  It may or may
13  not have been.  I really don't know.  I'm just --
14  BY MR. KOCH:
15   Q    The answer then is at the time that you filed
16  the lawsuit, you -- you did not know whether or not
17  the -- it was the result of negligence or malice?
18   A    No, I don't.
19   Q    Okay.  I don't see Officer Cardona's name in
20  the first amended complaint anywhere other than in
21  Paragraph 26.
22       Are you aware of any other actions by Officer
23  Cardona, other than his interviewing the mother of
24  Joshua, that you believe is a basis for your claims

212

1  against him?
2    A    No.
3    Q    Count 1 of the complaint is captioned False
4  Arrest and Imprisonment.  You reference defendant
5  officers, you ask for, that judgment be entered against
6  defendant officers.
7       Is Count 1 directed against Officer Cardona?
8    A    I -- I don't even -- can I look at something,
9  see what Count 1 is?
10   MR. KISS:   Yes, that's his answer.
11   MR. KOCH:   Mr. Aleman.
12   MR. KISS:   Look, it's in the complaint.  I'm not
13  trying to be obstreperous, I'm just saying, if you're
14  going to ask him to interpret every paragraph and every
15  count, you can do that.
16   MR. KOCH:   I would like to.
17   MR. KISS:   But I don't understand what the point
18  of that is with your limited time left.
19   MR. KOCH:   I would like the witness to answer.  Is
20  Count 1 directed against Officer Cardona?
21   THE WITNESS:   Yes.
22  BY MR. KOCH:
23   Q    What did Officer Cardona do to falsely arrest
24  or imprisonment?

213

```
 1        A    I don't feel that they did a proper -- that
 2   they jumped to conclusions.  They didn't do a proper
 3   investigation.
 4            If there would have been a different, proper
 5   investigation, thorough, they wouldn't have been so
 6   quick to jump the gun, I don't think I would have been
 7   arrested, period.
 8        Q    Are you speaking about Officer Cardona?  My
 9   question is about Officer Cardona.
10            What did Officer Cardona do that resulted in
11   your being falsely imprisoned and falsely arrested?
12        A    It goes back to, I think, what we just talked
13   about.  If it was negligent or if it was malicious,
14   whichever one, you know got the same result, then that
15   contributed to me being incarcerated, the way I see it.
16        Q    Are we talking about the interview that
17   Cardona conducted with the mother?
18        A    Yes.
19        Q    Anything else?
20        A    Uhm, no.
21        Q    Count 2 is failure to intervene.
22            Is that directed against Officer Cardona?
23        A    Yes.
24        Q    For any other reasons other than the
```

214

```
 1   allegation that he didn't conduct the interview with
 2   the mother properly?
 3        A    I feel like as information was coming up more
 4   and more -- as this went on, there was more
 5   information, people calling.  We were -- we were trying
 6   to show this, and we were given this, you know, to them
 7   and nobody seemed to want to do anything about it.
 8            They still -- nobody cared to investigate
 9   into any of these things.  I mean, it's kind of gray
10   area here.  You don't know exactly what I'm talking
11   about, but there were circumstances and things that is
12   came up that I believe should have been looked a lot
13   closer into if somebody was actually seeking out
14   justice.
15        Q    What did Officer Cardona do that -- that
16   constituted a failure on his part to intervene that you
17   know of today?
18        A    I understand that there was not entire
19   information accurate information given to the Medical
20   Examiner.
21        Q    Is that --
22        A    To Dr. Jones.
23        Q    Is that something that Officer Cardona did?
24        A    To my knowledge.
```

215

```
 1        Q    To your knowledge Officer Cardona did what?
 2        A    To my knowledge, she was one of the officers
 3   that went down to -- to interview the Medical Examiner,
 4   and to my knowledge, from the interviews my attorney
 5   done with the Medical Examiner, that what they told her
 6   was inaccurate.  What they told her the facts of the
 7   baby's condition and other things weren't accurate and
 8   which led her to give an opinion that was inaccurate.
 9   Then when she was shown other information, her opinion
10   changed, but that never came out.
11        Q    So it's your testimony that Officer Cardona
12   gave false information to the Medical Examiner?
13        A    Yes.
14            MR. KISS:  Objection, knowledge.  He doesn't know
15   what Officer Cardona did or did not do.
16            MR. KOCH:  I'm trying to find out what facts do
17   you have, do you know of that supports your allegation
18   that Officer Cardona failed to intervene as set out in
19   Count 2.
20            I'm not asking for your speculation.  What do
21   you know that Officer Cardona did or didn't do that
22   supports your count in claim two?
23            THE WITNESS:  I don't know.
24   BY MR. KOCH:
```

216

```
 1        Q    You don't know.  You don't know anything?
 2        A    I didn't say I don't know anything, I don't
 3   know what you just asked me, no, I don't know.
 4        Q    You don't have any facts to support your
 5   allegation against Officer Cardona in Count --
 6            MR. KISS:  Objection, asked and answered.
 7            MR. KOCH:  I'm trying to understand his answer.
 8            MR. KISS:  You're approaching the line of
 9   harassing.
10   BY MR. KOCH:
11        Q    Mr. Aleman, what I'm trying to find out --
12   let me try to clarify.
13            Are you aware of any facts to support your
14   claim against Officer Cardona, in Count 2, that she
15   failed to intervene?
16            MR. KISS:  Objection asked and answered.
17            MR. KOCH:  You can answer.
18            THE WITNESS:  I'm totally confused.
19            MR. KISS:  You can answer, if you know, the same
20   question that he has already asked.
21            THE WITNESS:  I don't -- I don't -- I don't -- I
22   don't know.  No, I don't know.
23   BY MR. KOCH:
24        Q    Count 3, false arrest and imprisonment.
```

