1    A    Yes.
2    Q    Let's being on.
3              (Whereupon, a portion of the video
4              was played.)
5    Q    Officer Micci just asked how hard did you
6    shake the baby and you said probably hard enough,
7    correct?
8    A    Yes.
9    Q    Did you also say I'm ashamed?
10   A    Yes, I did.
11   Q    We are now at hour 19, minutes 39, 41
12   seconds.
13             (Whereupon, a portion of the video
14             was played.)
15   Q    We're going to skip ahead now. We're now
16   skipping ahead to the video, same day, 19 hours
17   55 minutes, 28 seconds.
18        Mr. Aleman, do you have any reason to doubt
19   that this -- that this time recording is approximately
20   correct?
21   A    No, I don't have a reason to doubt it.
22             (Whereupon, a portion of the video
23             was played.)
24   Q    Did you say that the baby's head did probably

1    touch its back?
2    A    I sounded like I said did and then stopped
3    and said probably, but if you want to play it again,
4    just to hear it.
5    Q    Sure.
6    MR. KISS:  Well, just stop for a second. Counsel,
7    I'm sorry. Just for the record, I'm going to object.
8    If you play, just going to test him on hearing what
9    we're hearing off the video tape and you're playing him
10   little clips out of context, I suppose, again, it's
11   your deposition, we can do that for as long as we have
12   time under the federal rules, but it's -- you know, I'm
13   objecting to the form.
14   MR. KOCH:  You're objecting to form. Okay.
15   Objection noted.
16             (Whereupon, a portion of the video
17             was played.)
18   THE WITNESS:  Then I think I was agreeable what I
19   thought. I started to say did, caught myself, and said
20   probably because I didn't know, and I -- I was in this
21   pattern of just being agreeable at that point and
22   that's exactly what happened.
23   MR. KISS:  One more thing I'm going to object to.
24   This isn't being transcribed. It's a -- since it can't

1    be, and what's happening is and what's happened for all
2    of these clips we have had played today is that they
3    are played for a certain length of time, questions and
4    answers are exchanged, things are said, and then
5    routinely you ask about one snippet of the
6    conversation, which is played during the clip, and then
7    you're asking the client to confirm that one little
8    piece and it's out of context out of everything that
9    we're all hearing during a deposition. And the only
10   part of it that's making the record is that selected
11   portion which you're asking him to confirm.
12        I object to the form. I'm not just making
13   the standard form for whatever objection. I'm saying,
14   you know, none of this is making the record except for
15   this very small part which you asked him to confirm
16   and, of course, you're not asking him to confirm
17   everything else that is said before that, where his
18   obvious qualifications that he's making in all of these
19   answers, you're just asking him to confirm that
20   selected portion which presumably would support your
21   theory the most.
22        That's the objection that I mean to make.
23   MR. KOCH:  Let's go on. Let's go on.
24             (Whereupon, a portion of the video

1              was played.)
2    BY MR. KOCH:
3    Q    Officer Micci asked you how many times the
4    baby's head touched his back and you responded three or
5    four times, correct?
6    MR. KISS:  Objection. He responded probably three
7    or four times. This is what I'm talking about,
8    Counsel. None of this is making the record.
9         You're stating what we're hearing, and we all
10   know that more is being played in this deposition than
11   you're actually asking him about. That's unfair.
12   MR. KOCH:  You're objection is noted.
13   BY MR. KOCH:
14   Q    Mr. Aleman?
15   A    Yes.
16   Q    You told Officer Micci that his head touched
17   his back probably three or four times?
18   A    Probably touched his back three or four
19   times, that's what I said.
20   Q    I don't think you actually said probably, I
21   think you said three or four times.
22   MR. KISS:  He said probably.
23   MR. KOCH:  Let's go back.
24             (Whereupon, a portion of the video

265

```
1                          was played.)
2    BY MR. KOCH:
3        Q     Stopping the video at 19 hours, 46 minutes,
4    12 seconds. So I did hear the word probably.
5            You answered the officer that the baby's head
6    probably touched his back three or four times, correct?
7        A     Correct.
8        MR. KISS:  I'm sorry, I have to do this again
9    because none of this is making the record, the
10   transcript.
11       MR. MICHAEL HARTIGAN:  Can you make a standing
12   objection? If we play the whole thing, it will exceed
13   the federal rules.  We will be here all night.
14       MR. RUSSELL HARTIGAN:  Certainly you can ask him
15   whatever questions you want.
16       MR. KISS:  If there is any time left. You know, I
17   mean, I don't know if there will be any.
18       MR. MICHAEL HARTIGAN:  I'll order pizzas.
19       MR. RUSSELL HARTIGAN:  You're buying.
20       MR. KISS:  If it'll make it easier, I'll make a
21   standing objection, but I guess my objection is that we
22   are all hearing a lot of things and small part of it is
23   being read back.
24       MR. RUSSELL HARTIGAN:  Certainly, they can also be
```

266

```
1    indoctrinated to admit, too. So, we're trying to
2    facilitate and make it easier this way.
3        MR. KISS:  For example, he said also here it might
4    have been two or three times.
5                (Whereupon, a portion of the video
6                was played.)
7        MS. KEANE:  If you guys will stipulate to the
8    validity of the tape, as it stands.
9        MR. KISS:  If you want.
10       MS. KEANE:  Can we go off the record for a minute?
11       MR. KOCH:  Sure.  We'll go off the record.
12                (Whereupon, a discussion was had
13                off the record.)
14       MR. KOCH:  Let's go on the record.  Counsel, do
15   you want to make a stipulation?
16       MR. KISS:  Well, what am I getting in return here?
17   Are you going to ask other questions, or what?  You
18   said you had another question.
19       MR. KOCH:  I got a whole lot questions.  I have
20   one more question specifically that I want to ask.  If
21   you want to, if you want to stipulate to the
22   authenticity of all of the tapes, then we can stop
23   looking at the tapes.
24       MR. KISS:  That's not my problem with the tapes.
```

267

```
1    The problem with the tapes is that you are asking
2    questions based on information that is not getting into
3    the records, only parts of it.
4            I mean it's not getting entered as an
5    exhibit, that's my understanding.
6        MR. MICHAEL HARTIGAN:  It is going to be an
7    exhibit.
8        MR. KISS:  Right.  Well, my mistake then.  That
9    helps.
10       MR. KOCH:  I'll move on.
11           We're going to show one more clip.  It's
12   20 hours, 18 minutes, 44 seconds.
13                (Whereupon, a portion of the video
14                was played.)
15   BY MR. KOCH:
16       Q     You admitted to officer -- you stated to
17   Officer Micci that you did shake that baby too hard but
18   you didn't mean it, correct?
19       A     I did say that, yes.
20       Q     And that clip ran until 20 hours, 19 minutes
21   15 seconds, at least that's when I stopped the video?
22       A     Yes.
23       Q     Do you recall having any conversations with
24   Officer Micci other than what was -- what occurred in
```

268

```
1    the interview room?
2        A     No.
3        Q     Do you have any reason to believe that
4    Officer Micci was out to get you?
5        A     Yes.
6        Q     Okay.  What's your basis for believing that
7    he was out to get you?
8        A     Well, starting just with the -- when I
9    watched the interrogation video, I feel like I was -- I
10   feel like I was in the room with a professional.  I
11   feel like I was okay at first, and then I -- I was -- I
12   was put in a, after a certain amount of time, I was
13   strategically broken down and to, like I said, I felt
14   like I was just in a pattern, and I was just answering
15   questions to answer them.
16           I -- I -- I didn't feel like he was being
17   honest.  And he said, like I spoke about before, he
18   said that the doctor said that what you're showing me
19   isn't hard enough to hurt a baby.  Then he went in and
20   said the slightest little shake will do it, so then I
21   said oh, well, okay, I shook him a little bit and then
22   he said well, that's not hard enough, but in turn, the
23   Grand Jury hears that it is, that I admitted to shaking
24   the baby hard enough to hurt him, but I never admit to
```

269

1    that.  So something is out of whack, something's not
2    right.
3        Q    On the video, you told Officer Micci that you
4    shook the baby, whether it was two or three times or
5    three or four times, but you conveyed to Officer Micci
6    that you -- you shook the baby hard enough that the
7    head probably touched the baby's back, correct?
8        A    Yes, I did.
9        Q    And is there any reasons that you can -- is
10    there any reason for you to believe -- strike that.
11          Is there any reason why Officer Micci should
12    not have believed you when you said that?
13        A    Well, the way I feel is he almost said it and
14    I disagree with you, that's not exactly how it comes
15    off, but I was telling him the truth and I was giving
16    him the answers, and then he's coming at me with the
17    same questions in different form and I don't know why,
18    I eventually became more agreeable, or more wanting to
19    help and answer questions that I really wasn't
20    comfortable, but I did, and I -- I -- I don't know, but
21    sitting here today, I feel like I was, like I was a
22    fool, I was outmatched.  I feel like I was in the room
23    with a professional who has done this before and had
24    someone in front of them who had gone through something

270

1    more traumatic than anybody in this room will ever
2    realize that morning.
3          Just the fact of dealing with that baby that
4    morning was enough, and then after that everything that
5    came after that.  Many, many hours of sitting here,
6    many, many hours of being upset.  I was not myself.  I
7    was not thinking a hundred percent correctly.  My
8    answers were not always perfect, or sometimes I was
9    just reaching for answers when they weren't even there.
10         I should have just listened to my lawyer and
11    not said a damn word and I see why now.
12        Q    Did you have any reason to believe that
13    Officer Micci was doing something other than simply
14    doing his job?
15        A    Yes.
16        Q    What?
17        A    I feel that he was bound and determined, he
18    was convinced it was me no matter what, and I don't
19    think he was -- he wasn't listening to the answers that
20    I was giving him until -- until -- he only listened to
21    the answers that he liked.
22        Q    Such as? Can you give me an example of why
23    you think he was kind of determined or was --
24        A    Seemed like we went over the same ground a

271

1    zillion times.  I mean, I kept telling him that's all
2    that happened. He's telling me there's more, there's
3    more you're not telling me.  I said no, there's nothing
4    more.  You're wrong.  None of that was acceptable.
5    None of that ended the interview.
6        Q    He didn't believe you?
7        A    No.
8        Q    Okay.  Is there any reason for you to believe
9    that his -- his not believing you was anything other
10    than his simply trying to do his job?
11        A    No.
12        Q    For all you know, he was -- he was trying to
13    faithfully execute his duties and at the same time,
14    while interrogating you, didn't believe you?
15        MR. KISS:  Objection, compound, leading,
16    speculation, knowledge.
17        MR. KOCH:  You can answer the question.
18        THE WITNESS:  What was the question?
19        MR. KOCH:  I'll rephrase the question.  Strike
20    that.
21    BY MR. KOCH:
22        Q    When you were answering Officer Micci's
23    questions, were you trying to be truthful?
24        A    Yes.

