UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICK ALEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 5049 |
| | ) | |
| vs. | ) | Judge Bucklo |
| | ) | Magistrate Judge Denlow |
| VILLAGE OF HANOVER PARK, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S LR 56.1 STATEMENT OF FACTS**

**Parties**

    1.    Plaintiff is a resident of Glendale Heights, Illinois.

    2.    Defendant Hanover Park police officers are duly appointed and sworn Hanover Park police officers. At all relevant times, the police officers were acting in the course and scope of their employment, and under color of state law, ordinance and/or regulation.

    3.    Defendant Illinois State police officers are duly appointed and sworn Illinois State police officers. At all relevant times, the Defendant Illinois State police officers were acting in the course and scope of their employment, and under color of state law, ordinance and/or regulation.

    4.    Defendant Village of Hanover Park is a municipal corporation, duly incorporated under the laws of the State of Illinois, and is the employer and principal of the Hanover Park Defendant-Officers.

**Jurisdiction and Venue**

    5.    Jurisdiction for Plaintiff's federal claims is based on 28 U.S.C. §§ 1331 and 1343(a). Jurisdiction for Plaintiff's state claims is based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that the claims arose in this district.

**Undisputed Facts**

    6.    In 2005, Plaintiff Rick Aleman opened a small daycare business which he ran from his home. [Ex. 1, Dep of Plaintiff, p. 46.]

    7.    On Tuesday, September 6, 2005, Plaintiff was supposed to begin caring for a new

child, Joshua Schrik, who was 11 months old. The child's mother, Danielle Schrik, did not bring Joshua that day because he was sick with an ear infection and a fever. [Ex. 1, Dep of Plaintiff, p. 67, 50.]

8. Joshua was still sick on Wednesday, September 7, 2005, and Thursday September 8, when Danielle brought Joshua to Plaintiff's day care facility. [Ex. 1, Dep of Plaintiff, p. 55, 56; Ex. 7, Dep. of Danielle Schrik, p. 50-52, 60.]

9. On September 9, 2005, Danielle Schrik brought Joshua Schrik to Plaintiff's home around 8 a.m. [Ex. 1, Dep of Plaintiff, p. 67; Ex. 7, Dep of Danielle Schrik, p. 128.]

10. Around 9 a.m., Plaintiff noticed that Joshua was lethargic and lifeless. [Ex. 1, p. 94.]

11. Plaintiff attempted to perform CPR and revive the baby. [Ex. 1, pps. 108-109.]

12. Around 9:03 a.m., Plaintiff called 911 to report that Joshua Schrik was having trouble breathing. While waiting for the ambulance, Plaintiff attempted to clear his airway. [Ex. 1, pps.112-116]

13. An ambulance came to Plaintiff's home and took Joshua Schrik to the hospital shortly thereafter. [Ex. 1, pps. 118-119.]

14. Hanover Park police officers, including Defendant Lussky arrived at Plaintiff's home between 9:15 a.m. and 9:45 a.m. [Ex. 9, Dep of Lussky, p. 13.]

15. Defendant Lussky took Plaintiff to the Hanover Park police station. She placed Plaintiff in an interrogation room around 10:55 a.m. The interrogation room was under video and audio surveillance. [Ex. 9, Dep of Lussky, pps. 21-22.]

16. Plaintiff was not free to leave the Hanover Park police station. [Ex. 1, Dep of Plaintiff, pps. 302-303; Ex. 9, Dep. Of Lussky, p. 39.]

17. Plaintiff asked Lussky if he could leave and come back. Lussky said "no." [Ex.2, DVD of Interrogation, at 11:39:14-16.]

18. At about 5:12 p.m., Defendants Micci and Villanueva entered the interrogation room. [Ex. 2, at 17:12:28.]

19. Defendant Micci told Plaintiff that he had talked to several people about what had happened that day said and that Plaintiff "has the most information." [Ex. 2, at 17:13:33.]

20. Defendant Micci told Plaintiff to tell him what happened and that Micci would ask questions. [Ex. 2, at 17:13:44-59.]

