**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICK ALEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 07 C 5049** |
| | ) | |
| **VILLAGE OF HANOVER PARK, et al.,** | ) | **Judge Bucklo** |
| | ) | |
| **Defendants.** | ) | **Magistrate Judge Denlow** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**ILLINOIS STATE POLICE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Illinois State Police Defendants Master Sergeant JOSEPH MICCI and Master

Sergeant GERARD FALLON, by their attorney, LISA MADIGAN, Attorney General of

Illinois, submit this memorandum in support of their motion for summary judgment.

## INTRODUCTION & FACTUAL BACKGROUND

This is a lawsuit that should not have been brought. Joshua Schrik, a one-year-

old baby, attending a small day-care operated by Plaintiff Rick Aleman was picked up

by paramedics from Aleman's home on September 9, 2005 in a non-responsive

condition. (*See* Illinois State Police Defendants' Statement of Facts (hereinafter

"Facts"), ¶¶ 7, 40, 45-46.) Taken to a hospital, Joshua was found to have suffered a

subdural hematoma with bleeding on the brain and bi-lateral hemorrhaging. (Facts, ¶¶

10, 14, 17.) The chief of the hospital pediatric intensive care unit as well as an

ophthalmologist informed police investigators that Joshua had been subjected to

shaken baby syndrome. (Facts, ¶¶ 11, 20.) Joshua died within a few days. (Facts, ¶¶

94.)

Aleman, the last adult with access to the child, was taken to the Hanover Park police station for questioning the day of the incident. (Facts, ¶¶ 31-45.) There, Aleman voluntarily agreed to submit to questioning by Sgt. Micci and Hanover Park Police Department (HPPD) Officer Eric Villanueva. (Facts, ¶¶ 51-56.) The interview was recorded audio-visually. (Facts, ¶ 80.) DVD recordings of the interview show that Aleman submitted to questioning after having been read his *Miranda* rights, after having spoken to his attorney by telephone three times, and after having signed a *Miranda* waiver form. (Facts, ¶¶ 51-56.) The DVD recordings show that, during the interview, Aleman first denied ever shaking Joshua but later admitted doing so, specifically admitting that he had held the baby with hands under the baby's armpits and had shaken the baby in a panic, hard enough that the baby's unsupported head whipped back and forth, hitting the baby's back "probably three or four different times." (Facts, ¶¶ 73-79, 81.) During the interview, Aleman also said, "I admit it. I did shake the baby too hard. But I didn't mean any harm." (Facts, ¶ 79.) Aleman also made other damaging admissions, indicating that the baby had been sick but otherwise okay when he had been dropped off that morning by his mother and that while under his care Joshua was at different points in the morning, standing, crying, and looking around – in short, that the baby had motor control and sensory ability, neither of which were present when the baby was taken to the hospital in an unconscious and unresponsive state. (Facts, ¶¶ 61-64, 67-71.) Just before 10 p.m. that night, Aleman was advised by Sgt. Micci that he was under arrest. (Facts, ¶ 82.) The next morning, September 10, 2005, Aleman admitted to Sgt. Micci and Officer Villanueva that he did the wrong thing and that he felt terrible about what happened to Joshua. (Facts, ¶ 83.) After further questioning,

Aleman stated that he wanted his attorney present and the interview ended. (Facts, ¶ 84.)  On September 12, 2005, Cook County Circuit Court Judge Karen Tobin found probable cause to detain Aleman on charges of Aggravated Battery to a Child.  (Facts, ¶ 93.)  On Tuesday, September 13, 2005, Joshua Schrik was pronounced dead. (Facts, ¶ 94.)  On September 15, 2005, Judge Thomas Fecarotta, Jr., found probable cause to detain Aleman on the charge of First-Degree Murder. (Facts, ¶ 95.)

