**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RICK ALEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 07 C 5049** |
| | ) | |
| **VILLAGE OF HANOVER PARK, et al.,** | ) | **Judge Bucklo** |
| | ) | |
| **Defendants.** | ) | **Magistrate Judge Denlow** |

## ILLINOIS STATE POLICE DEFENDANTS' STATEMENT OF MATERIAL FACTS

Illinois State Police Defendants Master Sergeant Joseph Micci and Master

Sergeant Gerard Fallon, by their attorney, Lisa Madigan, Attorney General of Illinois,

submit the following as their Local Rule 56.1 statement of material facts in support of

their Motion for Summary Judgment.

## I.    JURISDICTION AND VENUE

1.    Jurisdiction for Plaintiff's federal claims is based on 28 U.S.C. §§ 1331

and 1343(a). Jurisdiction for Plaintiff's state claims is based on supplemental jurisdiction

pursuant to 28 U.S.C. § 1367(a).

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that the

claims arose in this district.

## II.    PARTIES

3.    Plaintiff was at all relevant times a resident of Hanover Park, Illinois.

4.    Defendants Joseph Micci and Gerard Fallon are duly appointed and sworn

Illinois State police officers and, all times relevant, were acting in the course and scope

of their employment.

## III.    UNCONTESTED FACTS

5.      On April 9, 2005 Illinois State Police Master Sergeant Joseph Micci, Sergeant Gerard Fallon, and Sergeant Steven Cardona were assigned to the Illinois State Police Child Victimization Unit.  (*See* Deposition Transcript of Joseph Micci, attached hereto as Exhibit A (hereinafter "Ex. A, Micci Dep."), p. 27.) (*See* Deposition Transcript of Gerard Fallon, attached hereto as Exhibit B (hereinafter "Ex. B, Fallon Dep."), p. 11.) (*See* Deposition Transcript of Steven Cardona, attached hereto as Exhibit C (hereinafter "Ex. C, Cardona Dep."), p. 13.)

6.      Sgt. Micci was the Unit supervisor.  (Ex. A, Micci Dep., p. 25.)

7.      At approximately 10:30 a.m. that day a telephone call came into the Unit from the Hanover Park Police Department (HPPD) asking for assistance in the investigation of a serious injury to a one-year baby boy named Joshua Schrik, who had been transported by Hanover Park paramedics from a day-care business operated by Plaintiff at 1434 Laurie Lane in Hanover Park to Saint Alexius Hospital in Hoffman Estates in a non-responsive condition.  (*See* Affidavit of Joseph Micci, attached hereto as Exhibit G (hereinafter "Ex. G., Micci Aff."), affidavit exhibit 1, p. 1.)

8.      Sgt. Micci, Sgt. Fallon, and Sgt. Cardona traveled to Hanover Park that day to assist Hanover Park police in their investigation.  (Ex. A, Micci Dep., p. 28.) (Ex. B, Fallon Dep., p. 15.) (Ex. C, Cardona Dep., p. 22.)

**Interviews of Doctors at St. Alexius Medical Center**

9.      Sgt. Cardona and HPPD Officer Todd Carlson interviewed Dr. Gerardo Reyes, medical director of the Pediatric Intensive Care Unit (PICU) at St. Alexius Medical Center, who was in charge of Joshua's medical care during his hospitalization.

(Ex. C, Cardona Dep., pp. 37, 39 & deposition exhibit 2.) (*See* Deposition Transcript of Dr. Gerardo Reyes, attached hereto as Exhibit D (hereinafter "Ex. D, Reyes Dep."), pp. 35, 50, 55.)

10.     Dr. Reyes informed Sgt. Cardona that Joshua had suffered a subdural hematoma (brain bleed) covering the right frontal lobe. (Ex. C, Cardona Dep., deposition exhibit 2.)

11.     Dr. Reyes informed Sgt. Cardona that to a reasonable degree of medical certainty, Joshua had been the victim of a violent shake which caused a catastrophic brain injury. (Ex. C, Cardona Dep., deposition exhibit 2.)

12.     Dr. Reyes informed Sgt. Cardona that the onset of symptoms would have been immediate following the traumatic event and that Joshua would not have been alert or functioning after the incident.  (Ex. C, Cardona Dep., deposition exhibit 2.) (Ex. D, Reyes Dep., p. 67.)

