## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RICK ALEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07 C 5049 |
| | ) | |
| vs. | ) | Judge Bucklo |
| | ) | Magistrate Judge Denlow |
| VILLAGE OF HANOVER PARK, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S COMBINED RESPONSE TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Rick Aleman, through counsel, Jackowiak Law Offices, respectfully submits the following response to the Defendants' motions for summary judgment.

## I.    Introduction

This is a case of egregious police misconduct that almost caused an innocent man to go to prison for life. When 11-month-old Joshua Schrik went to the hospital with symptoms of brain injury on September 9, 2005, the Hanover Park Police Department and the Illinois State Police were called to investigate if Joshua's injuries were the result of criminal behavior, and if so, who was responsible. Before a meaningful and proper investigation even began, the Defendants decided that Plaintiff Rick Aleman, a daycare provider who had begun caring for the child only three days before, was to blame. They worked backwards from there, twisting the evidence to conform to their predetermined conclusion, even when the evidence pointed at someone else.

Indeed, the Defendants repeatedly ignored evidence which pointed at Joshua's mother, Danielle Schrik, as the real culprit. Danielle had a had a long history of violence, and members of her own family saw her physically abusing Joshua on numerous occasions. (SOF, ¶¶ 6, 119-122.)  Joshua had been displaying symptoms of traumatic brain injury throughout the previous week, before Plaintiff had even met Joshua. (SOF, ¶¶ 2-17.) That previous Friday, Danielle left her child unattended and had a drunken fistfight with Joshua's natural father and grandfather after which she was charged with battery. (SOF, ¶¶ 116, 117.) But the Defendants ignored,

covered-up, and disregarded this and other evidence pointing at Danielle.

Plaintiff was arrested soon after Joshua was taken to the hospital and he was detained at the Hanover Park Police Station for the entire day. (SOF, ¶¶ 91, 92.) Plaintiff was interrogated illegally by Defendants Micci and Villanueva for four hours, during which time Plaintiff repeatedly asked for counsel. (SOF, ¶¶ 55-81.) During this interrogation, Plaintiff described what he did when Joshua became non-responsive at his home that morning. Plaintiff attempted to revive Joshua, performed CPR, and called an ambulance. (SOF, ¶¶ 40-54.) Defendants twisted this into a "confession" that he had intentionally injured Joshua. In reality, Plaintiff did exactly wheat he was supposed to do to try to revive Joshua. Nonetheless, that night Plaintiff was charged with aggravated battery. (SOF, ¶ 86.)

Meanwhile, the Defendants ignored Danielle. Later on September 9, Sergeant Cardona and Defendant Carlson asked her questions at the hospital for a few minutes. (SOF, ¶¶ 97, 104.) Although Danielle admitted that Joshua had been displaying symptoms of brain injury for nearly a week, the Defendants "ruled out" Danielle as a suspect immediately after this conversation and thereafter turned a blind eye to all evidence pointing at Danielle. (SOF, ¶¶ 98, 99, 108, 109, 111.) Carlson then developed a close personal relationship with Danielle and was even observed holding hands with her at Joshua's funeral. (SOF, ¶ 127.) Defendants also actively interfered with DCFS's investigation of the incident and purposely shielded Danielle from being questioned by Michael Booker, the DCFS investigator who was trying to conduct a proper and thorough investigation. Notably, Booker eventually concluded that Plaintiff was not the perpetrator and expressed grave concerns that Defendants were not investigating Danielle. (SOF, ¶¶ 128-132.)

In addition, Defendants intentionally misinterpreted and falsified the medical evidence to conform to their presumption that Plaintiff was guilty. Defendants deliberately misconstrued the statements of the doctors who treated Joshua to support their theory that Plaintiff had intentionally inflicted Joshua's fatal injuries that morning. In reality, every single doctor involved agreed that Joshua's brain injury could have occurred at any time in the preceding week. (SOF, ¶¶ 23-39.) The Defendants, however, did not question any of the other adults who had contact with Joshua in the week before his hospitalization because they had decided that Plaintiff was guilty before performing a proper investigation.

Likewise, Defendants deliberately ignored the evidence that Joshua had been showing symptoms of brain injury for several days before he was taken to the hospital in a non-responsive

state. The adults who observed Joshua on the morning of September 9 all saw that he was catatonic when he arrived at Plaintiff's home. (SOF, ¶¶ 1-22.) Indeed, Joshua had been sickly and lethargic during the preceding week—a sign that he had brain injury. (SOF, ¶¶ 23-25.) Defendants deliberately concealed this evidence from medical professionals who were evaluating the cause of Joshua's brain injury and death.

Most egregiously, Defendants lied to the medical examiner to get her to conclude that Joshua's injuries occurred the morning of September 9 when he was in Plaintiff's care. Defendants provided Dr. Jones with inaccurate and misleading summaries of the statements of witnesses to make it appear that Joshua was healthy, active and normal when he was brought to Plaintiff's home the morning of September 9. (SOF, ¶¶ 32-36.) That was blatantly false. Joshua had seen a doctor several times in the previous week and was extremely sick when Danielle dropped him off with Plaintiff that morning.

Because of Defendants' deliberate deception and misconduct, Plaintiff was charged with aggravated battery and later first degree murder, a possible capital crime. Plaintiff was jailed, lost his savings, his job, his reputation and his home. When prosecutors fully reviewed the evidence that Defendants had supposedly compiled against Plaintiff, there was only one conclusion to be reached: the charges had to be dropped. The lead prosecutor on the case, Karen Crothers, felt that Defendants had deceived both her and the medical doctors. She concluded that Joshua's mother was likely responsible for his death, and that the Defendants' interrogation of Plaintiff was unconstitutional. (SOF, ¶¶ 83-85.) Defendants now seek to evade liability for their gross misconduct. Their arguments totally lack merit, and their motion should be rejected.

## II.     The Red Herrings

Defendants' motions for summary judgment paint a phony picture of reasonable police officers who were just "doing their job." Their briefs rely heavily on statements of fact which are either false or irrelevant. Indeed, close examination of the evidence reveals that the Defendants engaged in deliberate malfeasance in furtherance of their scheme to charge Plaintiff with murder even after they discovered evidence that pointed elsewhere. This section addresses several of the Defendants' most serious factual misstatements.

*Red Herring 1: Plaintiff "admitted" that he shook Joshua*

Defendants try to give the Court the impression that Plaintiff made inculpatory statements that he violently shook Joshua, giving them proper reason to believe Plaintiff was responsible for Joshua's brain injuries. This is the same false impression that Defendants deliberately gave to prosecuting attorneys which led to the criminal charges against Plaintiff. The truth is that Plaintiff never admitted to any conduct that could have harmed Joshua.

