UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICK ALEMAN, | ) |
| | ) |
| Plaintiff, | ) No. 07 C 5049 |
| | ) |
| vs. | ) |
| | ) Judge Bucklo |
| VILLAGE OF HANOVER PARK, et al., | ) Magistrate Judge Denlow |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiff, Rick Aleman, through counsel, Jackowiak Law Offices, respectfully submits, pursuant to L.R. 56.1(b)(3)(C), the following statement of additional material facts which require the denial of Defendants' motions for summary judgment:

**Witness Observations of Joshua Schrik Prior to September 9, 2005**

1. When Joshua Schrik was alive, he lived with Danielle Schrik (his mother) and Nancy Schrik (Danielle's mother). [Ex. 14, Dep. of Nancy Schrik, p. 25:5-7.]

2. For at least three days prior to beginning day care with Plaintiff Rick Aleman, Joshua exhibited symptoms consistent with shaken baby syndrome. [Ex. 14, Dep. of Nancy Schrik, p. 40:16-24.]

3. On Sunday, September 4, 2005, Nancy observed that Joshua was extremely hot with a fever. [Ex. 14, Dep. of Nancy Schrik, p. 40:16-24.]

4. On Tuesday, September 6, 2005, Nancy saw that Joshua was "very lethargic." [Ex. 14, Dep. of Nancy Schrik, pp. 88:8-18.]

5. On Thursday, September 8, 2005, Nancy took care of Joshua while Danielle went to the store. Nancy observed that Joshua was extremely lethargic, could not walk, and could barely lift his head. [Ex. 14, Dep. of Nancy Schrik, pp. 51-52.]

6. That evening, Nancy observed Danielle curse at 11-month-old Joshua and violently grab him and take him to the basement of their home (presumably to inflict punishment out of view). [Ex. 14, Dep. of Nancy Schrik, pp. 54-55.]

7. On Thursday, September 8, 2005, Nancy observed that Joshua could barely open his eyes, and appeared to be looking "into space." [Ex. 14, Dep. of Nancy Schrik, p. 55:17-22.]

8. On Monday, September 5, 2005, Danielle took Joshua to a doctor. The doctor diagnosed a possible ear infection. [Ex. 7, Dep. of Danielle Schrik, p. 44.]

9. On Thursday, September 6, 2005, Joshua's regular doctor examined him and found that he did not have an ear infection. [Ex. 13, Dep. Of Hasson, p. 20:15-17; Ex. 7, Dep. of Danielle Schrik, p. 60.]

10. Beginning Monday, September 5, 2005, Danielle noted that Joshua's energy was very low, and he was not active and running around as he usually did. He stayed in this state the entire week. [Ex. 7, Dep. of Danielle Schrik, pp. 40-41, 46, 52.]

11. Danielle also observed that Joshua did not have a good appetite that week. [Ex. 7, Dep. of Danielle, p. 46.]

12. Barbara Sable, the mother of Danielle's boyfriend Seth, frequently spent time with Joshua. [Ex. 16, Dep. of Barbara Sable, pp. 17-19.]

13. On Monday, September 5, 2005, Barbara Sable observed that Joshua was irritable, cried a lot, and seemed to have a fever. [Ex. 16, Dep. of Barbara Sable, p. 45.]

14. On Thursday, September 8, 2005, Barbara Sable observed that Joshua was not alert and was unusually sleepy. [Ex. 16, Dep. of Barbara Sable, p. 24.] Barbara did not see Joshua eat that day. [Ex. 16, Dep. of Barbara Sable, p. 31.] Joshua did not cry or whine that day. [Ex. 16, Dep. of Barbara Sable, p. 62]

15. Seth Sable was dating Danielle from the time Danielle was pregnant with Joshua until after Joshua's death. Seth frequently spent time with Joshua and sometimes took care of Joshua by himself. [Ex. 17, Dep. of Seth Sable, pp. 14, 17, 66.]

16. Seth observed that Joshua did not feel well the entire week of September 4, 2005. [Ex. 17, Dep. of Seth Sable, p. 27.] Seth also observed that Joshua was not moving around normally that week. [Ex. 17, Dep. of Seth Sable, p. 81.]

17. Seth does not remember Joshua eating anything on Thursday, September 8, 2005. [Ex. 17, Dep. of Seth Sable, p. 45.]

18. On the morning of Friday, September 9, 2005, Adam Michalik, a parent whose child also attended Plaintiff's daycare, observed Joshua laying on the floor and not moving. Danielle told Michalik that Joshua was sleeping. [Ex. 19, Dep. of Michalik, pp. 38, 42, 43.]

