IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RICK ALEMAN,                          )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )
                                      )    No. 07 C 5049
VILLAGE OF HANOVER PARK, et al.,      )
                                      )
          Defendants.                 )
                                      )
                                      )

## MEMORANDUM OPINION AND ORDER

Plaintiff Rick Aleman ("Aleman") filed suit against the Village of Hanover Park and several officers of the Hanover Park Police Department ("HPPD") -- Detective Todd Carlson ("Carlson"), Detective Eric Villanueva ("Villanueva"), and Sergeant Carol Lussky ("Lussky") (together, the "HPPD defendants"). Also named as defendants in the complaint are two officers of the Illinois State Police ("ISP") -- Master Sergeants Joseph Micci ("Micci") and Gerard Fallon ("Fallon") (together, the "ISP defendants"). Aleman's complaint asserts several causes of action under federal and state law based on his arrest in 2005 for the aggravated battery (and subsequently, the first degree murder) of eleven-month-old Joshua Schrik ("Joshua"), a child for whom he had recently begun providing day care services.

The HPPD defendants and the ISP defendants have each moved for summary judgment on all nine counts of Aleman's complaint; Aleman

has moved for summary judgment only with respect to Count V. For the reasons discussed below, the defendants' motions for summary judgment are granted and Aleman's motion for partial summary judgment is denied.

## I.

## A.[1]

In May 2005, Rick Aleman began operating a child care service out of his home in Hanover Park, Illinois. In addition to his own children, Aleman cared for two others -- Carl Gutman's son, J.T., and Adam Michalik's son, Adam, Jr. In September 2005, Aleman had arranged with Jennifer Danielle Schrik ("Danielle") to begin taking

---

[1] In their joint response to Aleman's Rule 56.1 Statement of Additional Material Facts, the defendants have objected to, and moved to strike, an inordinate number of Aleman's assertions. In many instances, the basis given for the objection is "compound" and "without proper citation to the record." The defendants appear to take issue with the fact that many of Aleman's statements consist of more than one sentence. This objection is frivolous. "The paragraphs in [a party's] statement of material facts are not improperly compound paragraphs simply because they contain more than one fact or one sentence." *Fishering v. City of Chicago*, No. 07 C 6650, 2009 WL 395462, at *2 (N.D. Ill. Feb. 18, 2009). Nor must a paragraph or statement be stricken simply because it includes several sentences along with a single citation to the record. *See Norris v. Ferro*, No. 06 C 2793, 2009 WL 1033557, at *1 (N.D. Ill. Apr. 19, 2009). A single citation is sufficient, so long as it indicates the portions of the record that support all of the factual assertions made within that paragraph. As a general matter, Aleman's statements of additional fact meet this requirement. By repeatedly invoking compoundness as a basis for denying Aleman's factual assertions instead of offering a substantive response, the defendants have made it unnecessarily difficult to determine precisely which facts are in dispute in the case and which ones are not.

care of her son, Joshua. Danielle originally planned to leave Joshua with Aleman beginning on Monday, September 5, 2005. However, because Joshua had become ill, his first day in Aleman's care was Wednesday, September 7. Joshua was still ill on Wednesday, and on Thursday, September 8, Danielle took Joshua to his pediatrician, Dr. Albert Hasson ("Hasson").

At around 8:00 a.m. on Friday, September 9, Danielle dropped Joshua off at Aleman's home. She visited for about twenty minutes. During this period, Carl Gutman and Adam Michalik arrived to drop off their children. At about 9:00 a.m., after the parents had left, Aleman made a frantic phone call to 911. He told the dispatcher that Joshua had stopped breathing and had become unresponsive. The paramedics arrived and took Joshua to St. Alexius Hospital in Hoffman Estates, Illinois.

The HPPD sent Sergeant Lussky to Aleman's home to investigate the incident. Officer Carlson of the HPPD was later sent to St. Alexius to interview Danielle, other family members, and the doctors who were providing Joshua's medical treatment. In addition, the HPPD contacted the ISP and requested assistance from their Child Victimization Unit. The ISP sent Micci, Fallon, and Sergeant Steve Cardona ("Cardona")[2] to help with the investigation.

**B.**

---

[2] Cardona was originally named as a defendant in the suit but the claims against him were later voluntarily dismissed.

-3-

Shortly after the incident, Sergeant Lussky questioned Aleman and his wife, Barbara, at their home. Aleman told the paramedics and others who responded to his 911 call that he realized something was wrong with Joshua when he picked him up from the couch and found that Joshua had gone completely limp. After trying to revive Joshua and to perform CPR, Aleman called 911.

While at the Alemans' home, Lussky received a call from Carlson, who reported that Joshua had been diagnosed with a subdural hematoma with bleeding on the brain and bi-lateral hemorrhaging. Carlson also told Lussky that the doctors believed Joshua was a victim of "Shaken Baby Syndrome."[3] Pl.'s Resp. HPPD 56.1 Stmt. (Doc. 150) ¶ 37. At about 11:00 a.m., Lussky asked Aleman and his wife to accompany her to the HPPD Police Station for further questioning. They agreed. Aleman was not placed in handcuffs, and was not told that he was under arrest. However, at around 11:30 a.m., Aleman asked if he could leave the station and return after an hour. Lussky responded, "No. I'd rather have you here." Defs.' Joint Resp. to Pl.'s Stmt. Add'l Facts ¶ 92. The parties agree that at this point, Aleman was not free to leave the station. Defs.' Joint Resp. to Pl.'s Stmt. Add'l Facts ¶ 16.

### C.

---

[3] According to the defendants, during the interview at his home, Aleman used a plastic baby doll to demonstrate the manner in which he had shaken Joshua to revive him. Aleman denies having provided any such demonstration at his home. Pl.'s Resp. to HPPD 56.1 Stmt. ¶ 16.

While the Alemans were at the police station, the HPPD and ISP officers interviewed a number of other witnesses. Micci and Fallon interviewed the first responders to Aleman's 911 call. In general, these witnesses reported that Aleman had appeared distraught when they arrived on the scene, and that he appeared unable to calm down. Hanover Park Fire Lieutenant Paul Rosenthal reported that, according to Aleman, Joshua had been "lying on the couch, propped up"; that Aleman "could not get [Joshua] to have any interaction with either him or the other kids"; and that "all that [Joshua] wanted to do was sleep." Investigative Report notes of Interview with Rosenthal, Micci Aff., Ex. C (Doc. 129-9) at 6. Aleman had also reported that when he went to check on Joshua, "he found him to be cold and clammy" and that Joshua's eyes were "staring into space." *Id.* HPPD Sergeant John Dossey ("Dossey") told the officers that Aleman had said "at least twice that he did not want to go to jail for the rest of his life and did not want to be unable to see his children." Pl.'s Resp. to ISP 56.1 Stmt. (Doc. 149) ¶ 36.[4] In addition, Dossey reported that Aleman had said that Joshua had been crying after his mother left, and that Joshua had

---

[4] Although Aleman purports to dispute the defendants' claim that he made these statements, he fails to show that the dispute is a genuine one. Aleman does not specifically deny having made the statements about going to jail and being unable to see his children. Instead, he supports his objection merely by reciting other statements that were made to Micci and Fallon regarding the incident. Pl.'s Resp. to ISP 56.1 Stmt. ¶ 36. As a result, he has failed to raise a triable issue of fact as to whether he made the statements in question.

cried later on when Aleman tried to get him to interact with the other children.