217

```
1    Other than the interview with -- by Officer Cardona
2    with the mother, are you aware of anything else that
3    Officer Cardona did or didn't do to support your claim
4    in Count 3 against him that he participated in the
5    false arrest and imprisonment of you?
6         A    I am not.
7         Q    Count 4 is a civil conspiracy claim.
8         What's the basis for your allegation that
9    Officer Cardona was part of a conspiracy?
10        A    I -- I guess it is a blanket thing.  I -- I
11   don't know.  I don't know who did exactly what.  I
12   don't know.
13        Q    Is it fair to say that than Officer Cardona's
14   interview of the mother, you're not aware of any, any
15   facts to support your claim that he was an active
16   participant in a conspiracy?
17        A    Yes.
18        Q    That is correct?
19        A    That's correct.
20        MR. KISS:  I would object to the use of the word
21   active participant.  Form.
22   BY MR. KOCH:
23        Q    Other than Officer Cardona's interview with
24   the mother, are you aware of anything that Officer
```

218

```
1    Cardona did or omitted to do that is the basis for your
2    claim that he was part of a conspiracy against you?
3         A    No.
4         Q    Count 5 is a claim for illegal interrogation.
5    You've mentioned Defendants Micci and Villanueva.
6         Your Count 5 is not directed against Officer
7    Cardona, correct?
8         A    Correct.
9         Q    Your Count 6 claims for malicious prosecution
10   is not directed against Officer Cardona, correct?
11        A    Correct.
12        Q    Your count 7 claim for malicious prosecution
13   is not directed against Officer Cardona, correct?
14        A    Correct.
15        Q    Count 8 is another state law claim for civil
16   conspiracy.
17        Other than the allegation in Paragraph 26,
18   that Cardona interviewed Danielle Schrik, you are not
19   aware of any facts to support your allegation that --
20   that Officer Cardona was part of a civil conspiracy as
21   set out in count 8, correct?
22        A    Correct.
23        Q    Count 9 is a state law claim for intentional
24   infliction of emotional stress.  Is that being brought
```

219

```
1    against Officer Cardona?
2         A    No.
3         MR. KISS:  It is.
4    BY MR. KOCH:
5         Q    Why did you say it was not being brought
6    against Officer Cardona?
7         A    Just because I looked down here and I didn't
8    see his name.  You guys understand this stuff a lot
9    better than I do.
10        Q    Other than your allegation in Paragraph 26
11   that Cardona interviewed Danielle Schrik, are you aware
12   of any facts that support your claim that Officer
13   Cardona, intentionally inflicted emotional distress
14   upon you?
15        A    I don't know.
16        Q    The question is, are you aware of any facts
17   other than what's alleged in Paragraph 26?  Is the
18   answer no, you're not aware of any other facts other
19   than what's alleged in Paragraph 26?
20        A    That's my answer, no.
21        Q    Do you have any reason, whatsoever, that
22   Officer Cardona was out to get you for any reason?
23        A    No.
24        Q    Do you have any reason to believe that
```

220

```
1    Officer Cardona harbored any malice towards you?
2         A    No.
3         Q    Do you have any reason to believe that
4    Officer Cardona was doing anything other than simply
5    trying to do his job?
6         A    No.
7         MR. KISS:  Objection.  Leading.
8    BY MR. KOCH:
9         Q    In Paragraph 56 of the complaint you allege
10   that the defendants conspired and acted together to
11   cover up the false arrest of plaintiff without probable
12   cause or legal authority.
13        Are you aware of any facts to support that
14   allegation that Steve Cardona did anything to cover up
15   any allegedly -- any alleged wrongful conduct with
16   regard to your arrest?
17        A    No.
18        Q    In Paragraph 56 you allege that the
19   defendants quote "Made out false and incomplete
20   official reports and gave a false incomplete version of
21   events to other persons to cover up their own
22   misconduct."
23        With regard to Officer Cardona, what do you
24   mean by that?
```

221

1     A   I understood that he was one of the officers
2 who spoke to the Medical Examiner and the correct
3 information had not been given to her.
4     Q   Okay.  So -- so we have talked now about what
5 you believe was problems with Officer Cardona's
6 interview with the mother and now you have just talked
7 about information being given to the Medical Examiner
8 by Officer Cardona.
9     Is there anything else, any other actions by
10 Officer Cardona that you're aware of that makes you
11 believe that he's a proper defendant in this lawsuit?
12     A   No.
13     Q   And sitting here today, are you aware of what
14 Officer Cardona told the Medical Examiner that -- that
15 you contend was false or incomplete?
16     A   Yes.
17     Q   What?
18     A   Yes.  Uhm, I was told that -- through our
19 investigation, I was told that the Medical Examiner was
20 told that the boy, Joshua, was a hundred percent happy
21 and healthy all week, had no problems, everything was
22 fine.  It was just a normal week for the boy.
23     He was dropped off at my house and within an
24 hour this happened, and then she gave an opinion that

222

1 well, yeah, it's possible it could have been, Mr.
2 Aleman.  When, in fact, he had been to the Immediate
3 Care Center, he had been to his family physician.
4 Everybody that lived with him, or anybody who seen him
5 at my house, anybody that had contact with him that
6 week, are all on paper saying that he was out of sorts.
7 He was lethargic, not lifeless but lethargic, burning
8 up, and he wasn't eating, wasn't grasping, was not
9 doing any of these things.  Some of these were his own
10 family members.
11     So I -- I truly believe that if that was the
12 information, the correct information I should say, was
13 given to the Medical Examiner, I strongly feel that her
14 opinion would not have been the one that she gave that
15 day.
16     Q   What's the basis for your opinion that her --
17 her -- what's your opinion -- strike that.
18     What's the basis for your belief that her
19 opinion would have been different if she had known that
20 he had been lethargic, or not well, or not himself
21 during the two prior days?
22     MR. KISS:  Objection.  Speculation, knowledge.
23     MR. KOCH:  I'm asking, Counsel, I'm asking for the
24 basis for your opinion.