272

1        Q    Is there anything that you told Officer Micci
2    that wasn't true?
3        A    No.  There was things I told him I wasn't
4    sure of.  I might not have been sure, and I felt I was
5    being pressed for an answer, that's why there was so
6    many probabilities coming out of my mouth, and I don't
7    know, you know, if I did, then I'm sorry, if that was
8    hard enough, then I'm sorry, because I didn't think I
9    did anything wrong.
10         I didn't think, even then it was hard enough,
11    but if it was because you're telling me, which was
12    inaccurate, that the slightest shake can cause an
13    injury like that, which is completely false, I believed
14    him.
15         So, so I started questioning myself.  Gees,
16    maybe when I did that, oh, my goodness gracious, no,
17    that's not what happened.  Somebody hurt this baby, but
18    it wasn't me.  And because I'm the guy who's six-foot
19    two and had been in 61 days before, and last guy in the
20    room, hot potato, all of those great determining
21    factors, you know, I think, were against me right from
22    the get go and I -- I -- I was broken down and I -- I
23    probably should have stopped talking a lot sooner and
24    gave myself a fair chance.

273

```
 1       Q    Other than your interactions with Officer
 2  Micci in the interview room, is there anything else
 3  that Officer Micci did or didn't do that is the basis
 4  for your claims against him?
 5       A    Besides being in the interview room.
 6       Q    Besides what occurred in the interview room,
 7  is there anything else that you're aware of that
 8  Officer Micci did that's the basis for your claim
 9  against him?
10       A    No.
11       MR. RUSSELL HARTIGAN:  Can I ask one or two while
12  you're looking?
13       MR. KOCH:  Sure.
14               FURTHER EXAMINATION
15  BY MR. RUSSELL HARTIGAN:
16       Q    Would you agree, sir, and I don't know if I
17  specifically asked you, at the time of this incident,
18  September 9th, '05 that you really didn't have the
19  proper credentials to take into custody and control
20  three children at a child day care center?
21       A    I don't agree with that.
22       Q    You believe you had the credentials?
23       A    Credentials or I'm sorry.
24       Q    Experience?
```

274

```
 1       A    Yes, yes.
 2       Q    You never had experience like this before,
 3  though, is that correct, other than for a month or two?
 4       A    Not in professional child care, no.
 5       Q    Do you know a Lindsey McHugh (phonetic)?
 6       A    Yes.
 7       Q    Did her son, Aidan, A-I-D-A-N, was he in your
 8  care -- is it a he or she?
 9       A    He.
10       Q    Care, custody and control at the day care
11  center?
12       A    Yes, temporarily, for a short time.
13       Q    Did she ever complain to you about a bruise
14  on her child's thigh?
15       A    No.
16       Q    Did you ever hear about that?
17       A    Afterwards, I know that she put that in a
18  police report that one time she noticed a leg bruise on
19  his thigh or something like that, but, yeah, yeah, I'm
20  aware of that.
21       Q    Did she ever have any serious complaints that
22  were bought to your attention about the way that you
23  handled him?
24       A    Absolutely not.
```

275

```
 1       Q    Did she ever have any -- did she ever express
 2  any suspicions to you about you being a child care
 3  center?
 4       A    Absolutely not.
 5       Q    So she was a satisfied client, so to speak,
 6  with reference to her child?
 7       A    Yes.  As far as I know, yeah.  She kept
 8  bringing him.  She never said a word.
 9       Q    When did you first initiate the thought of
10  filing a federal civil rights lawsuit?
11       A    When I was sitting in jail.  I mean, I knew I
12  was wronged the first minute.  It took a little while,
13  but I knew if I got out that somebody, somebody is
14  responsible for this.  Somebody should be accountable
15  for it.
16       Q    So sitting in jail, is that your
17  understanding, when this thought occurred, correct?
18       A    Yes.  Sorry.
19       Q    Was it -- were you so frazzled -- Well, for
20  lack of a better term, were you so nervous and upset
21  about what had just occurred on your premises with
22  Joshua that you were not able to drive your motor
23  vehicle to the Hanover Park Police Department and asked
24  permission, or consented to Sergeant Lussky driving the
```

276

```
 1  vehicle?
 2       A    No, that's completely not true.
 3       Q    You were in a state of mind that you could
 4  drive your motor vehicle?
 5       A    Sure.  Absolutely.
 6       Q    Did you tell Sergeant Lussky that, I could
 7  drive my motor vehicle, I don't need you to transport
 8  me?
 9       A    No, I don't recall saying that.
10       MR. RUSSELL HARTIGAN:  Thank you for letting me
11  butt in there.
12               EXAMINATION
13  BY MR. KOCH:
14       Q    Okay.  Mr. Aleman, you said that you had a
15  Worker's Compensation claim in August of '05?
16       A    That's right.
17       Q    Or an incident occurred when you were working
18  as a pressman, correct?
19       A    Yes.
20       Q    You got a herniated disk?
21       A    Yes.
22       Q    Did you receive any medication for that?
23       A    Yes.
24       Q    What medication did you receive?
```

277

1    A    May have been Vicodin or Norton.
2    Q    And how long did you take Vicodin or Norton?
3    A    I was -- that whole year I was off, or
4    actually over a year.
5    Q    How many times were you supposed to take it a
6    day?
7    A    Like four times, four pills a day.
8    Q    Four pills of?
9    A    Directed as needed.  So up to four pills, as
10   I felt.
11   Q    Okay.  Now -- and how long did the -- how
12   long did the herniated disc cause -- did it cause
13   significant pain?
14   A    Yes.
15   Q    And how long did it cause significant pain?
16   A    Still does.  Still pending.
17   Q    So, after you had the incident on
18   August 16th, 2005, when did you get prescribed Vicodin?
19   A    Very shortly after, when I went to the
20   doctor, immediately.
21   Q    Couple of days, at most?
22   A    I went to the emergency room the next day and
23   I'm pretty sure I was prescribed, I left with the
24   prescription that day.

279

1    Q    Did you need four pills a day for the first
2    couple of months?
3    A    Usually I took two.
4    Q    When, on the August -- September 9th, 2005,
5    the date of this incident were you taking Vicodin?
6    A    No.
7    Q    Why not?
8    A    Because I wasn't in pain.  I was fit to go
9    back to work at that time, but instead of going back to
10   work, I went to child care.  I didn't need any medicine
11   then.
12   Q    This is like three weeks after the incident,
13   correct?
14   A    No.  I was hurt, and I was off work for
15   almost a year and a half or more, and then I opened a
16   child care.
17        When I was released, medically released to go
18   back to work, that's when I decided that no, why don't
19   I just keep doing what I'm doing, maybe I could pick up
20   a couple of kids.
21   MR. KISS:  It's a mistake.
22   MR. KOCH:  I understand.  Thank you.
23   BY MR. KOCH:
24   Q    Are you still taking Vicodin?

278

1    Q    Was it Vicodin?
2    A    It was either Vicodin or Norton, it was a
3    pain medication.  One of the two.  I'm not sure exactly
4    which one they gave me out of the hospital that day.
5    Q    When did you try to get Vicodin at the
6    pharmacist in Carol Stream?
7    A    A few years before that.  Maybe 2002 or '03,
8    I guess.
9    Q    Were you taking Vicodin?
10   A    At that time.
11   Q    When you tried to get it by impersonating a
12   physician?
13   A    No, actually I wasn't.
14   Q    Why did you try to get Vicodin?
15   A    I tried to get it for a friend who asked me
16   to do it.
17   Q    After -- after the incident in August of,
18   August 16th, 2005, how many times were you taking
19   Vicodin a day?
20   A    (No response.)
21   Q    The incident was August 16th, 2005, you
22   stated.
23   A    Didn't I just answer that.  Like up to four
24   pills a day depending on how I needed it.

280

1    A    No.
2    Q    Why did you stop?
3    A    I don't know.  About three years ago.
4    Q    How much do you weigh, sir?
5    A    Excuse me.
6    Q    How much do you weigh?
7    A    Presently, 175 pounds.
8    Q    You said that Adam Mahalik is really angry at
9    you?
10   A    Yes.
11   Q    Why?
12   A    Because I haven't paid him all his money back
13   yet.
14   Q    When did you see him last?
15   A    I seen him, visually, getting out of his car
16   within the last week or so.  We share the same day
17   care.
18   Q    Again you owe him about $1500.
19   A    I owe him $1500.
20   Q    Carl Gutman, you owe him?
21   A    Upwards of 20,000.
22   Q    I think you said earlier in the high 20's, is
23   that accurate?
24   A    Yes, yes.