21. Micci told Plaintiff that he was going to read him his rights before he began

talking. [Ex. 2, at 17:14:01-13.]

22. Before Micci read Plaintiff his rights, Plaintiff told Defendant Micci that he wanted to call his attorney before he spoke to them. Specifically, Plaintiff said: "before I do that I gotta call my guy. Just give me one phone call real quick and let me call him and tell him I'm about to do this so he knows." [Ex. 2, at 17:14:12-25.]

23. Plaintiff was not allowed to call his lawyer at that time. Instead, Defendant Micci began filling out a waiver of Miranda rights. He asked Plaintiff's name. Plaintiff asked whether his wife had waived her rights and whether his wife had called a lawyer. Defendant Micci said she had not called a lawyer and that she had already left to get their kids. [Ex. 2, at 17:14:35-55.]

24. Defendant Micci read Plaintiff his Miranda rights. [Ex. 2, at 17:16-02-15.] Micci told Plaintiff that he had to sign a waiver before talking. Micci said:

> Before I talk to you I would like this signed. If it is not signed I am not going to talk to you. And the pros and cons of that are I assume you have information that would help you out and would help me out as to what the heck happened here. If you talk to me I can get that information. If I don't talk to you, which I won't do, then I will go on the information that I've gotten from other sources which I don't like to do because its second hand. So, if you want to call your attorney first that's fine with me. [Ex. 2, at 17:16:15-53.]

25. Plaintiff replied, "Yeah. It will just take a second." [Ex. 2, at 17:16:53-55.]

26. Plaintiff went into the hall outside the interrogation room and called his attorney Paul Ankin at 5:17:43. [Ex. 2, at 17:17:43.]

27. Plaintiff told his attorney that he was being detained at the Hanover Park police station and that police had interviewed his wife. [Ex. 2, at 17:19:42-48; Ex. 3, Declaration of Attorney Paul Ankin, ¶ 1.] Plaintiff told his lawyer that the state police and Hanover Park police wanted to interview him and asked him to sign a waiver of his Miranda rights. [Ex. 2, at 17:20:00-11; Ex. 3, Decl. Of Ankin, ¶ 1.]

28. Plaintiff's attorney advised Plaintiff not to give an interview without an attorney present and not to sign a waiver of his Miranda rights. [Ex. 3, Decl. Of Ankin, ¶ 2.]

29. Defendant Villanueva was present in the hall outside the interrogation room while Plaintiff had this phone conversation with his attorney. [Ex. 4, Deposition of Villanueva, p. 55, lines 13-16.]

30. Plaintiff's phone conversation with his attorney was recorded on Hanover Park police department audio and video surveillance equipment. [Ex. 2, at 17:21-23.]

31. Plaintiff put his lawyer on the phone with Officer Villanueva. [Ex. 2, at 17:21:40-50; Ex. 3, Decl. Of Ankin, ¶ 3; Ex. 4, Dep. Of Villanueva, p. 56, line 21-24.] Plaintiff's lawyer

3

told Villanueva that he represented Plaintiff and that Plaintiff was invoking his right to remain silent. Plaintiff's lawyer told Villanueva that Plaintiff was not going to talk without his attorney present. [Ex. 3, Decl. Of Ankin, ¶ 3.]

32. Villanueva asked Plaintiff's attorney, "you gonna have him say that too?" [Ex. 2, at 17:21:35-17:22:12; Ex. 4, Dep of Villanueva, p. 57 lines 7-10.]

33. Villanueva gave the phone back to Plaintiff. [Ex. 2, at 17:22:20-28.] Plaintiff said, "OK. Thank you. I'll come back tomorrow." [Ex. 2, at 17:22:35-45.]

34. Villanueva instructed Plaintiff to go back into the interrogation room. Defendants Villanueva and Micci came back into the room about a minute later, around 5:25. [Ex. 2, at 17:24:58; Ex. 4, Villanueva, p. 58-59.]