Aleman has brought a civil lawsuit against the Village of Hanover Park, Illinois, members of the Hanover Park Police Department and Sgt. Micci and Sgt. Fallon, for allegedly violating his federal constitutional rights and for committing state law torts against him during the investigation into Joshua's injury and subsequent death.  This Court should grant summary judgment to Sgt. Micci and Sgt. Fallon.  There was probable cause to hold Aleman for questioning.  Aleman voluntarily submitted to questioning after waiving his right to an attorney.  During his interrogation, Aleman made clearly incriminating statements.  Plaintiff has not adduced any evidence supporting his various claims against Sgt. Micci or Sgt. Fallon.  At the very least, Sgt. Micci and Sgt. Fallon are entitled to qualified immunity.  They were simply doing their job.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the moving party has the burden to show there are no genuine issues of material fact that would prevent judgment as a matter of law.  Courts must construe the facts in the light most favorable to the non-moving party.  If the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Scaife v. Cook County,* 446 F.3d 735, 739 (7th

Cir. 2006).  Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant may not rest on the pleadings but must respond, with affidavits or otherwise, "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

## ARGUMENT

As set forth below in the count-by-count analysis, ISP Defendants are entitled to summary judgment with respect to each of the counts directed against them because there is no evidence that either of them violated Plaintiff's constitutional rights or committed state-law torts against Plaintiff.  In addition, Plaintiff's state-law claims are untimely.

## I. ISP DEFENDANTS DID NOT VIOLATE PLAINTIFF'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEIZURES

Plaintiff cannot prevail on his Fourth Amendment claims against Sgt. Micci and Sgt. Fallon because there was probable cause to detain and ultimately arrest Plaintiff on September 9, 2005.  Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers. *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007) (per curiam); *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997); *Fernandez v. Perez*, 937 F.2d 368, 370 (7th Cir. 1991); *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989).  Even if a factual question remained as to the existence of probable cause, Sgt. Micci and Sgt. Fallon are still entitled to qualified immunity on grounds that it was reasonable for them to conclude that probable cause did exist.

A. There was probable cause to arrest Aleman on
September 9, 2005

A police officer has probable cause to arrest "if, at the time of the arrest, the
'facts and circumstances within the officer's knowledge ... are sufficient to warrant a
prudent person, or one of reasonable caution, in believing, in the circumstances shown,
that the suspect has committed, is committing, or is about to commit an offense.' "
*Wagner*, 493 F.3d at 836 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct.
2627 (1979) (alteration in original)); *see also Beck v. Ohio*, 379 U.S. 89, 90, 85 S.Ct.
223 (1964); *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). In
determining whether an officer had probable cause, the court steps into the shoes of a
reasonable person in the position of the officer. *Mustafa v. City of Chicago*, 442 F.3d
544, 547 (7th Cir. 2006); *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000).
Thus, probable cause exists at the time of arrest when reasonably trustworthy
information, facts and circumstances would lead a prudent person to believe that a
suspect had committed or was committing a crime. *See Neiman v. Keane*, 232 F.3d
577, 580 (7th Cir. 2000); *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).

Moreover, "when an officer receives information from a third party whom the
officer has reason to believe is telling the truth, the officer has probable cause." *Kelley v.
Myler*, 149 F.3d 641, 647 (7th Cir. 1998); *see also, e.g., Gramenos v. Jewel
Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986) ("When an officer has received his
information from some person – normally the putative victim or an eye witness – who
seems reasonable to believe is telling the truth, he has probable cause"). "'Probable
cause does not depend on the witness turning out to have been right; it is what the

police know, not whether they know the truth, that matters.'" *Kelley*, 149 F.2d at 647 (quoting *Gramenos*, 797 F.2d at 439).

"[W]hen there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them," a court may decide the question of probable cause. *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000) (quoting *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996)) (citation and internal quotations omitted).

In this case, there clearly was probable cause to detain and arrest Aleman for aggravated battery on September 9, 2005.  From interviews of the Hanover Park police officers, firefighters, and paramedics, investigators learned that Aleman was the last adult with custody of Joshua, that Joshua was unresponsive and unconscious when first responders arrived at Aleman's home, that Aleman looked agitated, distraught, and nervous and made incriminating statements, including that he did not want to go to jail for the rest of his life and did not want to be unable to see his children. (Facts, ¶¶ 31-46.)  In addition, from interviews of first responders, investigators learned that Joshua had not arrived at Aleman's home in a nonresponsive state where Aleman had said that Joshua had been crying that morning. (Facts, ¶ 34.)