13.     Sgt. Cardona specifically recalled that Dr. Reyes said that Joshua's symptoms would have occurred immediately after the injuries.  (Ex. C, Cardona Dep., p. 45.)

14.     Dr. Reyes found the summary of information in the ISP investigative report prepared by Sgt. Cardona to be correct except that Sgt. Cardona had mistakenly reported "bi-lateral" hemorrhages in Joshua's "left eye" whereas the hemorrhaging was presenting in both eyes.  (Ex. D, Reyes Dep., pp. 55-57.)

15.     It was Dr. Reyes' expert medical opinion that shaking Joshua hard enough to cause Joshua's head to touch his back three or four times would have been sufficient

to cause the subdural hematoma and bilateral hemorrhaging that Joshua presented when he was brought into the hospital's emergency room.  (Ex. D, Reyes Dep., p. 58.)

16.     Sgt. Cardona and Officer Carlson interviewed Dr. Seigle, an ophthalmologist with Seigle-Ackermann Eye Associates, Ltd. at 901 Center Street in Elgin, who had been called to examine Joshua's eyes.  (Ex. C, Cardona Dep., pp. 49-50 & deposition exhibit 4.) (*See also* Deposition Transcript of Dr. Michael Seigle, attached hereto as Exhibit E (hereinafter "Ex. E, Seigle Dep."), pp. 9-10.)

17.     Dr. Seigle informed Sgt. Cardona that he had found bi-lateral retinal hemorrhages in Joshua's eyes that appeared to be "fresh".  (Ex. C, Cardona Dep., deposition exhibit 4.) (Seigle Dep., p. 23.)

18.     Dr. Seigle told Sgt. Cardona that "fresh" meant "just occurred".  (Ex. C, Cardona Dep., pp. 50-51.)

19.     It was Dr. Seigle's expert medical and ophthalmological opinion that the injury to Joshua had occurred that same day or within a 24-hour period.  (Seigle Dep., pp. 40-41.)

20.     Dr. Seigle  informed Sgt. Cardona that the injuries to Joshua's eyes were consistent with "shaken baby syndrome".  (Ex. C, Cardona Dep., deposition exhibit 4.) (Ex. E, Seigle Dep., pp. 17, 19-20, 24.)

21.     Sgt. Cardona and Officer Carlson interviewed Joshua's pediatrician, Dr. Albert Hasson of Northwest Pediatrics, 19 East Schaumburg Road in Schaumburg. (Ex. C, Cardona Dep., pp. 51-52 & deposition exhibit 5.)

22.     Dr. Hasson told Sgt. Cardona that Joshua's mother had brought Joshua to his office in Schaumburg on September 8, 2005.  (Ex. C, Cardona Dep., deposition exhibit 5.)

23.     Dr. Hasson told Sgt. Cardona that Joshua had been acting "normal" and that he had a standard viral infection.  (Ex. C, Cardona Dep., deposition exhibit 5.)

24.     Dr. Hasson told Sgt. Cardona that he had found no problems with Joshua's eyes and that the pupils had responded normally.  (Ex. C, Cardona Dep., deposition exhibit 5.)

25.     Dr. Hasson said the summary of his interview with Sgt. Cardona and Officer Carlson contained in the ISP investigative report was correct.  (*See* Deposition Transcript of Dr. Albert Hasson, attached hereto as Exhibit F, pp. 34-37.)

26.     Sgt. Cardona provided the information he had received from the doctors to investigators at the Hanover Park Police Department.  (Ex. C, Cardona Dep., pp. 62-64.)

**Interview of Joshua's Mother at St. Alexius Medical Center**

27.     Sgt. Cardona and Officer Carlson interviewed Joshua's mother, Jennifer Danielle Schrik, that same afternoon.  (Ex. C, Cardona Dep., pp. 58-59.)

28.     At the time of the interview, Sgt. Cardona considered the mother to be a suspect.  (Ex. C, Cardona Dep., p. 60.)

29.     Sgt. Cardona found her credible and acting appropriately.  (Ex. C, Cardona Dep., p. 64.)

30.     After the interview was completed, Sgt. Cardona did not consider the mother to be a suspect.  (Ex. C, Cardona Dep., p. 64.)