Plaintiff repeatedly stated throughout the his interrogation that Joshua was *already* limp, non cognitive and not breathing when Plaintiff picked him up to check on him. (SOF, ¶¶ 40-51.) Plaintiff only "admitted" that he made efforts to revive Joshua and get Joshua's attention by jostling him, slapping his cheek, shaking him and shouting his name before beginning rescue breaths and CPR. Id. The Defendants have even admitted that Plaintiff's attempts were *exactly* what should have been done under the circumstances. (SOF, ¶ 54.)

Defendant Micci extracted apologies from Plaintiff by falsely claiming that he had authoritative medical information that Joshua's injuries could *not* have occurred before he was brought to Plaintiff's home. (Response to ISP SOF, ¶ 77.) Confronted repeatedly with that lie, Plaintiff eventually agreed that if the only time Joshua could have been hurt was at his home, then he must have hurt Joshua in his efforts to revive him and perform CPR. Id.

Defendants decided that this amounted to a "confession" that Plaintiff had intentionally injured Joshua. They were the only ones who thought so. After prosecutor Karen Crothers reviewed the video of the interrogation, she concluded: "Ultimately, I thought it was more exculpatory than inculpatory." (SOF, ¶ 85.)

Defendants also make much of Plaintiff's demonstration of how he handled Joshua using a plastic doll at the police station. (See, ISP SOF, ¶ 81; Hanover Park SOF, ¶ 29.) Again, it was only in the minds of the Defendants that this demonstration amounted to an inculpatory statement.

When DCFS Investigator Michael Booker, who has 18 years of experience investigating shaken baby cases, reviewed this video, he was "not critical" of how Plaintiff handled the baby. In fact, Booker explained that the type of shake Plaintiff demonstrated "does not cause shaken baby syndrome," and is actually a proper CPR technique. (SOF, ¶ 53.) Likewise, Defendant Carlson specifically testified that he has received training on how to perform CPR on an infant and stated that the first step is to "shake the baby to try to revive the baby." (SOF, ¶ 54.)

*Red Herring 2: Prosecutors and Judges "Approved the Charges"*

Defendants attempt to argue that they had a limited role in bringing the unfounded criminal charges against Plaintiff and try to pass blame onto prosecutors who approved the charges and judges who found probable cause to detain Plaintiff on the charges. Those decisions are completely irrelevant, however, because they were based on the Defendants' false and misleading representations of the evidence.

Courts have repeatedly held that persons who supply false information in support of criminal charges cannot hide behind a prosecutor's decision to charge to evade liability. See, e.g, Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988); Pierce v. Gilchrist, 359 F.3d 1279, 1292-93 (10th Cir. 1990); Robinson v. Maruffi, 895 F.2d 649, 655-56 (10th Cir. 1990). Rather, liability extends to all persons who played a significant role in bringing the prosecution. See, e.g., Theriault v. Village of Schaumburg, 2002 WL 31803826 at *2 (N.D.Ill.) (Conlon, J.); Montes v. Disantis, 2005 WL 1126556 at *12 (N.D.Ill. 2005) (Pallmeyer, J.) citing Rodgers v. Peoples Gas, Light and Coke Co., 315 Ill.App.3d 340, 348-49 733 N.E.2d 835, 842 (1st Dist. 2000).

Here, Defendants extracted statements from Plaintiff that were consistent with the response one would expect from an innocent man trying to revive an unconscious baby. But the Defendants told prosecutors that Plaintiff's detailed explanation of his attempts to save Joshua's life were actually a "confession" to injuring Joshua. Based on that, a state's attorney approved the aggravated battery and murder charges against Plaintiff. (Notably, prosecutor Karen Crothers who witnessed the demonstration of the shake would not approve charges based solely on that.) Subsequently, a judge found probable cause based on the same false information the Defendants provided. (SOF, ¶¶ 86-90.) None of this ever would have happened to Plaintiff if not for Defendants' deliberate misrepresentations of the evidence. Under the law, they are accountable.

*Red Herring 3: Carl Gutman and Adam Michalik Testified Against Plaintiff*

Defendants repeatedly assert in their motion that Plaintiff's "friends" Adam Michalik and Carl Gutman testified against him before the grand jury, which based its ruling on their testimony. Defendants' motions attempt to give the Court the phony impression that the other parents who brought their children to Plaintiff's daycare on September 9 were witnesses against him and helped support the murder charges. In reality, Gutman and Michalik's testimony corroborated Plaintiff's version of events. Gutman testified to the grand jury that Joshua was

5

"slumped over" on the couch and had a "vacant stare" on the morning of September 9, before Plaintiff had any interaction with Joshua. (SOF, ¶¶ 20-22.) Likewise, Michalik testified that he saw Joshua lying on the floor immobile that morning. (SOF, ¶ 18.) This testimony supported Plaintiff's version of events—i.e. that Joshua was unresponsive when he picked him up and tried to revive him.

The truth is that the daycare parents adamantly supported Plaintiff throughout this ordeal, and even lent him substantial money to bond out of jail because they knew how good Plaintiff was with children and felt instinctively (and correctly) that the criminal charges the Defendants had brought against Plaintiff had to be false.

III.     **There is Substantial Evidence that Defendants Lacked Probable Cause to Arrest Plaintiff for Aggravated Battery**

Count I is directed against all of the individual Defendants. Each played a role in the wrongful arrest of Plaintiff for aggravated battery to Joshua. An arrest must be supported by probable cause. Probable cause exists if a prudent person would have believed that the arrestee had committed a crime. E.g., Smith v. Ball St. Univ., 295 F.3d 763, 768 (7th Cir. 2002); Qian v. Kautz, 168 F.3d 949, 953 (7th Cir. 1999). Probable cause is an objective standard, evaluated from the perspective of a "reasonable officer." Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996). The question of probable cause must be submitted to a jury when "there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." Gonzalez v. City of Elgin, 578 F.3d 526, 536 (7th Cir. 2009); Sornberger v. City of Knoxville, Ill., 434 F.3d 1006, 1013-14 (7th Cir. 2006). In this case, the facts known to Defendants and the reasonable inferences to be drawn from those facts are strongly disputed. Therefore a jury must decide whether there was probable cause to arrest Plaintiff for aggravated battery on September 9, 2005.

*Defendant Carol Lussky*

Defendant Lussky brought Plaintiff to the Hanover Park police station around 10 a.m. on September 9. (SOF, ¶ 91.) Plaintiff agrees that at that time, he was not arrested. However Lussky made it clear that Plaintiff was under arrest shortly thereafter.