19. Two days before, on Wednesday, September 7, 2005, Carl Gutman, another daycare parent, observed that Joshua was "sluggish" and not interacting with the other children. [Ex. 20, Dep. of Gutman, p. 71:15; pp. 74-75.]

20. On the morning of Friday, September 9, 2005, Gutman observed that Joshua "looked sick," had a "blank stare," and appeared "non cognitive [with no] hand movement, no body movement whatsoever." [Ex. 20, Dep. of Gutman, pp. 54-55.]

21. Gutman observed that when Plaintiff placed Joshua on the couch, Joshua "slumped forward" and "didn't have very good control of his muscles." [Ex. 20, Dep. of Gutman, p. 60:13-19.]

22. On Friday, September 9, 2005, Gutman observed that Joshua was not making any sounds. [Ex. 20, Dep. of Gutman, p. 62: 20-23.] He appeared to be "looking at [the other kids] but not seeing them." [Ex. 20, Dep. of Gutman, p. 63:21-24.]

**Doctor's Statements Regarding Symptoms and Timing of Injury**

23. Every doctor who treated Joshua testified that lethargy or irritability can be signs of traumatic head injury. [Ex. 11, Dep. Of Dr. Jones, pp. 12-13; Ex. 13, Dep. of Hasson, p. 43:11-18; Ex. 10, Dep. of Reyes, p.61; Ex. 12, Dep. of Siegle, pp. 33-34.]

24. Loss of appetite also can be a symptom of traumatic head injury. [Ex. 11, Dep. of Jones, p. 48:14-15; Ex. 10, Dep. of Reyes, pp. 61-62.]

25. Fever can be associated with traumatic head injury. [Ex. 11, Dep. of Dr. Jones, p. 48; Ex. 10, Dep. of Reyes, p. 76 ]

26. According to every doctor who treated Joshua, the brain injury that led to Joshua's death could have occurred any time within several days prior to Joshua being hospitalized. [Ex. 13, Dep. of Hasson, p. 42:5-8 ("it could be any time in the seven days after a brain injury there could be symptoms of brain edema"); p. 49 (it is possible that Joshua was suffering from brain edema on September 8, and Hasson didn't realize it); Ex. 10, Dep. of Reyes, p. 76 (the trauma was sometime between the last time Joshua was observed to have the normal behavior of an 11-month-old, and the time he was observed not to have normal behavior); Ex. 12, Dep of Siegle, p. 33 ("I would say several weeks."); p. 40 (the timeframe for the injury is "shortly before arrival to two weeks prior.")]

27. According to every doctor who treated Joshua, if Joshua was acting abnormally

3

lethargic in the previous days, that was a sign that the injury occurred before September 9, 2005. [Ex. 10, Dep. of Reyes, pp. 39-40, 79; Ex. 12, Dep. of Siegle, p. 38.]

28. According to every doctor who examined Joshua, a child would not immediately go into cardiac arrest or become unconscious upon receiving a brain injury similar to that which Joshua presented with at the hospital. [Ex. 10, Dep. of Reyes, pp. 67-69; Ex. 11, Dep. of Jones, p. 30: 11-16; Ex. 12, Dep. of Siegle, p. 40.]

29. Medical Examiner Nancy Jones testified that shaken baby is not a "lights out" injury, meaning Joshua would not automatically become unresponsive right after the trauma. [Ex. 11, Dep. Of Dr. Jones, p. 102:19-24.] Dr. Jones explained that a child could receive a traumatic head injury and not become unresponsive until days later. [Ex. 11, Dep. of Jones, p. 30:11-16.]

30. Violent head trauma to a child can be misdiagnosed as ear infection, viral infection or another disease. [Ex. 11, Dep. of Dr. Jones, p. 43:9-17.]

31. It is impossible to date a retinal hemorrhage. [Ex. 11, Dep. Of Dr. Jones, p. 54:13-19; Ex. 12, Dep. of Siegle, p. 33.]

32. Defendant Carlson was present at the autopsy of Joshua on the morning of September 14, 2005. [Ex. 21, Dep. of Carlson, p. 102, 106.] At that time, the Medical Examiner, Dr. Jones, told Carlson that she could *not* fix a timeframe for when the injuries to Joshua occurred. [Ex. 21, Dep. of Carlson, p. 108: 22-23; p. 109.]

33. Defendant Villanueva was also present at the autopsy. Villanueva falsely informed Dr. Jones that Joshua was fine when he was dropped off at Plaintiff's home on the morning of Friday, September 9, 2005. [Ex. 21, Dep. of Carlson, p. 110:21-25; p. 111:1-3.]

34. Carlson came back later that day and spoke to Dr. Jones. [Ex. 21, Dep. of Carlson, p. 108.] Carlson repeated Villanueva's false version of events. [Ex. 21, Dep. of Carlson, p. 111:9-12.]