Meanwhile, Carlson and Cardona interviewed Joshua's family and his treating physicians at St. Alexius. Dr. Gerardo Reyes ("Reyes"), medical director of the hospital's Pediatric Intensive Care Unit, was in charge of Joshua's medical care during his hospitalization. Reyes stated that Joshua had suffered a subdural hematoma. According to Cardona, Reyes opined to a reasonable degree of medical certainty that the injury had been caused by a "violent shake." ISP 56.1 Stmt. ¶ 11. Cardona also testified to remembering specifically that Reyes told him that Joshua's symptoms would have occurred immediately after the trauma, and that afterwards, Joshua would not have been alert and functioning. ISP 56.1 Stmt. (Doc. 129) ¶¶ 12, 13. Carlson likewise testified that he was told by Reyes that the onset of Joshua's injuries would have been immediate. HPPD 56.1 Stmt. ¶ 67.[5]

Next, Cardona interviewed Dr. Michael Seigle ("Seigle"), an ophthalmologist who had been called to examine Joshua's eyes. Seigle reported that he had found bi-lateral retinal hemorrhages in Joshua's eyes. He also stated that Joshua's injuries were consistent with "Shaken Baby Syndrome." In addition, Seigle stated

---

[5] Aleman purports to dispute the defendants' claims regarding Reyes's and other doctors' statements. I explain more fully below that, given the evidence on which he relies, Aleman's objections on this point fail. *See infra* at 17.

that Joshua's hemorrhages were "fresh." ISP 56.1 Stmt. ¶¶ 17-19; HPPD 56.1 Stmt. ¶ 98. According to Cardona, Seigle explained that by "fresh," he meant "just occurred." ISP 56.1 Stmt. ¶ 18.

Cardona also interviewed Dr. Hasson, Joshua's regular pediatrician, who had examined Joshua the previous day. According to Hasson, Joshua had been suffering from an ordinary viral infection. ISP 56.1 Stmt. ¶ 23. Hasson reported that Joshua's temperature was 97.1, HPPD 56.1 Stmt. ¶ 77, and that he had detected no abnormalities with Joshua's eyes, ISP 56.1 Stmt. ¶ 24. In addition, Hasson spoke with Sergeant Lussky, telling her that Joshua had "looked great" and that he was unable to provide any explanation as to why Joshua should have collapsed on Friday morning. HPPD 56.1 Stmt. ¶ 81.

In addition to interviewing the doctors, Cardona and Carlson each separately interviewed Danielle Schrik. According to Cardona, Danielle reported that Joshua had been ill since the beginning of the week, that on one day, he had a fever of 103 degrees, that his appetite had decreased, and he had been "fussy." HPPD 56.1 Stmt. ¶¶ 119, 120. She also stated that she had taken Joshua to see his pediatrician earlier that week. Carlson testified that he asked Danielle whether she had ever hit or struck Joshua; he claims that she told him she had not. HPPD 56.1 Stmt. ¶¶ 66, 118. Carlson Dep. at 33:12-17. Cardona testified that he found Danielle to be a credible witness. ISP 56.1 Stmt. ¶ 30.

Finally, Lussky and Fallon interviewed the other parents who had seen Joshua when they dropped off their children at Aleman's home that morning. They spoke with Carl Gutman. The parties do not discuss the substance of his testimony in detail. However, in his deposition, Gutman later testified that the officers' report of their interview omitted his statement that he had grabbed Joshua's hand and checked his head to see if he could "get some type of reaction out of him." *See* Gutman Dep. at 104:13-107:7; 106:11-14. Lussky and Fallon also interviewed Adam Michalik. He testified that he had seen Joshua lying on the floor that morning. The parties dispute whether Michalik said that Joshua was sleeping at that time or whether Joshua was watching television. Defs.' Joint Resp. to Stmt. Add'l Facts ¶ 18. According to the officers' report, Michalik told them that Joshua was "laying on the floor on the floor and appeared to be watching television," *see* Michalik Dep. at 42:21-23, but that Michalik later stated that he was unable to recall whether Joshua's eyes were open or closed, *see* Michalik Dep. at 43:2-5.

**D.**

At around 5:15 p.m., Aleman was interviewed by Micci and Villanueva at the HPPD Police Station. The interrogation was conducted intermittently for roughly four hours and will be discussed in further detail in connection with Count V of Aleman's complaint. Here it is necessary only to note that, after speaking

with his attorney by phone, Aleman signed a form waiving his *Miranda* rights, and proceeded to recount essentially the same story as the one he had told earlier that morning -- that Joshua had been ill all week, that Joshua was limp when he picked him up that morning, that he tried to perform CPR, and that he had eventually called 911.

Micci then began questioning Aleman and eventually suggested that Aleman might have shaken Joshua violently out of frustration or anger. Aleman adamantly denied having done so. He told Micci that he had shaken Joshua in an attempt to revive him, but he insisted that Joshua had been limp and lifeless *before* he picked him up from the couch. After repeated denials, Micci showed Aleman photographs of Joshua's injuries and told Aleman that he had spoken with three different doctors who had informed him that Joshua had been shaken in such a way that he would have become unresponsive immediately afterward. Interrogation at 19:26-19:27. Micci later explained in his deposition that he had not spoken with any doctors and that the deception was an interrogation tactic. Micci Dep. at 85:6-10; 104:23-105:6. However, Micci had spoken with several investigators in the case prior to the interview. ISP 56.1 Stmt. ¶ 48. Micci also told Aleman that the events of that morning could not have happened in the way that Aleman had described. Interrogation at 21:56-57.

At a later point in the interview, when Micci asked Aleman how

hard he had shaken Joshua in attempting to revive him, Aleman responded "probably hard enough . . . . I'm ashamed of myself." Pl.'s Resp. to ISP 56.1 Stmt. ¶ 75. The defendants also point to Aleman's statement, "I know in my heart that if the only way to cause [the injury] is to shake that baby, then, when I shook that baby, I hurt that baby," Pl.'s Resp. to ISP 56.1 Stmt. ¶ 77; and again, "I admit it. I did shake the baby too hard. But I didn't mean to. I didn't mean any harm." Pl.'s Resp. to ISP 56.1 Stmt. ¶ 79.

Aleman does not deny making these statements. However, he urges that they be viewed in context, and he emphasizes Micci's repeated claim that Aleman was the only person who could have caused Joshua's injuries. Aleman contends that Micci "extracted apologies from Plaintiff by falsely claiming that he had authoritative medical information that Joshua's injuries could *not* have occurred before he was brought to Plaintiff's home," and that "[c]onfronted repeatedly with that lie, Plaintiff eventually agreed that if the only time Joshua could have been hurt was at his home, then he must have hurt Joshua in his efforts to revive him and perform CPR." Pl.'s Resp. Br. at 4.

Viewing the interrogation as a whole, this is a plausible account of the interrogation (though not the only plausible account). Even after stating that he had shaken Joshua too hard, Aleman continued to deny and express disbelief that he could have

caused Joshua's injuries. Moreover, as noted below, when the prosecutor in charge of the case viewed a video recording of the interrogation some months later, she felt that it was more exculpatory than inculpatory. Pl.'s Stmt. Add'l Facts ¶ 85.

After the interrogation, Aleman was charged with aggravated battery to a child. On September 11, 2005, Villanueva signed the criminal complaint charging Aleman with the offense. The next day, a bond hearing was held. Aleman was released on a bond of $250,000. HPPD 56.1 Stmt. ¶ 34.