223

1     MR. KISS:  Made my objection, speculation,
2 knowledge.
3 BY MR. KOCH:
4     Q   You can answer the question, Mr. Aleman.
5     A   Confused again.
6     Based on an interview that we did with her
7 from our -- from the defense side that we did with her
8 after that interview, we gave her and we showed her
9 statements and we gave her the right information, her
10 opinion changed.
11     Q   Were you there when she --
12     A   No.
13     Q   And the interview was conducted by whom?
14     A   By my attorney.
15     Q   Which one of your attorneys?
16     A   Barry Spector.
17     Q   Do you know who Officer Gery Fallon is?
18     A   No.  I know the name.  I know he was involved
19 in the case, but I -- unless I see a picture of him, I
20 don't recall.
21     Q   In Paragraph 29 of the first alleged
22 complaint, you allege that Officer Fallon and Officer
23 Lussky interviewed Carl Gutman?
24     A   Yes.

224

1     Q   Are you -- are you contending that Officer
2 Fallon did anything wrongful as part of that interview?
3     A   I -- I feel that based on the information
4 that Carl Gutman was telling them and Adam Mahalik and
5 everybody that they were interviewing was giving them,
6 they should have definitely opened up their eyes to
7 different avenues besides me, and they didn't, and it
8 wasn't.
9     Q   Anything else?
10     A   No.
11     Q   Anything else that Officer Fallon did or
12 didn't do that is the basis for your claims against
13 him?
14     A   No.
15     Q   Paragraph 39, you allege that when you were
16 free on bond on the aggravated battery charge,
17 plaintiff was arrested by the defendants Fallon and
18 Carlson for first degree murder of Joshua.
19     You allege in Paragraph 40 there was not
20 probable cause for the arrest.
21     Are you bringing a false arrest claim against
22 Officer Fallon?
23     A   Yes.
24     Q   And is it based on what happened at the

225

1    Hanover Park police station on September 15th?
2    A   Yes.
3    Q   You voluntarily turned yourself in, correct?
4    A   Yes.
5    Q   Did you or your attorney speak to Officer
6    Fallon before coming to the Hanover Park police station
7    on that day?
8    A   I don't know who the attorney spoke to, but
9    he said he spoke to Hanover Park police, and they were
10   not going to put out a warrant if I turned myself in at
11   9:00 a.m. but I don't know which officer he spoke to.
12   Q   The warrant was issued by the court. They
13   upped your charge from aggravated battery to murder?
14   A   To my knowledge, there was no warrant. I
15   was -- if I could repeat myself, I was told that they
16   wouldn't issue a warrant provided that I turned myself
17   in the next morning. So I did. I never heard anything
18   about a warrant after that.
19   Q   You voluntarily turned yourself in, correct?
20   A   That's correct.
21   Q   Other than Officer Fallon's interview of Carl
22   Gutman and his being in the police station on
23   September 15th when you voluntarily turned yourself in,
24   do you have -- are you aware of any other facts to

226

1    support your claims against Officer Fallon in this
2    lawsuit?
3    A   No.
4    Q   Do you recall speaking to Officer Fallon on
5    September 15th when you turned yourself in?
6    A   I don't.
7    Q   What happened on the 15th when you came to
8    the station?
9    A   I remember going to the station and being put
10   in a -- you know, in a holding room or cell and then.
11   Q   Who put you there?
12   A   I think Carlson, but I can't answer that for
13   sure. I don't remember.
14   Q   Do you recall speaking with Officer Fallon?
15   A   I do, I do.
16   Q   What did you say to him and what did he say
17   to you?
18   A   Nothing. We didn't have a conversation, much
19   conversation.
20   Q   What did he say to you and what did you say
21   to him?
22   A   I don't recall. I just, you know, maybe just
23   told me to go here, do this, you know, ordered me
24   around, but you know, we didn't talk.

227

1    Q   Do you recall his saying anything to you that
2    you perceived as an order?
3    A   No, just generally, you know, directed me
4    around, you know, the procedure.
5    Q   Such as what, what, give me an example?
6    A   Like fingerprints. Go over here, sit down,
7    do this, go back in the cell, you know, stuff like
8    that.
9    Q   Other than, you know, sit down here or go
10   over here, do you recall anything else that he said to
11   you?
12   A   No.
13   Q   Do you recall him saying anything to anyone
14   else --
15   A   No.
16   Q   -- at the station on September 15th?
17   A   No.
18   Q   Did you see Officer Fallon at any time after
19   September 15th?
20   A   I don't recollect. No, I don't.
21   Q   Is Count 1 directed against Officer Fallon?
22   A   Yes.
23   Q   Paragraph 46, it says that defendant officers
24   did not have an arrest warrant, probable cause or any

228

1    other lawful basis to arrest or detain plaintiff.
2    Did Officer Fallon participate -- well,
3    strike that. You were arrested -- when was the first
4    time that you were arrested?
5    A   With regards to this? With regards to this
6    case?
7    Q   With regards to this case, yes?
8    A   Uhm, Friday night.
9    Q   Did Officer Fallon play any role in that
10   arrest?
11   A   I don't know. I just know who interviewed
12   me. I don't know -- I don't know when they leave the
13   room who they talk to, who's watching me on camera. I
14   don't know.
15   Q   What about the second time, when was the
16   second time that you were arrested?
17   A   What about it?
18   Q   When was the second time that you were
19   arrested?
20   A   I'm not sure. I think we talked about the
21   15th. No, no, I'm sorry. I don't know, days later.
22   Q   September 15th?
23   A   I'm not sure.
24   Q   When you voluntarily turned yourself in?