281

1    Q    On September 9th, you said that you didn't
2    feed Joshua, is that correct?
3    A    Yes.
4    Q    Did you try to feed Joshua?
5    A    I don't recall trying to feed him that day,
6    no.
7    Q    You did feed your own kids before they went
8    off with -- off to school, correct?
9    A    Yes, I did.
10   Q    What about JT Gutman, did you feed him?
11   A    No.
12   Q    What about Adam Junior, did you feed him?
13   A    No.
14   Q    Is there a time that you typically would have
15   fed the kids?
16   A    Not hard core, like on the minute, on the
17   hour, no, just -- just -- it was a routine. I would
18   get my kids fed, off to school, and then, you know,
19   very shortly after, I would feed the other ones. But,
20   you know, because of the -- all that was going on with
21   the baby was sick and whiny and the Carl stopped by, I
22   didn't get a chance to get those. I was going to do it
23   after he left.
24   Q    When you were describing, speaking with

282

1    Officer Lussky when she first arrived, I think you said
2    you told the officer how the baby was lying on the
3    floor, did I misunderstand, did you --
4    A    All I was saying, after all this went on,
5    there was in her report, she -- she explained how I
6    described the baby being on the floor with his butt up
7    and his head down, so that's what makes me say, yeah, I
8    did, because I don't remember doing it that day, in
9    front of her, but if I said it, I'm sure I did.
10   Q    So you looked at her report and when you were
11   answering questions about what you told Officer Lussky,
12   and Josh, about Joshua lying on the floor, you don't
13   actually have any memory of that?
14   A    I don't remember what I told -- everything
15   that I told the officers that were at the house that
16   day. One guy was running around taking pictures. I
17   was out of my mind. They were asking a lot of
18   questions. I don't remember. I don't recall that. It
19   doesn't mean it didn't happen, I just don't recall.
20   Q    Why are you taking your kids to day care
21   right now?
22   A    I take then because it's right across the
23   street from the school. I drop them off to play with
24   their friends. She doesn't charge me anything. They

283

1    get bored with me. She's their Godparent.
2    Q    Who is that?
3    A    The day care operator. She's -- Karen, she's
4    a Godparent, and they are like family to us, they have
5    raised -- they have helped raise the kids since they
6    were born, and they helped me with this, and we're real
7    close. She has kids over there.
8    Q    What's Karen's last name?
9    A    Robski (phonetic).
10   Q    Robski.
11        She lives where?
12   A    In Roselle.
13   Q    And the day care center is where?
14   A    At her house.
15   Q    What's the address?
16   A    200 something, I don't know. 204, 203 Pine
17   Street in Roselle.
18   Q    Pine Street.
19   A    Yes.
20   Q    All of your kids are not in school now?
21   A    No.
22   Q    So how many are in school and how many are
23   still going to day care?
24   A    None of the kids are in school right now,

284

1    it's summer break.
2    Q    I didn't mean -- before summer break began,
3    were all of your kids in school?
4    A    Yes.
5    Q    Okay. And they are going to day care now
6    because it's the summertime?
7    A    They go to day care -- they -- they don't go
8    every day, they -- like today they are there, now,
9    because I'm here. They like going over there. It's
10   boring hanging out with me, I'm sure.
11   Q    You have identified some persons on your
12   26(a)1 disclosures as having information.
13        Who is Jill Rodich (phonetic)?
14   A    She's a -- my understanding is she's a -- an
15   old acquaintance of Danielle Schrik.
16   Q    What information does she have that's
17   relevant to this lawsuit?
18   A    Just about how Danielle used to beat on her,
19   and ambushed her, jumped out of the bushes and beat her
20   up and stuff.
21   Q    Does she have any knowledge of any acts or
22   omissions by the defendants in this lawsuit?
23   A    No.
24   Q    So, the knowledge that she has just relates

285

1   to Danielle Schrik's past?
2       A    Yes.
3       Q    And Dr. Patrick Barnes, you testified earlier
4   about, I guess, some expenses relating to Patrick
5   Barnes.
6           Did your criminal defense team interview him?
7       A    Yes.
8       Q    Yes?
9       A    Hmm-hmm.
10      Q    Did you all have any expert witnesses?  Did
11  you retain any expert witnesses in your criminal
12  defense?
13      A    We had expert witnesses that we were prepared
14  to bring to court.
15      Q    Who were they?
16      A    Patrick Barnes, Dr. Stone.  We were going to
17  call their doctor, you know the doctors that worked on
18  the boy.
19      Q    Earlier you testified that one of the reasons
20  that you think that the State's Attorney dropped the
21  lawsuit was because you knew things that perhaps the
22  State's Attorneys Office didn't want to get out,
23  something to that effect.  Do you recall that?
24      A    Yes.  Yes.

287

1   why wasn't she at least the one, or one of the people
2   under the crossfire here, why wasn't she pursued more,
3   why -- why -- why did they just leave it on me.  Why,
4   when you got the, the grandmother who lives with the
5   boy calling you and telling you, you got the wrong guy
6   in jail, she beats the boy.  I've seen her beat the boy
7   before, why nothing was done about nobody said okay,
8   well, okay, let's see what's going on here, it didn't
9   happen.
10      Q    Anything else?
11      A    Uhm, not at this moment.
12      Q    Anything that would refresh your
13  recollection?
14      A    Maybe just some time to -- it's a little
15  intimidating.  It's a little hard for me to -- to do
16  everything that I want to recall when I'm sitting in
17  this room.
18           It's -- it's not what I do usually.  I'm not
19  very comfortable, so, you know, I'm sure I'm going to
20  leave here and be like oh, I forgot to say this or
21  that, but I'm here doing my best today.
22      Q    You can't recall anything else?
23      A    Not at this moment.
24      MR. KISS:   The question was is there anything else

286

1       Q    What are you referring to?
2       A    Uhm, the statement from Danielle Schrik's
3   mother, from her father, from other Joe Riddick
4   (phonetic), her old boyfriend, with regards to chronic
5   abuse of the boy, hitting him in the head, knocking him
6   out of the high chair, hitting her mother, breaking her
7   mother's jaw, being -- the mother describing what it
8   was like living with Danielle, being in fear for her
9   life everyday, putting a video surveillance on her
10  house because she was scared of her daughter, and just
11  many, many stories about a lot of abuse.
12      Q    So -- so other than stories about abuse
13  committed by Danielle Schrik, is there anything else
14  that you think the State's Attorney's Office did not
15  want to become public?
16      MR. KISS:   Objection, speculation.  Sorry.
17      THE WITNESS:  Uhm, my opinion is that, for
18  instance, like when I talked about the Medical Examiner
19  not being given correct information, and then later, I
20  mean information that was easily attainable if you're
21  looking for it.  I don't think that the State's
22  Attorney wanted anyone to know that the wrong guy was
23  arrested, that some, so much was pointed at the mother,
24  why wasn't she the one that was arrested originally, or

288

1   you can recall?  Objection, form.
2   BY MR. KOCH:
3       Q    Is there anything else that you can recall
4   about why you didn't --
5       A    Not at this time.
6       Q    Let me finish my question.
7           Is there anything else that you can recall
8   that would be the basis for your statement that the
9   State's Attorney's Office would want to end the case so
10  things wouldn't become public?
11      MR. KISS:   Objection, form, compound.
12      THE WITNESS:   Not at this time.
13  BY MR. KOCH:
14      Q    Let's just -- when did you become aware of
15  all this information about alleged abuse by Danielle
16  Schrik?
17      A    Shortly after I got out in jail.  When I was
18  in jail, I called my wife one time and she's like I got
19  good news.  Somebody called, there is an anonymous
20  caller calling and saying these things, that was the
21  first time somebody was alerted -- something was
22  alerted to me.  Excuse me.
23           When I got out of jail, I hired a credible
24  lawyer, and he started doing his job and we hired

289

1  investigators and between getting phone calls from
2  people coming forward and asking people who are
3  interviewed the right questions, new information
4  started coming up.
5      Q    Is there anyone who came forward with
6  information that was not put on your 26(a)1
7  disclosures?
8      A    I don't know what that means.
9      MR. KISS:  Counsel, I have to apologize, I don't
10  have my copy with me.  I have a lot of other things,
11  but I did not bring that, so I don't know if he can
12  answer that without looking at it.
13      MR. KOCH:  Why don't you take a look at this.
14      THE WITNESS:  What was the question?
15      MR. KISS:  The question is, can you think of
16  anybody else.
17      THE WITNESS:  Besides who I'm looking at here?
18  Who should be on here?
19      MR. KISS:  Right.  Then it goes on.
20      MR. KOCH:  Off the record.
21          (Whereupon, a discussion was had
22           off the record.)
23      MR. KOCH:  On the record.
24  BY MR. KOCH:

290

1      Q    Mr. Aleman, you're looking at the 26(a)1
2  disclosures that your office sent to defense counsel,
3  and I think you indicated that there may be some
4  persons who are not on the list on the 26(a)1
5  disclosures, and I would ask if plaintiff's counsel
6  would supplement that within a week or so, is that
7  acceptable?
8      THE WITNESS:  Certainly.
9  BY MR. KOCH:
10      Q    Do you have reason to believe that any of the
11  defendants in this lawsuit were aware of these
12  allegations of abusive behavior by Danielle Schrik on
13  September, September 9th?
14      A    On that day, do I think they were aware of
15  it?  I couldn't -- I don't know what questions they
16  asked.  I don't know.
17      Q    You don't have any, any basis to believe that
18  these anonymous sources and other people that started
19  contacting your wife, and you, and perhaps your
20  attorneys, also contacted the defendant officers on
21  September 9th, do you?
22      A    No, they did.
23      Q    Who did?
24      A    Nancy Schrik, she -- when she first -- she

291

1  had like a friend call because she was like nervous,
2  but she told me that they had called the police, she
3  called DCFS, they called our attorneys.
4      Q    On September 9th?
5      A    Not on September 9th.
6      Q    That was my question.
7      A    No, no, I was -- I have no idea.  I was in
8  the interview room, they put me in jail, so I don't
9  know what was going on outside on September 9th.
10      Q    You don't know whether the defendant officers
11  received information about Danielle's allegedly abusive
12  behavior, you know, prior to September 15th when the
13  murder charge was issued?
14      A    I don't -- I wouldn't think they needed
15  somebody else to tell them about her background, but...
16      Q    That's not my question.
17      A    I -- no, I don't know.  I don't know.  I
18  don't know if -- I don't think so.
19          EXAMINATION
20  BY MR. MICHAEL HARTIGAN:
21      Q    Mr. Aleman, in the two or three days
22  preceding this incident, did you ever suspect that
23  Danielle Schrik had been abusing her child, Joshua?
24      A    No.