35. Defendant Micci asked Plaintiff, "How we doing?" [Ex. 2, at 17:24:58-17:25:02.]

36. Plaintiff responded:

"Not good. I called him and he told me not to do this right now and to offer to come back tomorrow or whatever. Said you've been there all day, you've done above and beyond and cooperated. I told him I was tired and didn't feel real comfortable right now, you know, I honestly, I mean I was, you know, more alert and ready for this like hours ago. I've been stressing and asking to see my wife and this and that and I've just been making myself sick. I told him that, I didn't tell him all that, but briefly I told him that. And he said well then tell them that and tell them you'd love to come back. He said a couple other things, but I'm not trying to be like you know..." [Ex. 2, at 17:25:00-17:25:54.]

37. Defendant Villanueva understood this to mean that Plaintiff "was instructed not to talk" by his lawyer. [Ex. 4, Dep. Of Villanueva, p. 60, lines 5-18.]

38. Defendant Micci understood this to mean that "[Plaintiff's] lawyer, who he just spoke to up until this point, said not to talk with us." [Ex. 5, Dep. Of Micci, p. 54, lines 2-9.]

39. Defendant Micci continued to talk to Plaintiff. He said:

"I'm not trying to be the bad guy myself, but if I don't get to talk to you, you're not going home, OK?" [Ex. 2, at 17:25:40-17:25:47.] The information I have right now is leading me to believe that something happened at that house. After speaking with three doctors at the hospital with the information they gave me that's what I need to clear up. But if I can't speak with you about that, then you're going to be staying here."[Ex. 2, at 17:25:57-17:26:20.]

40. Plaintiff replied: "I don't know. I don't know what to do." [Ex. 2, at 17:26:20-23.]

41. Micci said: "So, look. It's up to you." Id.

4

42. Plaintiff replied: "I don't know." Id.

43. Micci continued:

"Rick, you need to make a decision. I'm not going to sit here and bullshit you. I want to talk to you, but if you don't want to talk to me, I'm not going to talk to you. [Ex. 2, at 17:26:23-35.] I'm not going to talk to you unless you sign this. That's how it is. [Ex. 2, at 17:26:35-39.] I have some questions to ask you about what happened. [Ex. 2, at 17:26:39-42.] That's the reason I want to talk to you to clear this up. The information that other people gave me are leading me to believe one thing. But I only have one half of the story. The main guy, you, who was there, has all the other information. If you don't give me other information, I can only go with what I have. ... But I can guarantee you this: If you don't talk to me and give me information that takes away from the information I have over here, you're not gonna be going home. [Ex. 5, Dep. Of Micci, p. 59; Ex. 2 DVD of interrogation, at 17:26:39-17:27:14.] Uh. So whether you're tired or not is not going to make a lot of difference right now because you're not gonna be going home. And I'm going to have to take a different route uh than that, so you need to make a decision. [Ex. 2, at 17:27:14-27.] I understand you're tired. I understand you're stressed out. I do this every day, I know exactly what you're talking about but you're the only person that can help yourself out. [Ex. 2, at 17:27:27-37.]

44. Plaintiff replied: "But I haven't done anything, just ... You know what I mean?" [Ex. 2, at 17:27:37-39.]

45. Micci continued:

"Listen, listen, listen, listen. That may be true, but I can't listen to you tell me that unless you agree to talk to me. Understand what I'm saying. I'm not saying that you're the bad guy, and I'm not saying that you did anything wrong. But I can't officially put something in my record unless you voluntarily agree to talk to me. [Ex. 2, at 17:27:39-17:28:00.] If you agree to talk to me, you may tell me ten things that are all good that may discount the information I have here or explain the information I have here. [Ex. 2, at 17:28:00-17:28:14.] But if you don't talk to me I can only go with what I have. It's that easy. I mean, I know you want to tell me what happened but I can't, I cannot legally listen to you unless you agree to talk to me on the record. [Ex. 2, at 17:28:14-27.] And that's where I'm sorta tied up here. I know you're stressed, I know you're tired.[Ex. 2, at 17:28:27-33.]