Interviews of treating doctors provided more information supporting the existence of probable cause to arrest Aleman.  Sgt. Cardona provided this information to the investigators at the Hanover Park Police station. (Facts, ¶ 26.)  The information included the following: Dr. Gerardo Reyes, medical director of the Pediatric Intensive Care Unit (PICU) at St. Alexius Medical Center, who was in charge of Joshua's medical care during his hospitalization, informed Sgt. Cardona that Joshua had suffered a subdural hematoma (brain bleed) covering the right frontal lobe and that it was his opinion, to a

reasonable degree of medical certainty, that Joshua had been the victim of a violent shake which caused a catastrophic brain injury. (Facts, ¶¶ 9-11.)  Significantly, Dr. Reyes informed Sgt. Cardona that the onset of symptoms would have been immediate following the traumatic event and that Joshua would not have been alert or functioning after the incident. (Facts, ¶¶ 12-13.)

Dr. Seigle, an ophthalmologist with Seigle-Ackermann Eye Associates, Ltd. at 901 Center Street in Elgin, who had been called to examine Joshua's eyes, informed Sgt. Cardona that he had found bi-lateral retinal hemorrhages in Joshua's eyes that appeared to be "fresh" meaning the hemorrhages had "just occurred". (Facts, ¶¶ 16-19.) Dr. Seigle  informed Sgt. Cardona that the injuries to Joshua's eyes were consistent with "shaken baby syndrome". (Facts, ¶ 20.)  Dr. Albert Hasson of Northwest Pediatrics, 19 East Schaumburg Road in Schaumburg, Joshua's pediatrician, told Sgt. Cardona that Joshua's mother had brought Joshua to his office in Schaumburg on September 8, 2005. (Facts, ¶¶ 21-22.)  Dr. Hasson told Sgt. Cardona that Joshua had been acting "normal" and that he had a standard viral infection. (Facts, ¶ 23.)  Dr. Hasson told Sgt. Cardona that he had found no problems with Joshua's eyes and that the pupils had responded normally. (Facts, ¶ 24.)

Sgt. Cardona also interviewed Joshua's mother that same day. (Facts, ¶ 27.) The mother is the other potential assailant according to Plaintiff.  While he testified that he considered the mother a suspect when he interviewed her, Sgt. Cardona found her credible and acting appropriately. (Facts, ¶¶ 28-29.)  After the interview was completed, Sgt. Cardona did not consider the mother to be a suspect. (Facts, ¶ 30.)

Sgt. Micci and Sgt. Fallon were entitled to rely on the information provided to them by the Hanover Park police officers, firefighters, and paramedics as well as the information provided to them by Sgt. Cardona. Taken together that information suggested that Aleman was a principal, if not prime, suspect.

This assessment was clearly validated when Aleman made numerous admissions during his interview that implicated him as the perpetrator of Joshua's injuries. Aleman first denied ever shaking Joshua but later admitted it, specifically admitting that he had held the baby with hands under the baby's armpits and had shaken the baby in a panic, hard enough that the baby's unsupported head whipped back and forth, hitting the baby's back "probably three of four different times." (Facts, ¶ 78.) He also said, "I admit it. I did shake the baby too hard. But I didn't mean any harm." (Facts, ¶ 79.) Aleman also admitted that Joshua had been sick but otherwise okay when he had been dropped off that morning by his mother and that while under his care Joshua had been at different points in the morning, standing, crying, and looking around or, in other words, that Joshua had been in a responsive state. (Facts, ¶¶ 61-64, 67-71.)

Based on the totality of circumstances, there was probable cause to detain Aleman on September 9, 2005. Accordingly, Plaintiff cannot prevail on Count I and summary judgment should be granted to ISP Defendants.

**B.  Even if there had not been probable cause to arrest Aleman on September 9, ISP Defendants are entitled to qualified immunity**

Qualified immunity is a doctrine of American law that protects police officers and other officials from reasonable mistakes in judgment in the exercise of their duties.