**Interviews of Firefighters, Police, and Paramedics Who Arrived at the Scene**

31.     At approximately 1:33 p.m. Sgt. Fallon and Sgt. Micci conducted an interview of HPPD Officer Terrence Sherrill at the HPPD.  (*See* Affidavit of Gerard Fallon, attached hereto as Exhibit H (hereinafter "Ex. H, Fallon Aff."), affidavit exhibit 1.)

32.     Sherrill told them that when he arrived at Aleman's house, Aleman appeared agitated and could not calm down.  (*Ibid.*)

33.     At approximately 2:10 p.m. Sgt. Micci and Sgt. Fallon conducted an interview of HPPD Sgt. John Dossey at the HPPD.  (Ex. H, Fallon Aff., affidavit exhibit 2.)

34.     Dossey told them that Aleman had said that Joshua had been crying after his mother left and also when Aleman had placed him on the couch with his blanket and stuffed animal and that he tried to get Joshua to interact with the other children.  (*Ibid.*)

35.     Dossey told them that Aleman had a panicked look on his face.  (*Ibid.*)

36.     Dossey told them that Aleman had said at least twice that he did not want to go to jail for the rest of his life and did not want to be unable to see his children. (*Ibid.*)

37.     At approximately 3:20 p.m. Sgt. Micci and Sgt. Fallon conducted an interview of Hanover Park Fire Department (HPFD) Lt. Paul Rosenthal at the HPFD. (Ex. G, Micci Aff., affidavit exhibit 1.)

38.     Rosenthal informed Sgt. Micci that that Plaintiff had appeared distraught and nervous. (*Ibid.*)

39.     At approximately 3:50 p.m. Sgt. Micci and HPPD Officer Eric Villanueva conducted an interview of HPFD Firefighter/Paramedic Paul Skiba. (Ex. G, Micci Aff., affidavit exhibit 2.)

40.     Skiba told them that he had been dispatched to a "child having difficulty breathing" call which was shortly upgraded to "full arrest." (*Ibid.*)

41.     Skiba told them that when he had arrived at Aleman's house the baby was not breathing and had no pulse and two attempts to intubate him had been unsuccessful. (*Ibid.*)

42.     At approximately 4:03 p.m. Sgt. Fallon and HPPD Lt. Cortese conducted an interview of HPFD Firefighter/EMT John Brodnick at the HPFD.  (Ex. H, Fallon Aff., affidavit exhibit 6.)

43.     Brodnick told them that when he arrived at Aleman's house, he observed Plaintiff five to ten feet outside his residence holding Joshua who had had his head tilted backwards with his arms hanging from the side.  (*Ibid.*)

44.     At approximately 4:14 p.m. Sgt. Fallon and HPPD Lt. Cortese interviewed HPFD Firefighter Dana Krosowski at the HPFD.  (Ex. H, Fallon Aff., affidavit exhibit 7.)

45.     Firefighter Krosowski told them that when he arrived at Aleman's home, he observed Plaintiff on the driveway of his home holding Joshua who had appeared lifeless with his arms hanging down. (*Ibid.*)

46.     Firefighter Krosowski told them the baby never regained consciousness. (*Ibid.*)

**Interview of Rick Aleman**

47.     Sgt. Micci was at the Hanover Park police station several hours prior to beginning his interview of Rick Aleman.  (Ex. A, Micci Dep., p. 29.)

48.     Sgt. Micci spoke with several investigators during the course of the day prior to commencing his interview of Aleman, including Sgt. Cardona, who was at the hospital speaking with Joshua's doctors.  (Ex. A, Micci Dep., pp.  59-60, 79, 168.)

49.     Sgt. Micci testified that he considered Aleman to have been under arrest prior to his beginning of the interview.  (Ex. A, Micci Dep., p. 163.)

50.     On more than one occasion, Aleman was allowed to contact his attorney on a cell phone prior to the initiation of an interview either by an Illinois State Police or Hanover Park Police officer. (*See* Deposition Transcript of Rick Aleman, attached hereto as Exhibit I (hereinafter "Ex. I, Aleman Dep."), pp. 138-39.)

51.     Aleman signed a *Miranda* waiver prior to giving an interview or being questioned by Hanover Park or Illinois State Police.  (Ex. I, Aleman Dep., p. 140; see also Ex. I, Aleman Dep., deposition exhibit 4; see also Ex. I, Aleman Dep., deposition exhibit 7, DVD #1 – 17:14:01-17:17:40.)[1]

52.     Before signing the *Miranda* waiver, Aleman spoke with his attorney on his cell phone. (Ex. I, Aleman Dep., p. 131; see also Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 17:49:08-17:50:01.)