At 11:39 a.m. Plaintiff asked Defendant Lussky if he could leave the police station for an

hour and come back. Defendant Lussky responded, "No. I'd rather have you here." (SOF, ¶¶ 91-92.) This conversation was recorded on Hanover Park police department video and audio surveillance equipment. (SOF, ¶ 92.) The Hanover Park Defendants assert that Plaintiff was not under arrest at this point because no one told him that he was arrested and he was not in handcuffs when he was brought to the police station. But based on Lussky's statement that Plaintiff was not free to leave, Plaintiff was under arrest. Indeed, Lussky admitted in her deposition that Plaintiff was not free to leave. See, e.g., United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (a person is under arrest "if in view of all of the circumstances around the incident a reasonable person would have believed that he was not free to leave.")

The question then is whether Lussky had probable cause to arrest Plaintiff at 11:40 a.m. She clearly did not. According to Lussky, all she knew at that time was that Joshua was injured and was taken to the hospital.[1] (SOF, ¶ 93.) If that were sufficient probable cause to arrest, then every parent whose child is injured and receives medical treatment could be arrested. Under those facts, it is Plaintiff who is entitled to judgment. At a minimum, this issue must be submitted to a jury.

*Defendants Micci, Villanueva, Carlson and Fallon*

Defendants Micci and Villanueva's role in the seizure began when they began interrogating Plaintiff at 5:12 p.m. (SOF, ¶ 55.) At that time, Plaintiff asked Defendant Micci if he could come back tomorrow, and Micci said that Plaintiff was "not gonna be going home." (SOF, ¶¶ 67, 70.)

Defendants Micci and Fallon argue that they had probable cause to arrest Plaintiff for aggravated battery on September 9, based on statements from first responders, interviews with treating doctors, and an interview with Joshua's mother. (ISP Defendants' brief, pps. 5-7.) However, based on this information, there was no more probable cause to arrest Plaintiff than there was to arrest *any* adult who had had contact with Joshua in the previous week. The question

---

[1] Hanover Park Defendants assert in their brief that Plaintiff demonstrated to Lussky how he handled Joshua by shaking a doll a at his home before Lussky took him to the police station. However, Plaintiff denies ever making any such demonstration. [Ex. 1, Dep of Plaintiff, p. 123-124.] Therefore, Defendants cannot rely on this disputed fact to support Lussky's claim that she is entitled to summary judgment.

of probable cause certainly cannot be decided on a motion for summary judgment in this case.
See, e.g., Gonzalez v. City of Elgin, 578 F.3d 526, 536 (7th Cir. 2009) (probable cause is a jury
question when reasonableness of officer's interpretation of the evidence is disputed.)

According to every first responder, Plaintiff's behavior was not only appropriate, but
exemplary and laudable. Plaintiff saw that Joshua was non-responsive, immediately made efforts
to perform life-saving first aid measures, and promptly called 911 for an ambulance. Officers
Sherrill and Dossey both described Plaintiff performing rescue breaths on Joshua as soon as
Plaintiff discovered Joshua was non-responsive. First responders who came to the home
described Plaintiff's demeanor as "concerned," "upset," and "frantic." Firefighter Krasowski
reported that Aleman came up to the ambulance to check on Joshua's condition. Hanover Park
Lieutenant Rosenthal described Plaintiff repeatedly asking how Joshua was doing. (SOF, ¶¶ 135-
140.) Of course, this is *exactly* how any concerned person would act under similar circumstances.

Significantly, Lieutenant Rosenthal learned early on and promptly reported to Micci and
Fallon that Joshua was displaying symptoms of brain injury earlier in the week. (SOF, ¶ 140.)
Rosenthal told them that Joshua had been ill with a fever and had been "sluggish." Id. Rosenthal
further reported that Joshua would not interact with other children and that "all Joshua wanted to
do was sleep." Id. Rosenthal also described how Plaintiff observed that Joshua's eyes appeared to
be "staring into space," which prompted Plaintiff to begin CPR. Id. Far from inculpating
Plaintiff, the first responders' statements to Defendants actually exculpated him.

Likewise, statements from Joshua's treating doctors did not implicate Plaintiff. While it is
true that Sergeant Cardona learned from treating physicians that Joshua had suffered brain injury
which could be attributable to violent shaking, no doctor gave Defendants a time frame as to
when that injury occurred. (SOF, ¶ 26.) In fact, according to every single physician, the injury
could have occurred any time in the preceding week, if not a longer time frame. Id. Dr. Seigle
testified that the time frame for the injury to Joshua's eyes was "shortly before arrival to two
weeks prior." Id. Dr. Seigle further testified that he could not date retinal hemorrhages other than
to say that they occurred within "several weeks." (SOF, ¶ 26.) Dr. Reyes could not fix the time of
the traumatic injury other than that it occurred "between the time Joshua was reliably observed to
have the normal behavior of an 11-month-old child, and the time when Joshua was reliably
observed not to have the normal behavior of an 11-month-old child." Id. Dr. Reyes testified that
the fact that Joshua was lethargic the previous day was important in determining when the injury

occurred. (SOF, ¶ 28.) Dr. Hasson testified that the onset of symptoms of brain edema can occur any time in the seven days after a brain injury. (SOF, ¶ 26.)

Some doctors said Joshua would become symptomatic right after the injury, but no doctor said Joshua would go into immediate cardiac arrest or unconsciousness. (SOF, ¶ 28.) Rather, they all said that the onset of symptoms such as lethargy, irritability and loss of appetite would be after the traumatic event. (SOF, ¶¶ 23-25, 29.) Of course, these were Joshua's symptoms *before* he arrived at Plaintiff's home on September 9, 2005. *Every doctor* involved in Joshua's treatment states that brain edema (swelling of the brain), which Joshua presented with at the hospital, can develop slowly over time, eventually causing unconsciousness and cardiac arrest as long as two weeks after the traumatic event. (SOF, ¶ 26.)

Defendant Micci manipulated the doctors' statements to support his hasty determination that Plaintiff had injured Joshua on the morning on September 9, 2005. Defendants rely heavily on Micci's self-serving, *subjective* beliefs about the incident for their argument that he had probable cause. But probable cause is an *objective* standard. Micci's deliberate misinterpretation of the medical findings was manifestly unreasonable and unsupported by the doctors' testimony. His self-serving and biased interpretation of Sergeant Cardona and Carlson's interviews cannot be considered a basis for probable cause to arrest Plaintiff as a matter of law.