35. Carlson and Villanueva's summaries were deliberately falsified. Specifically, Defendants told Jones that witnesses observed Joshua "up and running around or behaving normally" when Danielle dropped him off at Plaintiff's house on September 9. That was false. [Ex. 11, Dep. of Dr. Jones, p. 32: 19-22; p. 33:19-22.] Based on that falsehood, Jones told Defendant Carlson that Joshua's injury must have occurred at Plaintiff's home on September 9, 2005. [Ex. 11, Dep. of Dr. Jones, p. 72.]

36. Witnesses actually had observed Joshua "sleeping or appearing to be asleep." [Ex.

4

11, Dep. of Jones, p. 33:19-22.]

37. Upon learning the truth about what the witnesses really had said, Jones again said she could not provide a timeframe for when the injuries that caused Joshua's death occurred. [Ex. 11, Dep. of Dr. Jones, p. 55.]

38. Dr. Reyes, the treating pediatric neurologist, believes that "Aleman did not do this [injure Joshua]." She based this on the witnesses' description of Joshua's behavior on the morning of September 9. [Ex. 10, Dep. of Dr. Reyes, pp. 36-37.] Dr. Reyes could not determine if the injury to Joshua occurred within the preceding 24 hours. [Ex. 10, Dep. of Dr. Reyes, p. 32:9-15.]

39. The doctors, including Reyes and Jones, both told Assistant State's Attorney Crothers that Joshua was symptomatic of brain injury before he was dropped off at Plaintiff's home. [Ex. 8, Dep. of Karen Crothers, pp. 112-113.]

**Statements by Plaintiff to Defendants Micci and Villanueva**

40. Joshua began day care at Plaintiff's home on Wednesday, September 7, 2005. [Ex. 2, DVD, 20:24:55-20:25:55.]

41. Joshua was supposed to start on September 6, but Danielle said Joshua was too ill. Joshua had a 104 degree temperature. [Ex. 2, DVD, 20:24:55-20:25:55.]

42. When Joshua began at Plaintiff's day care on Wednesday, September 7, 2005, he was still suffering from a fever. Id.

43. Joshua had a very poor appetite on Wednesday and Thursday. ("He doesn't want nothing to do with food.") [Ex. 2, DVD of interrogation, at 18:52:00 - 18:52:26]

44. Joshua was very lethargic, groggy and inactive on Wednesday and Thursday. ("He's been sleeping all day. He doesn't have a lot of energy.") [Ex. 2, DVD of interrogation, at 18:52:30 - 18:53:31]

45. On the morning of Friday, September 9, 2005, Joshua was very sick from the time his mother dropped him off. [Ex. 2, DVD, at 18:17:00 - 18:18.]

46. Joshua was "propped up" on the couch and was not interacting with the other children. [Ex. 2, DVD, at 18:17:00 - 18:27:57.]

47. Plaintiff went to pick Joshua up from the couch to include him with the other children. Plaintiff heard Joshua gasping for breath. [Ex. 2, DVD, at 20:08:23-59 ("When I first

5

picked up the baby, I picked him up, something was wrong, he was gasping for air.")]

48. Plaintiff shook Joshua in an effort to alert and revive him. [Ex. 4, Dep. Of Villanueva, p. 72: 8-14; Ex. 2, DVD, at 20:37:09-39.]

49. Joshua was already lifeless and non responsive when Plaintiff picked him up. [Ex. 2, DVD of Interrogation, at 20:19:45-55 (*Micci*: You told me that you noticed something was wrong when you picked him up before this. *Rick:* Yes, which is what prompted me to do it. Yes. Absolutely. Or I would have never shook him.); Ex. 2, DVD at 20:37:09-39 (*Rick*: When I saw that he wasn't breathing I was trying to revive him, I was like, 'Josh, Josh' ... because I wanted to get some kind of responses out of him. He didn't seem alert. I was shaking him, ... but I was shaking him to try to revive him. I didn't shake him any other time. I shook him to revive him, after the fact.) Ex. 4, Dep. of Villanueva, p. 72: 8-14.]

50. Plaintiff performed rescue breaths on Joshua. Fluid came out of Joshua's nose and mouth. [Ex. 2, DVD, at 21:25:14 – 21:40:31.]

51. Plaintiff called 911 and with the advice of the dispatcher continued to perform CPR. [Ex. 2, DVD, at 21:25:14 – 21:40:31.]