### E.

Tragically, Joshua passed away on September 13, 2005. Dr. Nancy Jones ("Jones") performed an autopsy the following morning. Carlson and Villanueva were present, ¶¶ HPPD 56.1 Stmt. 57, 69, along with Michael Booker ("Booker"), an investigator for the Department of Children and Family Services ("DCFS"). Jones opined that the manner of Joshua's death was homicide and that the cause of his death was a subdural hematoma due to blunt trauma. HPPD 56.1 Stmt. ¶¶ 101-02. Initially, Jones was unable to determine when Joshua had been injured. Pl.'s Stmt. Add'l Facts ¶ 32; Carlson Dep. at 108:21-109:8.[6] However, after speaking again with Carlson later that afternoon, Dr. Jones opined that Joshua's injuries had been sustained on Friday, September 9, 2005. HPPD

---

[6] The defendants deny this statement but their position is not borne out by the evidence.

56.1 Stmt. ¶ 70.

In her deposition, Jones testified that the officers at the autopsy led her to believe that the parents who had seen Joshua that morning had described him as "fine and behaving normally" before he was left with Aleman. Joint Resp. to Pl.'s 56.1 Stmt. Add'l Facts ¶ 35; Jones Dep. at 33:11-22. She emphasized that her determination regarding the timing of Joshua's injury was based on this information. Jones Dep. 71:2-72:13. Months later, after learning more about Joshua's condition at the time he was left with Aleman, she withdrew her opinion. Joint Resp. to Pl.'s 56.1 Stmt. Add'l Facts ¶ 37.

While the police investigation of Aleman was proceeding, DCFS Investigator Booker was attempting to conduct his own investigation into Joshua's death. Booker told Carlson that he was concerned that the police were not investigating Danielle as a suspect. Pl.'s Stmt. Add'l Facts ¶ 101; Carlson Dep. at 80:12-16. Booker had made several unsuccessful attempts to speak with Danielle. According to Danielle's mother, Nancy Schrik ("Nancy"), Carlson instructed her and Danielle not to speak with Booker. Defs.' Joint Resp. to Pl.'s Stmt. Add'l Facts ¶¶ 128, 130. Carlson himself told Booker that he had instructed Danielle and Nancy not to speak with him and that he wanted to be present for any interviews. Joint Resp. Stmt. Add'l Facts ¶ 130.

Lussky, Villanueva, and an Assistant State's Attorney ("ASA")

-12-

interviewed Carl Gutman for a second time on September 11, 2005. Gutman stated that Joshua had not been well when he arrived on the morning of September 9. In particular, he emphasized that Joshua had a "vacant stare." Pl.'s Resp. to ISP 56.1 Stmt. ¶ 101. On September 15, 2005, Carlson signed a criminal complaint charging Aleman with two counts of first degree murder.

## F.

About a year later, on November 13, 2006, the charges against Aleman were dropped by entry of *nolle prosequi*. Assistant State's Attorney Karen Crothers ("Crothers") explained that, based on the evidence before her at that time, she no longer believed that she would be able to meet her burden of proof in prosecuting Aleman. Crothers Dep. at 102:22-103:3. In particular, she stated that after she and other prosecutors viewed the video recording of Aleman's interrogation, they felt that there were inconsistencies between Aleman's actual statements and the officers' characterization of his statements. Pl.'s 56.1 Stmt. Add'l Facts ¶ 88; Crothers Dep. at 104:5-105:12. Crothers also had concerns about Aleman's interrogation. She testified that she felt that Aleman's statements during the interrogation were more exculpatory than inculpatory. Pl.'s Stmt. Add'l Material Facts ¶ 85; Crothers Dep. at 107:12-15.

## II.

Summary judgment is appropriate where the record shows that

there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant initially bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quotation marks omitted). Once the movant has met this burden, the non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The facts must be construed in the light most favorable to the non-movant, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson*, 477 U.S. at 255.

## A. Count I: False Arrest for Aggravated Battery

In Count I of his complaint, Aleman alleges that the officers falsely arrested him on charges of aggravated battery. In order to prevail on a § 1983 claim for false arrest, a plaintiff must show that the defendants lacked probable cause for his arrest. *See, e.g.*, *Williams v. Rodriguez*, 509 F.3d 392, 398-99 (7th Cir. 2007).

-14-

Probable cause exists when "the facts and circumstances within [the arresting officers'] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense." *Id.* (citations and quotation marks omitted). "[P]robable cause depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer -- seeing what he saw, hearing what he heard." *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010) (quotation marks omitted).

Each of the officers named in Count I had probable cause to arrest Aleman for aggravated battery. Aleman was placed under arrest, at the earliest, around noon on September 9, 2005, when Sergeant Lussky denied him permission to leave the station. By this point, Lussky had been told by Carlson that Joshua was exhibiting symptoms of Shaken Baby Syndrome. Lussky also knew that Aleman was the last person to have custody of Joshua. At this incipient stage of the investigation, these facts gave Lussky probable cause to suspect that Aleman had committed aggravated battery. *Cf. Ebert v. Gaetz*, 610 F.3d 404, 414 (7th Cir. 2010) ("Probable cause does not require evidence sufficient to support a conviction, nor even evidence that it is more likely than not that the suspect committed a crime.").

The information gathered throughout the rest of the day

-15-

bolstered the initial probable cause determination. For example, Micci was aware of Aleman's expressions of angst about being sent to jail for the rest of his life.[7] Although not necessarily incriminating, these statements could reasonably have been regarded as evidence of a guilty conscience. Probable cause was further supported by the information that had been obtained from the doctors who cared for Joshua at the hospital -- particularly, Dr. Reyes's and Dr. Seigle's comments that Joshua's injuries were "fresh" or had happened immediately.

Aleman disputes -- or purports to dispute -- the defendants' account of what the doctors told them. However, in doing so, he relies on the doctors' subsequent deposition testimony, in which they qualify or elaborate on the statements they are claimed to have made on September 9. For example, in his deposition, Dr. Reyes explained that in telling the officers that Joshua would not have been "alert and functioning" after the injury, he meant only that Joshua would not have been "walking, crawling and eating" and "doing the normal things that an 11-month-old will do." Pl.'s Resp. Hanover Defs.' 56.1 Stmt. ¶ 67. He claimed that he had not meant to suggest that Joshua would have been unable to cry or exhibit certain other behaviors that Joshua had been displaying

---

[7] Aleman claims that this statement is not supported by the record. The defendants' statement, however, is almost a verbatim transcription of Fallon's notes on his investigation report. Ex. H to ISP Defs.' 56.1(a)(3) Stmt., Ex. 2 to Fallon Aff.(129-10 at 9).

before he was left with Aleman on the morning in question. *Id.* Similarly, when Dr. Seigle was asked during his deposition to define what he meant when he said that Joshua's injuries were "fresh," he answered that it meant "within the last week," Pl.'s Resp. Hanover Defs.' 56.1 Stmt. ¶ 98; Pl.'s Resp. ISP 56.1 Stmt. ¶ 18.[8]

Notably, the doctors do not deny making the statements attributed to them by the defendants. On the contrary, they confirmed having said them -- or at least stated that they had no reason to doubt that they said them. Thus, for example, Reyes reviewed Cardona's investigative report from the day of the incident and was asked whether he had any disagreement with Cardona's statements that "Dr. Reyes stated in his expert medical opinion Joshua was the victim of a violent shake which caused such a catastrophic brain injury that the onset of the symptoms would have been immediately following," and that Reyes was "confident Joshua would not have been alert or functioning after the incident." HPPD 56.1 Stmt. ¶ 90; ISP 56.1 Stmt. ¶ 14; Reyes Dep. at 55:3-57:11; 81:17-82:6. Reyes responded that he did not. *Id.*

_____

[8] Elsewhere in his deposition, Seigle states that the injury occurred within the previous twenty-four hours. ISP 56.1 Stmt. ¶ 19; Seigle Dep. at 41. Seigle's testimony appears to be that, judging solely by the bi-lateral hemorrhaging, Joshua's injury might have occurred at any point within the previous week or so; but when taken together with the subdural hematoma and the fact that Joshua was unresponsive, it was possible to infer that the injury had been suffered on the same day. *See* Seigle Dep. at 41.