229

```
1      A    I'm not sure if that was the day but...
2      Q    Count 2 is a failure to intervene count, is
3  that brought against Officer Fallon?
4      A    Yes.
5      Q    You allege that Officer Fallon had an
6  opportunity to intervene but chose not to intervene
7  when you were falsely arrested.
8           What's the basis for your allegation that he
9  had an opportunity to intervene but chose not to
10 intervene?
11     A    What do you mean, like on the spot that day,
12 or do we mean --
13     Q    I'm asking you about your complaint. These
14 are your allegations.
15     A    Can you repeat the question.
16     Q    In paragraph 49 you state that when plaintiff
17 was falsely arrested, defendant officers had an
18 opportunity to intervene but chose not to intervene.
19          What's the basis for your allegation that
20 Officer Fallon had an opportunity to intervene but
21 chose not to intervene?
22     A    The way I understood it was -- was that they
23 were consulting with the doctor based on what I was
24 saying and the doctor was telling them that -- what
```

231

```
1  against you?
2      A    No.  No.
3      Q    Do you have reason to believe that Officer
4  Fallon was out to get you?
5      A    To be honest with you, I'm not sure who --
6  who played what role exactly.  Who was out to get me or
7  who -- I know the results and I know the players who
8  were involved.
9      Q    That's not my question.  My question is, do
10 you have any reason to believe that Officer Fallon was
11 out to get you?
12     MR. KISS:  Objection.
13     THE WITNESS:  No.
14     MR. KISS:  Speculation.
15 BY MR. KOCH:
16     Q    Do you have any -- do you have any reasons to
17 believe that Officer Fallon had or harbored malice
18 towards you?
19     MR. KISS:  Objection, speculation.
20     THE WITNESS:  No.
21 BY MR. KOCH:
22     Q    Do you have any reason to believe that
23 Officer Fallon acted intentionally to violate your
24 civil rights?
```

230

```
1  he's telling me is it's not shaken baby, it's not hard
2  enough.  That's not it, and I was -- I was -- I was
3  arrested anyway.  I mean...
4      Q    What's your basis for saying that?
5      A    For saying what?
6      Q    That the doctor was saying that?
7      A    That -- well because that's what's on the
8  tape, that's what Villanueva had told me, or Micci
9  said.  He kept saying, I think you're leaving something
10 out.  I talked to the doctor, just got off the phone
11 and what you're telling me is not accurate, it's not,
12 that's not enough, that's not enough.  A little shake
13 isn't it.  It's not enough.  There is something that
14 you're leaving out.  We would go back and forth about
15 how I wasn't leaving anything out.
16          If the doctor is telling you it's not enough
17 to shake a baby and hurt him, then why was I arrested
18 for hurting the baby.
19     Q    What's Officer Fallon's role in that?
20     A    I don't know.
21     Q    Other than interviewing Carl Gutman and being
22 there on the 15th when you voluntarily turned yourself
23 in, are you aware of any facts to support your
24 allegation that Officer Fallon was part of a conspiracy
```

232

```
1      A    Yes.
2      Q    What?
3      A    Well, what I spoke of earlier.  I'm sorry, I
4  got it confused.  I'm just going to say no.
5      Q    Do you have any reason -- did you have any
6  reason to believe that Officer Fallon was -- wasn't
7  simply doing his job or wasn't simply trying to do his
8  job?
9      MR. KISS:  Objection, speculation.
10     THE WITNESS:  No.
11 BY MR. KOCH:
12     Q    Are you aware of any relationship that
13 Officer Cardona had with the Hanover Park police, any
14 Hanover Park police officer, other than the
15 professional relationship arising out of this, out of
16 this investigation?
17     A    Did Cardona?
18     Q    Yes?
19     A    With the officers from Hanover Park you said?
20     Q    Strike that.
21     A    I'm sorry.
22     Q    I'll try to rephrase it.
23     A    Thank you.
24     Q    Do you know if Officer Cardona knew any of
```

233

1  the Hanover Park police officers prior to this
2  investigation?
3      A    I have no idea.
4      Q    Do you know if Officer Fallon knew any of the
5  Hanover Park police officers before his investigation?
6      A    No.
7      Q    Do you know if Officer Micci knew any of the
8  Hanover Park police officers before this investigation?
9      A    No.
10     Q    Do you know what the Medical Examiner told
11 your attorney, Barry Spector?
12     A    Uhm, bits and pieces, not everything, no, I
13 wasn't there.
14     Q    Well, what did you -- what did you find out?
15     A    Uhm, I found out that -- I found out that she
16 was upset, angry, when new evidence was put in front of
17 her. She felt that she was, not betrayed but, you
18 know, not given accurate information. She didn't like
19 the way it went down.
20          When she seen this, she was upset with the
21 police department for not divulging that information to
22 her when she made her opinion.
23     Q    And is this -- is memorialized someplace,
24 written down somewhere?