292

1      Q    You indicated that the grandmother called and
2  said that she beat that boy.
3          You were referring to Nancy Schrik; is that
4  correct?
5      A    That's correct.
6      Q    Do you know whether or not that call was
7  placed to any particular defendant to this lawsuit,
8  where it be any member of the Hanover Park Police
9  Department?
10      A    I don't know which officer fielded her call.
11  I was told, by her, that -- that they did call and
12  they -- they weren't interested in listening.
13      Q    I think you indicated earlier you don't know
14  when that call was made?
15      A    I don't.
16      Q    Could have been well after the murder charges
17  were lodges against you, is that fair?
18      A    It was.
19      Q    Mr. Aleman, do you have any knowledge as to
20  whether or not a relationship developed, of a romantic
21  nature between Danielle Schrik and any particular
22  defendant to this lawsuit?
23      A    I was -- I was told that there is a good
24  possibility of that.  I was told by Nancy Schrik that

293

```
1   she witnessed them being much more closer than regular
2   victim and -- or, you know, officer/victim
3   relationship.
4       Q     When you say they being much more closer,
5   obviously you're referring to Danielle Schrik and
6   somebody else, do you know who?
7       A     I was told Officer Carlson.
8       Q     All the information that you have received in
9   this regard was from Nancy Schrik?
10      A     That's correct.
11      Q     That's based upon her observations?
12      A     Yes.  That's correct.
13      Q     Do you know if anybody else observed
14  Detective Carlson and Danielle Schrik in this quasi
15  relationship?
16      A     I don't know if anybody else is aware of
17  that.
18      Q     When did you learn about this from Nancy
19  Schrik, that being this relationship?
20      A     Midway between -- maybe closer to the front
21  end of me getting out of jail and them dropping the
22  case.  Maybe after that.
23      Q     Would you agree that Detective Carlson had to
24  interview and work with Danielle Schrik as far as
```

295

```
1       MR. MICHAEL HARTIGAN:   We have no further
2   questions.  Nothing further.
3       MR. KOCH:   For the record, we -- we have marked
4   the -- the DVD videos of the interrogation --
5       MR. MICHAEL HARTIGAN:   We already did that.
6       MR. KOCH:   Oh, you did that.
7       MR. MICHAEL HARTIGAN:   So we're good.
8                   EXAMINATION
9   BY MR. KISS:
10      Q     Rick, do you recall what time it was that you
11  were first taken to the Hanover Park police station on
12  the date of this incident?
13      A     I would think -- I think I recall it being
14  after 10:00 o'clock, around 10:00 o'clock if I
15  remember.
16      Q     10:00 o'clock a.m.
17      A     Yes, a.m.
18      Q     Okay.  All right.  And we watched numerous
19  video clips today during your deposition?
20      A     Yes, yes.
21      Q     All right.  Now, by the time you were making
22  an apology of some kind to Sergeant Micci on the one
23  video clip.  Do you remember watching that today?  I
24  know it was awhile ago.
```

294

```
1   getting information and essentially informing her of
2   the progress of the case?
3       A     Yes, I'm sure he did.
4       Q     Do you think that would be unusual that they
5   would communicate with one other by phone or in person?
6       A     I don't know.
7       MR. MICHAEL HARTIGAN:   Those are all the questions
8   I have for now.
9       THE WITNESS:  Thank you.
10      MR. KOCH:   Hold on.
11      MR. MICHAEL HARTIGAN:   For housekeeping, let's
12  mark all the exhibits and so when we get a motion
13  two years from now, we'll know what exhibit number was
14  what.
15          Just for the record, we'll mark this as Group
16  Exhibits 7, the three DVDs documenting the interview of
17  Rick Aleman from Hanover Park Police Department from
18  September 9th and 10th, 2005.  There are three total
19  which will comprise Group Exhibit 7 to today's
20  deposition.  I trust there is no objection.
21      MR. KISS:   No objection.
22               (Whereupon, Aleman Exhibit
23               No. Group 7 was marked for
24               identification.)
```

296

```
1       A     Yes, I do.
2       Q     Just for the record, I'm referring to a slip
3   that was starting, I believe, at 1054 and 14 seconds
4   p.m.  Actually, I don't know whether that was a.m. or
5   p.m. by that's the time on it.
6       A     I'm sure it was p.m.
7       Q     At that time, how long had you been in
8   custody if you can approximate?
9       A     If it was 10:40 p.m. then I had been in
10  custody approximately 12 hours.
11      MR. KOCH:   Just to clarify the record, the video
12  said 10:54:14.  That's 10:54 a.m.  That's a 24-hour
13  clock.
14      MR. KISS:  All right.
15  BY MR. KISS:
16      Q     So this, assuming that you got there sometime
17  after 10:00 a.m, correct?
18      A     Yes.
19      Q     You were making some statement about what
20  you're sorry about at 10:54 a.m.?
21      A     That can't be right.  Those officers -- those
22  officers didn't show up until four, five o'clock that
23  afternoon.  I wasn't questioned until later that day.
24      Q     All right.  Do you have a recollection of
```

297

```
1   about how long you were in custody for this
2   interrogation?
3       A    I -- I would -- between 12, 14 hours I would
4   guess.  Not guess, but I would approximate.
5       Q    All right.  And during that 12 or 14 hour
6   period, did you ever have an attorney come there to the
7   Hanover Park Police Department?
8       A    No.
9       Q    Except for the time where your wife initially
10  came to the station, was there anyone there for you?
11      A    No.
12      Q    How many times were you fed during that
13  period?
14      A    I remember them placing food in front of me
15  once, that's all.
16      Q    Do you remember what it was?
17      A    It was a sandwich of some sort, I don't
18  remember.  I remember food being placed in front of me,
19  it didn't mean anything to me, so I don't remember what
20  it was.
21      Q    Did you eat that food?
22      A    No.
23      Q    Why is that?
24      A    I -- my stomach was -- I had too much nerves
```

298

```
1   in my stomach, I didn't want to eat.  I wanted to know
2   what was going on.
3       Q    All right.  Were you ever allowed to leave
4   during that period of time?
5       A    I -- only that room, I was allowed to leave
6   two times.  I wasn't allowed to leave like on my own
7   accord at all.  I was allowed to leave the room after I
8   requested to get some air because I was starting to do
9   some of this stuff, (Indicating.)  I immediately get
10  goofy.
11      Q    For the record, you were breathing heavy?
12      A    I was hyperventilating.  Not full blown, but
13  I --
14      Q    Okay.  Earlier today you were talking about
15  how you felt like you weren't given a choice about
16  whether you would have to talk or not to the police, do
17  you remember that testimony?
18      A    I do.
19      Q    Okay.  Can you elaborate on why you thought
20  you didn't have a choice about whether you could stop
21  talking?
22      MR. KOCH:   Objection, leading.
23      THE WITNESS:   Because I -- because I know I
24  didn't.  Because everything, my requests weren't being
```

299

```
1   honored.
2           Can you ask the question again?  I'm really
3   sorry.  This is -- this is very emotional stuff for me.
4   I'm not trying to be difficult.
5   BY MR. KISS:
6       Q    It's been a long day for everybody.  My
7   question is, why did you think that you didn't have a
8   choice about speaking to the police?
9       A    Because I was told I had a choice, but then
10  after I was told, and I acted on it and I -- I
11  consulted counsel, and I expressed, you know, my
12  concern and my opinion about what I wanted, it was
13  like -- it was overlooked.  And I mean, when I -- I
14  watched that tape, you could see it happen.  I said
15  wow, you know, I, you know, he said that, I think I was
16  feeling better, I would rather come back tomorrow and
17  then it was like, I didn't even say that.  He just went
18  right over that and I -- we can watch the tape, I don't
19  remember what he said, but it didn't address what I
20  said, and he's calling the shots, I'm in the room.
21  I -- I couldn't do anything.
22           I -- I asked to leave and I couldn't leave.
23  I told him I wanted -- I didn't want to talk, I wanted
24  to have an attorney here, and I wasn't allowed to do
```

300

```
1   that.
2           I started feeling like in a corner and his
3   voice reflections were going up, and I felt like I was
4   out of control, like I wasn't getting, you know, no
5   matter what I said they weren't going to believe at
6   that point.  My requests weren't being honored.
7       Q    Okay.  And to be clear let's see.  Let me
8   find the -- you're describing what was going on around
9   that moment where you had come back from talking to
10  your attorney on the telephone; correct?
11      A    Yes.
12      Q    Is that the first time that you talked to him
13  on the phone?
14      A    No.  First time that day?
15      Q    Yes.
16      A    No.  I -- I, uhm, I called him from my house
17  when the police were there.  Uhm, I'm pretty sure after
18  they asked me to go down to the station with them, I
19  called the same attorney, I said, hey, this is what
20  just happened at my house.  He said the mother, it was
21  funny in my opinion he was right, I thought he was nuts
22  at the time, and I just wanted to make sure.  I have
23  been in trouble before, obviously, and I just wanted to
24  make sure I was doing what I needed to do at that time.
```