46. Plaintiff replied: "I understand, I'm confused...." [Ex. 2, at 17:28:33-36.]

47. Micci continued:

I've been here just as long as you have OK? [Ex. 2, at 17:28:36-44.] I've been here just as long as you have, running around doing this, doing the other thing. I've got some information that I can share with you, but I can't do that either

5

unless you voluntarily agree to talk to me. [Ex. 2, at 17:28:44-52.] So it's a big decision, I know it is, but you're the only guy who can make it. I can't. Eric can't. [Ex. 2, at 17:28:52-17:29:01.] So if you don't want to, I'm walking out right now, and you're staying. I promise you that. [Ex. 2, at 17:29:01-09.] You're not going anywhere. If you want a couple of minutes to think about it, you can think about it, but it's very cut and dry. [Ex.2, at 17:29:09-20.]

48. Plaintiff then asked to call his attorney again. [Ex. 2, at 17:29:00-30.]

49. Plaintiff called his attorney Paul Ankin on the phone in the hallway outside the interrogation room. This conversation was also recorded on Hanover Park police surveillance equipment. [Ex. 2, at 17:29:58-17:37:20.]

50. Among other things, Plaintiff said to his attorney: "I wish you were here," and "I need your help. I can't help myself in here." [Ex.2, at 17:32:30-36.] Plaintiff's attorney instructed him again not to speak. [Ex. 3, Declaration of Ankin, ¶ 6.]

51. Plaintiff also made a few phone calls in an attempt to reach his wife. [Ex.2, at 17:20-17:44:50.]

52. Officer Villanueva asked Plaintiff "So, you've called your attorney?" [Ex. 4, Dep of Villanueva, p.70; Ex. 2, at 17:42:22-27.]

53. Plaintiff replied, "Yeah." Id.

54. Officer Villanueva told Plaintiff to hang up the phone and have a seat in the interrogation room. He told Plaintiff not to use the phone again. Micci said: "I ask that you don't use the phone until we decide what we're gonna do." [Ex. 2, at 17:44:53; Ex. 4, Dep of Villanueva, pps. 70-71.]

55. Micci and Villanueva came back into the interrogation room again around 5:49 p.m. Micci asked: "OK, where are we at?" [Ex. 2, at 17:49:00-07.]

56. Plaintiff replied: "Um you know I talked to the lawyer and you know I tried to talk him into doing it you know ... Yeah, you know, I mean I really don't have a problem doing it. It's just you know he said no [gesturing], so I just followed.." [Ex. 2, at 17:49:07-17:50.]

57. Plaintiff signed a waiver at 5:50 p.m. [Ex. 2, at 17:50:00.]

58. Defendants Micci and Villanueva questioned Plaintiff from approximately 6p.m. until 10 p.m. on September 9, 2005. [Ex.2, at 18:00:00 – 22:00.]

59. Plaintiff was charged with aggravated battery to Joshua Schrik on September 10, 2005. [Ex. 6.]

60. Plaintiff was charged with first degree murder of Joshua Schrik on September 15,

6

2005. [Ex. 6.]

61. All charges against Plaintiff were dismissed on entry of *nolle prosequi* on November 13, 2006. [Ex. 6, p. 3.]

62. Assistant State's Attorney Karen Crothers testified that the decision to nolle the case arose from "numerous issues," including that Defendant-Officers' reports regarding the interrogation of Plaintiff were exaggerated or falsified, that Defendant-Officers obtained a statement from Plaintiff in violation of his constitutional rights, and two medical experts believed that the child was showing symptoms of shaken baby syndrome before he was dropped off at Plaintiff's home. [Ex. 8, dep. of Crothers, pps. 104-107; 112-113.]

                                                Respectfully submitted,

                                                /s/ Adele D. Nicholas
                                                *Counsel for the Plaintiffs*

Louis J. Meyer
Adele D. Nicholas
Law Offices of Lawrence V. Jackowiak
20 North Clark Street, Suite 1700
Chicago, Illinois 60602
(312) 795-9595