*Harlow v. Fitzgerald*, 457 U.S. 800, 816-17, 102 S. Ct. 2727 (1982), *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034 (1987). The purpose of qualified immunity is to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986). The doctrine of qualified immunity "erects a substantial barrier for plaintiffs, and appropriately so" as government officials with discretionary duties should not be exposed to financial peril when forced to make decisions in the absence of clearly established precedent. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994). Qualified immunity is an issue of law to be determined by the trial court as soon as possible. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806 (1985). The doctrine balances the need to vindicate constitutional rights against the social costs of litigation generally and the danger specifically that fears of litigation will emasculate officials in their willingness to carry out their duties property and even boldly when necessary. *Harlow*, 457 U.S. at 813-14.

The defense of qualified immunity is available if a reasonable police officer could have mistakenly believed that probable cause existed, which has been described as "arguable probable cause." *Williams v. Jaglowski,* 269 F.3d 778, 781 (7th Cir. 2001); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). "The question ... is whether there was any reasonable basis to suppose there was probable cause." *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004). "If a case involves a question of whether or not probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause

existed." *Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993) (quoting *Cross v. City of Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992)).

In this case, given all that the investigators had learned about the circumstances of Joshua's injuries on September 9, 2005, Sgt. Micci and Sgt. Fallon would be entitled to qualified immunity. Even if the Court were to find that there was a material factual question regarding the existence of probable cause, Sgt. Micci and Sgt. Fallon clearly would have had a reasonable basis to believe that they had probable cause to hold Aleman.

## II. PLAINTIFF'S FAILURE-TO-INTERVENE CLAIMS FAIL GIVEN THE EXISTENCE OF PROBABLE CAUSE TO ARREST HIM

Count II appears to be directed against both Sgt. Micci and Sgt. Fallon, presumably for the actions leading to Plaintiff's detention at the Hanover Park Police station on September 9, 2005. To establish a claim for failure to intervene, a plaintiff must show that the officer had reason to know "that any constitutional violation has been committed by another law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Easley v. Reuss*, 247 Fed. Appx. 823, 827 (7th Cir. 2007) (quoting *Windle v. City of Marion*, 321 F.3d 658, 663 (7th Cir. 2003)). Where no underlying constitutional violation has occurred, a defendant cannot be liable under a failure-to-intervene theory. *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004); *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir.2001); *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir.1981).

In this case, Plaintiff has not adduced any evidence to support a claim that Sgt. Micci or Sgt. Fallon were aware of any fact that would lead a reasonable officer to believe that Aleman had been arrested and was being held in the absence of probable

cause. Moreover, if the Court finds the existence of probable cause and/or qualified immunity stemming from Plaintiff's arrest on September 9, 2005, then Plaintiff's Count II must necessarily fail as a matter of law. Accordingly, the ISP Defendants request that the Court dismiss Count II and find that no genuine issue of material fact exists as to an alleged failure to intervene to prevent a false arrest/imprisonment from occurring.

## III. SERGEANT FALLON DID NOT VIOLATE PLAINTIFF'S FOURTH AMENDMENT RIGHTS WHEN PLAINTIFF VOLUNTARILY SURRENDERED TO POLICE

Count III is directly against Sgt. Fallon and alleges that he violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures. Plaintiff alleges that Sgt. Fallon violated his Fourth Amendment rights when Sgt. Fallon participated in the arrest of Aleman at the Hanover Park Police station on September 15, 2005. However, the undisputed evidence supports a finding of probable cause for Aleman's arrest. Furthermore, there is no evidence that Sgt. Fallon caused or otherwise participated in issuance of the criminal complaint by HPPD Officer Carlson against Aleman. Instead, the evidence supports a finding that Sgt. Fallon played a largely administrative role in processing Aleman when he came to the Hanover Park Police station, accompanied by his attorney, to surrender. (Facts, ¶¶ 104-105.)

### A. There was probable cause to arrest Aleman on September 15, 2005

Sgt. Fallon adopts and incorporates by reference the probable cause argument set out in the Hanover Park Defendants' memorandum of law. *See* Dkt 112, pp. 9-12.

**B. Sgt. Fallon properly relied upon the arrest warrant when participating in Aleman's surrender to police on September 15, 2005**

The uncontested facts are that Sgt. Fallon assisted in the arrest of Plaintiff only after HPPD Officer Carlson signed a complaint against Aleman for first degree murder and Aleman, accompanied by his attorney, surrendered himself at the Hanover Park Police station. On the same day, Plaintiff presented himself before Judge Fecarotta, who found probable cause to detain Aleman on the charge of first-degree murder. (Facts, ¶¶ 94-95.)