53.     Aleman recalled being given three (3) phone calls to his attorney, Paul Ankin, prior to the interview by law enforcement personnel. (Ex. I, Aleman Dep., pp. 144-45.)

54.     Aleman was never denied a request by the members of the Hanover Park Police Department to make a phone call. (Ex. I, Aleman Dep., p. 145.)

---

[1] Hanover Park Defendants have manually filed Aleman Deposition Exhibit 7, DVDs #1 and #2.

55.     At 5:49 p.m. Aleman reported to Sgt. Micci that his lawyer had advised him to go ahead and speak with them and then confirmed that he would agree to speak with them. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 17:49:08 – 17:49:36.)

56.     Then Aleman signed the *Miranda* waiver form and Sgt. Micci and Officer Villanueva countersigned the form. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 17:49:36 – 17:50:20.)

57.     At 5:57 p.m. Sgt. Micci and Officer Villanueva began interviewing Aleman. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 17:57:09.)

58.     At 6:15 p.m. Aleman said that that morning Joshua and his mother had arrived at their regular time, 8 a.m., and that Joshua "looked the same [as] the last two times I [had] seen him." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:15:28 – 18:15:40.)

59.     At 6:16 p.m. Aleman said that the mother had stayed with Joshua for about fifteen minutes and then had left. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:16:06.)

60.     At 6:16 p.m. Aleman said that Carl Gutman came over with his son, J.T., at about 8:30 that morning and stayed for 10 to 15 minutes. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:16:30 – 18:17:04.)

61.     At 6:17 p.m. Aleman said that he was sitting with Joshua with Joshua's head on his shoulder because "mommy had left and he [Joshua] was crying." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:17:20 – 18:17:27.)

9

62.     At 6:17 p.m. Aleman described taking Joshua to the door to watch his mother leave and that the baby saw his mother and felt better. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:17:27 – 18:17:48.)

63.     At 6:17 p.m. Aleman said that Joshua "calmed down and he put his head here" motioning to his shoulder. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:17:48 – 18:17:54.)

64.     At 6:18 p.m. Aleman described how, when Carl Gutman knocked on the door, he (Aleman) had said to Gutman "Carl, listen, I said, I'm not trying to be rude, but I've got this sick baby here, and I just got him down" and "He's calming down" and also "This guy's not feeling so well and I just got him feeling better."  (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:17:54 – 18:18:49.)

65.     At 6:20 p.m. Aleman said that after Gutman left he (Aleman) started playing with the other kids and then went to grab Joshua off the couch to include him. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:19:48 – 18:20:18.)

66.     At 6:20 p.m. Aleman said "When I picked him up, it was like picking up … nothing" and "As soon as I picked him up, my heart dropped. I knew something was wrong."  (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:20:18 – 18:20:30.)

67.     At 6:27 p.m. Aleman said "When I picked him [Joshua] up, he was alert" and that he was "confident" he Joshua was alert up until the time Aleman walked back in the room after Gutman had left." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:27:20 – 18:27:32.)

68.     At 6:43 p.m. Aleman said that Joshua was standing when Gutman was still in the house, on the right side of the couch.  (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:43:05 – 18:43:52.)

69.     At 6:44 p.m. Aleman said that at one point that morning Joshua "was just looking around, not familiar with his surroundings still, and not too happy." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:44:35 – 18:44:50.)

70.     At 6:45 p.m. Aleman said that when the mother left "Josh started crying." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:45:28 – 18:45:48.)

71.     At 6:49 p.m. Aleman agreed that Joshua was okay up until Carl Gutman left. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 18:49:50 – 18:49:59.)

72.     At 7:25 p.m. Aleman said that Joshua was crying to his mom earlier in the morning. (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 19:25:42 – 19:25:55.)

73.     At 7:26 p.m., after being informed that Joshua's injuries were indicative of shaken baby syndrome," Aleman said "I didn't shake that baby." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 19:25:55 – 19:26:55.)

74.     At 7:38 p.m. Aleman admitted to shaking the baby "in a panic" three or four times and that Joshua's head and legs were limp when he shook him.  (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 19:37:13 – 19:38:55.)