Defendants claim that Sergeant Cardona's so-called "interview" with Joshua's mother, Danielle, also formed part of the basis for the arrest of Plaintiff. The record shows, however, that nobody ever seriously questioned Danielle. Cardona spoke to Danielle one time (on September 9 at St. Alexius Hospital) about Joshua's injury. When Cardona spoke to Danielle, Cardona did not take any notes and does not even remember any specific question he asked. Cardona never conducted a background check on Danielle. (SOF, ¶ 107.) Carlson also had a brief conversation with Danielle that day. (SOF, ¶ 97.)

Significantly, during those two brief conversations on September 9, 2005, Danielle admitted to Carlson and Cardona that Joshua had been displaying symptoms of brain injury earlier in the week. Danielle told them that Joshua had been very ill, had not been eating, and had been lethargic and inactive the entire week. (SOF, ¶¶ 98, 108, 109.) Cardona has admitted that based on his training, lethargy, inactivity, and loss of appetite are signs of shaken baby syndrome. (SOF, ¶ 110.) Nonetheless, Cardona and Carlson inexplicably "ruled out" Danielle as a suspect even after they learned of Danielle's criminal history and tendency towards violence. (SOF, ¶¶

9

99, 112.)

Far from inculpating Plaintiff in the injury to Joshua, the interviews with Danielle put Defendants on notice that the injury to Joshua likely occurred earlier in the week and that they needed to consider other adults who had contact with Joshua as suspects, especially Danielle herself.

Finally, Defendants attempt to argue that Plaintiff's statements to Defendants Micci and Villanueva at the Hanover Park Police Station between 5:12 p.m. and 10:30 p.m. "validated" the earlier information they received from doctors and paramedics. Whatever Aleman said to Micci and Villanueva during the interrogation that night cannot form the basis for their alleged probable cause to arrest him for aggravated battery earlier in the day. By Micci's own admission, Plaintiff was under arrest *before* they interviewed him. (ISP Defendants' SOF, ¶ 49.) Furthermore, Micci unambiguously told Plaintiff he was under arrest before the interrogation began: "You're not going home."[2] (SOF, ¶ 70.)

Villanueva admits that when the interrogation began, the only information known to him was that Plaintiff was the last person to have custody of Joshua and that Joshua was injured. (SOF, ¶ 94.) Micci testified that he has no recollection of what he knew at this point. The most Micci can claim to know is that Plaintiff had contact with Joshua that morning before he became completely non responsive, that Plaintiff saw Joshua and performed CPR, and that Plaintiff was highly concerned for Joshua's well being. Indeed, if that was enough information to arrest, any parent whose child is injured and receives medical attention could be arrested.

Sergeant Fallon completed an ISP arrest report listing himself as the arresting officer for Aleman's arrest for aggravated battery to a child. Carlson filled out the paperwork seeking charges against Plaintiff. Villanueva signed the complaint. However, the Defendants lacked sufficient evidence to arrest Plaintiff for aggravated battery to Joshua on September 9. At a minimum, there is a genuine fact dispute with regard to whether Defendants had probable cause to make an arrest.

---

[2] Regardless, Plaintiff's statements to Defendants were not inculpatory and did not provide probable cause for any charges. Plaintiff's statements actually established that Joshua was symptomatic long before that morning. He described that Joshua had been "groggy," "lethargic" and had a high fever all week. Plaintiff explained that he attempted to revive Joshua after he found him limp and non responsive. Indeed, when Assistant State's Attorney Karen Crothers reviewed the video tape of the interrogation, she found the statements made by Plaintiff to be *exculpatory*. Those statements were one of the reasons Crothers decided to drop the charges against Plaintiff.

### B.     Defendants are not Entitled to Qualified Immunity

Predictably, Defendants also assert that even if there are genuine disputes of fact about whether they had probable cause to arrest Plaintiff for aggravated battery, they are still entitled to summary judgment on this claim because they had "arguable probable cause." This argument lacks merit.

Qualified immunity shields a police officer from a lawsuit "insofar as his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). Of course, Plaintiff's right to be free from an arrest unsupported by probable cause was clearly established in September 2005. See, e.g., Marshall ex rel. Gossens v. Teske, 284 F.3d 765, 772 (7th Cir. 2002) (collecting cases).

As explained above, there is ample evidence from which a jury could conclude that Defendants lacked probable cause to believe that Plaintiff had committed an aggravated battery including how the Defendants ignored, twisted and fabricated evidence to support their false presumption that Plaintiff caused Joshua's fatal injuries. Under those circumstances, Defendants are not entitled to qualified immunity.

### IV.     Failure to Intervene

A police officer is liable for failure to intervene if he knows that a constitutional violation is occurring or is about to occur, has a realistic opportunity to intervene to prevent harm from occurring, and fails to intervene to prevent the violation. Lanigan v. Village of East Hazel Crest, Ill., 110 F.3d 467, 477 (7th Cir. 1997). The failure of a police officer to prevent another officer from violating the civil rights of a suspect or arrestee was recognized by the Seventh Circuit in Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972). Defendants are of course correct that if there is no underlying constitutional violation, there can be no claim for failure to intervene. As explained above, however, there is a triable issue of fact regarding whether there was probable cause to arrest Plaintiff. Therefore, Plaintiff's claim for failure to intervene must also survive the Defendants' motions for summary judgment. Each of the Defendants was an active participant in this case and knew of Plaintiff's arrest for aggravated battery. They could have intervened to stop Plaintiff's arrest, but chose not to. If Plaintiff proves these facts at trial, obviously the Defendants could also be liable for failure to intervene.

V.     **False Arrest for Murder**

Even if Defendants subjectively (albeit unreasonably) believed that there was probable case to arrest Plaintiff for aggravated battery to Joshua on September 9, they should have realized by September 15 that they were wrong about their initial conclusion. Those six days afforded Defendants ample opportunity to properly investigate the circumstances of Joshua's death and to interview witnesses, including doctors and other adults that had contact with Joshua. Indeed, they had a duty to do so before charging Plaintiff with first-degree murder. They didn't.

The Seventh Circuit has held that "it is incumbent upon law enforcement officials to make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest." Moore v. Marketplace, 754 F.2d 1336, 1345-46 (7th Cir. 1985) (reversing summary judgment). The leading Seventh Circuit case addressing failure to investigate is BeVier v. Hucal, 806 F. 2d 123 (7th Cir. 1986), in which the Court held: "A police officer may not close his or her eyes to facts that would help clarify the circumstances of the arrest. Reasonable avenues of investigation must be pursued ...." Id., at 128.

Under BeVier, Plaintiff is entitled to a trial on his claim of false arrest for murder. Plaintiff never would have been charged with murder if Defendants had fulfilled their obligation to conduct a reasonable investigation before arresting Plaintiff and charging him with first-degree murder. But they didn't even try to do so.