52. DCFS Investigator Michael Booker was assigned to investigate the death of Joshua. [Ex. 18, Dep. of Booker, p. 27.]

53. During an interrogation a few days later, Plaintiff demonstrated for Booker how he "shook" Joshua. Booker stated that he was "not critical" of how Plaintiff handled Joshua. Booker explicitly stated that the shake Plaintiff demonstrated "does not cause Shaken Baby Syndrome." Booker testified that what Plaintiff demonstrated to him was consistent with the shake on the videotaped interrogation. Booker based his conclusion on his 18 years of experience investigating shaken baby cases. [Ex. 18, Dep. of Booker, p. 57:5-9; p. 56:16-21.] Booker described the shake as an "alert" that is a proper technique in CPR. [Ex. 18, Dep. of Booker, pp. 54-55.]

54. Defendant Carlson testified that he has received training on how to perform CPR on an infant. He agreed that the first step in performing CPR on an infant is to "shake the baby to try to revive the baby." [Ex. 21, Dep. of Carlson, p. 66.]

**Interrogation and Requests for Counsel**

55. Defendants Villanueva and Micci began interrogating Plaintiff at the Hanover

6

Park police station around 5:12 p.m. Plaintiff was in an interrogation room that was under audio and video surveillance. [Ex. 2, DVD, at 17:12:28.]

56. Micci told Plaintiff that he had talked to several people about what had happened that day said and that Plaintiff had "the most information." [Ex. 2, at 17:13:33.]

57. Plaintiff told Micci that he wanted to call his attorney before he spoke to them. Specifically, Plaintiff said: "before I do that I gotta call my guy. Just give me one phone call real quick and let me call him and tell him I'm about to do this so he knows." [Ex. 2, at 17:14:12-25.]

58. Plaintiff was *not* allowed to call his lawyer at that time. Instead, Micci began filling out a waiver of Miranda rights. He asked Plaintiff's name and began filling out the waiver. [Ex. 2, at 17:14:35-55.]

59. At 5:16, Plaintiff again stated that he wanted a lawyer. Micci said, "Before I talk to you I would like this signed. ... I assume you have information that would help you out. ... if you want to call your attorney first that's fine with me." Plaintiff replied, "Yeah. It will just take a second." [Ex. 2, at 17:16:02-55.]

60. Villanueva has admitted that he knew Plaintiff asked to call a lawyer after he and Micci began questioning him. [Ex. 4, Dep. of Villanueva, p. 51.]

61. Villanueva stood next to Plaintiff in the hallway near the interrogation room while Plaintiff was on the phone with his lawyer. He was present throughout Plaintiff's conversation with his attorney. [Ex. 4, Dep. of Villanueva, pp. 55-56; Ex. 2, DVD, at 17:18:25-17:23:31.]

62. Villanueva spoke directly to Plaintiff's attorney on the phone. [Ex. 4, Dep. of Villanueva, p. 56:21-24; Ex. 2, DVD, at 17:21:48-17:23:31.]

63. Plaintiff's lawyer told Villanueva that he represented Plaintiff and that Plaintiff was invoking his right to remain silent. Plaintiff's lawyer told Villanueva that Plaintiff was not going to talk without his attorney present. [Ex. 3, Decl. Of Ankin, ¶ 3.]

64. Plaintiff's phone conversation with his attorney was recorded on Hanover Park police Department audio and video surveillance equipment. [Ex. 2, DVD, at 17:21-23.]

65. Villanueva instructed Plaintiff to go back into the interrogation room after Plaintiff spoke to his attorney. Defendants Villanueva and Micci came back into the room about a minute later, around 5:25. [Ex. 2, at 17:24:58; Ex. 4, Villanueva, p. 58-59.]

66. Micci asked Plaintiff, "How we doing?" [Ex. 2, DVD at 17:24:58-17:25:02.]

67. Plaintiff responded: "Not good. I called him and he told me not to do this right

7

now..." Plaintiff said he would come back tomorrow to talk. [Ex. 2, DVD at 17:25:00-17:25:54.]

68. Villanueva has admitted that he understood this to mean that Plaintiff "was instructed not to talk" by his lawyer. [Ex. 4, Dep. Of Villanueva, p. 60:5-18.]

69. Micci has admitted that he understood this to mean that "[Plaintiff's] lawyer, who he just spoke to up until this point, said not to talk with us." [Ex. 5, Dep. Of Micci, p. 54:2-9.]

70. Micci continued to talk to Plaintiff. He said: "If I don't get to talk to you, you're not going home, OK?" [Ex. 2, at 17:25:40-17:25:47.] Micci also said, "If I can't speak with you about that, then you're going to be staying here." [Ex. 2, at 17:25:57-17:26:20.]