Aleman contends that the officers manipulated the doctors' answers by deliberately feeding them misinformation about the severity of Joshua's condition at the time he was dropped off at Aleman's. Pl.'s Resp. at 2-3. To be sure, some of the doctors later testified that the opinions they gave to the officers might have been different if they had known more about the symptoms that Joshua had exhibited during the previous week -- for example, his fever, his decreased appetite, his lethargy. However, even assuming *arguendo* that the officers provided the doctors with incorrect information during these initial interviews, there is simply no evidence in the record to suggest any intention to deliberately deceive the doctors.

As another basis for disputing Cardona's and Carlson's testimony, Aleman points out that Dr. Reyes did not specifically remember having spoken with either officer on September 9, 2005. Pl.'s Resp. to ISP 56.1 Stmt. ¶ 9. But given the amount of time that had passed, it is not surprising that Reyes was unable to remember the particular officers with whom he spoke. Reyes never expressed any doubt that he had spoken to the officers.

Although all factual disputes must be viewed in the light most favorable to Aleman, he has failed to raise a genuine dispute about what the officers were told on the date of Joshua's collapse. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When the moving party has carried its burden under Rule 56(c), its opponent must do

-18-

more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (alteration and quotation marks omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").[9]

Finally, even assuming the officers lacked probable cause for Aleman's arrest, they would nonetheless be entitled to summary judgment based on the doctrine of qualified immunity. "Qualified immunity protects police officers from suit to the extent that their actions could reasonably have been thought consistent with

---

[9] Aleman argues that Villanueva did not have probable cause to arrest him in light of Villanueva's concession that, when the interrogation began (at which point Aleman was already under arrest), Villanueva knew only that (1) Aleman was the last person to have custody of Joshua and (2) that Joshua had been injured. Pl.'s Stmt. Add'l Facts ¶ 94. This overlooks the fact that "[a]n arresting officer need not have personal knowledge of facts establishing probable cause to arrest. When officers are in communication regarding a suspect, one officer's knowledge is imputed to the others under the collective knowledge doctrine." *United States v. Hayden*, 353 Fed. App'x. 55, 57 (7th Cir. 2009); *see also Nawrocki v. Scully*, No. 05 C 1466, 2006 WL 1735294, at *7 (N.D. Ill. June 19, 2006) ("In assessing the propriety of an arrest, the arrest is proper so long as the collective knowledge of the investigating agency is sufficient to ground probable cause.").

the rights they are alleged to have violated." *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010) (quotation marks omitted). "Deciding a claim of qualified immunity generally involves two inquiries: (1) has the plaintiff alleged facts that, if proved, would establish a constitutional violation; and (2) would a reasonable officer have known his actions were unconstitutional in light of clearly established law?" *Id.*

The Seventh Circuit has explained that "[w]ith an unlawful arrest claim in a § 1983 action when a defense of qualified immunity has been raised, [the court will] review to determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). "Courts have referred to the second inquiry as asking whether the officer had 'arguable' probable cause." *Id.* "Arguable probable cause exists when a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Id.* (quotation marks omitted). Given the early stage of the investigation and given the information they had at the time, if the officers were mistaken in believing that they had probable cause to arrest Aleman for aggravated battery, the mistake was a reasonable one.

-20-

Since the officers had probable cause (or at least arguable probable cause) to arrest Aleman for aggravated battery on September 9, they are entitled to summary judgment on Count I.

## B. Count II: Failure to Intervene

In Count II, Aleman asserts a claim under § 1983 for failing to intervene to prevent the violation of his rights. He contends that each of the defendants should have known that he had been falsely arrested, and that each officer is liable for failing to stop his or her fellow officers from violating his rights. This argument fails because there can be no claim for failing to intervene without proof of an underlying constitutional violation. *See, e.g.*, *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Since Aleman cannot show that his arrest for battery was unconstitutional, he cannot maintain a claim based on the officers' failure to intervene. The defendants' motions for summary judgment as to Count II are granted.

## C. Count III: False Arrest for First Degree Murder

In Count III, Aleman asserts a § 1983 claim against Fallon and Carlson for falsely arresting him on first degree murder charges. As with Aleman's arrest for battery, this claim turns on whether the officers had probable cause to arrest him -- that is, whether Fallon and Carlson were in possession of facts that "would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the

-21-

offense." *Swearnigen-El*, 602 F.3d at 863.

Fallon had probable cause to arrest Aleman. As the defendants point out, Fallon arrested Aleman pursuant to a facially valid warrant.[10] "Generally, a person arrested pursuant to a facially valid warrant cannot prevail in a § 1983 suit for false arrest; this is so even if the arrest warrant is later determined to have an inadequate factual foundation." *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992). To be sure, this rule does not apply in "situations where officers responsible for bringing about an unlawful arrest knew that the arrest warrant had issued without probable cause." *Juriss*, 957 F.2d at 350. But Aleman cites no evidence suggesting that Fallon had any reason to suspect that the warrant had been issued without probable cause.

Nor does Aleman raise any other reason for thinking that Fallon lacked probable cause. Aleman's central contention is that, notwithstanding the defendants' claims to the contrary, Fallon's role in his arrest was not purely administrative or ministerial. Specifically, Aleman maintains that Fallon was the supervisor assigned by the ISP Child Victimization Unit to investigate Joshua's death, and that Fallon "played a key role in investigating the injuries to Joshua, including interviewing first responders and

---

[10] The warrant is mentioned in the ISP defendants' summary judgment brief, *see* ISP Br. at 12, but not in the passages cited in their Rule 56.1 Statement. However, Aleman does not dispute that Fallon arrested him pursuant to a warrant.

other witnesses." Pl.'s Resp. Br. at 15. The record does not support this claim. The portions of the record on which Aleman relies indicate only that Fallon interviewed a number of witnesses on September 9, 2005. Pl.'s Stmt. Add'l Facts ¶¶ 135-140. More importantly, even if Fallon did play an important role in Aleman's arrest, it does not follow that he lacked probable cause to do so. Aleman never explains why Fallon's alleged central role in his arrest undermines a finding of probable cause. Thus, I grant Fallon summary judgment on Count III.

The question whether Carlson had probable cause to arrest Aleman is somewhat closer; nevertheless, he, too, is entitled to summary judgment on Count III.[11] He argues that his probable cause determination was based on five pieces of evidence: (1) Dr. Jones's opinion that Joshua's manner of death was consistent with homicide; (2) Jones's opinion that Joshua's cause of death was a subdural hematoma due to blunt head trauma; (3) Jones's opinion that the injuries were sustained on September 9, 2005; (4) the doctors' statements that the onset of Joshua's injuries was immediate; and (5) Aleman's admission during his interrogation to having shaken

---

[11] Unlike Fallon, Carlson does not claim that he had probable cause based on the fact that a warrant had been issued for Aleman's arrest. This may be due to the fact that Aleman makes specific allegations that Carlson knowingly provided false information that led to the issuance of the warrant, and that, consequently, Carlson would have known that the warrant was not supported by probable cause.

the baby too hard and his "violent" demonstration of his actions with the plastic doll.