234

1      A    To my knowledge, yes.
2      Q    Where?
3      A    Somewhere in this case file from the criminal
4  case.
5      Q    Did your -- did your lawyer, Barry Spector,
6  interview her privately or cross examine her on the
7  stand?
8      A    He interviewed her privately.
9      Q    And what was -- other than her being upset
10 that she didn't have that she -- she thought she should
11 have had initially, did she arrive -- express any
12 opinions?
13     A    To my knowledge, she would have -- she would
14 have had a different opinion if she had all the
15 information initially.
16     Q    What would that different opinion have been?
17     A    The -- that it mostly didn't happen at my
18 house, and the time frame would have changed from the
19 injury to the unresponsiveness.
20     Q    Let me ask you some questions about Officer
21 Micci.
22          When is the first time that you met Officer
23 Micci?
24     A    When he walked in the room on the tape, in

235

1  the interview room.
2      Q    Did you have any -- you didn't have any
3  discussions with him outside of the interview room?
4      A    No.
5      Q    Prior to the -- to the interview beginning?
6      A    No, no.
7      Q    And he allowed you to speak with your
8  attorney, correct?
9      A    Correct.
10     Q    You signed the waiver form?
11     A    Yes.
12     Q    You voluntarily agreed to sit for the
13 interview, correct?
14          MR. KISS:  Objection.
15          THE WITNESS:  I did.
16          MR. KISS:  That's not the case.
17          MR. KOCH:  It's a question, Counsel. Let the --
18          MR. KISS:  You're misstating facts. It's not a
19 fair question.
20          MR. KOCH:  Your client can answer. Is that
21 correct?
22          THE WITNESS:  Can you repeat it again because --
23          MR. KOCH:  Can you read back the question.
24                  (Whereupon, the record was read.)

236

1          THE WITNESS:  No, and then yes.
2  BY MR. KOCH:
3      Q    What do you mean by that?
4      A    Well, I didn't want to sit for the interview,
5  I wanted to come back the next day. I expressed my
6  opinion and my feelings and they were ignored and just
7  talked right over it.
8      Q    Did Officer Micci restrain you from leaving?
9      A    Physically?
10     Q    Yes.
11     A    No. Not physically, no.
12     Q    Did he --
13     A    I don't think I could have left, though.
14     Q    Did he say anything to you, that -- that --
15 did he force you to talk?
16     A    Yes.
17     Q    How so?
18     A    He told me that I was not going to leave.
19 You don't talk then you can't leave, then you're going
20 to be here, and in the frame of mind I was in, it felt
21 like forever. I interpreted it as you're going to be
22 in jail forever. That's how I interpreted it. I felt
23 like I had no other choice but to do it his way at that
24 point.

237

1     Q     Did you tell him that you felt you had no

2 other choice?

3     A     I didn't use those words, no.

4     Q     What words did you use, if any?

5     A     I told him I wanted to come back tomorrow.

6     Q     But?

7     A     He said, well, then, he says you can't go,

8 you're not going to go home. You need to talk to me

9 now.

10     Q     After Micci told you that if you didn't talk,

11 you wouldn't be able to leave, did you subsequently

12 talk to your attorney before any kind of substantive

13 interview began?

14     A     I called my attorney back again.

15     Q     What was the result of that discussion?

16     A     He told me the same thing he told me the

17 first time, not to talk to them. He said they are

18 lying, they are not going to let you go anyway, blah,

19 blah, blah.

20     Q     So the attorney told you they are not going

21 to let you go anyway, so don't talk to them?

22     A     Well, what he said was, do you think they're

23 going to let you go. He asked me, and I said I don't

24 think so.

238

1     Q     So you didn't think you were going to leave

2 anyway, correct?

3     A     (Nodding head.)

4     Q     Okay.

5     A     If I didn't talk, I wasn't going to leave.

6     Q     You just said that you didn't think you were

7 going to leave anyway, correct?

8     A     If I didn't talk, then I wasn't going to be

9 allowed to leave.

10     Q     I'm sorry. I thought you just said that you

11 told your attorney that you didn't think that you were

12 going to leave anyway, regardless of whether you talked

13 or not?

14     A     I'm sorry, I misstated this whole thing.

15     Q     Did you decide to go against your attorney's

16 advise?

17     A     I did, yes.

18     Q     So your attorney advised you not to talk and

19 you talked, correct?

20     A     He advised me not to talk. I took his advice

21 and I conveyed that to the officers and they weren't

22 happy with that answer, *so* I ended up calling him back

23 and asked him again, and he told me the same thing, and

24 I felt very pressured, and I was scared, and I -- I --

239

1 nobody was moving.

2     I said I didn't want to talk and nobody got

3 up and nobody left. It just kept going. It wasn't

4 going to happen, that's what it appeared to me. It

5 didn't appear like my answer was being respected, and

6 that day, I didn't see anything else but to talk to

7 them at that point because they didn't listen to my

8 answer.

9     Q     Did you decide to go against the advice of

10 your Counsel when you started answering, signed the

11 waiver and sat down and answered questions?

12     A     Yes, yes.

13     MR. KOCH:     Let's take a short five-minute break.

14         (Whereupon, a recess was taken.)

15     MR. KOCH:     Back on the record.

16 BY MR. KOCH:

17     Q     Mr. Aleman, I want to try to resolve a couple

18 of questions that I have from your earlier description

19 of what happened in the house before the paramedics

20 arrived.

21     I think you testified that you had -- that

22 Mr. Gutman was in the house for about 20 minutes,

23 correct?

24     A     Yeah, roughly, hmm-hmm.

240

1     Q     You were more or less talking to him that

2 whole time?