301

1   I was in a situation that was a lot bigger.
2       Q    Now, again, you stated that you -- you
3   entered the Hanover Park Police Department sometime
4   after 10:00 a.m.
5       A    That's correct.
6       Q    You weren't formally told you were under
7   arrest until what was indicated on video tape as 2158?
8       A    That's correct.
9       Q    Which would have been almost 10:00 p.m.
10  correct?
11      A    Yes.
12      Q    So at that time you had been in custody close
13  to 12 hours, is that right?
14      A    Yes.
15      Q    You were shown a clip of your interrogation
16  that had occurred at about, well, according to the
17  stamp, 20, 19, 18 seconds, do you remember watching
18  that clip today?
19      A    With regards to what?
20      Q    This is the clip which was a segment showing
21  when you say something to the effect of that you
22  probably did shake the baby hard enough.
23      A    Yes, I do remember watching that tape.
24      Q    Yes. This is the clip, again that was time

302

1   stamped 20, 19, 18. Figuring that would be 8:00,
2   9:00 p.m., that statement then would have been made
3   about ten hours after you had been taken into custody,
4   correct?
5       A    That sounds about right, yes.
6       Q    Could you describe the course of your
7   impressions of how things were going during this period
8   that you were in custody at the Hanover Park Police
9   Department?
10      A    Uhm, how they were going?
11      Q    How did it start off?
12      A    Well, I -- it started where I entered the
13  station, I went in the interrogation room, and they
14  left me -- my wife and I in there, they left the room
15  and her and I were very upset and concerned about what
16  was going on. We had some discussion.
17           Lussky would poke her head in every once in a
18  while to see how everything was. I requested to go
19  outside because I was becoming more and more, as the
20  time went on, I was becoming more and more physically
21  upset and, you know, I got clammy and dizzy and so I
22  needed to get some air, and I did.
23           I was scared, and I was nervous, and I didn't
24  like being in that room. I didn't like the whole

303

1   feeling. I wanted to leave, you know, and then I asked
2   if I could leave and I was -- I said I could go home
3   and come back tomorrow if you need me. No, they said
4   the people are coming. I said I wanted to go home and
5   be in the comforts of my home and she denied that
6   request. Then she kind of hurried up the time I was
7   taking, we went back in and sat in the room before.
8           We did the same thing again. I requested to
9   leave again and I wasn't allowed to. We went back in
10  the room and we -- she kept poking in and telling us
11  updates. They were all similar, that they are on their
12  way. We're waiting for DCFS, and this and that.
13          I would ask her, occasionally, how the
14  condition of the boy was, and she would tell me what
15  she knew or at least if she was being honest or not, I
16  don't know, she would tell me something anyway.
17          After, eventually, many hours Micci and
18  Villaneuva showed up. Well, actually before that they
19  took my wife out of the room. They separated us. They
20  had to, like being nervous, uncomfortable, things like
21  that, but I just waited and I -- I was getting more and
22  more like sick. I don't know if they gave me a
23  blanket. I was throwing up and stuff like that because
24  I was breaking down, like inside. I am not, in normal

304

1   daily life I'm not the strongest emotionally, I can say
2   it was really hard.
3           My wife was gone. Then those guys came in.
4   I was really anxious to help, to get out. I was really
5   anxious to help. Called my lawyer because I wanted to
6   see what he thought, you know. He told me, no, no, no.
7   So I listened to him, that's why I called him, you
8   know, like I said, I expressed that, and it was ignored
9   and, you know, I'm feeling sicker and sicker. You know
10  everything that happens adds to it.
11          I talked to the lawyer, you tell them. They
12  don't listen. It keeps getting worse and worse. So
13  after I asked to see, if I could go or whatever, come
14  back tomorrow he ignored that. He just kept
15  pushing for c'mon you got to sign this thing, I'm going
16  to talk to you, maybe I can help. I believe, I
17  remember, I didn't see it on the tape, but I really
18  remember him saying if there is anything you can tell
19  me, this baby's in the hospital fighting for his life
20  right now, if there is something, maybe something you
21  know, something you can tell me by talking that could
22  help the baby, that's the most -- that was the most
23  compelling for me to -- to want to help, to want to
24  talk when he's telling me not to, but still I stuck to

305

1    my, no, I'm not going to, this is what my lawyer said.
2    This is what I've been advised to do.  They were still
3    pushing, pushing, pushing.
4            So me, like I keep saying, I want to be
5    agreeable.  I want to be -- I want to helpful by my
6    nature.  I want to, whether it's dumb for me or not
7    that's who I am.  So, I feel like an idiot now, but I
8    call him back.  I'm trying to convince him to change
9    his mind.  He knows what's right for me.
10       Q    Your lawyer?
11       A    Yes.
12       MR. MICHAEL HARTIGAN:   You know what, I hate to
13   object and cut him off, but this is turning into a
14   narrative.  It's almost a conversation between the two
15   of you.  I forgot the question.  Just to that extent
16   I'll object.
17       THE WITNESS:  My apologies.
18       MR. MICHAEL HARTIGAN:   No, not at all.  It's been
19   a long day.
20       THE WITNESS:  I'm new at this.
21   BY MR. KISS:
22       Q    How did you feel at the end of this
23   interrogation?
24       A    What do you mean when he said we're going to

306

1    lock you in a cell?
2        Q    Yes.
3        A    I was miserable, scared.  Scared of a lot of
4    things as you can possibly imagine.  I was -- I was
5    distraught.  I mean, that's the worst things you can
6    get.  Everything I didn't want.  That's what I was
7    trying to do is cooperate so I could leave.
8        MR. KISS:   I have no further questions.
9    BY MR. MICHAEL HARTIGAN:
10       Q    Rick, would you mind giving us your cell
11   phone number that you had on the date of this incident?
12       A    708-268-4123.
13       Q    Is that still your cell phone number?
14       A    No, sir.
15       Q    You had your cell phone with you the entire
16   time during this detention at Hanover Park Police
17   Department, is that fair to say?
18       A    I don't -- I believe, especially when I look
19   at that, that's my wife's cell phone.
20       Q    You had a cell phone?
21       A    I don't think I had the cell phone.  No, they
22   took the cell phone out of house, off the computer
23   table.
24       Q    You were seen multiple times on the video

307

1    with a cell phone in your hand?
2        A    Correct.
3        Q    Who's cell phone was that?
4        A    My wife's.
5        Q    Your wife left it with you and then she left
6    the room, is that right?
7        A    Yes, apparently so.
8        Q    You had your wife's cell phone the whole
9    time?
10       A    Not the whole time.
11       Q    When was it taken away, when you were
12   processed?
13       A    No, it was taken away a few hours before I
14   was interviewed by Micci and Villanueva.
15       Q    Who took it away?
16       A    I don't remember.
17       Q    Counsel had indicated, you know, referenced
18   how you apologized and this was some hours ago when we
19   showed you that clip.
20           Do you recall being shown a clip where you,
21   indeed, made that apology the following day,
22   September 10th, 2005, at 10:54 a.m., that would have
23   been in the morning on the second day, do you recall
24   that now?

308

1        A    Yes, I do.
2        Q    And you also referenced how you wanted to
3    cooperate and comply with the questioning, and it's
4    referenced how you had been in the room for about
5    12 hours.
6            You were not being questioned for a good
7    75 percent of those 12 hours, you were sitting there
8    alone, do you recall that?
9        A    Yes.
10       Q    You had a lot of time to think about what you
11   were going to say to these officers that were probably
12   going to question you, is that fair to say?
13       MR. KISS:  Objection.  Leading.
14       THE WITNESS:  No, it's fair.  I would say I had a
15   lot of time to sit there, but my mind wasn't being -- I
16   wasn't being strategic at that time.  I was concerned
17   for myself and the baby and...
18   BY MR. RUSSELL HARTIGAN:
19       Q    You, at some point, learned from either
20   Sergeant Micci or others that there was -- that the
21   baby had suffered some head injuries and had blood on
22   the brain?  Had you learned that at some point on the
23   date of this incident?
24       A    Yes.

309

1  Q   When you shook the baby as you did as was
2  depicted on this video, might you understand why you
3  would be considered a prime suspect in the -- in the
4  battery of this child and the eventual death of the
5  child?
6      MR. KISS:  Objection.
7  BY MR. MICHAEL HARTIGAN:
8      Q   Can you see where an officer might see you as
9  the prime suspect as opposed to Danielle Schrik?
10     MR. KISS:  Objection. Hold on a second. Let me
11 make my objection. Leading, form, compound,
12 speculation.
13     THE WITNESS:  No.
14 BY MR. MICHAEL HARTIGAN:
15     Q   Earlier you indicated that you thought it was
16 your nerves that maybe made you shake that plastic baby
17 a little too hard, do you remember saying that?
18     A   Yes, I do.
19     Q   If you were to be given that model baby
20 today, you wouldn't shake as hard, is that what
21 you're saying?
22     A   I couldn't speculate. I really couldn't.
23     Q   Ultimately, you did learn of the cause of
24 this baby's death, is that fair to say?