As the Supreme Court noted in *Baker v. McCollan*, 443 U.S. 137 (1979):

> The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished "without due process of law." A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers-all of whom may be potential defendants in a § 1983 action-is entirely consistent with "due process of law."

*Id.* at 145. In other words,

> The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released. Nor are the manifold procedural protections afforded criminal defendants under the Bill of Rights "without limits."

*Ibid.* (quoting *Patterson v. New York*, 432 U.S. 197, 208 (1977)). Clearly, the act of processing Plaintiff when he surrendered on September 15, 2005 did not in itself violate Plaintiff's constitutional right to due process. Moreover, there is no evidence that Sgt. Fallon participated in the autopsy of Joshua or otherwise played any role is the execution of the criminal complaint by HPPD Officer Carlson. Accordingly, the Court should grant summary judgment to Sgt. Fallon on Count III.

**C.   Even if there was no probable cause to arrest Aleman on September 15, Sergeant Fallon is entitled to qualified immunity**

For the same reasons that qualified immunity would apply to Sgt. Fallon's conduct on September 9, 2005, qualified immunity would also apply to Sgt. Fallon's largely administrative work in receiving Aleman on September 15, 2005.

Even if the Court were to find that there was a material factual question regarding the existence of probable cause to arrest Aleman on September 15, Sgt. Fallon clearly would have had a reasonable basis to believe that probable cause existed to take Aleman into custody. Otherwise, a booking officer would be at his peril for damages and would be compelled to make an independent examination of another officer's investigation every time an arrestee is brought to the station. Law enforcement could not function that way. Accordingly, the Court should grant summary judgment to Sgt. Fallon on Count III.

**IV.   THERE IS NO EVIDENCE OF A CONSPIRACY UNDER FEDERAL LAW TO DEPRIVE THE PLAINTIFF OF HIS CONSITUTIONAL RIGHTS**

To succeed on his civil conspiracy claim, Plaintiff must demonstrate (1) that Defendants had an express or implied agreement to deprive plaintiff of his constitutional rights, and (2) that he was deprived of his constitutional rights by Defendants' overt actions in furtherance of the agreement. *Williams v. Senif*, 342 F.3d 774, 782 (7th Cir. 2003); *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988); *Thurman v. Village of Hazel Crest*, 570 F. Supp. 2d 1019 (N.D. Ill. 2008) (Bucklo, J.)

To carry his burden of proving the existence of a conspiracy, "a plaintiff must show that the conspirators agreed to inflict injury upon him; in other words, that they acted with a single plan, the general nature and scope of which was known to each

conspirator." *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002); *Hernandez v. Joliet Police Department*, 197 F.3d 256, 263 (7th Cir. 1999). While a plaintiff may rely upon circumstantial evidence from which the existence of an agreement may be inferred, in order for that inference to arise, there must be "sufficient evidence that would permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Green*, 281 F.3d at 197, *Hernandez*, 197 F.3d at 263. Moreover, simply because there may have been phone calls or communications between the alleged co-conspirators is insufficient to support a conspiracy claim and to reach that conclusion "is the purest of conjecture." *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006). "To assert that the [communications] are evidence of a conspiracy is simply speculation." *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

In this case, Plaintiff has not adduced any evidence to support a claim that either Sgt. Micci or Sgt. Fallon conspired with themselves or with the Hanover Park Defendants to deny Plaintiff any of his constitutional rights. On the contrary, the evidence supports a finding that both Sgt. Micci and Sgt. Fallon conscientiously performed their duties as Illinois State Police officers.

Sgt. Micci properly relied on information he received from witnesses and from other investigators, such as Sgt. Cardona, to conclude that probable cause existed to hold Aleman as a suspect. After Aleman voluntarily submitted to questioning and made numerous incriminating statements, Sgt. Micci properly informed him that he was under arrest. (Facts, ¶¶ 82-92.) The propriety of Sgt. Micci's conduct is further shown by the fact that a court separately found probable cause to exist to hold Aleman. (Facts, ¶ 93.)