75.     At 7:39 Sgt. Micci asked Aleman how hard he shook the baby, and Aleman responded "probably hard enough. … I'm ashamed of myself." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 19:39:35 – 19:39:41.)

76.     At 7:40 p.m. Aleman admitted to holding Joshua under his armpits and shaking him.  (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 19:39:41 – 19:40:33.)

11

77.     At 7:55 p.m. Aleman stated "I know in my heart that if the only way to cause it [the injury] is to shake that baby, then, when I shook that baby, I hurt that baby." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 19:54:55 – 19:55:41.)

78.     At 7:55 p.m. Aleman said that when he was shaking Joshua, the baby's head touched his back "probably three or four different times." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 19:55:41 – 19:56:06.)

79.     At 8:19 p.m. Aleman said "I admit it. I did shake the baby too hard.  But I didn't mean to.  I didn't mean any harm." (Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 20:19:00 – 20:19:15.)

80.     At 9:05 p.m. Aleman was advised by Sgt. Joseph Micci that the interview was being videotaped. (Ex. I, Aleman Dep., p. 149; *see also* Ex. I, Aleman Dep., deposition exhibit 7, DVD #2 – 21:05:50-21:06:17).

81.     At 9:41 p.m. Aleman was provided a plastic baby and demonstrated to Sgt. Micci and Officer Villanueva how he handled Joshua Schrik after he became unresponsive. (Ex. I, Aleman Dep., p. 149; *see also* Ex. I, Aleman Dep., deposition exhibit 7, DVD #2- 21:41:33-21:43:20).

82.     At 9:58 p.m. Aleman was advised by Sgt. Micci that he was under arrest. (Ex. I, Aleman Dep., p. 159; *see also* Ex. I, Aleman Dep., deposition exhibit 7 - DVD #2 – 21:58:10 - 21:58:22).

83.     On September 10, 2005, Aleman admitted to Sgt. Micci and Officer Villanueva that he did the wrong thing and that he felt terrible about what happened to Joshua. (Ex. I, Aleman Dep., p. 163; *see also* Ex. I, Aleman Dep., deposition exhibit 7, DVD #3 - 10:53:53 - 10:54:40).

84.     On September 10, 2005, after Aleman stated that he wanted his attorney present, the interview ended. (Ex. I, Aleman Dep., p. 172; *see also* Ex. I, Aleman Dep., deposition exhibit 7, DVD #3 – 11:25-31 – 11:25:54).

85.     During his deposition, Sgt. Micci said that Aleman's statement that Joshua had been standing the morning of September 9 was significant given the nature of Joshua's injuries.  (Ex. A, Micci Dep., pp.  155-56.)

86.     Because Sgt. Micci understood that the onset of symptoms of catastrophic brain injury would have been instantaneous and would not have come on gradually, Aleman's admission suggested that the injury inflicted on Joshua had not occurred prior to the time that he had been dropped off by his mother.  (Ex. A, Micci Dep., p. 156.)

87.     Sgt. Micci found Aleman's numerous statements that Joshua had been crying at the house also significant because it was his belief that Joshua would not have been able to cry if Joshua already had suffered a catastrophic brain injury prior to coming to Aleman's house.  (Ex. A, Micci Dep., p.  157.)

88.     Sgt. Micci found Aleman's statements that he had been "interacting" with Joshua that day significant for the same reason.  (Ex. A, Micci Dep., p.  157.)

89.     Sgt. Micci believed that with "the symptoms and signs of a severe brain injury such as Joshua had, he would be incapable of interacting with anybody. … He would have been nonresponsive from the point of the brain injury."  (Ex. A, Micci Dep., pp. 157-58.)

90.     Sgt. Micci found Aleman's statements that at one point Joshua was "looking around" and was not happy significant because "[Joshua] would have been

13

physically incapable of standing, looking around, most likely of seeing anything at that point."  (Ex. A, Micci Dep., pp.  158-59.)

91.    Sgt. Micci also found significant that Aleman said that he shook Joshua "in a panic" (Ex. A, Micci Dep., p. 159); "probably hard enough" (Ex. A, Micci Dep., p.  159); hard enough that the baby's head probably hit the baby's back three or four times (Ex. A, Micci Dep., pp.  149, 155-56, 161); and the manner in which Aleman demonstrated how he shook Joshua (Ex. A, Micci Dep., p.  149).