BeVier is on point. In BeVier, the Seventh Circuit upheld a jury verdict against a police officer who was alleged to have falsely arrested two parents for child neglect. When the officer made the arrest, he knew that the couple's children were in direct sunlight on a very hot day, they were filthy and living near machinery and livestock, and one child had a severe diaper rash for which he had been hospitalized. BeVier, 806 F.2d at 126. The Seventh Circuit upheld the jury's finding that it was unreasonable for the Defendant-Officer to make the arrest without first conducting an investigation including questioning the parents, the medical personnel who had recently treated the baby, and the babysitter. If the officer had done so, he would have learned that the parents had given the babysitter proper instructions about caring for their child, that they bathed their children regularly, and they were treating the baby's diaper rash with medication. This information would have shown that the parents did not act "knowingly or willfully," an

element of the crime of child neglect. Id. at 127.[3]

Likewise in this case, if Defendants had conducted a reasonable investigation between September 9 and September 15, they would have learned important information about the cause of Joshua's injuries. They would have learned from doctors that the injury could have occurred up to two weeks before he was hospitalized. They would have learned about the violence in Danielle's background. And they would have learned that Joshua was symptomatic of brain injury long before September 9. All of this information was readily available to the Defendants. Indeed, everyone who had contact with Joshua in the preceding week was at St. Alexius Hospital for much of the time between September 9 and 13. They easily could have interviewed these people or brought them to the police station for questioning as they did with Plaintiff. They chose not to do so.

The Defendants were not going to take any steps which would have called into question their rush to judgment and erroneous decision to charge Plaintiff with aggravated battery. After that hasty decision, there was no turning back. The Defendants' plan was to mold the evidence to justify their mistake, and to hide any evidence which could expose it. Thus the Defendants ignored and whitewashed any incongruous evidence, including all the evidence which pointed at Joshua's mother as the culprit. This was unconstitutional. See, e.g., BeVier, 806 F. 2d at 128; Stokes v. Board of Education, — F.3d —, 2010 WL 986639 at *6 (7th Cir. 2010) (officer may not "close his or her eyes to exculpatory facts"); Mason v. Godinez, 47 F.3d 852, 856 (7th Cir. 1995) (duty to investigate before making arrest is greater for serious crimes); Sheik-Abdi v. McClellan, 37 F.3d 1240, 1247 (7th Cir. 1994) ("when there is a lapse of time between the lawbreaking and the arrest ... we find it more likely that some type of investigation, for example the questioning of witnesses, will be appropriate.")

*Hanover Park Defendants' Argument*

In their brief, the Hanover Park Defendants rely on five so-called "facts" that they claim provided probable cause to arrest Plaintiff for murder. (Dkt. 112 at p. 11.) Two of those facts indicate only that Joshua was injured, not that Plaintiff injured him. The other three "facts" were deliberate lies and falsehoods contrived by the Defendants themselves.

---

[3] As in BeViers, the Defendants in this case lacked any evidence on the intent element of the crime. Plaintiff was steadfast in his assertions that he only shook Joshua in an effort to revive him after he was already non responsive. As in BeViers, the Defendants should have investigated further.

13

The first two asserted facts are: The medical examiner determined that the manner of death was a homicide, and the medical examiner determined the cause of death was subdural hematoma due to blunt head trauma. Of course, those facts do not incriminate anyone in particular, but only indicate that *someone* harmed Joshua.

The third "fact" is: "The medical examiner's opinion that the injuries were sustained on September 9, 2005." (Hanover Park brief, at p. 11.) The evidence in this case shows that Defendants obtained this opinion through lies and manipulation. Carlson and Villanueva were present at the autopsy of Joshua on the morning of September 14, 2005. At that time, the Medical Examiner, Dr. Jones, told Carlson that she could *not* fix a time when the injury occurred.

Carlson returned to talk to Dr. Jones again later in the day, and gave her false and misleading information regarding Joshua's behavior on the morning of September 9. (SOF, ¶¶ 33-36.) Specifically, Dr. Jones recalled Defendants telling her that Joshua was "up and running around." (SOF, ¶ 35.) In reality, both parents who witnessed Joshua that morning, Carl Gutman and Adam Michalik, observed that Joshua was immobile and almost comatose. (SOF, ¶ 36.) Villanueva and Carlson lied to Dr. Jones and claimed that Joshua was normal and active to get her to conclude that the fatal injury happened when Joshua was at Plaintiff's daycare. (SOF, ¶ 35.) When Dr. Jones learned that Gutman and Michalik had actually stated that Joshua was not moving when he was left with Plaintiff, she returned to her original statement that she could not fix a time of the injury. (SOF, ¶ 37.)

The fourth "fact" is: "The onset of injuries sustained by Joshua were immediate." Defendants argue that Joshua would have immediately become unconscious after the injury. This is not a fact, but only the self-serving opinion of the Defendants in this case. Every single doctor who was involved in Joshua's treatment *agrees* that the onset of Joshua's symptoms could have been any time in the seven days after his injury. (SOF, ¶ 26.) Had Defendants interviewed the doctors without trying to manipulate them with false descriptions of witness statements, they would have learned this.

Defendants' final "fact" is: "Plaintiff admitted to having shaken the baby too hard and demonstrated the same with a plastic doll in front of the officers." As described above, even some of the Defendants agree that Plaintiff's statements were actually exculpatory, and the shake he demonstrated not only was incapable of causing Joshua's very severe injuries, but it was actually proper CPR technique. (SOF, ¶¶ 152, 153.)

If it weren't for Defendants' lies and manipulation, they wouldn't have had any evidence to support murder charges against Plaintiff. The prosecutors realized this when they reviewed the file and promptly dropped the case. Defendants are not entitled to summary judgment.

*Fallon's Argument*

Defendant Fallon also tries to argue that, because he merely processed Plaintiff and his role was merely administrative, he is entitled to summary judgment on Plaintiff's claim that he was falsely arrested for murder. This argument can be squarely rejected.

Fallon was the supervisor assigned to the investigation of Joshua's death from the ISP child victimization unit. He played a key role in investigating the injuries to Joshua, including interviewing first responders and other witnesses. (SOF, ¶¶ 135-140.) He was one of the officers who placed Plaintiff under arrest for murder on September 15. His role was much more than the mere booking officer. Fallon cannot evade liability for his significant role in the false arrest of Plaintiff by trying to hide behind the actions of others. See, e.g, Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988).

## VI.    Civil Conspiracy

Plaintiff's civil conspiracy claim is directed against the individual Defendants in this case. To succeed on a § 1983 claim for civil conspiracy, Plaintiff must show an express or implied agreement among Defendants to deprive him of a constitutional right and overt acts in furtherance of that agreement. Fries v. Helsper, 146 F.3d 452, 457 (7th Cir. 1998).