71. Micci asked Plaintiff to sign a waiver of his Miranda rights. [Ex. 2, at 17:26:35-39.] Micci told Plaintiff that if Plaintiff talked to him, he could "help himself out," [Ex. 2, at 17:27:27-37] and "clear this up." [Ex. 2, at 17:26:39-17:27:14.] Micci told Plaintiff two more times that he would not be going home if he didn't talk. [Ex. 5, Dep. Of Micci, p. 59; Ex. 2 DVD of interrogation, at 17:26:39-17:27:27.]

72. Micci promised Plaintiff that it was in his best interest to talk: "I'm not saying that you're the bad guy, I'm not saying that you did anything wrong." [Ex. 2, at 17:27:39-17:28:33.]

73. Micci again told Plaintiff that he "wasn't going anywhere" unless he talked. [Ex. 2, at 17:29:01-20.]

74. Plaintiff then asked to call his attorney again. [Ex. 2, at 17:29:00-30.]

75. Plaintiff called his attorney Paul Ankin on the phone in the hallway outside the interrogation room. This "consultation" was also recorded on Hanover Park police surveillance equipment. [Ex. 2, at 17:29:58-17:37:20.]

76. The Hanover Park surveillance equipment recorded Plaintiff saying to his attorney: "I wish you were here," and "I need your help. I can't help myself in here." [Ex. 2, at 17:32:30-36.] Plaintiff's attorney instructed him again not to speak. [Ex. 3, Declaration of Ankin, ¶ 6.]

77. Back in the interrogation room, Officer Villanueva asked Plaintiff "So, you've called your attorney?" [Ex. 4, Dep. of Villanueva, p. 70; Ex. 2, at 17:42:22-27.] Plaintiff replied, "Yeah." Id.

78. Villanueva told Plaintiff to hang up the phone and have a seat in the interrogation room. Villanueva told Plaintiff not to use the phone again. [Ex. 2, at 17:44:53; Ex. 4, Dep. of Villanueva, pp. 70-71. ("I ask that you don't use the phone until we decide what we're gonna

8

do." )]

79. Micci and Villanueva came back into the interrogation room again around 5:49. Micci asked Plaintiff to talk to him again. [Ex. 2, at 17:49:00-07.]

80. Plaintiff replied that his lawyer had said "no." [Ex. 2, at 17:49:07-17:50.]

81. From the time the interrogation began at 5:12 until 5:50, Micci repeatedly and persistently demanded that Plaintiff sign a waiver and agree to talk to him. Plaintiff would not agree and instead asked for an attorney on at least five different occasions. But after Defendants pressured, threatened and badgered Plaintiff, Plaintiff finally succumbed and signed Micci's waiver at 5:50 p.m. [Ex. 2, at 17:50:00.] Defendants then interrogated Plaintiff for about four hours. [Ex. 4, Dep. of Villanueva, pp. 71-72.]

82. Plaintiff called his wife during a break in the interrogation. The phone call was recorded on Hanover Park surveillance equipment. Defendant-Officers can be heard speaking directly outside the door. Plaintiff explained, "When I called the lawyer, the lawyer says no. And I put them on the phone, and the lawyer says no, he's not going to talk. And then they say 'well he's not going home.'" [Ex. 2, DVD, at 20:46:35 - 20:46:45]

83. When Assistant State's Attorney Karen Crothers reviewed the video tape of the interrogation of Aleman, she determined that the state could not use the statements in its case against Plaintiff. She stated that "he asserted his right to have an attorney present ... [and] ... there might be issues with possible coercion by saying 'you're not going anywhere until you talk to us.'" [Ex. 8, Dep. of Crothers, pp. 106 - 107.]

84. The unconstitutional interrogation of Plaintiff was one of the reasons Karen Crothers, the lead state's attorney prosecuting Aleman for murder, decided to nolle the murder case against Plaintiff. [Ex. 8, Dep. of Crothers, p. 103.]

85. Crothers also found that the statements Defendants extracted from Plaintiff were not helpful to the prosecution. After she reviewed the video she said, "Ultimately, I thought it was more exculpatory than inculpatory." [Ex. 8, Dep. of Crothers, p. 107.]

**Use of Statements Against Plaintiff**

86. After the interrogation, Defendant Villanueva signed the criminal complaint to charge Plaintiff with felony aggravated battery to a child. [Ex. 4, Dep. Of Villanueva, p. 79:14-19.] Villanueva based this charge on "the statement that [Plaintiff] had made in the interview."

9

[Ex. 4, Dep. Of Villanueva, p. 81:3-6.] Villanueva has admitted that he had no other information to support the charges against Plaintiff other than the information the Defendants got from the interrogation. [Ex. 4, Dep. Of Villanueva, p. 82:15-19.]

87. Carlson filled out paperwork to seek aggravated battery charges against Plaintiff. [Ex. 21, Dep. of Carlson, p. 68-69.]