The first two pieces of evidence, without more, do not implicate Aleman in particular.[12] Jones's opinion that Joshua's injuries occurred on September 9 specifically implicates Aleman; but Aleman has cited evidence from which a jury could reasonably infer that Carlson deliberately provided Dr. Jones with false information in order to influence her findings. It is undisputed that Carlson was at the autopsy and that he provided Jones with information about Joshua's condition on the morning of his collapse. Pl.'s Stmt. Add'l Facts ¶¶ 32, 34. Further, as previously stated, Jones testified that the officers who attended the autopsy told her that "Joshua had allegedly been reported as

---

[12] It is true that this was essentially the same information (together with the fact that Aleman was the last adult to have custody of Joshua) that Lussky had when she denied Aleman permission to leave the station on September 9. The fact that this evidence was sufficient to give Lussky probable cause to arrest Aleman for aggravated battery at that time does not mean that the same evidence was enough to give Carlson probable cause to arrest Aleman for murder several days later. As the Seventh Circuit recently observed, "[i]n some situations, an officer may be required to conduct some investigation before making an arrest; in others, an officer may have probable cause for arrest without any need for investigation. Relevant factors include the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the alleged crime." *See, e.g.*, *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 624-25 (7th Cir. 2010). Given the greater seriousness of the murder charge, and the lack of any imminent danger of repetition, the probable cause threshold was correspondingly higher when Carlson signed the complaint against Aleman on September 15.

being fine by other parents on the morning that he was dropped off at Mr. Aleman's house." Joint Resp. Pl.'s 56.1 Stmt. Add'l Facts ¶ 35; Jones Dep. at 34:19-22. By the time of the autopsy, it was clear that Joshua was not "fine" or acting normally on the morning of September 9. Although the severity of Joshua's condition may have been unclear, all of the parents who saw Joshua on that morning -- including Danielle -- reported that he was unwell. If Carlson told Jones that the parents had described Joshua as "fine" or "normal," a jury could infer that Carlson knew his statements were untrue and that his intention was to deceive.

Aleman's claim that Carlson intentionally deceived Jones draws additional support from evidence suggesting that Carlson's relationship with Danielle was more than strictly professional. For example, Nancy Schrik testified that Carlson attended Joshua's funeral, and that he was "on his hands and knees holding [Danielle's] hand, sobbing with her." Pl.'s Stmt. Add'l Facts ¶ 127. Moreover, Carlson instructed Danielle and Nancy not to talk to Booker, Pl.'s Stmt. Add'l Facts ¶ 128, and he insisted on being present if Booker wished to interview Danielle. From this evidence, a jury could infer that Carlson had developed an interest of a personal nature in Danielle and that this gave him a motive to try to pin Joshua's death on Aleman.

Carlson's fifth piece of evidence -- Aleman's demonstration of the manner in which he shook Joshua and his admission that he shook

Joshua too hard -- adds little to the calculus. The inculpatory statements cited by the defendants lose much of their incriminating character when viewed within the context of the interrogation as a whole -- as evidenced by Crothers's reaction that the interrogation was "more exculpatory than inculpatory." Crothers Dep. at 107:12-15. Nor is there anything necessarily incriminating about Aleman's demonstration of the manner in which he shook Joshua. The defendants characterize the demonstration as "violent," but the evidence they cite in support of their claim is far from compelling. They rely on Aleman's statement during the interrogation that when he shook Joshua, the baby's neck tilted backward so that his head hit his back. HPPD 56.1 Stmt. ¶ 13. While the defendants regard this as evidence that Aleman must have shaken Joshua with considerable vigor, the statement also supports Aleman's claim that Joshua was "limp" and had no muscle control when Aleman picked him up. HPPD Defs.' 56.1 Stmt. ¶¶ 30, 53. For his part, Aleman notes that when Booker (who has investigated Shaken Baby cases for eighteen years) viewed the video of Aleman's demonstration, he stated "[t]hat type of shake does not cause shaken baby syndrome." Pl.'s Stmt. Add'l Facts ¶ 53; Booker Dep. 56-57.

Ultimately, however, Carlson's fourth piece of evidence is sufficient to support a finding of probable cause. Cardona and Carlson both specifically claim that Dr. Reyes told them that the

effects of Joshua's injuries would have been immediate. HPPD Defs.' 56.1 Stmt. ¶ 67; ISP Defs.' 56.1 Stmt. ¶ 12. They were also told by Seigle that the injuries were "fresh." HPPD 56.1 Stmt. ¶ 98. Against this, Aleman once again cites the doctors' subsequent qualifications of their statements in their depositions. But as already explained, based on what they were told at the time, the officers reasonably took the doctors' statements to mean that Joshua would have become unresponsive immediately after sustaining the injury. As a result, they reasonably perceived the evidence as directly implicating Aleman.

The existence of probable cause is not vitiated by the evidence that Carlson deliberately provided Dr. Jones with false or misleading information during Joshua's autopsy. Probable cause to arrest Aleman existed based on the doctors' initial statements to the officers, with or without Dr. Jones's autopsy findings. So long as probable cause can be established on an independent basis, it still serves as an absolute defense to any claim under § 1983 for wrongful arrest. *See, e.g.*, *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007); *King v. Young*, 21 F.3d 430 (7th Cir. 1994) (Even assuming officer intentionally omitted exculpatory information, if probable cause could be "established via objective information independent of the omitted fact then the existence of probable cause precludes the claim for unlawful arrest").

Aleman's central argument in rejoinder is that the officers

had a duty to conduct a more thorough investigation before arresting him on murder charges, and that if they had done so, they would have uncovered evidence that implicated Danielle in Joshua's death. The evidence to which Aleman refers is disquieting. Danielle had a criminal history -- one, in fact, that included crimes of violence. Carlson Dep. at 138:8-139:26.[13] Nancy Schrik later testified that, among other things, she had previously seen Danielle hit Joshua and "fling" him away when he wanted to be held. Pl.'s Stmt. Add'l Facts ¶ 120. She also said that she had seen Danielle shake Joshua on many occasions. Pl.'s Stmt. Add'l Facts ¶ 120. Indeed, Nancy stated that her boyfriend had to protect Joshua from Danielle's violent behavior. Pl.'s Stmt. Add'l Facts ¶ 121. On one occasion, Nancy claims that Danielle said to her, "Don't be surprised if when you come back [from vacation] Joshua's in a coffin." *Id.* Further, there is evidence in the record to indicate that on the weekend before September 9, Danielle was charged with battery as a result of an altercation with Richard Straube ("Straube"), Joshua's alleged biological father. Pl.'s Stmt. Add'l Facts ¶ 117; *see also* Carlson Dep. at 148; 149:13-151:17.

Nevertheless, Aleman's contention that Carlson and the other officers had a duty to investigate further cannot be squared with

---

[13] The parties do not discuss the nature of Danielle's crimes in detail.

settled law. In particular, the Seventh Circuit has consistently affirmed that once probable cause to arrest a particular suspect has been established, an officer is not obligated to investigate further for potentially exculpatory evidence. *See, e.g.*, *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009); *Garcia v. City of Chicago*, 24 F.3d 966 (7th Cir. 1994); *Gramenos v. Jewel Companies*, 797 F.2d 432, 442 (7th Cir. 1986); *Kompare v. Stein*, 801 F.2d 883 (7th Cir. 1986).

The principal case on which Aleman relies, *BeVier v. Hucal,* 806 F.2d 123 (7th Cir. 1986), is distinguishable. In *BeVier*, the plaintiffs brought a § 1983 suit against an officer who arrested them for child neglect after finding their children, who had been left with a babysitter, sitting listless in direct sunlight, covered in filth and sunburns. Officer Hucal spoke with the sitter, who said that she was watching the children. When the children's father arrived, Hucal arrested him without asking any further questions. The court held that although Hucal had probable cause to believe that the children had been neglected, he lacked any evidence that the neglect had been knowing or wilful, an essential element of the offense of child neglect. The court went on to explain that if Hucal had taken even rudimentary steps to investigate, he would have found that the BeViers had in fact made substantial efforts to care for their children and to ensure that their sitters did so as well.