3     A     Yeah.

4     Q     I think you also testified that at one point

5 you went to the kitchen to do some dishes, correct?

6     A     Clean up the breakfast stuff, yeah.

7     Q     I think you previously that you are away from

8 the front room and in the kitchen for maybe a minute or

9 so?

10     A     Yes.

11     Q     Is it fair to say that in approximately

12 19 minutes you were in the front room with Mr. Gutman

13 and Joshua?

14     A     Yes.

15     Q     How much of that time were you holding

16 Joshua?

17     A     I believe the whole time.

18     Q     You believe it was all 19 minutes?

19     A     Hmm-hmm.

20     Q     Okay. And where were you when you were

21 holding Joshua?

22     A     Sitting on a couch next to Carl.

23     Q     And Joshua was in your arms?

24     A     Like I described, up here, head on my

241

```
 1   shoulder.
 2        Q     The head on your shoulder.
 3        A     Hmm-hmm.
 4        Q     And was Joshua sleeping, was he doing
 5   anything?
 6        A     No, he was just inactive.
 7        Q     Inactive?
 8        A     Hmm-hmm.
 9        Q     Could you hear him breathe?
10        A     I have no idea.  I couldn't remember
11   something like that right now.
12        Q     But you were holding him for 20 minutes,
13   anything -- did he do anything or -- strike that.  Did
14   anything occur in those 19 minutes that you were
15   holding Joshua to make you think that he was in
16   distress or having any problems?
17        A     No.
18        Q     I think you earlier testified that he was
19   lethargic; is that correct?
20        A     Yes.
21        Q     What was he doing that makes you describe him
22   as lethargic?
23        A     Just nothing.  Just laying around, not doing
24   anything.  Maybe I'm confused on the definition of the
```

242

```
 1   words.
 2        Q     You testified that you went back later to try
 3   to get Joshua involved with the other kids, correct?
 4        A     Correct.
 5        Q     Joshua was on the couch?
 6        A     Correct.
 7        Q     And how was he lying on the couch?
 8        A     On his back.
 9        Q     Okay.  What about Joshua, Joshua's condition
10   that alarmed you?
11        MR. KISS:  I'm going to object.  All these
12   questions have been asked and answered by the plaintiff
13   during Mr. Hartigan's time.
14        MR. KOCH:  You can answer the question.
15        THE WITNESS:  I'm trying to think what the
16   question was again.  I'm sorry.  What was the question?
17   I'm sorry.
18        MR. KOCH:  Could you read it back, please?
19             (Whereupon, the record was read.)
20        THE WITNESS:  When I picked him up and he just
21   wasn't moving around at all, like, like dead weight in
22   my hands.  It was a feeling I never felt before with a
23   child.
24   BY MR. KOCH:
```

243

```
 1        Q     What was the difference between how he felt
 2   when you picked him up off the couch and how he felt
 3   when you were holding him while you were talking to him
 4   with Mr. Gutman for 19 minutes?
 5        A     He felt lifeless when I picked him up.  His
 6   body was just limp.  It was just there.
 7             When I -- when I was holding him on me, I
 8   didn't feel anything out of the ordinary.  Nothing
 9   struck me as funny.  Just seemed like I was holding a
10   baby on my arm.  Everything seemed to be fine at that
11   time.
12        Q     He seemed lethargic to you but he didn't seem
13   lifeless, correct?
14        A     When?
15        Q     When you were holding him for 19 minutes in
16   your arms talking to Mr. Gutman?
17        A     Nothing appeared to be wrong, yes.  He didn't
18   appear to be lifeless.
19        Q     He did not appear to be lifeless at that
20   time, correct?
21        A     Correct.
22        Q     Okay.  Did you see -- Joshua could walk,
23   correct?  He was able to walk.
24        A     I seen him walk a couple times, yeah.  Yeah,
```

244

```
 1   he was able to walk.
 2        Q     You testified that he bumped his head?
 3        A     Right.  With the support of the stroller, you
 4   know.  So it was an aid, you know, but he didn't do any
 5   walking.  The only time I seen Joshua walk was when
 6   they initially brought him over to check the place out,
 7   they put him down and he walked around then.
 8             After that, he only laid around in my house,
 9   and the one time he did walk was with the aid of the
10   cart.
11        Q     How did he get the cart?
12        A     I don't know.  I was doing my thing, and I
13   was writing diaries and here he comes with the cart,
14   rolling this way, and because of the island, when he
15   past me I -- I couldn't see him, then I heard a thud,
16   and I looked over and he fell down by the cart.  So I
17   could only assume that he ran into the cart.
18        Q     Sitting here today, you don't recall -- you
19   don't recall Joshua walking on Friday the 9th?
20        A     Absolutely not.
21        Q     Do you recall him standing?
22        A     Absolutely not.
23        Q     You never saw him standing?
24        A     No way.
```

249

1 don't remember exactly where he was at that time.
2     Q     Do you recall -- do you recall that he was
3 crying and that because he was crying, you picked him
4 up?
5     A     Yes.
6     Q     Okay.  And he was crying and you picked him
7 up and took him to the door and at least you waved at
8 the mother; is that correct?
9     A     No, I don't know if anybody -- when I said
10 wave good-bye, I shouldn't have said waved.  Went to
11 the door to say good-bye.
12          I don't remember if anybody waved.  I just
13 said hey, come on, let's say good-bye to mama.
14     Q     Do you recall -- do you recall saying, "say
15 good-bye to mama," to Josh?
16     A     No, no.
17     Q     So, you didn't say -- say good-bye to mama
18 and you didn't wave good-bye?
19     A     I -- I don't know -- I didn't use those exact
20 words.  I don't know what exact words I used.  My
21 intent, my feeling with him was like when I speak and
22 say, come on, Josh, let's go, I don't even know if
23 those words came out of my mouth, but that's what was
24 going on, and that's how I remember this, the thought