310

1      A   Yes.
2      Q   What was your understanding?
3      A   That's almost correct. Only because the
4  Medical Examiner, or medical experts that we talked to,
5  you know, opinions were similar but not completely
6  consistent. I'm not exactly sure.
7      Q   Did you ever learn from your attorneys that
8  were representing you in the criminal matter -- I'm
9  almost finished -- what it is that the Chief Medical
10 Examiner didn't have when she was completing her
11 post-mortem examination and report? Do you know what
12 it was that she needed?
13     A   I think she was deprived of the information
14 that would describe the condition of the baby leading
15 up to Friday, the week leading up to Friday, his
16 health.
17     Q   Did you notice any visible marks or abrasions
18 or what they call like bruising on any portion of
19 Joshua's body upon your first taking custody of him
20 that Wednesday?
21     A   No.
22     Q   Okay. And the only really -- the only marks
23 that you saw were the bruise that you saw on his
24 forehead after he had fallen when he was in your

311

1  custody?
2      A   That's correct.
3      MR. MICHAEL HARTIGAN:  That's all the questions I
4  have. Thank you. I said that before, though.
5      THE WITNESS:  Thank you.
6      MR. KOCH:  Last question. I have a follow up to
7  what you just said.
8      THE WITNESS:  That's fine.
9  BY MR. KOCH:
10     Q   You said I wasn't allowed to have an attorney
11 there when you were being interviewed by Officer Micci
12 and Villaneuva.
13     A   I said that?
14     Q   Yeah, you said I wasn't allowed to have an
15 attorney there. Did you mean to say that?
16     A   No, I -- if I said that, what I meant to say
17 was I wasn't allowed to wait for my attorney, or I
18 wasn't allowed to be given an opportunity to have an
19 attorney here.
20     Q   But --
21     A   Because my attorney didn't want to come until
22 the next day and they were pushing me to no, right now.
23     Q   They didn't tell you that if your attorney
24 arrived, they didn't say that your attorney couldn't

312

1  come there and -- and be there that day, correct?
2      A   No.
3      Q   It's just your attorney who didn't want to
4  come that day, correct?
5      A   I don't know if he didn't want to.
6      Q   He didn't offer to?
7      A   I would assume he didn't.
8      Q   Is that correct?
9      A   That's correct.
10     MR. KOCH:  I have no further questions.
11     MR. KISS:  I hate to do it to everybody, two
12 questions.
13            EXAMINATION
14 BY MR. KISS:
15     Q   Did you shake Josh as vigorously as you
16 appeared to shake him in the demonstration that we saw
17 in the video tape clip?
18     A   No.
19     Q   Did you shake him harder than what we saw or
20 less?
21     A   I'm sure I shook him a lot less. I'm sure.
22     Q   How hard would you shake a baby?
23     A   I wouldn't shake a baby at all. Normally, in
24 that circumstance, I did what I did. I -- I shook him

313

```
1   lightly.  Again shake, I -- I'm not as educated as I
2   needed to be, I struggled for another word that would
3   describe a little better what it was.  That's why I
4   said rouse, but I very gently shook him.  That's the
5   answer.
6        Q     Regarding a question from Counsel about
7   having your lawyer, or whether you were allowed to have
8   your lawyer there, did you -- did you have any
9   impression whether the police were going to wait for
10  your lawyer to get there before they started
11  questioning you?
12       A     No, I had no impression of that.
13       Q     They kept questioning you after you told them
14  that you wanted to go home, correct?
15       A     Yeah.
16  MR. KISS:   That's really it for me.
17  MR. MICHAEL HARTIGAN:   Nothing further.
18  MR. KOCH:   No further questions.
19  THE WITNESS:   He almost had one.
20  MR. KISS:   We will reserve signature.
21  MR. MICHAEL HARTIGAN:   I will take a regular and a
22  mini.
23  MR. KOCH:   I will take a mini.  E-mail one.
24  MR. KISS:   I'll take a mini.
```

315

```
1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3   RICK ALEMAN,                    )
4        Plaintiff,                 )
5        -vs-                       )  No. 07 C 5049
6   VILLAGE OF HANOVER PARK; HANOVER)  Judge
    PARK POLICE OFFICERS CAROL LUSSKY)
7   Star 12; ERIC VILLANUEVA, Star 9; )  Magistrate
    TODD CARLSON, Start 126; JOHN    )  Judge
8   DOSSY, Star 48; ILLINOIS STATE   )
    POLICE OFFICERS JOSEPH MICCI,    )
9   Start 3566, STEVE CARDONA, Star  )
    3213; and GERY FALLON, Star 4060,)
10       Defendants.                )
11
12
13            I hereby certify that I have read the
14  foregoing transcript of my deposition given on July
15  24th, 2008, at the time and place aforesaid, and I do
16  again subscribe and make oath that the same is true,
17  correct, and a complete transcript of my deposition so
18  given as aforesaid, as it now appears.
19
20            _____
21                      RICK ALEMAN
    SUBSCRIBED AND SWORN TO
22  before me this _____ day
    of _____, A.D. 2008.
23
24  _____
         Notary Public
```

314

```
1              FURTHER DEPONENT SAYETH NOT. . .
2
3
```

316

```
1   STATE OF ILLINOIS)
                     ) SS:
2   COUNTY OF W I L L )
3
4            I, SUSAN G. BRADTKE, a notary public in
5   and for the County of Will and State of Illinois, do
6   hereby certify that RICK ALEMAN was duly sworn to
7   testify the whole truth, and that the foregoing
8   deposition was recorded stenographically by me and was
9   reduced to typewriting by me, and that the said
10  deposition constitutes a true record of the testimony
11  given by said witness.
12            I further certify that the reading and
13  signing of said deposition was not waived by the
14  witness and his counsel.
15            I further certify that I am not a
16  relative or employee or attorney or counsel for any of
17  the parties, or a relative or employee of such attorney
18  or counsel, or financially interested directly or
19  indirectly in this action.
20            IN WITNESS WHEREOF, I have hereunto set
21  my hand and affixed my seal of office at Chicago,
22  Illinois, this 27th day of July, A.D. 2008.
23
24  _____
         Notary Public, Will County, Illinois
```

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RICK ALEMAN,                          )
                                      )
                    Plaintiff,        )    No. 07 C 5049
                                      )
          vs.                         )    Judge Bucklo
                                      )    Magistrate Judge Denlow
VILLAGE OF HANOVER PARK, et al.,      )
                                      )
                    Defendants.       )

```
┌─────────────────────┐
│      EXHIBIT         │
│        /             │
│     7-24-08          │
└─────────────────────┘
```

## PLAINTIFF'S ANSWERS TO HANOVER PARK DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff RICK ALEMAN, through counsel, Law Offices of Lawrence V. Jackowiak, answers and objects to Defendants LUSSKY, VILLANUEVA, CARLSON, DOSSEY, and VILLAGE OF HANOVER PARK'S First Set of Interrogatories as follows:

1. Please state your complete legal name, current residence address, date of birth, marital status and social security number.

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's name is Rick Aleman, born October 3, 1968. Plaintiff's current address is: 220 East Lincoln, Glendale Heights, Illinois. Plaintiff is married.**

2. State whether you have been employed during the five (5) years immediately prior to the date of the occurrence alleged in your Complaint and if your answer is in the affirmative, (a) state the names and addresses of each employer; (b) the date on which you were employed by each.

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, Plaintiff states that in 2003, Plaintiff worked for Blooming Color, 230 Eisenhower Lane North, Lombard, Illinois. In 2002-2003, Plaintiff worked for Creative Printing, 1701 Birchwood Avenue, Des Plaines, Illinois.**

3. State the full name and address of each person who witnessed or claims to have witnessed the occurrence alleged in your Complaint.

**ANSWER:** **See Plaintiff's Rule 26(a)(1) disclosures.**

1

4. State the full name and address of each person not named (in three) above who was present or claims to have been present at the scene immediately before, at the time of, or immediately after said occurrence.

**ANSWER:** **None at this time. Discovery and investigation continues.**

5. Please state whether you ingested any alcohol or drugs within 24 hours of this incident.

**ANSWER:** **No.**

6. Have you ever filed any other suit for your own personal injures or any civil rights lawsuit? If so, state the court in which filed, the year filed and the title and docket number of said case.

**ANSWER:** **Yes. Plaintiff filed a worker's compensation case, 05 WC 35993, Rick Aleman v. Blooming Color, Incorporated, on August 16, 2005, for an incident that took place on May 19, 2003. His attorney was Paul Ankin and the case closed on December 16, 2005.**

7. Do you have statements from any witness other than yourself? If so, give the name and address of each such witness, the date of said statement, and state whether such statement was written or oral.

**ANSWER:** **See bates-stamped documents produced by Plaintiff (hereafter "documents") 1-149.**

8. Have you ever been convicted of a felony, or a misdemeanor involving truth and veracity, (theft, shoplifting, passing bad checks, mail fraud, etc.)? If so, state the year, court and court number and the type of felony or misdemeanor.

**ANSWER:** **Objection. Overly broad, seeks information beyond the scope of Federal Rule of Evidence 609. Subject to and without waiving said objection, Plaintiff states he was arrested in 2004 for retail theft in Cook County. Plaintiff was also arrested and convicted for burglary on June 6, 1986, case number 86 C 11587801, with probation terminated on June 5, 1989. Plaintiff was also arrested for a Wheaton, Illinois, ordinance violation, incident number 03121101532, on December 11, 2003. Discovery and investigation continues.**

9. Please state for how long before and after September 9, 2005, that you had been operating the child day care center out of your home, then located at 1434 Laurie Lane, Hanover Park, IL, as referenced in paragraph nine (9) of your Complaint at Law?

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence, relevancy. Plaintiff began operating his child day care center in July of 2005. As a result of this incident, the center stopped operations on September 9, 2005.**

10. Please state the legal name under which you were operating your child day care from your home and indicate the nature of its organization, i.e. corporation, limited liability corporation, partnership, sole proprietorship, etc.?

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence.**

11. Please state whether you, by and through your child day care center were bonded and/or covered by a policy of liability insurance? If so, please provide the name of the insurance carrier(s), policy number(s), effective date(s) and policy limit(s).