Plaintiff's claims against Sgt. Fallon relate solely to his role in interviewing witnesses Carl Gutman and Adam Michalik and in taking Aleman into custody on September 15, 2005 after he was charged with murder. (Facts, ¶ 103.) With regard to the Gutman interview, there is no evidence that Sgt. Fallon made any misrepresentation as to what Gutman said. Moreover, Gutman later was interviewed by a prosecutor and testified himself before a Grand Jury. (Facts, ¶¶ 99-102.) Thus, any alleged misrepresentation by Sgt. Fallon of what Gutman previously had said would have become moot. With regard to the Michalik interview, the witness confirmed that Sgt. Fallon's summary of the interview in the ISP Investigative Report he prepared was accurate and there's no evidence that Sgt. Fallon made any misrepresentation of what Michalik had said. (Facts, ¶ 96.) Michalik also testified before the Grand Jury, so any alleged misrepresentation of his testimony would be moot as well. (Facts, ¶¶ 97-98.) Moreover, to the extent that Plaintiff suggests that police ignored exculpatory statements by Gutman and Michalik relating to Joshua appearing unresponsive earlier in the morning, this argument goes nowhere in light of the fact that Aleman repeatedly made incriminating statements, e.g. that he did not want to go to jail for the rest of his life, and described Joshua as being responsive that morning. (Facts, ¶ 36.)

The Court should grant summary judgment to Sgt. Micci and Sgt. Fallon on Count IV.

## V. PLAINTIFF CANNOT MAKE OUT A SUBSTANTIVE DUE PROCESS VIOLATION AFTER PLAINTIFF WAS ADVISED OF HIS MIRANDA RIGHTS, CONFERRED WITH HIS ATTORNEY AND SIGNED A MIRANDA WAIVER

Count V is directed against Sgt. Micci and alleges a violation of Plaintiff's substantive due process rights in the manner in which Plaintiff was interviewed at the

Hanover Park Police station. Specifically, Plaintiff has alleged in his amended complaint that "[d]uring the interrogation, Plaintiff told Defendant-Officers that he wanted to speak to an attorney, and that he did not want to speak to the officers" and that "Defendant-Officers continued to question and interrogate Plaintiff after he stated that he wanted to speak to an attorney." *See* First Amend. Complt., ¶¶ 32, 33.

As the Seventh Circuit has noted, "[t]he scope of substantive due process, however, is very limited and protects plaintiffs only against arbitrary government action that 'shocks the conscience.'" *Montgomery v. Stefaniak*, 410 F.3d 933, 939 (7th Cir. 2005) (quoting *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005)). *See also Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997).

Here, the evidence fails to show any conduct on the part of Sgt. Micci sufficiently shocking to rise to the level of a violation of Plaintiff's substantive due process rights. In fact, Sgt. Micci's interview of Aleman did not even violate the prophylactic requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966.) Under *Miranda* a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and this right must be explained before questioning begins. *Davis v. United States*, 512 U.S. 452, 457 (1994). A suspect who invokes his right is free to change his mind and volunteer whatever information he chooses. *Miranda*, 384 U.S. 436, 478. The undisputed facts show that Sgt. Micci complied with *Miranda*. Formal questioning of the Plaintiff began after he was orally advised of his *Miranda* rights and after he signed a *Miranda* waiver form. (Facts, ¶¶ 51-56.) Aleman spoke with his personal attorney on at least three occasions prior to formal questioning. (Facts, ¶ 53.) He was never denied a request to make a phone call to his attorney.

(Facts, ¶ 54.) Aleman was orally advised by Sgt. Micci that the interview was being videotaped. (Facts, ¶ 80.) On the morning of September 10, 2005, Plaintiff was again advised of his *Miranda* rights, and when he asked to have his attorney present for any further questioning, the interview promptly terminated. (Facts, ¶ 84.) The undisputed facts establish that Sgt. Micci respected Plaintiff's *Miranda* rights and did not otherwise violate Plaintiff's constitutional right to silence or to counsel. Nor did Sgt. Micci's conduct in interrogating Plaintiff "shock the conscience." Accordingly, Sgt. Micci is entitled to summary judgment on Plaintiff's Count V.