92.    Based on what Aleman stated during his interview, Sgt. Micci was comfortable with Aleman being held overnight at the Hanover Park Police station.  (Ex. A, Micci Dep., p.  162.)

**Filing of Charges against Aleman**

93.    On September 12, 2005, Judge Karen Tobin found probable cause to detain Aleman on charges of Aggravated Battery to a Child. (Ex. I, Aleman Dep., p. 172.) (*See* Transcript of Proceedings before Hon. Karen Tobin, attached hereto as Exhibit J, p. 4.)

94.    On Tuesday, September 13, 2005, Joshua Schrik died. (*See* Transcript of Proceedings before Hon. Thomas P. Fecarotta, Jr., attached hereto as Exhibit K, p. 7.)

95.    On September 15, 2005, Judge Thomas P. Fecarotta, Jr., found probable cause to detain Aleman on the charge of First-Degree Murder. (*Ibid.*)

**Role of Sergeant Gerard Fallon**

96.    The ISP investigative report prepared by Sgt. Fallon accurately recounted what Michalik had told police during his interview on September 10, 2005.  (*See*

14

Deposition Transcript of Adam Michalik, attached hereto as Exhibit L (hereinafter "Ex. L, Michalik Dep."), pp. 37-41.)

97.     After being interviewed by Sgt. Fallon and HPPD Sgt. Carol Lussky, Michalik appeared before a grand jury in the Circuit Court of Cook County at the Rolling Meadows courthouse.  (Ex. L, Michalik Dep., p. 49.)

98.     Before testifying at the grand jury, he discussed with Assistant State's Attorney Lance Northcutt the questions that would be posed to him and the answers that he would give.  (Ex. L, Michalik Dep., pp. 51-52.)

99.     The summary of the September 9, 2005 interview of Carl Gutman prepared by HPPD Sgt. Lussky was correct but "it lacked some detail as far as the account and – that happened on that morning".  (*See* Deposition Transcript of Carl Gutman, attached hereto as Exhibit M (hereinafter "Ex. M, Gutman Dep."), p. 106.)

100.    The only information not contained in Sgt. Lussky's report was that on the morning of the incident, Gutman had "gone up and touched Joshua's forehead and held [Joshua's] hand and moved in front of [Joshua] to see if his eyes followed."  (Ex. M, Gutman Dep., p. 106.)

101.    Gutman had a second interview with Sgt. Lussky, HPPD Officer Villanueva, and Assistant State's Attorney Matt Medina on September 11, 2005, in which he specifically informed them that Joshua had a "vacant stare".  (Ex. M, Gutman Dep., pp. 93-94.)  .

102.    Gutman testified before the grand jury on September 22, 2005.  (Ex. M, Gutman Dep., p. 96.)

103.    Plaintiff's claims against Sgt. Fallon are based on Sgt. Fallon's being one of the officers who interviewed Adam Michalik and Carl Gutman and in Sgt. Fallon's being one the officers who took Aleman into custody on September 15, 2005.  (Ex. I, Aleman Dep., pp. 224-26.)

104.    With regard to his arrest for first-degree murder on September 15, 2005, Plaintiff admitted that he voluntarily turned himself in at the Hanover Park Police station, accompanied by an attorney. (Ex. 1, Aleman Dep., pp. 224-227.)

105.    Plaintiff did not recall having any substantive conversation with Sgt. Fallon and believed Sgt. Fallon's role was limited to processing task such as fingerprinting Plaintiff. (Ex. 1, Aleman Dep., pp. 224-227.)

106.    Aleman testified that he was not aware of any facts to support his failure-to-intervene claim or his conspiracy claim against Sgt. Fallon.  (Ex. I, Aleman Dep., pp. 229-32.)

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

/s/ Peter C. Koch
PETER C. KOCH
ALICE KEANE
Assistant Attorneys General
General Law Bureau
100 West Randolph Street, 13th Floor
Chicago, Illinois  60601
(312) 814-6534, -3711

16

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of Illinois State Police Defendants' Statement of Material Facts was served this 18th day of December 2009 by electronic filing pursuant to Rule XI of the General Order On Electronic Case Filing.

/s/ Peter C. Koch
Peter C. Koch
Assistant Attorney General
100 W. Randolph Street, 13th Floor
Chicago, IL 60601
(312) 814-6534
pkoch@atg.state.il.us