There is ample evidence that very early on in the investigation, Defendants collectively adopted a conclusion that Plaintiff was guilty of deliberately battering and injuring Joshua. There was a meeting of the minds among the Defendants that all further efforts in the investigation would be directed at supporting their erroneous decision that Plaintiff was guilty, regardless of where the evidence actually led. There is also ample evidence that Defendants took concerted action to manipulate the evidence to hide their mistake and quash all of the evidence that someone else was guilty of intentionally battering Joshua.

As explained below, there is evidence of at least three distinct acts that Defendants took in furtherance of this conspiracy. None of these acts are susceptible to an innocent interpretation. All are evidence of the agreement among the Defendants and their plan.

## A.    The Defendants lied to Medical Examiner Jones

The evidence shows that Defendants Villanueva and Carlson were dissatisfied with Medical Examiner Jones' determination that she could not give a timeframe to support their framing of Plaintiff. So they deliberately gave her false information so she would conclude that Joshua's injuries were inflicted while he was in Plaintiff's care.

Villanueva and Carlson told Dr. Jones that the adults who had seen Joshua on the morning of September 9 had observed him "up and running around" and otherwise behaving like a normal, healthy 11-month-old child. (SOF, ¶ 35.) However, the truth is the witnesses actually said Joshua was "slumped over," lacked muscle control, had a vacant, glazed look in his eyes, and never moved voluntarily. (SOF, ¶ 18-22.)

The Defendants wanted an opinion from Dr. Jones that would support their agreed-upon theory that Plaintiff caused Joshua's fatal injuries on the morning of September 9. The manipulation worked. Based on the false information from Defendants that Joshua was "fine" when left in Plaintiff's care on September 9, Dr. Jones concluded that Joshua's fatal injuries were inflicted when he was at Plaintiff's home.

Of course, when Jones received a truthful and accurate summary of what the witnesses observed, she had to change her opinion. In light of the fact that Joshua was symptomatic when he was dropped of at Plaintiff's home on September 9, today Dr. Jones she maintains that she cannot determine when Joshua suffered the fatal injuries. (SOF, ¶ 37.)

## B.    Defendants deliberately hindered the DCFS investigation

Investigator Booker from the Division of Child and Family Services had 18 years of experience investigating shaken baby cases. (SOF, ¶ 53. ) Booker disagreed with how Defendants were handling the investigation of Joshua's death. (SOF, ¶ 101.) He believed that Defendants needed to consider suspects other than Plaintiff, including Danielle and other adults who had contact with Joshua. Booker was particularly troubled by the violence in Danielle's background and her lack of stability. (SOF, ¶ 131.) Booker told Carlson that he was concerned that law enforcement was not examining the role Danielle may have had in injuring her child. (SOF, ¶ 101.)  Defendants, however, didn't want anyone to uncover evidence that might contradict their erroneous decision to charge Plaintiff with first degree murder.

Defendants deliberately hindered Booker's ability to conduct an independent investigation of Joshua's death. Booker called Nancy and Danielle and left voice mails

16

approximately 10 times in efforts to set up an interview. (SOF, ¶ 129.) They never responded. In fact, Carlson had instructed Danielle and Nancy not to speak to Booker. (SOF, ¶ 130.) Carlson never permitted Booker to speak to Nancy and Danielle without him being present. (SOF, ¶ 130.)

### C. Defendants falsely characterized Plaintiff's statements as a "confession"

Defendants deliberately mischaracterized Plaintiff's statements to Micci and Villanueva during their interrogation as a "confession" to intentionally battering Joshua. As described above, Plaintiff maintained throughout the interrogation that Joshua was gasping for air and was limp *before* Plaintiff picked him up. When Assistant State's Attorney Crothers and DCFS Investigator Booker reviewed the tape of the interrogation, they determined that Plaintiff hadn't "confessed" to any improper conduct. Rather, they saw an innocent person trying to explain his efforts to save Joshua's life and conduct CPR. Defendants rely heavily on Plaintiff's alleged "confession" to justify their actions. But Plaintiff only described the actions of a properly trained person who was trying to revive an unconscious baby.

## VII. Unconstitutional Interrogation

The ISP Defendants argue that they are entitled to judgment on Count V because they "respected Plaintiff's Miranda rights." In support of that argument, the ISP Defendants assert that Defendant Micci read Plaintiff his rights, had him sign a waiver, and allowed him to call a lawyer prior to the interrogation. As explained below, the argument fails.

Micci's four-hour interrogation of Plaintiff was unconstitutional from basically the time it began. During the second minute of the interrogation, Plaintiff said that before he spoke, he wanted to speak with his lawyer. (SOF, ¶ 57.) Micci ignored not only this first request, but also Plaintiff's *five* subsequent requests for counsel. (SOF, ¶¶ 63, 67, 74, 77, 80.) Micci then pressured and harassed Plaintiff until he finally succumbed and signed a waiver. (SOF, ¶ 81.) The waiver was obtained through threats of indefinite detention and false promises of leniency if Plaintiff agreed to talk without an attorney. (SOF, ¶¶ 56, 59, 70, 71.) Defendants' assertion that they satisfied the requirements of Miranda by allowing Plaintiff to call an attorney is legally meaningless. Plaintiff was only permitted to "consult" with his attorney while Defendant Villanueva stood directly by his side and monitored every word of the conversation. (SOF, ¶ 60.) Moreover, Plaintiff's conversation with his attorney was recorded on Hanover Park video and audio surveillance equipment. (SOF, ¶ 63.)

17

If this were a criminal case, there is no question that a motion to quash and suppress Plaintiff's statements would be granted. In fact, when Karen Crothers, the lead state's attorney prosecuting Plaintiff for murder, viewed the video tape of the interrogation, she concluded that the state could not even oppose Plaintiff's motion to suppress. She stated, "I believe that he asserted his right to have an attorney present... [and] I believed that there might be issues with possible coercion by saying 'you're not going anywhere until you talk to us.'" (SOF, ¶ 83.) The unconstitutional interrogation of Plaintiff was one of the reasons Crothers decided to drop the murder charges against Plaintiff. (SOF, ¶ 84.)

### A. Plaintiff had a right to have counsel *present* during the interrogation

As explained in Plaintiff's motion for summary judgment on Count V, the Defendants were obligated to cease all questioning of Plaintiff once he asked to speak with a lawyer. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 293, 100 S.Ct. 1682, 1686 (1980) ("once a defendant in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present"), Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880 (1981).