88. Prosecutors relied on Plaintiff's statements to Villanueva and Micci to support the criminal charges against him. At the bond hearing on the aggravated battery charges the state's attorney offered Plaintiff's statements in support of the charges. "This defendant ... did admit to having shaken baby Joshua that morning." [Ex. 23, Transcript of September 12 hearing, p. 4.] Defendants provided this information to prosecutors before prosecutors had a chance to review the tape of the interrogation. [Ex. 8, Dep. of Crothers, p. 103 ("Once we finally received a copy of the video and saw the statement, there [were] discrepancies between what had been said was said and what was actually said.")]

89. The statements were offered again by prosecutors at the bond hearing for the first degree murder charge. "Hanover Park police personnel, along with the Illinois State Police child victimization unit, interviewed Rick Aleman ... Aleman admitted to shaking Joshua while Joshua was in his care ...." [Ex. 24, Transcript of September 15 hearing, p. 7.]

90. After the prosecutors watched the video of Plaintiff's "admission," all charges against Plaintiff were dismissed on entry of *nolle prosequi* on November 13, 2006. [Ex. 6, Certified Disposition, p. 3.]

**Defendants' Investigation**

91. On Friday, September 9, 2005, around 10 a.m., after Joshua was taken by ambulance to the hospital, Defendant Lussky brought Plaintiff and his wife from their home to the Hanover Park police station. [Ex. 9, Dep of Lussky, p. 20.]

92. After arriving at the Hanover Park police station, at 11:39 a.m., Plaintiff asked Defendant Lussky if he could leave for an hour. Lussky responded "No. I'd rather have you here." [Ex. 2, DVD of interrogation at 11:39:14-16.] Plaintiff was not free to leave the Hanover Park police station. [Ex. 1, Dep. of Plaintiff, pp. 302-303; Ex. 9, Dep. Of Lussky, p. 39.]

93. At that time, all Lussky knew about the case was that Joshua had been injured and was at the hospital. [Ex. 9, Dep. of Lussky, p. 17.]

10

94. At 5:00 p.m., the only facts known to Villanueva regarding the investigation were that Joshua was injured at some unknown time and that Plaintiff was the last person to have custody of Joshua. Villanueva received this information from Micci. [Ex. 4, Dep. of Villanueva, p. 41:4-8.] To Villanueva's knowledge, no doctor had given a timeframe for the injury to Joshua. [Ex. 4, Dep. Villanueva, p. 42:6-10.]

95. On September 9, 2005, Villanueva signed the complaint to charge Plaintiff with aggravated battery. [Ex. 4, Dep. Of Villanueva, p. 79:14-19.]

96. Carlson was the lead investigator in charge of the case when Plaintiff was charged with aggravated battery and murder. [Ex. 21, Dep. of Carlson, p. 78:19-21; p. 58 6-23.]

97. Carlson interviewed Danielle one time. This conversation took place at St. Alexius hospital sometime in the morning of September 9. [Ex. 21, Dep. of Carlson, pp. 28; 38.]

98. Danielle told Carlson that Joshua was sick the whole week, that Joshua had a 103 degree fever, and Joshua had been to the doctor twice that week. [Ex. 21, Dep. of Carlson, pp. 31-32.]

99. By 8 p.m. on September 9, Carlson had ruled out Danielle as a suspect. [Ex. 21, Dep. of Carlson, p. 34-35; p. 64.] After Plaintiff was charged with battery on September 9, Carlson considered Plaintiff the "only suspect." [Ex. 21, Dep. of Carlson, p. 65:2-12.]

100. Carlson never interviewed any of the other parents whose children attended Plaintiff's daycare. [Ex. 21, Dep. of Carlson, p. 76:17-20.]

101. Three days later, on September 12, 2005, DCFS Investigator Booker told Carlson he was concerned that Defendants were not investigating Danielle Schrik as a suspect. [Ex. 21, Dep. of Carlson, p. 80: 12-16; Ex.18, Dep. Of Booker, p. 108: 9-14.]

102. Carlson never interviewed Danielle as a possible suspect. [Ex. 21, Dep. of Carlson, p. 85: 21-23.] Carlson did not consider Danielle a suspect at any time after Plaintiff was initially charged with aggravated battery. [Ex. 21, Dep. of Carlson, p. 58:1-4; p. 64.]

103. Carlson signed the complaint against Plaintiff for murder after Joshua was taken off life support on September 12. [Ex. 21, Dep. of Carlson, p. 58:21-23.] Plaintiff was arrested for murder on September 15. [Ex. 21, Dep. of Carlson, p. 58:21-23.]