The facts of this case are very different from those in *BeVier*. Here, the HPPD and ISP interviewed multiple witnesses, including both Aleman and Danielle. Notably, Carlson also interviewed Nancy at the hospital on September 9, and when he asked her whether she knew of anyone who had ever hit Joshua, Nancy replied that she did not. Nancy Schrik Dep. at 63:5-10. (In her deposition, she explained that she did not tell Carlson about Danielle's treatment of Joshua because she was afraid that Danielle would kill her. Nancy Schrik Dep. at 63:11-13). To be sure, good police practice might have required Carlson to conduct a more thorough investigation of Danielle.[14] But as the Seventh Circuit has emphasized, "the Constitution does not require police to follow the best recommended practices." *Gramenos*, 797 F.2d at 442. "There is a gap, often a wide one, between the wise and the compulsory. To collapse those two concepts is to put the judicial branch in general superintendence of the daily operation of

---

[14] This is not to say that probable cause to suspect Aleman would necessarily have dissipated if the officers had become aware of the evidence pointing to Danielle. *See, e.g.*, *Lindenberg v. Verdini*, No. Civ.A.03-40267-DPW, 2004 WL 2980724, at *1 (D. Mass. Dec. 2, 2004); *United States v. Moody*, 762 F. Supp. 1491, 1500 (N.D. Ga. 1991) ("To satisfy the fourth amendment's probable cause requirement, the government need not demonstrate that a person is the *chief* suspect in a criminal investigation. Indeed, implicit within the concept of probable cause is the notion that the government may pursue multiple, perhaps even divergent lines of investigation so long as the government establishes probable cause as to each prior to the issuance of any warrant."). It is also important to note that Danielle was never charged in connection with Joshua's death.

government, which neither the fourth amendment nor any other part of the Constitution contemplates." *Id.* Based on the information provided by the doctors and other witnesses, Carlson had probable cause to believe that Aleman had inflicted Joshua's injuries.

In sum, both Fallon and Carlson had probable cause to arrest Aleman for murder. Accordingly, both officers are entitled to summary judgment on Count III.

## D.  Count IV: Civil Conspiracy

In Count IV, Aleman asserts a claim for civil conspiracy under § 1983. To prevail on this claim, Aleman "must show '(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivation of those rights in the form of overt acts in the furtherance of the agreement.'" *Shaw v. Klinkhamer*, No. 03 C 6748, 2005 WL 1651179, at *6 (N.D. Ill. July 1, 2005) (quoting *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988)).

Although none of the parties addresses the issue explicitly, it is well-settled that a plaintiff cannot prevail on a § 1983 conspiracy claim if he is unable to prove an underlying violation of his constitutional rights. *See, e.g.*, *Hampton v. Hanrahan*, 600 F.2d 600, 622-23 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 754 (1980) (holding that in order to state "an adequate claim for relief under section 1983, a plaintiff must allege and prove both a conspiracy and an actual deprivation of rights; mere

proof of a conspiracy is insufficient to establish a section 1983 claim"); *Antonelli v. Askew*, NO. 95 C 3007, 1996 WL 131177, at *1 (N.D. Ill. Mar. 21, 1996) ("[A] plaintiff must allege and prove both a conspiracy and an actual violation of constitutional rights in order to establish a cognizable claim under section 1983."); *Newsome v. O'Grady*, No. 89 C 8992, 1992 WL 245606, at *4 (N.D. Ill. Sept. 18, 1992) ("[I]n order to state an adequate claim for relief under § 1983 as to an alleged conspiracy, Newsome must allege and prove both a conspiracy and an actual deprivation of rights. Because no constitutional violation has occurred, Newsome is unable to establish a § 1983 claim of conspiracy.") (citations omitted).

Aleman has failed to show that his Fourth Amendment rights were violated by either of his arrests. He cites three "overt acts" in support of his claim -- Villanueva's and Carlson's alleged attempt to manipulate Dr. Jones's autopsy findings; Carlson's alleged attempt to interfere with Booker's DCFS investigation; and the defendants' alleged mischaracterization of his statements during the interrogation as a "confession." But Aleman does not contend or explain how these amounted to violations of his constitutional rights; he offers the overt acts as evidence of the defendants' agreement upon a common plan. Because Aleman is unable to show an underlying violation of his constitutional rights, his § 1983 conspiracy claim also fails.

**E.   Count V: Illegal Interrogation**

-32-

Count V of Aleman's complaint asserts that he was illegally interrogated in violation of the Fifth Amendment. Specifically, Aleman claims that Micci and Villanueva violated his Fifth Amendment right to counsel by continuing to interrogate him after he stated that he wished to speak with his attorney. Both Aleman and the defendants have moved for summary judgment on Count V. Because Aleman never unambiguously invoked his right to counsel, his claim fails.

For purposes of addressing this issue, it is necessary to examine the interrogation (all of which was videotaped) in some detail. The salient portion of the interview begins as Micci was preparing to read Aleman the *Miranda* warning. At that point, the following dialogue ensued:

Micci:     Before I get started . . . uh I do this for every single person I talk to so there's never a mistake with anybody. And I'm sure you've heard these on T.V. a million times before.

Aleman:    Oh here we go.

Micci:     I know, well, this is State Police policy.

Aleman:    I know, but before I do that I gotta call my guy. Just give me one phone call real quick and let me call him and tell him I'm about to do this so he knows. Interrogation at 17:14:12-25.[15]

Micci continues to fill out the *Miranda* form, asking Aleman

_____

[15] The defendants point out that Aleman does not ask to speak to his attorney, but instead says that he wants to call his "guy." Defs.' Joint Resp. to Pl.'s 56.1 Stmt. ¶ 57. However, they do not contest that Aleman was asking to speak with his attorney.

-33-

his name.  After some chit-chat, Micci reads Aleman the warning:

Micci:      Alright, like I said, I'm just gonna read this to you.
            And I ask this of everybody, no matter who it is.  That
            way, if ten years from now, somebody asks me, "Hey, you
            talked to this person on this particular date," uh . . .
            I don't even know, I don't even need to know what it's
            about.  I know that they filled these [the *Miranda* forms]
            out because I do them for everyone I talk to.  Half of
            them I end up throwing out because I don't need them.
            But I do it anyway.

            Uh . . . so before I ask you any questions, or before you
            even tell me anything, even if I don't ask you questions,
            okay, you have the right to remain silent; anything you
            say can be used against you in court or other
            proceedings; you have the right to talk to a lawyer for
            advice before I ask you any questions, and to have him
            with you during questioning; if you cannot afford a
            lawyer, one will be appointed for you free of any cost to
            you, and before any questioning if you wish.

            So . . . basically what this is saying is that anything
            -- before I talk to you, I would like this signed.  If it
            is not signed I am not going to talk to you.  And the
            pros and cons of that are I assume you have information
            that would help you out and would help me out as to what
            the heck happened here. If you talk to me I can get that
            information. If I don't talk to you, which I won't do,
            then I will go on the information that I've gotten from
            other sources, so . . . which I don't like to do because
            it's second hand. So, if you want to call your attorney
            first that's fine with me.

Aleman:     Yeah. It will just take a second.  Interrogation at
            17:15:39-17:16:58.