250

1 process.
2     Q     That he's crying?
3     A     Come on buddy.
4     Q     He's crying and you want to make him feel
5 better, correct?
6     A     Yes.
7     Q     You -- you picked him up, you held him in
8 your, in your arms, correct?
9     A     Yes.
10     Q     Was he facing outward so he could see his
11 mother leave?
12     A     Yes.
13     Q     Did you have one hand under his -- his
14 bottom?
15     A     I don't know.  I don't remember that.  I
16 don't -- I don't remember exactly the placement of my
17 hands that day.
18     Q     Did the mother turn around?  Did you see the
19 mother turn around and wave good-bye to Joshua?
20     A     I don't know.  I don't remember.
21     Q     Did he continue to cry in your arms?
22     A     Somewhat.  That's what -- that's what
23 prompted me to go to the couch and sit with him and
24 coddle him because he was upset, he was sick, and

251

1 that's why I spent one on one time with him and sat
2 down with him.
3     Q     How long -- how long until he stopped crying?
4     A     I have no idea.  You keep saying crying, and
5 I say he was whining.
6     Q     I think crying was a word you used, which is
7 it, crying or is it crying and whining, what is it?
8     MR. KISS:  Or is it just whining.
9     MR. KOCH:  Counsel, I'm asking him.
10     MR. KISS:  You're asking --
11     THE WITNESS:  I said whining like four times so
12 I'm sure it was whining.  He was whining.  His mother
13 was leaving.  He wasn't full out crying like somebody
14 stepped on his foot and he's crying, like a crying
15 spell.  How long was he crying, he was whining.
16          His mom left.  I sat on the couch with him.
17 I don't remember him crying on the couch or anything
18 like that.
19 BY MR. KOCH:
20     Q     But he's making noise, he's whining?
21     A     Yes, yes.
22     Q     And you don't recall how long he was whining?
23     A     Short time.  No, I don't.
24     Q     Was he --

252

1     A     Just the duration of her leaving.
2     Q     When you went back and sat on the couch, how
3 long did you sit with him on the couch while he was
4 calming down?
5     A     Until a minute or so.  Until Gutman knocked
6 on the door.
7     Q     Until Gutman knocked on the door, okay.
8     A     That's why I said next time I said just come
9 in because the baby is not feeling really well, fussy,
10 whatever and he's like oh, I wanted JT to learn how to
11 knock.  I said that's okay.
12     Q     When Gutman came in, were you still holding
13 Joshua?
14     A     Yes.
15     Q     Did you go towards the door to open the door?
16     A     Yes, I went towards it but I don't believe I
17 opened it.  I believe he then -- it had taken so long,
18 because he knocked on it, and I said who is it, c'mon
19 on in and he knocked again I was like who is it.  I got
20 up, and by the time I -- as I was walking through the
21 kitchen, he opened the door.
22          And then he said, then he told me what
23 happened.  He was teaching the kid how to knock.
24     Q     What did you then do with Joshua after you

253

```
1   opened the door for Gutman?
2       A    As far as I remember, we went and sat on the
3   couch together.
4       Q    That's when you held him in your arms for
5   approximately 19 minutes while Gutman was in the house?
6       A    Yes.
7       Q    And then when you went into the kitchen,
8   where did you put Joshua?
9       A    He was in the front room.
10      Q    Where?
11      A    On the couch.
12      Q    Where was Gutman?
13      A    In the front -- well, when I went in the
14  kitchen to --
15      Q    For the one minute.
16      A    I'm sorry.  I thought when Gutman was
17  leaving.
18           I left the boy in the front room.  I don't
19  remember if I left him on the floor or with Gutman or
20  on the couch.  I went and cleaned up the breakfast
21  stuff, I came back in, sat with the boy until Carl got
22  his phone call and that was the end.
23      Q    Did you again sit with Joshua with his head
24  on your shoulder?
```

255

```
1       A    She was in the house.  She may have been in
2   the front, in the kitchen.  I was looking for a library
3   book.  I was getting my kids off to school.  I wasn't
4   watching every move where she was, but she was in the
5   house for a short time.
6       Q    She was in the house and the baby was, you
7   said, on his stomach, face down?
8       A    Yes.
9       Q    In the middle of the room?
10      A    That's right.
11      Q    And the mother was there?
12      A    She put him there, yes.
13      Q    Have you -- we have been showing you some
14  excerpts from the video tape of your interview by
15  Officer Micci, have you seen this video taped interview
16  before?
17      A    Yes.
18      Q    When?
19      A    I watched some of it a long time ago.  I don't
20  know, like maybe eight months ago I watched some of it,
21  and I -- I watched a little bit of it last night.
22      Q    What parts did you watch last night?
23      A    Just the part where -- where I asked to talk
24  to my lawyer, or when I -- when I told him that I, you
```

254

```
1       A    Yes.  Yes.  Until -- when he got the call,
2   and he got up to leave, that's when his boy, similar to
3   what happened, you know, was, you know, seeing that he
4   was leaving and he started crawling, chasing him and...
5       Q    Who started chasing who?
6       A    JT was chasing, like, you know, following his
7   father.  His father was leaving and he knew it.  That's
8   when I, after 20 minutes, I put the baby down.
9       Q    Where did you put the baby?
10      A    On the couch.  Comes back and then I went and
11  grabbed JT.  Carl had seen him, he was in the front
12  window there, he could see him and then he went on his
13  business, and then I went in the front room to play
14  with him.
15      Q    Then you went into the front room.
16      MR. KISS:  I object.  All of these questions have
17  been asked and answered before.
18  BY MR. KOCH:
19      Q    When -- when did you see Joshua on the floor?
20  Was it before Gutman was there, or after, or after
21  Gutman was there?
22      A    Before.  Before.
23      Q    Okay.  And where was the mother when Joshua
24  was on the floor?
```