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence.**

12. Please list and describe what licensing and/or certification you obtained, or were in the process of obtaining, from the State of Illinois, Department of Child and Family Services ("DCFS"); County of Cook; and/or the Village of Hanover Park, to operate a child day care center from your home then located at 1434 Laurie Lane, Hanover Park, IL?

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence, relevancy. Plaintiff had contacted DCFS and requested the forms and documents required to operate. He received and returned the first correction, and the second correction was in progress in September of 2005.**

13. Please state if you have applied for a child day care license through the Illinois DCFS, and if so, please state:

   a) When you applied;
   b) The result of your application;
   c) Whether this was your first application to DCFS to operate out of your home, then located at 1434 Laurie Lane, Hanover Park, IL.

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence. See answer to interrogatory number 12 above.**

14. Prior to the date of the occurrence described in your Complaint at Law, have your ever received and/or obtained any formal education/training for purposes of

3

operating a child day care center?

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has not had formal training to operate a day care center. Plaintiff received CPR training at Hanover Park Fire Department in June of 2005.**

15. If the answer to #14 is in the affirmative, please list:

    a) The provider or said training/education;
    b) The date(s) upon which you received said training/education;
    c) The date(s) upon which you completed said training/education;
    d) A description of the education/training as it pertains to your operating a child day care center.

**ANSWER:** **See Plaintiff's Answer to Interrogatory number 14 above.**

16. Aside from your day care provided at 1434 Laurie Lane, Hanover Park, IL, please state whether you have ever operated any other child day care centers out of any other locations either before or after the incident described in your Complaint at Law?

**ANSWER:** **Objection. Not reasonably calculated to lead to the discovery of admissible evidence.**

17. Subsequent to this occurrence more fully described in your Complaint at Law, did you cease or temporarily suspend operating the day care center out of your home then located at 1434 Laurie Lane, Hanover Park, IL.

**ANSWER:** **Yes, because of this incident, the day care center immediately stopped operating.**

18. Please provide the name of your criminal defense attorney(s) and list any and all expenses that you incurred as a result of defending the criminal charges brought against you post-occurrence. (Also, pursuant to Rule 34, please provide any and all invoices for criminal defense attorney's fees).

**ANSWER:** **Plaintiff was represented by Barry Spector, Paul Ankin, Ed Edens, and Alexander Vesselinovich. See bates-stamped documents produced by Plaintiff (hereafter "documents") 488. Discovery and investigation continues.**

19. Please list any and all expenses that you intend to claim were the direct result of

4

the occurrence described in your Complaint at Law.

**ANSWER:** **Bond, attorney fees, moving expenses ($1,000.00), lost income ($700.00 a week). Discovery and investigation continues.**

20. Please give the Defendants an approximation of how much time you spent incarcerated and/or held against your will subsequent to the occurrence described in your Complaint at Law.

**ANSWER:** **Plaintiff was arrested at the time of the incident on September 9, 2005, and held until approximately September 13 or 14, 2005, when he was released on bond for the aggravated battery charge. Plaintiff was then arrested on September 15, 2005, for first-degree murder and held in custody until October 14, 2005, when he was released on bond. Thus, Plaintiff was in custody a total of 35 or 36 days.**

21. Please state whether you shook Joshua Schrik at anytime subsequent or prior to the Hanover Park paramedics/firefighters taking custody of the child on September 9, 2005.

**ANSWER:** **Objection. Calls for legal analysis and conclusions. The word "shook" is vague, ambiguous, and subject to different meanings and interpretation.**

22. Please describe any and all efforts that you made to revive Joshua Schrik both prior and subsequent to the Hanover Park paramedics/firefighters taking custody of the child on September 9, 2005.

**ANSWER:** **Plaintiff performed CPR on Joshua Schrik as well as put an ice pack on his head. See Complaint. Discovery and investigation continues.**

23. Are you claiming a loss of income as a result of the occurrence described in your Complaint at Law?

**ANSWER:** **Yes.**

24. If the answer to #23 is in the affirmative, please list the total income lost as a result of the occurrence and describe, in detail, how you arrived at that figure.

**ANSWER:** **Plaintiff is claiming lost income resulting from the loss of his day care center and the criminal charges. Discovery and investigation continues as to the amount of income lost.**

25.  Prior or subsequent to the date of the occurrence, have you ever been under the care of a mental health provider, i.e. licensed clinical social worker ("LCSW"), psychologist and/or psychiatrist? If so, please state:

    a)    The name and address of said provider;
    b)    The date(s) upon which you were treated and seen by said provider(s);
    c)    Whether any formal diagnosis was made any of the providers lists;
    d)    Whether any medication(s) were prescribed, listing name of said medication, dosage and name of ordering psychiatrist.

**ANSWER:** **Plaintiff objects to this interrogatory on the basis that it is vague and overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, Plaintiff states none.**

26.  On the date of the occurrence, were you taking any medications prescribed by a medical doctor and/or psychiatrist? If so, please state the name of said medication; how long you had been taking said medication(s), the dosage amount and name of ordering doctor and/or psychiatrist.

**ANSWER:** **No.**

27.  Have you ever had a problem with drugs or alcohol for which you have received treatment? If so, please describe the nature of said treatment; the address and provider where said treatment is being given and indicate whether you are still undergoing treatment.

**ANSWER:** **Plaintiff objects to this interrogatory on the basis that it is vague and overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, Plaintiff states none.**

Respectfully submitted,

Lawrence V. Jackowiak
*Counsel for the Plaintiff*

Lawrence V. Jackowiak
Louis J. Meyer
Daniel P. Kiss
Law Offices of Lawrence V. Jackowiak
20 North Clark Street, Suite 1700
Chicago, Illinois 60602
(312) 795-9595

6

## CERTIFICATE OF SERVICE

I, Lawrence V. Jackowiak, certify that on March 20, 2008, I caused the foregoing Plaintiff's Answers to Hanover Park Defendants' First Set of Interrogatories to be hand-delivered to:

Michael R. Hartigan
Russell W. Hartigan
Patrick H. O'Connor
Hartigan & Cuisinier, PC
222 North LaSalle Street, Suite 2150
Chicago, Illinois 60601

Alice Keane
Peter C. Koch
Assistant Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601

Lawrence V. Jackowiak
*Counsel for the Plaintiff*

7

## **VERIFICATION**

I, Rick Aleman, hereby state and swear under oath that I have read the foregoing Answers to Interrogatories and those answers are true and accurate to the best of my knowledge.

_Rick Aleman_

Rick Aleman

SUBSCRIBED AND SWORN to before me
this _20_ day of _March_ , 2008

_Edyta McFarland_

NOTARY PUBLIC

OFFICIAL SEAL
EDYTA MCFARLAND
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/20

HANOVER PARK POLICE DEPARTMENT
DETECTIVE DIVISION
Supplemental ( X )   Narrative ( )
CASE REPORT NUMBER:  050909031997

OFFENSE/SERVICE:  Homicide
CODE:  0110
STATUS:  03
DATE OF INCIDENT:  090905
INCIDENT LOCATION:  1434 Laurie
OFFICER ASSIGNED:  Sgt. C. J. Lussky
DATE OF REPORT:  091905

```
┌─────────────────────┐
│      EXHIBIT         │
│         2           │
│      7-24.08        │
└─────────────────────┘
```

NARRATIVE:

On 090905 I was advised by Sgt. Dossey that patrol had responded to a call at 1434 Laurie of a baby not breathing.  I responded to that location and arrived at approximately 0945.

When I arrived at the scene the following people were present:

> Sgt. Dossey
> Ofc. Sherrill
> Lt. Rosenthal (FD)
>
> Rick Aleman
>
> Juveniles
> Amanda Aleman
> JT Gutman
> JR Michalik

Rick Aleman was explaining what had happened regarding the baby not breathing.  In summary Rick Aleman said that the baby (juvenile #1) was on the couch and had been sleeping.  He said that he walked by him several times and the baby would open his eyes and watch him go past.

Aleman said that the baby was on the couch and he reached down and picked him up and he was "limp".  Aleman was in the family room where the couch was and physically demonstrated how the baby was laying on the couch.  He said he was laying there with his blanket and monkey which he retrieved.  The blanket was in a clothes type basket along the East wall.  Aleman got the blanket and a brown stuffed monkey that was on the floor and held them near his face.  He said and demonstrated that Juvenile #1 was sleeping with the blanket under him and his hands near his face (one on either side of his face).  Aleman then got on the floor in this position, hands by his face and his butt in the air.  Aleman said that when he picked Juvenile #1 up he was "limp" and having difficulty breathing.  Aleman said that he went thru steps toward CPR and tried to give Juvenile #1 a "Rescue breath".  As Aleman was explaining he walked and re-enacted his movements.  Aleman said that he put Juvenile #1 on the stairs to do this.  He said that he heard "gurgling" from Juvenile #1's stomach and froth came from Juvenile #1's nose.

SUBMITTED BY: Sgt. C. J. Lussky          SIGNATURE: _____

SUPERVISORS SIGNATURE: _____

Copies to:    PATROL  ( )    INVESTIGATIONS  ( )   LEGAL DEPT  ( )
              ADMIN  ( )     HUMAN SERVICES  ( )   COMM DEVEL  ( )

HC0059

HANOVER PARK POLICE DEPARTMENT
DETECTIVE DIVISION
Supplemental (X )   Narrative (   )
CASE REPORT NUMBER: 050223006564

Aleman said there also appeared to be blood in the froth.  Aleman said that he lifted Juvenile #1 up and Juvenile #1 vomited on his right shoulder.  Aleman said that he shook Juvenile #1 to try to revive him but the baby was "limp, lifeless".  Aleman said that he then realized Juvenile #1 was in a serious condition so he placed Juvenile #1 on the counter top and called 911.  He said that he then ran outside while on the phone with 911 and waited for the ambulance.  He said the 911 operator told him to make sure his airway was clear so he turned him on his side and Juvenile #1 again vomited.  He said that he ran to the ambulance when he heard the sirens coming.  Aleman led us outside as he was relating this and pointed to a small wet spot on the sidewalk between the front door and the driveway.