## VI. THERE IS NO EVIDENCE OF CONSPIRACY UNDER STATE LAW AND THE CLAIMS ARE BARRED UNDER 745 ILCS 10/8-101

A "conspiracy" under Illinois law is a combination of two or more persons to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means. *Bosak v. McDonough*, 192 Ill. App. 3d 799, 549 N.E.2d 643 (1st Dist. 1989); *Abell v. First National Bank*, 153 Ill. App.3d at 948, 506 N.E.2d 684. If made solely by circumstantial evidence, proof of civil conspiracy must be clear and convincing. *Bosak v. McDonough*, 192 Ill. App. 3d 799, 549 N.E.2d 643 (1st Dist. 1989) (citing *Tribune Co. v. Thompson*, 342 Ill. 503, 529, 174 N.E. 561 (1930)); *Abell v. First National Bank*, 153 Ill. App. 3d at 948, 506 N.E.2d 684.

Plaintiff's state law conspiracy claim against Sgt. Micci and Sgt. Fallon fails for the same reason that his federal conspiracy claim fails: Plaintiff has failed to adduce any evidence to support a finding that Sgt. Micci or Sgt. Fallon conspired among themselves or with the Hanover Park Defendants to violate any of Plaintiffs' rights under state law. In addition, as set out in the Hanover Park Defendants' memorandum, which ISP Defendants incorporate and adopt by reference, Plaintiff's state law conspiracy claims

are untimely as they were brought more than one year after they accrued.  Accordingly,

the Court should grant summary judgment to Sgt. Micci and Sgt. Fallon on Count VIII.

**VII.    THERE IS NO EVIDENCE TO SUPPORT CLAIMS FOR INTENTIONAL
         INFLICTION OF EMOTIONAL DISTRESS AND THE CLAIMS ARE
         BARRED BY 745 ILCS 10/8-101**

In order to state a claim for intentional infliction of emotional distress under Illinois

common law, a plaintiff must allege facts which establish that: (1) the defendant's

conduct was extreme and outrageous; (2) the defendant either intended that his

conduct should inflict severe emotional distress, or knew that there was a high

probability that his conduct would cause severe emotional distress; and (3) the

defendant's conduct in fact caused severe emotional distress. *Wilson v. Norfolk &*

*Western Ry. Co.*, 187 Ill. 2d 369, 384 (1999).  "[T]he infliction of such emotional distress

as fright, horror, grief, shame, humiliation and worry is not sufficient to give rise to a

cause of action. The emotional distress required to support the cause of action must be

so severe that no reasonable person could be expected to endure it." *Adams v.*

*Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 39 (1st Dist. 1997).

The evidence adduced in discovery does not support any finding that the actions

of Sgt. Micci or Sgt. Fallon rose to the level of extreme and outrageous conduct under

Illinois law.   Here, neither the actions of Sgt. Micci or Sgt. Fallon could reasonably be

described as outrageous or extreme.  In addition, as set out in the Hanover Park

Defendants' memorandum, which ISP Defendants adopt and incorporate by reference,

Plaintiff's state law claims for intentional infliction of emotional distress are untimely as

they were brought more than one year after they accrued.  Accordingly, the Court

should grant summary judgment to Sgt. Micci and Sgt. Fallon on Count VIII.

WHEREFORE, Defendants JOSEPH MICCI and GERARD FALLON respectfully request that summary judgment be entered in their favor on all counts and against Plaintiff, and that the Court grant them any and all further relief it deems appropriate.

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

/s/ Peter C. Koch
PETER C. KOCH
ALICE E. KEANE
Assistant Attorneys General
General Law Bureau
100 W. Randolph St., 13th Floor
Chicago, Illinois 60601
(312) 814-6534 & -3711

## CERTIFICATE OF SERVICE

The undersigned, an attorney of record, states that a copy of the attached Memorandum of Law in Support of Illinois State Police Defendants' Motion for Summary Judgment was served this 18th day of December 2009 by electronic filing pursuant to Rule XI of this Court's General Order on Electronic Case Filing.

/s/ Peter C. Koch
PETER C. KOCH
Assistant Attorney General
General Law Bureau
100 West Randolph Street, 13th Floor
Chicago, Illinois  60601
(312) 814-6534
pkoch@atg.state.il.us