The videotape of Plaintiff's interrogation by Defendants Micci and Villanueva shows that Plaintiff requested an attorney on at least *six* occasions:

1. At 5:14 p.m., two minutes after Defendants entered the interrogation room, Plaintiff requested an attorney. ("Before I do this, I gotta call [my attorney].") (SOF, ¶ 57.)

2. At 5:16 p.m., Plaintiff made his second request. (Micci: "If you want to call your attorney first that's fine with me." Plaintiff: "Yeah. It will just take a second.") (SOF, ¶ 59.)

3. At 5:25 p.m., after Defendants listened in on Plaintiff's phone conversation with his attorney, Plaintiff informed Defendants that his attorney advised him to remain silent. (Micci: "How we doing?" Plaintiff: "Not good. I called him and he told me not to do this right now.") (SOF, ¶¶ 66, 67.)

4. At 5:29 p.m. Plaintiff again told Defendants he wanted an attorney. ("Can I call [my attorney] back?") (SOF, ¶ 74.)

5. At 5:42 p.m. Plaintiff reiterated that he had a lawyer. (Micci: "So you called your attorney?" Plaintiff: "Yeah.") (SOF, ¶ 77.)

6. At 5:49 p.m. Plaintiff again stated that his attorney told him not to speak. ("I talked to the lawyer and he said no.") (SOF, ¶¶ 80, 81.)

Defendants rebuffed all of these requests and repeatedly badgered Plaintiff to waive his right to an attorney. (See also, Plaintiff's response to ISP Defendants' SOF, ¶ 51.)

Unfortunately for Defendants, Micci and Villanueva have both *admitted* that they knew that Plaintiff had invoked his right to counsel. Villanueva has explicitly stated that he understood Plaintiff "was instructed not to talk" by his lawyer. (SOF, ¶ 68.) Micci also has explicitly admitted that he knew that Plaintiff had received instructions from his lawyer to remain silent. (SOF, ¶ 69, "[Plaintiff's] lawyer, who he just spoke to up until this point, said not to talk with us.") Even after Plaintiff's *lawyer* himself told Defendant Villanueva directly that Plaintiff was not going to speak, Defendants reinitiated interrogation of Plaintiff repeatedly.

Defendants' assertion that they complied with Miranda by permitting Plaintiff to merely *call* a lawyer is both silly and directly contrary to controlling Supreme Court precedent. In <u>Minnick v. Mississippi</u>, 498 U.S. 146, 111 S.Ct. 486 (1990) the Court rejected the notion that the right to counsel is satisfied by permitting the accused to merely *consult* with an attorney. Rather, interrogation must cease until counsel is *present*:

> [T]he requirement that counsel be "made available"... refers to more than an opportunity to consult with an attorney outside the interrogation room.... [T]he rule bar(s) police-initiated interrogation unless the accused has counsel with him at the time of questioning.... [*W]hen counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney....* A single consultation with an attorney does not remove the suspect from persistent attempts by officials to persuade him to waive his rights, or from the coercive pressures that accompany custody and that may increase as custody is prolonged. *... We decline to remove protection from police-initiated questioning based on isolated consultations with counsel who is absent when the interrogation resumes.*

<u>Minnick</u>, 498 U.S. at 152-54, 111 S.Ct. at 491(emphasis added).

What occurred in this case is exactly what <u>Edwards</u>, <u>Minnick</u> and their progeny are designed to prevent. When Defendant Micci read Plaintiff his Miranda rights, Plaintiff said that he would like to speak to his attorney before submitting to questions. At that point, all further interrogation should have ceased. But it didn't. Instead Defendants kept talking to Plaintiff and pressuring him to sign the waiver.

Plaintiff was allowed to call a lawyer, but Villanueva stood directly next to him and listened to the "consultation." When the call was over, Micci began questioning and badgering Plaintiff yet again, and repeatedly told Plaintiff that if he didn't waive his rights he would be

detained. ("If you don't talk to me... you're not gonna be going home.") (SOF, ¶ 70.) Through persistent pressure and repeated threats, Plaintiff eventually succumbed to Defendants' pressure to sign a waiver and answer questions without counsel present.

### B. Plaintiff's Subsequent Waiver of His Right to Counsel was not Voluntary

Defendants contend that they are entitled to summary judgment on Count V because Plaintiff signed a waiver. The evidence shows that Defendant Micci badgered and threatened Plaintiff into signing the waiver after he had invoked his right to counsel. To be valid, a Miranda waiver must be shown to be intelligent and voluntary. See, e.g., Edwards, 451 U.S. at 482, 101 S.Ct. at 1884. Plaintiff's waiver was involuntary *as a matter of law*.

The Supreme Court has made it clear that if an individual requests an attorney and the police subsequently initiate questioning in the absence of counsel, any statements are considered involuntary "*even where the suspect executes a waiver* and his statements would be considered voluntary under traditional standards." McNeil v. Wisconsin, 501 U.S. 171, 177, 111 S.Ct. 2204 (1991). "This is designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Id., citing Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). See also, Arizona v. Roberson, 486 U.S. 675, 682, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (if an individual has requested an attorney, "it is presumed that any subsequent waiver ... has come at the authorities' behest ... and is not the purely voluntary choice of the suspect.")

Here, after Plaintiff first made a request for a lawyer, Defendant Micci told Plaintiff that it was in his best interests to waive his rights, stating "I assume you have information that would help you out." (SOF ¶ 24.) Then, after Plaintiff "consulted" with his attorney (with Villanueva right next to him), and told Defendants "[my attorney] told me not to do this right now," Micci told Plaintiff that he would be detained if he didn't agree to waive his rights. Micci said: "If I don't get to talk to you, you're not going home." (SOF ¶ 39.) Micci then continued to pressure Plaintiff with threats of indefinite detention and promises that speaking to the police could only help Plaintiff. He said: "the reason I want to talk to you is to clear this up. ... I'm not saying that you're the bad guy, I'm not saying that you did anything wrong." (SOF, ¶ 69-71.)

Then after Plaintiff spoke to his attorney on the phone a *second* time, Defendants *again* ordered him back into the interrogation room, where Micci resumed the interrogation. It was only under repeated threats of jail that Plaintiff signed Micci's waiver.

### C.    Defendants Advocate an Inapplicable Standard

The ISP Defendants argue that an illegal interrogation claim under § 1983 must rise to the level of a substantive due process violation, i.e. conduct that "shocks the conscience." However, the Seventh Circuit has squarely held that a Fifth Amendment violation gives rise to a claim under § 1983 when a criminal case is initiated. Sornberger v. City of Knoxville, Ill., 434 F.3d 1006 (7th Cir. 2006). Plaintiff need not prove a substantive due process violation. Rather, the standard under § 1983 is exactly the same as in a criminal case. Plaintiff needs only to show that he was interrogated in violation of his Fifth Amendment rights and that statements he made were used against him in the initiation of criminal proceedings. Id. See also, Walden v. City of Chicago, 391 F. Supp.2d 660, 676 (N.D.Ill. 2005) (Filip, J.) (rejecting notion that Fifth Amendment violation does not provide any basis for civil liability under § 1983.)