104. Cardona spoke to Danielle one time about the injury to Joshua. This conversation took place at St. Alexius Hospital on September 9. [Ex. 15, Dep. Of Cardona, p. 58:14-17.]

105. When Cardona spoke to Danielle at the hospital on September 9, Cardona did not

11

take any notes. [Ex. 15, Dep. Of Cardona, p. 58: 21-23.]

106. Cardona does not remember any specific question he asked Danielle . [Ex. 15, Dep. Of Cardona, p. 59: 9-12.]

107. Cardona never conducted a background check on Danielle . [Ex. 15, Dep. Of Cardona, p. 61:13-15.] Carlson never conducted a background check on Danielle. [Ex. 15, Dep. of Carlson, p. 36.]

108. During his September 9 interview, Danielle told Cardona that Joshua had not been eating for the previous week. [Ex. 15, Dep. Of Cardona, p. 69:18-21.]

109. Danielle also told Cardona that Joshua had been lethargic and inactive the previous week. [Ex. 15, Dep. Of Cardona, pp. 69-70.]

110. In Cardona's training with regard to investigating shaken baby cases, he learned that lethargy, inactivity, and not eating can be symptoms of shaken baby syndrome. [Ex. 15, Dep. Of Cardona, p. 69: 5-17.]

111. After this interview, Cardona says that he "ruled out" Danielle as a suspect. [Ex. 15, Dep. Of Cardona, p. 70:20 – p. 71:2; p. 64:13-15.]

112. Cardona later learned of Danielle's criminal history. [Ex. 15, Dep. Of Cardona, p. 75: 22-24.] Cardona never interviewed Danielle again. [Ex.15, Dep. Of Cardona, p. 70.]

113. In his training regarding investigating shaken baby cases, Cardona was instructed that all adults who had recent contact with an injured child should be considered initial suspects. [Ex. 15, Dep. Of Cardona, p. 77:5-9.]

114. Cardona never interviewed Joshua's grandmother Nancy, Danielle's boyfriend Seth Sable, or Seth's mother Barbara Sable. [Ex. 15, Dep. Of Cardona, p. 77:19-25; p. 78: 1-4.]

115. Barbara Sable, Nancy and Seth Sable all had contact with Joshua the week of September 5, 2005. [Ex. 16, Dep. of Barbara Sable, pp. 24, 45; Ex. 17, Dep. of Seth Sable, p. 27, Ex. 14, Dep. of Nancy, pp. 40, 88, 51-52.]

116. Over Labor Day weekend in 2005 (prior to the September 9 incident), Seth Sable and Danielle were in Browns Lake, Wisconsin. They went on a walk and left Joshua unattended in a condo. [Ex. 17, Dep. of Seth Sable, pp. 26, 28.]

117. Seth and Danielle had a fight with Richard Straube, whom Danielle believes is Joshua's father. Straube denied being the father and a fight broke out between Seth, Danielle, Straube and Straube's father. After this fight, Danielle was arrested for battery. [Ex. 17, Dep. of

12

Seth Sable, pp. 27-29, 34.]

118. Seth Sable told Investigator Booker that there had been physical fights between himself and Danielle. [Ex. 17, Dep. of Seth Sable, p. 78.]

119. Nancy felt that Danielle neglected Joshua. [Ex. 14, Dep. of Nancy Schrik, p. 26:22-24.]

120. Nancy frequently saw Danielle hit Joshua, scream at Joshua, and "fling" him away if he wanted to be held. [Ex. 14, Dep. of Nancy Schrik, p. 27:2-5.] Nancy had seen Danielle shake Joshua on many occasions. [Ex. 14, Dep. of Nancy Schrik, p. 34:5-21.]

121. Nancy's boyfriend Luddie Campbell had to protect Joshua from Danielle's violent behavior. [Ex. 14, Dep. of Nancy Schrik, p. 34:17-21.]

122. Danielle had threatened to kill Joshua in the spring or summer of 2005. Danielle said to her mother: "Don't be surprised if when you come back [from vacation] Joshua's in a coffin." [Ex. 14, Dep. of Nancy Schrik, pp. 86-87.]

123. Nancy believes that Danielle killed Joshua. [Ex. 14, Dep. of Nancy Schrik, p. 19: 19-21.]

124. Danielle threatened to kill her mother, Nancy, if her mother came to court. [Ex. 14, Dep. of Nancy Schrik, p. 18:7-10.] Danielle had also threatened her mother on previous occasions. [Ex. 14, Dep. of Nancy Schrik, p. 18: 18-19; p. 32:3-5.]

125. Danielle had once broken Nancy's jaw. [Ex. 14, Dep. of Nancy Schrik, p. 31:1-8.]

126. Nancy once had to kick Danielle out of her home because Danielle threw a chair at the wall in a violent rage. [Ex. 14, Dep. of Nancy Schrik, p. 37:8-12.]