    Aleman then makes a phone call to his attorney, Paul Ankin,

from a phone in the hallway outside the interrogation room.  Ankin

tells Aleman not to waive his rights.  He also tells Villanueva

that Aleman is invoking his right to remain silent and will not

talk without his attorney present.[16]  Aleman is then taken back to the interrogation room, where the following exchange with Micci takes place:

> Micci:     How we doing?
>
> Aleman:    Not good. I called him and he told me not to
>            do this right now and to offer to come back
>            tomorrow or whatever. Said you've been there
>            all day, you've done above and beyond and
>            cooperated. I told him I was tired and didn't
>            feel real comfortable right now, you know, I
>            honestly, I mean I was, you know, more alert
>            and ready for this like hours ago. I've been
>            stressing and asking to see my wife and this
>            and that and I've just been making myself
>            sick. I told him that, I didn't tell him all
>            that, but briefly I told him that. And he said
>            well then tell them that and tell them you'd
>            love to come back. He said a couple other
>            things, but I'm not trying to be like you know
>            . . . ."
>
> Micci:     I'm not trying to be the bad guy myself, but
>            if I don't get to talk to you, you're not
>            going home, okay?  The information I have
>            right now is leading me to believe that
>            something happened at that house. After
>            speaking with three doctors at the hospital
>            with the information they gave me that's what
>            I need to clear up. But if I can't speak with
>            you about that, then you're going to be
>            staying here.  Interrogation at 17:25-
>            17:26:18.

Aleman expresses uncertainty about what he should do and asks

---

[16]  The defendants object to Aleman's assertions concerning the conversation between Ankin and Villanueva, noting that the evidence on which Aleman relies -- ¶ 3 of Ankin's declaration -- does not support his statement. *See* Defs.' Joint Resp. to Pl.'s Stmt. Add'l Facts ¶ 63.  Aleman appears merely to have cited the wrong paragraph of the declaration.  Paragraph 4 of the declaration supports his assertions.

if he can call Ankin again. Ankin claims that he once more instructed Aleman not to speak. Ankin Decl. ¶ 6. The parties then return to the interrogation room:

Micci:      Okay, where are we at?

Aleman:     Um, I, you know, I talked to a lawyer and you know, I, you know, I tried to talk him into doing it, you know, and, you know, he, he's telling me to go ahead, you know, he's --

Micci:      He said go ahead?

Aleman:     Yeah, you know, I mean I really don't have a problem doing it. It's just you know he said [inaudible], so I just followed --

Micci:      So he said go ahead, then do it, then?

Aleman:     I can do it, yeah.

Micci:      Okay, yeah.

Shortly thereafter, Aleman signs the form, makes another call to his wife, and the interrogation, the substance of which has been recounted above, begins.

Aleman claims that he invoked his right to counsel when he stated (as Micci was preparing to read the *Miranda* form), "I know, but before I do that I gotta call my guy. Just give me one phone call real quick and let me call him and tell him I'm about to do this so he knows." Interrogation at 17:14:12-25. Aleman claims that he invoked the right again when he responded to Micci's statement, "if you want to call your attorney first that's fine with me," by saying, "Yeah. It will just take a second." Interrogation at 17:15:39-17:16:58. Aleman claims that after these

-36-

statements, Micci and Villanueva were required under the Fifth Amendment to immediately cease the interrogation.

It has long been settled that when a defendant "requests counsel, the interrogation must cease until an attorney is present." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quotation marks omitted); *see also Minnick v. Mississippi*, 498 U.S. 146, 150 (1990) ("[O]nce an individual in custody invokes his right to counsel, interrogation must cease until an attorney is present.") (quotation marks omitted). It is equally well established, however, that the right to counsel must be invoked unambiguously. As the Supreme Court recently reaffirmed in *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010), "[i]n the context of invoking the *Miranda* right to counsel . . . a suspect must do so unambiguously.") (quotation marks omitted); *see also Davis v. United States*, 512 U.S. 452, 459 (1994); *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009) ("The burden is . . . on the suspect to make a clear and unambiguous assertion of his right to counsel to stop questioning.")(quotation marks omitted). "If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis*, 130 S. Ct. at 2259-60 (citations and quotation marks omitted).

Aleman never unambiguously invoked his right to counsel.

While his statements indicate that he wished to speak with his attorney, they do not suggest, or even intimate, an unwillingness to answer questions without his attorney present. Quite the contrary: Aleman's remark, "Just give me one phone call real quick and let me call him and tell him I'm about to do this so he knows," indicates that he intended to speak with Micci and Villanueva, and that he simply wanted to inform his attorney of his decision. Under these circumstances, it was appropriate for Micci to seek clarification from Aleman about his willingness to talk after speaking with his attorney. Micci's question, "Where are we at?," was intended to do just that.

Despite Aleman's claims to the contrary, Micci did not reinitiate the interrogation by asking this question. For purposes of *Miranda*, the term "interrogation" "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Micci's question, "Where are we at?" was simply an attempt to clarify Aleman's intentions; it did not call for Aleman to reveal anything about the case, and was not reasonably likely to elicit incriminating statements. *Cf. Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Micci not only refrained from asking any questions about the case until Aleman

-38-

signed the *Miranda* waiver, he stopped Aleman on several occasions from volunteering information about the events in question until Aleman had made a clear decision about whether to waive his rights.

Aleman places great emphasis on the fact that his attorney told Villanueva that Aleman was invoking his right to remain silent and that Aleman would not talk without his attorney present. What Ankin said, however, is not what matters. Ankin had no authority to assert Aleman's Fifth Amendment rights. As both the Supreme Court and the Seventh Circuit have expressly stated, "the privilege against compulsory self-incrimination is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled." *Moran v. Burbine*, 475 U.S. 412, 433 n. 4 (1986); *see also United States v. Muick*, 167 F.3d 1162, 1166 (7th Cir. 1999)("We are also cognizant of the Supreme Court's holding that only the accused may invoke the *Miranda* right to counsel. This principle alone dictates that the attorney's letter and phone call were insufficient to invoke the *Miranda* right to counsel. Only Muick could invoke his *Miranda* right to counsel.").[17] After conferring with Ankin, it was up to Aleman to decide whether he

---

[17] For this reason, Aleman's claim that "[b]y their own admission, Defendants knew that Plaintiff had invoked his right to counsel," is inaccurate. In support of this claim, Aleman cites the defendants' acknowledgment that Ankin had instructed Aleman not to talk to them. Since Ankin could not invoke Aleman's *Miranda* right to counsel, the fact that Micci and Villanueva knew that Ankin had told Aleman not to talk does not mean that they knew that Aleman had invoked his right to counsel. Pl.'s 56.1 Stmt. ¶¶ 37-38.

wished to make a statement. Regardless of what Ankin told Aleman and Villanueva, therefore, it was appropriate for Micci to ask Aleman whether he wished to waive his *Miranda* rights.

Aleman also contends that his right to counsel was denied because he was never allowed to speak privately with his attorney. He points out that when he made his first call to Ankin, Villanueva was standing near by. But Aleman never expressed a desire for greater privacy and seemed perfectly content to make his call from the hallway phone. In fact, when Micci asked Villanueva whether there was a place from which Aleman could make his call, it was Aleman himself who replied, "Right around the corner right there," gesturing toward the phone in the hallway. Interrogation 17:16:57.

Aleman further points out his "telephone conversation with his lawyer was also recorded on the Hanover Park police station audio and video surveillance equipment." Aleman S.J. Mem. at 3. This is true, but only because the microphone of the video camera in the interrogation room picked up ambient sound from the adjoining hallway where Aleman made his call. Only Aleman's part of the conversation was recorded. There is no evidence that the officers tapped the phone line or took any other steps to monitor the conversation. Nor was Aleman under any misapprehension about others' ability to hear his statements. As Aleman himself points out, Villanueva was in the hallway with him when he phoned Ankin.