256

```
1   know, I would rather come back tomorrow.  I watched
2   that when I -- when called my lawyer, when I called him
3   again, and until he started questioning me, and then I
4   didn't even see myself sign the waiver.  That's all I
5   watched.
6       Q    You didn't really watch the substance of the
7   interview?
8       A    No, I just watched that one little part.  I
9   have never seen the interview from front to back.
10      MR. RUSSELL HARTIGAN:  Do you have a few more?
11      MR. KOCH:  Oh, yes, there are a couple of things
12  that I want to go through in there.
13      MR. RUSSELL HARTIGAN:  I thought you were through,
14  I'm sorry.
15               (Whereupon, a portion of the video
16               was played.)
17  BY MR. KOCH:
18      Q    Mr. Aleman, do you recall Officer Micci
19  talking to you about shaken baby syndrome?
20      A    Yes.
21      Q    Do you recall telling Officer Micci that you
22  did not shake the baby?
23      A    Yes.
24      Q    You later admitted to Officer Micci that you
```

257

1    did shake the baby, correct?
2         A    Yes.
3         Q    Why did you tell the officer that you didn't
4    shake the baby initially?
5         A    Because he was describing shaken baby
6    syndrome, and what I was understanding was that you
7    shake the baby in a harmful manner, did you shake him
8    hard, did you, you know, and the answer was no, and
9    then I -- the way I recollect it, he went on to say
10   that even the slightest little shake can do this, you
11   know.  And then I was like well, wait if you're talking
12   about the slightest little shake, I -- I tried to rouse
13   him, you know, nudging him like that but -- but
14   that's -- that's -- when he said that, that's when I
15   considered, well, if any shake can be a shake, maybe
16   it's considered when I did that a shake.
17              When he was talking about shaken baby
18   syndrome, you can do this, I knew I had done nothing
19   like that.
20        Q    But you did admit to Officer Micci that you
21   shook the baby hard enough so that the baby's head
22   touched the baby's back, correct?
23        MR. KISS:   Objection.  Misstates his testimony.
24        MR. KOCH:   Excuse me.

258

1         MR. KISS:   Misstates his testimony.
2    BY MR. KOCH:
3         Q    You did not admit that?
4         A    I -- yeah, I think I said that.
5         Q    Yeah, you admitted that you shook the baby
6    hard enough that the baby's head touched the baby's
7    back, correct?
8         A    I don't know if I said might have.  I think
9    I -- I think I was careful to explain that I wasn't
10   sure.  I could be wrong, but the way I remember it, I
11   said I'm not sure if it actually did or not.
12              That was at the point where I was like he was
13   saying stuff and I was just started like agreeing with
14   it, you know, that's bad for me.
15        Q    Why did you start agreeing to it?
16        A    Because I had been there many hours, and I
17   got in this pattern.  I was conditioned, it seems, I'm
18   answering you honestly, I feel like I was continued for
19   question, answer, question, answer, and I caught myself
20   just wanting to answer for the sake of answering, and
21   there was even a couple times where I caught myself and
22   I'm not even sure, I'm just answering.
23        Q    Let me go through a little bit more of the
24   video.  I think maybe this may refresh your

259

1    recollection.
2              We're showing a part of the video and the
3    time is -- this on September 9th, 2005, the hour 19,
4    minutes 37, seconds 43.
5                   (Whereupon, a portion of the video
6                   was played.)
7         Q    Okay.  Did you -- did you in that clip, did
8    you ever tell Officer Micci that were you in a panic?
9         A    Yeah.
10        Q    And did you -- did you tell Officer Micci
11   that you -- that you shook the baby?
12        A    Yes.
13        Q    Let me continue on.  We're now at hour 19,
14   minute 38, seconds 21.
15                  (Whereupon, a portion of the video
16                  was played.)
17        Q    Let me just stop.  The part that you have
18   just seen, here and we're now at hour 19, 38 minutes,
19   seconds 53.  You -- you told Officer Micci that you
20   shook the baby three or four times; correct?
21        A    Yes.
22        Q    Continuing on.
23                  (Whereupon, a portion of the video
24                  was played.)

260

1         Q    Did you just describe that you were -- you
2    were hitting Joshua on the cheek?
3         MR. KISS:   Objection to the word "hitting."
4    BY MR. KOCH:
5         Q    You were making a slapping sound with your
6    hand, correct?
7         A    Yes.
8         Q    Is it fair to say that you were describing
9    for Officer Micci that you were at least slapping
10   Joshua on the face?
11        A    Ha-ha, don't know, there has got to be a
12   better way to describe it than that.  I wasn't slapping
13   Joshua on the face.  As I said that I was attempting to
14   revive him by patting his cheek, I would call it, more
15   than I would say slapping him in the face.
16        Q    Well, that patting noise that you demonstrate
17   for Officer Micci makes a noise, correct, on the video?
18        A    Yeah.
19        Q    Let's continue on.  We're at hour 19, 39
20   minutes, seconds 14.
21                  (Whereupon, a portion of the video
22                  was played.)
23        Q    We just heard you described that you're
24   panicked a second time, correct?