Aleman made several phone calls while I was there.  He called the parents of the children present to have them return to the house.

I contacted D/C Webb and apprized him of the incident and suggested an MCAT activation.  He advised he would confer with the Chief and contact me.

At approximately 1030 Barbara Aleman returned to the house (with a co-worker).  I requested Barbara and Rick Aleman come into the police station so that we could interview them both.  They both said they would come.  Rick Aleman said that he was too shaken to drive.  I offered to drive them into the station so they came in my vehicle, opting to both ride in the backseat.

People who came into the house prior to my departure:
> Carl Gutman
> Adam Michalik
> Barbara Aleman
> Taryn Szalony

We arrived at the police station shortly before 1100.  Just prior to leaving the house I was contacted by Inv. Carlson who advised me that the initial examining Doctor had observed injuries consistent with "shaken baby" and that the baby was in extremely serious condition and might die.

Once at the station the Aleman's were placed in Interview Room "B".  Because of the seriousness of the baby's injuries and the statement by the ER Doctor that the baby might die, I immediately activated the DVD recording device for that room.

Once at the station I spoke with D/C Webb who advised that MCAT had been activated and they in turn had contacted the Illinois State Police Child Victimization Unit.  MCAT would be sending only their forensic team at this time.

I explained to the Aleman's that I did not want them to go through multiple interviews so we were waiting for the investigator who would be handling the case.  While we were waiting I made several offers to the Aleman's for something to eat or drink.  Several times Rick Aleman said that he needed fresh air and so they (Rick and Barbara Aleman) went out in front of the

---

SUBMITTED BY: Sgt. C. J. Lussky          SIGNATURE:

SUPERVISORS SIGNATURE:

Copies to:   PATROL   (   )   INVESTIGATIONS  (   )   LEGAL DEPT  (   )
             ADMIN    (   )   HUMAN SERVICES  (   )   COMM DEVEL  (   )

2

HC0060

HANOVER PARK POLICE DEPARTMENT
DETECTIVE DIVISION
Supplemental (X )    Narrative (   )
CASE REPORT NUMBER:  050223006564

police station and sat on the brick wall.  At times I stayed with them, at other times I checked the baby's status and left them alone.

At approximately 1300 members of the child victimization unit arrived and were briefed.

SUBMITTED BY: Sgt. C. J. Lussky          SIGNATURE: _____

SUPERVISORS SIGNATURE: _____

Copies to:   PATROL     (   )    INVESTIGATIONS  (   )    LEGAL DEPT  (   )
ADMIN      (   )    HUMAN SERVICES  (   )    COMM DEVEL  (   )

3

**HC0061**

October 11, 2006

**EXHIBIT**

3

7·24·08

Dear Barb,

We wish the best for you, Rick and the kids during this ordeal. We would like to help your family monetarily with a loan of $5,000.00 under the condition that this money be applied solely and entirely to the cost of the bail for his release. We understand this loan will be repaid in full upon the return of bail money by the court.

We hope this situation improves and ends with Rick's prompt release and acquittal.

Sincerely,


Mike & Laurie Gregory

493

## ALEMAN COSTS
### 12/1/2005 Through 12/27/2007

12/27/2007                                                                                    Page 1

| Date | Account | Num | Description | Memo | Category | Clr | Amount |
|------|---------|-----|-------------|------|----------|-----|--------|
| 5/10/2006 | One | 8195 | DEBRA GRANT | | ALEMAN COSTS | R | -22.05 |
| 6/6/2006 | One | 8222 | DR. REYES | | ALEMAN COSTS | R | -750.00 |
| 6/28/2006 | One | 8239 | RECORD COPY SER... | | ALEMAN COSTS | R | -469.75 |
| 6/30/2006 | One | 8243 | STUART BRESSLER | | ALEMAN COSTS | R | -780.00 |
| 7/10/2006 | One | 8250 | FEDERAL EXPRESS | DAVIS | ALEMAN COSTS | R | -43.04 |
| 7/13/2006 | One | 8255 | EQUITY INVESTIGATI... | | ALEMAN COSTS | R | -500.00 |
| 8/1/2006 | One | 8279 | STUART BRESSLER | INVESTIGATION | ALEMAN COSTS | R | -287.50 |
| 8/17/2006 | One | 8289 | DR. JAMES STONE | | ALEMAN COSTS | R | -2,500.00 |
| 8/22/2006 | One | 8298 | CASH | TAXI STONE | ALEMAN COSTS | R | -22.00 |
| 8/25/2006 | One | 8301 | FEDERAL EXPRESS | WINTERS | ALEMAN COSTS | R | -25.60 |
| 9/5/2006 | One | 8315 | STUART BRESSLER | INVESTIGATION | ALEMAN COSTS | R | -152.50 |
| 9/11/2006 | One | 8324 | CHARTER BANK | | ALEMAN COSTS | R | -46.48 |
| 9/20/2006 | One | 8335 | MICHAEL BOOKER | | ALEMAN COSTS | R | -30.00 |
| 10/13/2006 | One | 8357 | CHASE CARD SERVI... | INT | ALEMAN COSTS | R | -28.14 |
| 11/10/2006 | One | 8387 | STUART BRESSLER | INVESTIGATION | ALEMAN COSTS | R | -120.00 |
| 11/10/2006 | One | 8389 | DR. PATRICK BARNES | | ALEMAN COSTS | R | -1,000.00 |
| 11/22/2006 | One | 8404 | CHASE CARD SERVI... | INT | ALEMAN COSTS | R | -28.18 |
| TOTAL 12/1/2005 - 12/27/2007 | | | | | | | -6,803.24 |

| | |
|---|---|
| TOTAL INFLOWS | 0.00 |
| TOTAL OUTFLOWS | -6,803.24 |
| NET TOTAL | -6,803.24 |

*[handwritten:]*

Plus...

Equity Investigation   2,611.95

Dr Stone              2,500.00

Visa-                 1,050.40

Total - 12,965.59

*[handwritten:]* 494

# KattenMuc...nRosenman LLP

*Direct Billing Inquiries to:*
**Alexander S.**
*312-902-5660*
*FEIN: 36-2796532*

525 W. Monroe Street
Chicago, IL 60661-3693

September 26, 2005

Rick Aleman ~d *Barbara Neman*
1434 Laurie lane
Hanover Park, IL 60133

Invoice No. 1300262198
Client No. 335074

---

**Re:**   **Legal Representation**   Firm Matter No. (00001)

For legal services rendered through September 19, 2005 ................   $9,675.00

**CURRENT INVOICE CHARGES:**   $9,675.00

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Disbursements and other charges incurred which have not yet been posted
as of the above date will be billed at a later date.

Katten Muchin Rosenman LLP is an Illinois limited liability partnership, including professional corporations, that has elected to be
governed by the Illinois Uniform Partnership Act (1997).

489

Rick Aleman ) ) 335074.00001
Legal Representation
Invoice No. 1300262198

## PROFESSIONAL SERVICES

| Date | Attorney or Assistant | Description | Hours |
|------|----------------------|-------------|-------|
| 09/10/05 | Vesselinovitch, Alexander S. | Confer with R. Aleman, Illinois State Police J. Micci, Hanover PD E. Villaneuva; confer with B. Aleman and other witness in Hanover Park, IL; telephone conferences with B. Aleman, A. Gutterman regarding bond hearing. | 4.80 |
| 09/12/05 | Vesselinovitch, Alexander S. | Confer with A. Gutterman regarding bond hearing and factual background; telephone conference with DCFS Agent and R. Aleman. | 0.80 |
| 09/12/05 | Gutterman, Allen B. | Bond hearing at Rolling Meadows courthouse; preparation, travel to court, interviews of defendant and witnesses, courtroom presentation, draft and obtain entered order for preservation of the 911 communications, return to office. | 6.50 |
| 09/13/05 | Vesselinovitch, Alexander S. | Telephone conferences with B. Aleman and A. Gutterman regarding status of bond conditions, DCFS, and limits of representation; telephone conference with B. Hedrick regarding potential representation. | 0.70 |
| 09/13/05 | Gutterman, Allen B. | Research re: DCFS procedures re: Safety Plan and protective custody orders, administrative review of initiation of same; Dupuy decision and Illinois statutes; teleconferences with DCFS Investigator Booker, former DCFS Supervisor P. Parry, DCFS Legal Representative P. Dalmage, and interoffice conference with A. Vesselinovitch. | 5.50 |
| 09/14/05 | Vesselinovitch, Alexander S. | Confer with A. Gutterman regarding conversations with R. Aleman, bond hearing, and court appearance. | 0.50 |
| 09/14/05 | Gutterman, Allen B. | Teleconferences with R. Aleman and family, as well as DCFS investigators, Illinois State Police, and Hanover Park Police re: upgrade of charges, necessity of new bond hearing, and surrender procedure. | 2.80 |
| 09/15/05 | Vesselinovitch, Alexander S. | Telephone conference with R. Aleman regarding bond hearing and new charges; confer with A. Gutterman regarding same and strategy for bond hearing. | 0.50 |
| 09/15/05 | Gutterman, Allen B. | Surrender of R. Aleman at Hanover Park police station; preparation for bond hearing, including interviews of defendant, witnesses, and substitute counsel; court appearance re: | 7.50 |

2