This case is analogous to Sornberger. In that case, the plaintiff sued under § 1983 because she was interrogated without being advised of her Miranda rights. Statements she made during the interrogation were later used to support criminal charges against her at a preliminary hearing, although the case was dropped prior to trial. The Seventh Circuit held that the Fifth Amendment violation was actionable under § 1983 because her confession was "used to initiate a criminal prosecution." Sornberger, 434 F.3d at 1026.

Here, as in Sornberger, Defendants violated Plaintiff's Fifth Amendment rights when they continuously interrogated him after he repeatedly requested an attorney. As in Sornberger, Defendants obtained information which they characterized as a "confession" and used it against him in the resulting criminal case.[4] The Court can therefore reject Defendants' argument that the Court should employ a substantive due process analysis.

---

[4] Villanueva signed the complaint to charge Plaintiff with aggravated battery to a child. Villanueva admitted in his deposition that his *only* basis for that charge was "the statement that [Plaintiff] had made in the interview." (SOF, ¶ 86.) Moreover, at the bond hearing on the aggravated battery charges the state's attorney offered Plaintiff's alleged "confession" in support of the charges. (SOF, ¶ 87.) ("This defendant... did admit to having shaken baby Joshua that morning.") The statements were offered *again* by prosecutors at the bond hearing for the murder charge. (SOF, ¶ 88.) ("Hanover Park police personnel, along with the Illinois State Police child victimization unit, interviewed Rick Aleman... Aleman admitted to shaking Joshua while Joshua was in his care....")

## VIII. Plaintiff's Claim for Intentional Infliction of Emotional Distress is Timely

Defendants contend that Plaintiff's state law claim for intentional infliction of emotional distress should be dismissed because it is untimely.[5] Defendants argue that the intentional infliction of emotional distress claim accrued on September 9, 2005, the day Plaintiff was first detained and arrested. As explained below, the argument fails.

The murder charges against Plaintiff was terminated on November 13, 2006, on entry of *nolle prosequi*. This case was filed on September 7, 2007, less than one year after the charges were dropped. Judges in this district have repeatedly held that the statute of limitations for an intentional infliction of emotional distress claim arising from a criminal case does not begin to run until the case is terminated. <u>See, e.g.</u>, <u>Pierce v. Pawelski</u>, 2000 WL 1847778 at *3 (N.D. Ill. 2000) (Gottschall, J.) ("Pierce's IIED claim is based not just on the events occurring the day of his arrest, but on defendants' participation in his wrongful prosecution and their allegedly false testimony at trial. Accordingly, the IIED claim did not accrue until Pierce's trial concluded and he was acquitted."); <u>Bergstrom v. McSweeney</u>, 294 F. Supp. 2d 961, 969 (N.D. Ill. 2003) (Castillo, J.) ("As Bergstrom's intentional infliction of emotional distress claim incorporates the conduct underlying his malicious prosecution claim, the cause of action did not accrue until the state criminal proceedings against him were terminated.); <u>Treece v. Naperville</u>, 903 F.Supp. 1251, 1259 (N.D.Ill. 1995) (Williams, J.) ("The clock did not start running on plaintiff's intentional infliction of emotional distress claim until the state criminal proceedings were terminated.") Accordingly, Plaintiff's intentional infliction of emotional distress claim is timely.

## IX. Malicious Prosecution

Finally, the Hanover Park defendants argue that they are entitled to judgment on Plaintiff's malicious prosecution claim because they had probable cause for the charges and Plaintiff cannot demonstrate malice. As explained above, however, there is significant evidence from which a reasonable jury could find that the Defendants lacked probable cause to charge Plaintiff. In addition, a reasonable jury could also conclude that the Defendants acted with malice based upon their fabrication and manipulation of evidence to support their erroneous determination that

---

[5] The ISP defendants also argue that the evidence does not support "any finding that the actions of Micci or Fallon rose to the level of extreme and outrageous." However, Defendants do not make any citation to the record or to case law in support of this contention. Therefore, (besides being meritless) the argument is waived.

Plaintiff intentionally inflicted Joshua's fatal injuries.

First, with regard to probable cause, Defendants argue that the grand jury's indictment of Plaintiff establishes a presumption that they had probable cause to charge Plaintiff. As Defendants' own motion points out, however, this presumption can be overcome by evidence that Defendants "committed some improper act... for example, pressured or influenced the prosecutors to indict, made knowing misstatements to the prosecutor, testified untruthfully or covered up exculpatory evidence." Snodderly v. R.U.F.F. Drug Enforcement Task Force, 239 F.3d 892, 901 (7th Cir. 2001). Of course, that is exactly what Plaintiff alleges. If not for Defendants' knowing misrepresentation of Plaintiff's statements to prosecutors, their deliberate misinterpretation and manipulation of the medical evidence, and concerted plan to charge Plaintiff at all costs, Plaintiff would not have been indicted for first-degree murder. The factual dispute regarding probable cause is obvious.

Second, with regard to malice, Defendants argue that "there is nothing to suggest that either [Carlson or Villanueva] brought these charges for any reason other than to bring Mr. Aleman to justice." To the contrary, Plaintiff has developed evidence of several improper reasons for the charges these Defendants brought against Plaintiff. Both Micci and Carlson had motive to prosecute Plaintiff to cover up their misconduct in the initial investigation and arrest of Plaintiff. They summarily arrested Plaintiff for aggravated battery and illegally detained him. They would expose themselves to liability for false arrest if they later admitted that they had the wrong person. In addition, the evidence shows that Carlson was personally involved with Danielle and was trying to protect her from possible suspicion. He was seen holding hands with her, and told DCFS not to talk to her. There is clearly a factual dispute regarding malice that precludes summary judgment on Plaintiff's malicious prosecution claim.

## CONCLUSION

For all of the above reasons, the Defendants are not entitled to summary judgment on any claim in Plaintiff's Second Amended Complaint. This meritless motion should be denied in its entirety.

Respectfully submitted,


/s/ Lawrence V. Jackowiak
*Counsel for the Plaintiff*


Lawrence V. Jackowiak
Adele D. Nicholas
Law Offices of Lawrence V. Jackowiak
20 North Clark Street, Suite 1700
Chicago, Illinois 60602
(312) 795-9595