127. Defendant Carlson was seen holding hands with Danielle at Joshua's funeral. [Ex. 14, Dep. of Nancy Schrik, p. 70:2-9.]

128. Carlson instructed Danielle and Nancy not to speak to DCFS investigator Booker. [Ex. 14, Dep. of Nancy Schrik, pp. 83-84.]

129. Investigator Booker called Nancy and Danielle approximately 10 times and received no response. [Ex. 18, Dep. of Booker, p. 31:10-19.]

130. Carlson told Booker that he had directed Nancy and Danielle not to speak to Booker. [Ex. 18, Dep. of Booker, p. 36.]

131. When Booker and Carlson interviewed Danielle together on September 13, 2005, they learned that Danielle had a criminal background and that Joshua's biological father had

13

rejected Danielle and denied being the father. These things concerned Booker. [Ex. 18, Dep. of Booker, p. 60.]

132. Danielle also told Carlson and Booker that Joshua had had a fever since Tuesday, September 6, 2005. This sent up a "red flag" for Booker that Joshua was injured over the Labor Day weekend around the time of Danielle's battery arrest. [Ex. 18, Dep. of Booker, p. 60.]

133. Carlson falsely reported that Medical Examiner Nancy Jones had given him a definitive timeline that Joshua had been injured on September 9, 2005. [Ex. 18, Dep. of Booker, p. 67.] When Investigator Booker called Dr. Jones to confirm this, Jones denied that she could give any timeline for the injury. [Ex.18, Dep. Of Booker, p. 68.]

134. Investigator Booker learned that Joshua had been ill the entire preceding week and that every witness had seen that Joshua was lethargic and sick prior to arrival at Plaintiff's daycare on September 9, 2005. [Ex.18, Dep. Of Booker, p. 108.]

**Interviews with Other Witnesses**

135. On the afternoon of September 9, 2005, Defendants Micci and Fallon interviewed Officer Thomas Sherrill, who had responded to the Aleman home immediately after Plaintiff called 911. Sherrill told Micci and Fallon that he learned from Aleman that when Aleman picked Joshua up there were "no signs of life." [ISP Defendants' Exhibit H, attachment 1, Sherrill interview notes.]

136. Sherrill also told Micci and Fallon that Aleman told him he performed rescue breaths and CPR on Joshua. [ISP Defendants' Exhibit H, attachment 1, Sherrill interview notes.]

137. On the afternoon of September 9, Micci and Fallon interviewed Hanover Park Sergeant John Dossey, who responded to the Aleman home about 20 minutes after Plaintiff called 911. Dossey told Micci and Fallon that he learned from Aleman that Joshua was sick when he was dropped off at Plaintiff's home that morning. [ISP Defendants' Exhibit H, attachment 2, Dossey interview notes.]

138. Dossey told Micci and Fallon that he learned from Aleman that Joshua would not interact with the other children. Dossey stated that Plaintiff told him that Joshua was on the couch looking "lifeless." Dossey reported that Plaintiff performed a rescue breath on Joshua and called 911. [ISP Defendants' Exhibit H, attachment 2, Dossey interview notes.]

139. On the afternoon of September 9, Defendants Micci and Fallon interviewed EMT

14

Timothy Hillscheim, who told them that he took Joshua from Plaintiff. Hillscheim reported Plaintiff looking "concerned and upset." [ISP Defendants' Exhibit H, attachment 3, Hillscheim interview notes.]

    140.    On the afternoon of September 9, 2005, Defendants Micci and Fallon interviewed Hanover Park Lieutenant Rosenthal, who responded to the Aleman home immediately following Plaintiff's 911 call. Rosenthal told Micci and Fallon that he learned from Plaintiff that Plaintiff had just begun to watch Joshua that week. Rosenthal further related that Joshua was supposed to start at Plaintiff's day care on September 6, but Joshua was too sick; that Joshua had a fever that week; that Joshua was "sluggish;" that Joshua would not interact with Plaintiff or with the other children and "all Joshua wanted to do was sleep." Rosenthal learned from Plaintiff that when Plaintiff checked on Joshua, Joshua had a vacant stare. Aleman performed a rescue breath and called 911. [ISP Defendants' Exhibit H, attachment 1, Rosenthal interview notes.]

    Respectfully submitted,

    /s/ Lawrence V. Jackowiak
    *Counsel for Plaintiff*

Lawrence V. Jackowiak
Adele D. Nicholas
Law Offices of Lawrence V. Jackowiak
20 North Clark Street, Suite 1700
Chicago, Illinois 60602
(312) 795-9595