None of the authorities cited by Aleman suggests that his

right to counsel was violated for want of confidentiality. The cases on which he relies stand only for the unremarkable proposition that confidentiality and privacy are essential to the attorney-client relationship. *See* Aleman Reply at 2-3. The decisions do not suggest that the right to counsel requires the police to provide an accused with confidentiality even when the accused himself has not asked for it.

Finally, in addition to arguing that his right to counsel was violated, Aleman argues that his subsequent waiver of his *Miranda* rights was not voluntary. These arguments are in effect flip sides of the same coin: Aleman contends that since he signed the waiver after he invoked his right to counsel, the waiver was involuntary as a matter of law. This argument is a non-starter since Aleman did not invoke his right to counsel.

Aleman's argument also contains scattered allegations that he signed the *Miranda* waiver due to "repeated badgering, promises, threats and improper questioning." Aleman S.J. Mem. at 7. I do not take Aleman to be arguing that these alleged promises and threats alone were sufficient to render his waiver involuntary, irrespective of whether he invoked his right to counsel. To the extent that he purported to raise such a claim, it would have been forfeited because it was never properly developed. Aleman fails to cite any case authority supporting such an argument. *See, e.g., United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)

("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

Nor would such a claim be convincing on the merits. Aleman's chief example of alleged coercion is Micci's statement, "If I don't get to talk to you, you're not going home." Aleman characterizes this as "a threat of indefinite detention." However, Micci never suggested that Aleman might be detained indefinitely; he merely indicated -- truthfully -- that there was probable cause to arrest Aleman and that, unless Aleman could provide a different account of what happened, he would not be allowed to return home that evening.

Moreover, as the Seventh Circuit stated in *United States v. Miller*, 450 F.3d 270 (7th Cir. 2006), *abrogated on other grounds*, *Kimbrough v. United States*, 552 U.S. 85, 93 n.4 (2007): "[a] choice between cooperation and freedom, on the one hand, and silence followed by custody and prosecution, on the other, is a common one. This is the real choice many suspects face whether or not the police lay it out in so many words; clear articulation of the options makes a choice better informed and thus more rather than less voluntary. . . . Suspects are not entitled to full information, but can't complain when they get it and learn that some of the options are unpalatable." *Id.* at 272 (7th Cir. 2006) (citations omitted).

In short, the defendants did not violate Aleman's right to counsel because Aleman never invoked the right, and because his waiver of the right was voluntary. The defendants' motion for summary judgment on Count V is granted; Aleman's motion is denied.

**F.  Counts VI and VII: Malicious Prosecution**

In Counts VI and VII, Aleman asserts claims for malicious prosecution. Count VI is asserted against Villanueva in connection with Aleman's arrest on aggravated battery charges; Count VII is asserted against Carlson in connection with the arrest on first degree murder charges. Probable cause is an absolute defense to a claim for malicious prosecution. *See, e.g.*, *Porter v. City of Chicago*, 912 N.E.2d 1262, 1271 (Ill. App. Ct. 2009) (noting that probable cause is an absolute defense to malicious prosecution). As explained above, both officers had probable cause to make their respective arrests. Accordingly, I grant the HPPD officers' motion for summary judgment on Counts VI and VII.

**G.  Count VIII:  Civil Conspiracy Under Illinois Law**

Like Count IV, Count VIII of Aleman's complaint asserts a claim for civil conspiracy. However, Count VIII's conspiracy claim arises under Illinois law, not § 1983. The statute of limitations for conspiracy claims under Illinois law is one year. *Griffin v. Willoughby*, 867 N.E.2d 1007, 1012 (Ill. App. Ct. 2006) ("[S]ection 8-101 of the Tort Immunity Act provides [that] no civil action . . . may be commenced . . . against a local entity or any of its

employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued.") (quotation marks and brackets omitted); *see also Swanigan v. Trotter*, 645 F. Supp. 2d 656, 683 (N.D. Ill. 2009). Aleman's suit was filed on September 7, 2007 -- more than a year after his injury. In any event, Aleman has failed to respond to the defendants' argument on this point. As a result, the defendants' motion for summary judgment is granted as to Count VIII.

## H. Count IX: Intentional Infliction of Emotional Distress

Finally, in Count IX of his complaint, Aleman alleges a claim against all of the officers for intentional infliction of emotional distress. Like Aleman's conspiracy claim in Count VIII, his IIED claim is subject to a one-year limitations period. *See, e.g.*, *Blunt v. Becker*, No. 08 C 7157, 2010 WL 570489, at *4 (N.D. Ill. Feb. 16, 2010) ("In Illinois, the applicable statute of limitations for an intentional infliction of emotional distress claim against a police officer is one year."). Aleman argues that his IIED claim is not time-barred because the limitations period did not begin to run until November 13, 2006 -- the date on which the criminal case against him was terminated. Since his complaint was filed on September 7, 2007, Aleman maintains that the claim was asserted within the limitations period.

The Seventh Circuit rejected essentially the same argument in

-44-

*Evans v. City of Chicago*, 434 F.3d 916 (7th Cir. 2006).  There, the plaintiff brought an IIED claim in 2001 based on police conduct that had allegedly occurred in 1997.  Seeking to bring his claim within the one-year limitations period, the plaintiff argued that his cause of action did not accrue until 2000, when the criminal proceedings which he claimed had been falsely brought against him were terminated.  The Seventh Circuit disagreed, reiterating that "the default rule, under Illinois law, is that a cause of action for personal injuries accrues when the plaintiff suffers injury." *Id.* at 934 (quotation marks omitted).  The court considered whether the IIED claim might be salvaged by application of the continuing violation doctrine and observed that "the statute of limitations is only held in abeyance until the date of the last injury suffered or when the tortious acts cease." *Id.* (quotation marks omitted).  In Evans's case, the last tortious act (excluding court appearances, which the court held were not relevant) could have occurred no later than December 1997, since that was the date of the last confirmed interaction between the plaintiff and the officers named in the complaint.  *Id.* at 935 & n.29.  As a result, the court held that the plaintiff's IIED claim was untimely.

Here, none of the parties has attempted to identify the date of Aleman's last interaction with any of the defendants (excluding court appearances, which the court held were not relevant).  Based on Aleman's allegations, however, the latest conceivable date would

appear to be in October 2005 -- when Aleman was indicted by a grand jury for first degree murder. His suit was not filed until September 7, 2007, almost two years later. As a result, the claim is untimely.

Against this, Aleman cites several cases in which IIED claims based on false arrest and malicious prosecution were deemed not to have accrued until after the plaintiff was acquitted in underlying criminal proceedings. *See Bergstrom v. McSweeney*, 294 F. Supp. 2d 961, 964 (N.D. Ill. 2003); *Pierce v. Pawelski*, No. 98 C 3337, 2000 WL 1847778 (N.D. Ill. Dec. 14, 2000); *Treece v. Village of Naperville*, 903 F. Supp. 1251, 1254 (N.D. Ill. 1995). These decisions are inapposite. In each of these cases, the defendant officers' tortious conduct was alleged to have continued throughout the length of the plaintiffs' prosecution, including testifying against the plaintiff at trial. Hence, these were continuing violation cases in which the last injury was suffered, or the last tortious act was committed, when the criminal case ended. Here, the officers are not alleged to have engaged in such continuous tortious conduct.

Aleman's IIED claim is therefore untimely. As a result, the defendants are entitled to summary judgment on Count IX.

### III.

For the reasons discussed above, the defendants' motions for summary judgment are granted and Aleman's partial motion for

summary judgment is denied.

**ENTER ORDER:**

_____
        **Elaine E. Bucklo**
    United States District Judge

Dated: September 29, 2010